Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Proposed Counsel for Enovational Corp.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 22-55-ELG |
| | ) | (Chapter 11) |
| ENOVATIONAL CORP. | ) | |
| | ) | |
| Debtor. | ) | |

**MOTION TO REJECT OFFICE LEASE AGREEMENT BY AND
BETWEEN TMG 1400 L STREET, L.L.C. AND ENOVATIONAL CORP.**

Comes now Enovational Corp. (the "Debtor" or "Enovational"), pursuant to Section 365(a) of Title 11 of the United States Code (the "Bankruptcy Code"), as well as Federal Rule of Bankruptcy Procedure 6006, and moves this Honorable Court for leave to reject the Office Lease Agreement By and Between TMG 1400 L Street, L.L.C. and Enovational Corp. (the "Lease," a copy of which is appended hereto as Exhibit A),[1] and in support thereof states as follows:

---

[1] The Debtor does not possess a fully executed copy of the Lease; accordingly, missing from the attached copy is, *inter alia*, a date. The DocuSign signature verification suggests execution on May 7, 2021. The Debtor appears to have executed a subordination, non-disturbance, and attornment agreement – which references the Lease as being then-extant in nature – on April 27, 2021, nearly two weeks prior. The date of the Lease, however, is ultimately of minimal relevance to this motion, though it may prove relevant to the assessment of any resulting claim later brought in this case.

1

I.     **Introduction**

At a time when Enovational's financial prospects appeared as optimistic as they were unbounded, the Debtor executed the Lease with designs of filling 96,619 square feet of office space in the heart of Washington, DC – just a few blocks from the White House. In the ensuing months, the space has been built out but never actually occupied by Enovational; aspirations of assuming occupancy in the coming weeks have been dashed by the realities of this bankruptcy and the Debtor's need to strategically reassess certain operating expenses.

The Lease calls for payments of $66,945,730.92 (subject to certain abatements) over a ten-year period, with an average annual rent obligation of $5,578,810.91. As discussed in greater detail below, this is not an obligation the Debtor can afford as it endeavors to streamline its overhead obligations. To the contrary, the Debtor has developed a marked ability to have its employees effectively telecommute, with remote working increasingly becoming the prevailing norm in much of the tech-savvy corporate space occupied by the Debtor.

For these reasons, and as extrapolated upon *infra*, Enovational believes it prudent to reject the Lease, and seeks to do so promptly so as to avoid any argument that post-petition obligations accrue in the nature of an administrative expense claim.[2]

II.    **Standard**

The Bankruptcy Code allows, *inter alia*, "…the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

In assessing a request to reject an unexpired lease, courts traditionally look to the exercise, *vel non*, of the trustee's (or, as it is, debtor-in-possession's) "sound business judgment." *In re US*

---

[2] As Judge Catliota has recently observed, "Until an executory contract is assumed or rejected, the debtor's obligations under the contract are an administrative expense claim of the estate." *In re Parking Mgmt., Inc.*, 620 B.R. 544, 553 (Bankr. D. Md. 2020) (citing 11 U.S.C . § 365(d)(5)).

*Airways Group, Inc.*, 287 B.R. 643, 645 (Bankr. E.D. Va. 2002) ("The standard in this Circuit for approving a request to reject an unexpired lease is whether the trustee or debtor in possession has exercised sound business judgment.") (citing *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985)).

### III.     Argument: The Lease Should Be Rejected

Quite simply, the Debtor cannot afford the Lease. With a move-in date only weeks away, and rental payments due not long thereafter, there is a plain incapacity of the Debtor to withstand these obligations while endeavoring to effectively reorganize its affairs. To the contrary, it is clear the Debtor's workforce can tend to its various responsibilities remotely – as it has now been doing for some time – and the Debtor is best situated to successful confirm a plan herein if unburdened by the ongoing onus of an average of $464,900.91 in monthly payments.

The question thusly is not if the Debtor ought to assume the Lease or reject the Lease but, rather, if the Debtor ought to (i) assume the Lease for purposes of assignment or (ii) reject the Lease outright. The Debtor is cognizant of the unliquidated and contingent claim the Landlord may have herein pursuant to Section 502(b)(6) of the Bankruptcy Code, by virtue of rejection, but the Debtor is also confident the Landlord will expend all commercially reasonable efforts to relet the demised premises and mitigate that claim before it can be asserted. *See, e.g.*, *16 Cobalt LLC v. Harrison Career Inst.*, 590 F. Supp. 2d 44, 50 (D.D.C. 2008) ("Under District law, '[u]ntil damages are fixed an action [ ] does not lie and it [is] error to allow recovery for 'rent' accrued after the eviction.' That is, where as here, 'the extent [of the loss or deficiency in rent] cannot be determined,' it is premature to grant damages as to future lost rent. The law recognizes that, '[i]n determining the amount of a damages award, of course, there must be no double recovery for the same injury 'for a plaintiff is not entitled to be made more than whole unless punitive damages are

warranted.'"") (quoting *McIntosh v. Gitomer*, 120 A.2d 205, 207 (D.C. 1956); *Bay General Industries, Inc. v. Johnson*, 418 A.2d 1050, 1057 (D.C. 1980) (quoting *Franklin Invest. Corp. v. Smith*, 383 A.2d 355, 358 (D.C. 1978))).

To be sure, the Debtor's reasonable judgment is informed by a keen awareness of the hardships that have befallen the commercial real estate market during the COVID-19 pandemic, with the Debtor being far from the only corporate citizen to discover the economic – and employee lifestyle – benefits of remote work. So for the Debtor to assume the Lease with goals of assigning the Lease, and allow rent to accrue post-petition (inviting a potential administrative claim), would be decidedly unwise.

There is simply no reason to believe the Debtor – a technology company – is better situated to market the Lease than the Landlord is to relet the premises. To the contrary, the cost of paying rent during a marketing period would be crippling, and the devotion of resources that would be required of such an endeavor would be disproportionate to those readily available to Enovational as it sharply focuses on belt-tightening and reorganization.

For want of ambiguity, the Lease is for exquisite space, in an exquisite location, and the Debtor fully trusts the Landlord will expend all reasonable efforts to promptly relet the premises in accord with the mandate of *16 Cobalt LLC* and its progeny. This rejection is not a free ticket for the Landlord to file a claim for 15% of what is due on the Lease, or to simply call the letter of credit that serves as security for the Lease.[3] Should the Landlord do so, such will be met with

---

[3] *See, e.g.*, *In re Parking Mgmt., Inc.*, 620 B.R. at 553 (Bankr. D. Md. 2020) ("The rejection or assumption of an executory contract or unexpired lease does not determine whether the nondebtor party holds a claim; it establishes the nature of the claim as either 'a pre-petition obligation of the debtor or as an administrative expense entitled to the highest priority.'") (quoting *In re Stewart Foods, Inc.*, 64 F.3d 141, 144 (4th Cir. 1995) (citing *Leasing Serv. Corp. v. First Tenn. Bank Nat'l Assoc.*, 826 F.2d 434, 437 (6th Cir. 1987))).

4

vociferous objection from the Debtor. But this rejection is an acknowledgement that the Landlord is exceedingly well suited to find a new tenant who can make more economically responsible use of the subject space, and a vote of confidence in the Landlord being able to efficiently and expeditiously honor its legal obligation to do so.

### IV. Relief Should be *Nunc Pro Tunc*

While the limited course of dealing on the Lease gives rise to a good faith belief no rental payments are currently due, and none will come due between the filing of this motion and a ruling hereupon, the Debtor nonetheless seeks *nunc pro tunc* relief out of an abundance of caution. This is a small business case in which every dollar will matter when a plan of reorganization is proposed; the instant motion is driven, in no small part, by an abiding concern the Debtor not be saddled with post-petition administrative obligations on the Lease.

Familiarly, "a bankruptcy court, when principles of equity so dictate, may approve a rejection of a nonresidential lease pursuant to section 365(a) retroactive to the motion filing date." *In re CCI Wireless, LLC*, 279 B.R. 590, 595 (Bankr. D. Colo. 2002) (quoting *In re Thinking Machines Corp.*, 67 F.3d 1021 (1st Cir. 1995)). *See also*, *In re Player's Poker Club, Inc*., --- B.R. ---, 2022 WL 349344, at *14 (Bankr. C.D. Cal. 2022) ("…the nunc pro tunc approval of a lease rejection is consistent with the Supreme Court's decision in *Mitchell v. Overman*, 103 U.S. 62, 26 L.Ed. 369 (1880)).[4]

Here, equity strongly supports *nunc pro tunc* relief. This motion is being filed as soon as possible – within hours of the petition for relief being docketed. The only reason for a delay

---

[4] Case law periodically observes rejection *nunc pro tunc* to the date on which a motion is filed, and periodically observes rejection *nunc pro tunc* to a petition date. The distinction is of no moment *sub judice* since the instant motion is brought of even date with the petition being docketed.

between the filing of this motion, and a ruling hereupon, is the Debtor's need to file its petition for relief on a Saturday, so as to avoid the potential perils of Congress not timely acting to renew the debt limit increase for Subchapter V cases such as this.

By contrast, if relief is not granted *nunc pro tunc*, at least four days of rental obligations might accrue under the Lease, creating an administrative claim of up to $64,260.08.[5] The Debtor is a small business looking to strategically reorganize in a responsible and prudent manner; it plainly cannot afford to be saddled with one such claim, and the existence of such a claim could irreparably jeopardize reorganization prospects herein.

### V.  Conclusion

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) enter an order rejecting the Office Lease Agreement by and Between TMG 1400 L Street, L.L.C. and Enovational Corp., *nunc pro tunc* to March 26, 2022; and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: March 26, 2022    By:    /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Proposed Counsel for the Debtor*

---

[5] The Debtor does not believe any rent is currently due under the Lease, owing to various delays. And, as noted *supra*, no viable claim can be filed, on account of the Lease, until the landlord carries out its duty to mitigate damages. So this ought not be construed as an acknowledgement of any liability but, rather, a recognition that landlords are often rather fond of filing administrative claims.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of March, 2022, a copy of the foregoing was served electronically upon filing via the ECF system, with copies also being tendered to a third party vendor for dissemination via US Mail, postage prepaid, to all parties on the attached matrix, and a copy is being sent via electronic mail to Wil Machen, the contact indicated on the Lease, at wilmachen@tmgdc.com.

/s/ Maurice B. VerStandig
Maurice B. VerStandig