*EXECUTION COPY*

# OFFICE LEASE AGREEMENT

## BY AND BETWEEN

## TMG 1400 L STREET, L.L.C.

### AND

## ENOVATIONAL CORP.

**1400 L STREET, N.W.,
WASHINGTON, DC  20005**

# TABLE OF CONTENTS

Page

| ARTICLE I | DEFINITIONS | 1 |
| ARTICLE II | PREMISES | 3 |
| ARTICLE III | TERM | 6 |
| ARTICLE IV | BASE RENT | 11 |
| ARTICLE V | INCREASES IN OPERATING CHARGES AND REAL ESTATE TAXES | 12 |
| ARTICLE VI | USE OF PREMISES | 22 |
| ARTICLE VII | ASSIGNMENT AND SUBLETTING | 26 |
| ARTICLE VIII | MAINTENANCE AND REPAIRS | 31 |
| ARTICLE IX | ALTERATIONS | 33 |
| ARTICLE X | SIGNS | 40 |
| ARTICLE XI | SECURITY DEPOSIT | 42 |
| ARTICLE XII | INSPECTION | 44 |
| ARTICLE XIII | INSURANCE | 45 |
| ARTICLE XIV | SERVICES AND UTILITIES | 45 |
| ARTICLE XV | LIABILITY OF LANDLORD | 56 |
| ARTICLE XVI | RULES | 59 |
| ARTICLE XVII | DAMAGE OR DESTRUCTION | 59 |
| ARTICLE XVIII | CONDEMNATION | 61 |
| ARTICLE XIX | DEFAULT | 62 |
| ARTICLE XX | BANKRUPTCY | 66 |
| ARTICLE XXI | SUBORDINATION | 67 |
| ARTICLE XXII | HOLDING OVER | 69 |
| ARTICLE XXIII | COVENANTS OF LANDLORD | 70 |
| ARTICLE XXIV | PARKING | 71 |
| ARTICLE XXV | GENERAL PROVISIONS | 72 |
| ARTICLE XXVI | RIGHT OF FIRST OFFER | 78 |

EXHIBIT A — Plan Showing Premises
EXHIBIT B — Work Agreement
EXHIBIT C — Rules and Regulations
EXHIBIT D-1 — Certificate Affirming the Lease Commencement Date
EXHIBIT D-2 — Certificate Affirming the Rent Commencement Date
EXHIBIT E — Acceptable Form of Letter of Credit
EXHIBIT F — Insurance Requirements for Contractors
EXHIBIT G — Form of Subordination, Non-Disturbance and Attornment Agreement
EXHIBIT H-1 — Options for Approximate Size and Location of Exterior Entrance Sign
EXHIBIT H-2 — Approximate Size and Location of Building Top Exterior Sign
EXHIBIT I — Janitorial Specifications
EXHIBIT J — HVAC Specifications
EXHIBIT K — Amenity Reservation Pamphlet
EXHIBIT L —Rooftop Equipment Area

# OFFICE LEASE AGREEMENT

THIS OFFICE LEASE AGREEMENT (this "Lease") is dated as of _____ (the "Execution Date"), by and between **TMG 1400 L STREET**, **L.L.C.**, a Delaware limited liability company ("Landlord"), and **ENOVATIONAL CORP.**, a District of Columbia corporation ("Tenant").

## ARTICLE I
## DEFINITIONS

1.1    Building: a Twelve (12) story building deemed to contain one hundred sixty-eight thousand five hundred ninety-seven (168,597) square feet of office rentable area and one hundred seventy-eight thousand seven hundred forty-seven (178,747) square feet of total building rentable area, each as measured in accordance with the BOMA Standard, and located at 1400 L Street, N.W., Washington, DC  20005.

1.2    Premises:  deemed to contain ninety-five thousand six hundred nineteen (95,619) square feet of rentable area in the aggregate constituting fifteen thousand nine hundred forty-eight rentable square feet comprising the entirety of the rentable square footage on the seventh (7th) floor (the "Seventh Floor Space") of the Building, fifteen thousand nine hundred forty-eight rentable square feet comprising the entirety of the rentable square footage on the eighth (8th) floor (the "Eighth Floor Space") of the Building, fifteen thousand nine hundred forty-eight rentable square feet comprising the entirety of the rentable square footage on the ninth (9th) floor (the "Ninth Floor Space") of the Building, fifteen thousand nine hundred forty-eight rentable square feet comprising the entirety of the rentable square footage on the tenth (10th) floor (the "Tenth Floor Space") of the Building, fifteen thousand nine hundred fifty-one rentable square feet comprising the entirety of the rentable square footage on the eleventh (11th) floor (the "Eleventh Floor Space") and fifteen thousand eight hundred seventy-six rentable square feet comprising the entirety of the rentable square footage on the twelfth (12th) floor (the "Twelfth Floor Space") of the Building, as more particularly designated on Exhibit A.

1.3    Lease Term: the period commencing on the Lease Commencement Date and ending on the last day of the tenth (10th) Lease Year, subject to the terms and provisions of this Lease, including, without limitation, Article III.

1.4    Anticipated Lease Commencement Date: the date that is ninety (90) days following the Execution Date.

1.5    Base Rent:  an annual amount payable as follows:

| Lease Year | Annual Rate per Rentable Square Foot of Premises | Monthly Installment | Annual Installment* |
|---|---|---|---|
| 1 | $62.50** | $498,015.63** | $5,976,187.56 |
| 2 | $64.06 | $510,446.10 | $6,125,353.20 |
| 3 | $65.66 | $523,195.30 | $6,278,343.60 |

| | | | |
|---|---|---|---|
| 4 | $67.30 | $536,263.23 | $6,435,158.76 |
| 5 | $68.98 | $549,649.89 | $6,595,798.68 |
| 6 | $70.70 | $563,355.28 | $6,760,263.36 |
| 7 | $72.47 | $577,459.08 | $6,929,508.96 |
| 8 | $74.28 | $591,881.61 | $7,102,579.32 |
| 9 | $76.14 | $606,702.56 | $7,280,430.72 |
| 10 | $78.04 | $621,842.23 | $7,462,106.76 |

\* Based on twelve (12) full calendar months
\*\* Subject to abatement as more fully set forth in Section 4.2, below.

1.6    [Intentionally Deleted]

1.7    Operating Charges Base Year:  calendar year 2022.

1.8    Real Estate Taxes Base Year:  calendar year 2022.

1.9    Security Deposit Amount: Two Million Nine Hundred Eighty-Eight Thousand Ninety-Three and 78/100ths Dollars ($2,988,093.78), subject to reduction as set forth in Section 11.4.

1.10    Broker(s):  CBRE, Inc. ("Landlord's Broker"); and Akridge ("Tenant's Broker" and, together with Landlord's Broker, the "Brokers").

1.11    Tenant Notice Address: 1101 K Street, N.W., Suite 1010, Washington, DC 20005, Attn:  Vlad Enache, with a copy to Holland & Knight LLP, 800 17th Street, N.W., Suite 1100, Washington, DC 20006, Attn: Robert N Boyd, Esq., until Tenant has commenced beneficial use of the Premises, and at the Premises, Attn:  Vlad Enache, with a copy to Holland & Knight LLP, 800 17th Street, N.W., Suite 1100, Washington, DC 20006, Attn: Robert N Boyd, Esq., from and after Tenant has commenced beneficial use of the Premises.

1.12    Landlord Notice Address: TMG 1400 L Street, L.L.C., c/o The Meridian Group, 3 Bethesda Metro Center, Suite 1400, Bethesda, Maryland 20814, Attn:  Wil Machen.

1.13    Landlord Payment Address: TMG 1400 L Street, L.L.C., P.O. Box 37757, Baltimore, MD 21297. For payments made via overnight mail: Capital One Bank, 6200 Chevy Chase Drive, Lockbox Department, for P.O. Box 37757, Laurel, Maryland 20707, Client ID: CUST5224.

1.14    Building Hours: 8:00 a.m. to 6:00 p.m. Monday through Friday (excluding Holidays) and, provided that notice is given to Landlord in accordance with Section 14.1 of this Lease, 9:00 a.m. to 1:00 p.m. on Saturday (excluding Holidays), and such other additional hours, if any, as Landlord may determine from time to time upon written notice to Tenant.

1.15    [Intentionally Deleted]

1.16    Retail Area: deemed to contain ten thousand one hundred fifty (10,150) square feet of rentable area in the Building, which area is comprised of premises leased or hereafter leased to tenants primarily for retail purposes (the "Retail Space"), and any common areas and

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

facilities as Landlord may from time to time designate for the convenience of the customers of said tenants (the "Retail Common Areas").

1.17    Tenant's Proportionate Share: initially 56.71% for Operating Charges, and initially 53.49% for Real Estate Taxes, subject to change from time to time as more fully set forth in Sections 5.2(a) and 5.3(a) respectively.

1.18    Parking Allotment: sixty-four (64) monthly parking permits (based on one (1) permit for each one thousand five hundred (1,500) square feet of rentable area in the Premises).

1.19    Holidays: all holidays recognized by the United States federal government.

1.20    Construction Allowance: Seventeen Million Six Hundred Eighty-Nine Thousand Five Hundred Fifteen and 00/100ths Dollars ($17,689,515.00), which is equal to One Hundred Eighty-Five and 00/100ths Dollars ($185.00) per square foot of rentable area in the Premises.

ARTICLE II
PREMISES

2.1    Tenant leases the Premises from Landlord for the Lease Term and upon the conditions and covenants set forth in this Lease.  Tenant will have the non-exclusive right to use the common and public areas of the Building.  Except as may otherwise be expressly provided in this Lease, the lease of the Premises does not include the right to use the balconies (except to the extent same are shown as part of the Premises on Exhibit A), terraces or roofs adjacent to the Premises, roof, mechanical rooms, fan rooms, electrical closets, shafts, stacks, pipes, conduits, wires, ducts and appurtenant fixtures, janitorial closets, telephone rooms, parking areas or non-common or non-public areas of any portion of the Building, all of which are expressly excluded from the Premises and reserved to Landlord.  However, Tenant shall have the non-exclusive right to use:  (1) the plenums, risers, electrical closets, telephone rooms, ducts or pipes on or serving the floor on which the Premises are located (other than those installed for another tenant's exclusive use and provided Tenant shall have such utilization in no greater proportion than the ratio by which the square feet of rentable area in the Premises compares to the square feet of rentable area in the Building) in accordance with plans and specifications to be approved by Landlord in its reasonable discretion, which approval shall not be unreasonably withheld, conditioned or delayed; (2) the Parking Facility in accordance with Article XXIV; and (3) any mechanical rooms, electrical closets and telephone rooms located within the Premises, for the purpose for which they were intended, but only with Landlord's prior consent (except to the extent that such rooms and closets contain no system, wiring or other item related to either the Building Structure and Systems (as hereinafter defined) or to a structure or system of any tenant or occupant other than Tenant, in which case no such prior consent of Landlord shall be required for use by Tenant's on-site, properly licensed and trained technicians), which consent shall not be unreasonably withheld, conditioned or delayed, and strictly in accordance with Landlord's rules, regulations and requirements in connection therewith.  The rentable square footage of the Premises shall not be subject to remeasurement during the Lease Term (including any Renewal Term pursuant to Section 3.5 below, if applicable), except in connection with an expansion or contraction of the Premises.

3

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

2.2    <u>Expansion Option</u>.

(a)    So long as there is no Event of Default by Tenant continuing, and subject to the satisfaction of all of the applicable conditions in this Section 2.2, Tenant shall have the option (the "<u>Expansion Option</u>") to expand the Premises as more fully set forth in this Section 2.2, effective as of a date determined by Landlord but occurring during the period commencing on the first day of the forty-eighth (48th) full calendar month, and ending on the last day of the sixtieth (60th) full calendar month, following the Rent Commencement Date (the "<u>Expansion Window</u>"), by leasing not less than one-half (1/2) of the sixth (6th) floor, and no more than the entire fifth (5th) and sixth (6th) floors, of the Building (the "<u>Potential Expansion Space</u>").  Tenant acknowledges that Landlord intends to construct individual "spec" suites on the fifth (5th) floor of the Building (the "<u>Spec Suites</u>").  Landlord shall notify Tenant of the date on which the Expansion Space will be delivered to Tenant (the "<u>Expansion Space Anticipated Inclusion Date</u>"), which Expansion Space Anticipated Inclusion Date shall be within the Expansion Window, by written notice (the "<u>Expansion Notice</u>") delivered to Tenant no earlier than the date that is fifteen (15) months, and no later than the date that is twelve (12) months, prior to the Expansion Space Anticipated Inclusion Date, and which Expansion Notice, to the extent the Potential Expansion Space includes any Spec Suites, shall include true, accurate and complete plans for such Spec Suites.  As used herein, the term "<u>Expansion Space Inclusion Date</u>" shall mean the actual date of delivery of the Expansion Space by Landlord to Tenant.  Tenant shall have thirty (30) days following receipt of the Expansion Notice to notify Landlord whether Tenant elects to lease all or a portion of the Potential Expansion Space so offered (subject to the other terms and conditions set forth herein) (the "<u>Tenant's Election Notice</u>").  If Tenant fails to timely give the Tenant's Election Notice, then Tenant's rights pursuant to this Section 2.2 shall lapse and be of no further force or effect.  If Tenant properly and timely delivers the Tenant's Election Notice, then the "<u>Expansion Space</u>" shall be the space identified by Tenant in the Tenant's Election Notice, subject to the following conditions: (i) Tenant may elect to lease no less than one-half (1/2) of (1) full floor of the Building (i.e., one-half (1/2) of the sixth (6th) floor) and no more than two (2) full floors of the Building (i.e., the fifth (5th) and sixth (6th) floors), (ii) Tenant shall only have the right to lease all or a portion of the fifth (5th) floor of the Building if Tenant elects to also lease all of the sixth (6th) floor of the Building, and (iii) if, in addition to the entire sixth (6th) floor of the Building, Tenant elects to lease only a portion of the fifth (5th) floor of the Building, then (I) if Landlord has not constructed Spec Suites, Tenant shall elect to lease at least fifty percent (50%) of the rentable square footage of the fifth (5th) floor of the Building, and the final determination of the size, location and configuration of the actual Expansion Space shall be as reasonably determined by Landlord and Tenant, taking into consideration the marketability, aesthetics, code compliance, preferable window lines and other reasonable considerations with respect to the Expansion Space and any remaining space on the fifth (5th) floor of the Building, or (II) if Landlord has constructed Spec Suites, then Tenant shall elect to lease the entirety of one (1) or more of such Spec Suites (and not, for clarity, only a portion of an existing Spec Suite). Notwithstanding anything herein to the contrary, if Tenant leases any portion of the Potential Expansion Space pursuant to Tenant's right of first offer set forth in Section Article XXVI, then such portion shall no longer be considered Potential Expansion Space, and Landlord shall not be required to offer Tenant alternative space in the Building in lieu of such space (it being acknowledged and agreed that the Potential Expansion Space shall consist solely of the portions of the fifth (5th) and sixth (6th) floor of the Building not then leased by Tenant).

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

(b)    If Tenant properly and timely delivers Tenant's Election Notice, then effective as of the Expansion Space Inclusion Date, (i) the Expansion Space shall be added to the Premises, (ii) the Base Rent payable with respect to the Expansion Space shall be equal to the then-escalated Base Rent on a per square foot basis under this Lease, (iii) the Base Year with respect to the Expansion Space shall be calendar year 2022, (iv) Tenant's Proportionate Share shall be adjusted to reflect the increased rentable square footage of the Premises, (v) Tenant's parking allocation shall be increased to reflect the increased rentable square footage of the Premises, (vi) the term with respect to the Expansion Space shall expire at the expiration of the Lease Term (subject to Tenant's right to renew the Lease Term pursuant to Section 3.5 below), and (vii) Tenant shall receive a construction allowance and rent abatement for the Expansion Space equal to the applicable market construction allowance and rent abatement for expanding tenants taking into consideration the size and condition of the Expansion Space and the remaining Lease Term among other applicable considerations (the "Expansion Concessions"). For a period of thirty (30) days following Tenant's delivery of Tenant's Election Notice (the "Expansion Negotiation Period"), Landlord and Tenant shall cooperate in good faith to agree upon the Expansion Concessions.  If Landlord and Tenant are unable to agree on the Expansion Concessions during the Expansion Negotiation Period, then the Expansion Concessions shall be determined pursuant to the three-broker arbitration method described in Section 3.5 below. Upon determination of the Expansion Concessions, the parties shall promptly execute an amendment to this Lease memorializing the addition of the Expansion Space to the Premises, the then-escalated Base Rent payable with respect to the Expansion Space, the Expansion Concessions, and any additional terms so determined.

(c)    Landlord shall deliver the Expansion Space to Tenant on the Expansion Space Inclusion Date vacant, free of tenants and any other occupants and otherwise in its current as-is, broom clean condition, with all of the prior tenant's personal property removed including data cabling (unless otherwise instructed in writing by Tenant at least one hundred eighty (180) days prior to the Expansion Space Anticipated Inclusion Date).  Tenant shall commence paying rent for the Expansion Space (subject to any additional abatement period determined as part of the Expansion Concessions pursuant to Section 2.2(b) above) on the earlier of (i) the date that Tenant commences beneficial occupancy of the Expansion Space for the conduct of its business, and (ii) one hundred fifty (150) days following the Expansion Space Inclusion Date (and the 150-day free rent buildout period shall not be factored into the determination of Expansion Concessions).

(d)    Except for the foregoing, the Expansion Space shall be added to the Premises pursuant to all of the terms and conditions of this Lease.

(e)    Notwithstanding anything contained herein to the contrary, delivery of possession of the Expansion Space to Tenant and commencement of Tenant's leasing thereof is and shall be subject to Landlord's obtaining possession from any prior tenant or occupant who holds over beyond the applicable lease expiration date, and Tenant shall have no claim against Landlord (for damages or otherwise) and Landlord shall have no obligation or liability for, on account of or with respect to any holdover in all or any portion of the Expansion Space; provided, however, that, in the event any such prior tenant or occupant has not vacated and surrendered the Expansion Space within the first thirty (30) days after the Expansion Space Anticipated Inclusion Date, Landlord shall commence eviction proceedings against such prior

5

tenant or occupant. Notwithstanding anything contained in this Lease to the contrary, in the event Landlord has been unable to deliver possession of the Expansion Space, or any portion thereof, to Tenant within six (6) months following the Expansion Space Anticipated Inclusion Date, then, at Tenant's sole option, Tenant shall have the right to terminate the Lease with respect to such Expansion Space only by written notice delivered to Landlord at any time until the Expansion Space has been delivered to Tenant, which termination shall be effective thirty (30) days following Landlord's receipt of Tenant's termination notice (provided, however, that if Landlord delivers the Expansion Space to Tenant during such thirty (30) day period, then Tenant's termination notice shall be deemed rescinded), in which event any expansion amendment to this Lease shall, if previously executed, be deemed void and of no further force or effect.

(f)    If an uncured Event of Default exists under this Lease on the date Tenant sends Tenant's Election Notice or on the Expansion Space Inclusion Date, then, at Landlord's election, Tenant's rights pursuant to this Section shall lapse and be of no further force or effect with respect to the Expansion Space.

(g)    Tenant's right of expansion under this Section may be exercised only by Tenant and may not be exercised by or for the benefit of any transferee, sublessee or assignee of Tenant except an Affiliate to whom this Lease has been assigned in its entirety pursuant to a Permitted Transfer (as hereinafter defined).

ARTICLE III
TERM

3.1    All of the provisions of this Lease shall be in full force and effect from and after the Execution Date. The Lease Term shall commence on the Lease Commencement Date and expire on the last day of the tenth (10th) Lease Year, unless extended or earlier terminated in accordance with the terms and provisions of this Lease. The Lease Term shall also include any properly exercised renewal or extension of the term of this Lease.

3.2    The "Lease Commencement Date" shall be the date that Landlord delivers the Premises to Tenant in the condition required under this Lease, which date shall be no earlier than the Anticipated Lease Commencement Date (i.e., the date that is ninety (90) days following the Execution Date). The "Rent Commencement Date" shall be December 1, 2021; provided, however, that (i) the Rent Commencement Date shall be extended as set forth in Section 3.3, if applicable, and (ii) Tenant shall have the right to extend the Rent Commencement Date, as extended pursuant to the foregoing subpart (i), if applicable, by up to an additional one hundred twenty (120) days on a day-for-day basis for each day that Tenant elects not to commence (and actually does not commence) Beneficial Occupancy of the Premises due to the existence of a health emergency (such as an epidemic or pandemic). Notwithstanding the foregoing to the contrary, for clarification purposes, if Tenant commences Beneficial Occupancy of the Premises prior to the Rent Commencement Date, Tenant shall not be required to pay any Base Rent or Tenant's Proportionate Share of any increases in Operating Charges and Real Estate Taxes during the period from and after any such Beneficial Occupancy of the Premises and continuing until the day immediately preceding the Rent Commencement Date. As used herein, "Beneficial Occupancy" shall mean that (a) Tenant has commenced business operations in all or any portion

of the Premises, and (b) Tenant would be permitted to have at least one hundred (100) people in the Premises at the same time without such occupancy being in violation of or otherwise contrary to the latest District of Columbia recommendations regarding occupancy limitations for commercial office buildings as the same are evidenced in the most recent emergency legislation or other guidance issued by the District of Columbia or the Mayors' office, provided, however, that Tenant's Beneficial Occupancy shall not include occupancy of a *de minimis* nature for routine administrative activities in support of Tenant's business (e.g. checking and sorting mail, minor clerical support work etc.). Promptly after the Lease Commencement Date is ascertained, Landlord and Tenant shall execute the certificate confirming the Lease Commencement Date attached to this Lease as <u>Exhibit D-1</u>. Promptly after the Rent Commencement Date is ascertained, Landlord and Tenant shall execute the certificate confirming the Rent Commencement Date attached to this Lease as <u>Exhibit D-2</u>. Failure to execute said certificate shall not affect the commencement or expiration of the Lease Term or the commencement of Rent. If this Lease is terminated before the Lease Term expires, then upon Landlord's request the parties shall execute, deliver and record an instrument acknowledging such fact and the date of termination.

3.3    It is presently anticipated that the Premises will be delivered to Tenant in the condition required under this Lease on the Anticipated Lease Commencement Date; provided, however, that if Landlord does not deliver possession of the Premises in the condition required under this Lease on the Anticipated Lease Commencement Date, except as otherwise expressly provided in this Lease, Landlord shall not have any liability whatsoever, and this Lease shall not be rendered void or voidable, as a result thereof. Notwithstanding the foregoing, so long as there is no Event of Default continuing, if Landlord fails to deliver the Premises to Tenant on or prior to (i) the date that is thirty (30) days following the Anticipated Lease Commencement Date (the "<u>Initial Target Delivery Date</u>"), then the Rent Commencement Date shall be extended by one (1) day for each day of such delay commencing on the thirty-first (31st) day of such delay and expiring on the eighty-ninth (89th) day of such delay, (ii) the date that is ninety (90) days following the Anticipated Lease Commencement Date (the "<u>Extended Target Delivery Date</u>"), then the Rent Commencement Date shall be extended by two (2) days for each day of such delay commencing on the ninety-first (91st) day of such delay and expiring on the day immediately preceding the date on which the Premises is delivered to Tenant, and (iii) the date that is one hundred twenty (120) days following the Anticipated Lease Commencement Date (the "<u>Outside Target Delivery Date</u>") (provided, however, that such Outside Target Delivery Date shall be extended by one (1) day for each day that Landlord is delayed in delivering the Premises to Tenant in the condition required by this Lease due to a Force Majeure Event), then Tenant shall have the right to terminate this Lease by delivering a written notice of termination to Landlord anytime from and after such date until the date the Premises is delivered to Tenant, which termination shall be effective thirty (30) days after Landlord's receipt thereof; provided, however, if Landlord delivers the Premises to Tenant within such thirty (30) day period, Tenant's termination notice shall be deemed null and void. If this Lease is terminated pursuant to this Section 3.3, Landlord shall reimburse Tenant for all actual out of pocket costs incurred by Tenant in connection with this Lease, as reasonably evidenced by Tenant in the form of bills, invoices, receipts or other written documentation, including, without limitation, architect and engineering costs and reasonable attorneys' fees (not to exceed, in the aggregate, $750,000.00), and, upon such reimbursement, neither party shall have any further obligations or liability under this Lease to the other party. Notwithstanding the foregoing to the contrary, (a) in the event the

Tenant Construction Ready Date (hereinafter defined) has not occurred as of the Initial Target Delivery Date, then the Initial Target Delivery Date, the Extended Target Delivery Date and the Outside Target Delivery Date (each, a "Target Delivery Date") shall be extended on a day for day basis for each day from and after the Initial Target Delivery Date until the Tenant Construction Ready Date occurs, (b) in the event of any Landlord Delay (as such term is defined in Exhibit B) occurs from and after the Lease Commencement Date, the parties agree that the Rent Commencement Date shall be extended on a day for day basis for each day of such Landlord Delay, and (c) in the event that any Landlord Delay occurs or in the event that Landlord fails to deliver the Premises to Tenant by any Target Delivery Date, and in order to mitigate Landlord's damages, Landlord shall have the right, but not the obligation, to require Tenant to accelerate its construction schedule for the completion of Tenant's Work and Tenant's Beneficial Occupancy of the Premises in attempt to reduce or eliminate any of the rent abatement penalties pursuant to this Section 3.3, above, provided that (w) Tenant's general contractor agrees to same, (x) Landlord agrees to reimburse Tenant, in addition to Landlord funding the Construction Allowance, for all incremental additional costs of such acceleration including "additional" or "overtime" labor (provided that Landlord and Tenant shall reasonably agree in writing on the nature of such acceleration and budget therefor prior to the commencement of any such acceleration), (y) Tenant shall be under no obligation to compromise Tenant's construction standards, quality or safety in connection with the construction of the Tenant's Work, and (z) in the event Landlord elects to accelerate the Tenant's Work, the parties acknowledge and agree that the Rent Commencement Date, as extended pursuant to the foregoing terms and provisions set forth in this Section 3.3, shall be accelerated on a day for day basis by the number of days between the completion of construction of the Tenant's Work with Landlord's acceleration and the completion of the construction of Tenant's Work that would have occurred without Landlord's acceleration.   If Landlord elects to accelerate the construction schedule for completion of the Tenant's Work, prior to commencing any such acceleration and Landlord agreeing in writing to reimburse Tenant for all incremental additional costs associated therewith, Landlord and Tenant shall meet with Tenant's general contractor to discuss the nature of such acceleration of the construction schedule for completion of the Tenant's Work, the likelihood of achieving such desired acceleration, and the estimated cost of such acceleration.  As used herein, the term "Construction Ready Date" shall mean the date that Tenant is ready, willing and able to commence construction of the Tenant's Work in the Premises, as evidenced by an issued building permit for the construction of the Tenant's Work, a fully executed construction contract for the Tenant's Work between Tenant and its general contractor, and reasonable evidence from Tenant's general contractor that construction of Tenant's Work in the Premises is ready to immediately commence (or, in the event of any Landlord Delay prior to the Lease Commencement Date, the date that Tenant would have been ready, willing and able to commence construction of the Tenant's Work in the Premises but for such Landlord Delay).

3.4    "Lease Year" shall mean a period of twelve (12) consecutive months commencing on the Rent Commencement Date, and each successive twelve (12) month period thereafter; provided, however, that if the Rent Commencement Date is not the first day of a month, then the second Lease Year shall commence on the first day of the month immediately following the first anniversary of the Rent Commencement Date.

3.5    Landlord hereby grants to Tenant the right, exercisable at Tenant's option, to renew the Lease Term, with respect to all or a specified portion of the Premises (such portion as

8

so specified in subsection 3.5(g) only), for two (2) successive terms of five (5) years each (each, a "Renewal Term"), subject to the terms and provisions of this Section 3.5. If exercised, and if the conditions applicable thereto have been satisfied, the first such Renewal Term (the "First Renewal Term") shall commence immediately following the end of the initial Lease Term provided in Sections 1.3 and 3.1; and the second Renewal Term (the "Second Renewal Term") shall commence immediately following the end of the First Renewal Term. The rights of renewal herein granted to Tenant shall be subject to, and shall be exercised in accordance with, the following terms and conditions:

(a)    Tenant shall exercise its right of renewal with respect to the applicable Renewal Term by giving Landlord written notice (the "Renewal Option Notice") of such election not earlier than twenty (20) months nor later than fifteen (15) months prior to the expiration of the then-current Lease Term. The parties shall then have thirty (30) days after Landlord's timely receipt of such notice (the "Negotiation Period") in which to agree on the annual base rent, escalation factor, additional rent and tenant concessions for such Renewal Term. The parties shall attempt in good faith to agree upon the annual base rent payable for the first year of the Renewal Term which would equal one hundred percent (100%) of the applicable Fair Market Rent, annual escalations for the Renewal Term, additional rent and tenant concessions for the applicable Renewal Term between Landlord and Tenant with respect to such Renewal Term. The term "Fair Market Rent" shall mean the base rental rate and applicable concessions that would be agreed to by a landlord and a comparable tenant at the Building or at a Comparable Building, each of whom is willing, but neither of whom is compelled, to enter into a lease and/or amendment transaction. The Fair Market Rent shall take into account any existing tenant improvements and shall take into account and include the following factors: (i) rental for comparable premises in Comparable Buildings (taking into consideration, but not limited to, annual escalations; relevant base year for operating expenses and taxes, term of lease, method of measurement, quality, age and location of the applicable Comparable Buildings; and location and/or floor level within the applicable Comparable Buildings); (ii) the rentable area of the premises being leased; (iii) the length of the pertinent rental term; and (iv) the quality and creditworthiness of Tenant (which shall include, without limitation, any security deposit in place and/or being offered). As used herein, the term "Comparable Buildings" shall mean office buildings in the East End and Central Business District submarkets of the District of Columbia of an age, size, first-class quality, condition and type of building systems comparable to that of the Building. If during the Negotiation Period the parties agree on such Fair Market Rent, then they shall promptly execute an amendment to this Lease stating the terms so agreed upon. If during the Negotiation Period the parties are unable, for any reason whatsoever, to agree on such Fair Market Rent, then within ten (10) days after the end of the Negotiation Period, the parties shall each appoint a real estate broker who (i) shall be licensed in the District of Columbia and who specializes and is active in the field of commercial office space leasing in the downtown Washington, D.C. market, (ii) has at least ten (10) years of experience and is recognized within the field as being reputable, (iii) in the case of Landlord's broker, must have experience representing landlords and, at Landlord's sole discretion, tenants; (iv) in the case of Tenant's broker, must have experience representing tenants and, at Tenant's sole discretion, landlords; (v) in the case of the third broker only, must have experience representing both landlords and tenants; (vi) in the case of the third broker only, is not then representing either Landlord or Tenant and has not represented either Landlord or Tenant in any capacity during the three (3) year period prior to being selected hereunder; and (vii) in the case of the third broker only, shall

9

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

not have been involved in any disputes with Landlord, Tenant or any of the other brokers.  Such two individuals shall each determine, within ten (10) days after their appointment, such Fair Market Rent.  If such individuals do not agree on the Fair Market Rent, then the two individuals shall, within ten (10) days, render separate written reports of their determinations and together appoint a third similarly qualified individual.  The third individual shall, within ten (10) days after his or her appointment, select either Landlord's broker's determination or Tenant's broker's determination (this being the third broker's sole function) as being closest to the applicable Fair Market Rent as determined by such third individual and he or she shall notify the parties of such selection.  If either party fails to timely deliver its determination to such third individual, then, in the event such party does not deliver its determination to such third individual within five (5) business days following receipt of written notice of such failure, the other party's determination of the Fair Market Rent shall be final and conclusive.  The third broker's decision shall be final and conclusive, and binding on Landlord and Tenant.  Landlord and Tenant shall each bear the cost of its own broker and shall share equally the cost of the third broker.  Upon determination of the Fair Market Rent payable pursuant to this Section, the parties shall promptly execute an amendment to this Lease stating the rent and additional terms so determined.

(b)    If any Renewal Option Notice is not given timely, then Tenant's right of renewal with respect to the applicable Renewal Term shall lapse and be of no further force or effect.

(c)    If Tenant is in default under this Lease beyond any applicable notice and cure periods on the date Tenant sends a Renewal Option Notice or as of the commencement date of the applicable Renewal Term, then, at Landlord's election, such Renewal Term shall not commence and the term of this Lease shall expire at the expiration of the then-current Lease Term; provided, however, if Tenant cures any default asserted by Landlord, the such renewal shall be allowed to commence in accordance with the terms of the Renewal Option Notice.

(d)    If Tenant's right of renewal with respect to any Renewal Term lapses for any reason, then Tenant's right of renewal with respect to any subsequent Renewal Term shall similarly lapse and be of no further force or effect.

(e)    If at the time Tenant sends the Renewal Option Notice more than fifty percent (50%) of the square feet of rentable area of the Premises has been subleased or assigned, or if this Lease has been terminated with respect to such portion of the Premises, then Tenant's rights pursuant to this Section shall lapse and be of no further force or effect.

(f)    Tenant's right of renewal under this Section may be exercised only by Tenant and may not be exercised by or for the benefit of any other transferee, sublessee or assignee of Tenant other than an Affiliate to whom this Lease has been assigned in its entirety pursuant to a Permitted Transfer (as hereinafter defined).

(g)    Each Renewal Term may be exercised by Tenant only, at Tenant's election, given at the time of, and included in, Tenant's Renewal Option Notice, with respect to either (i) all of the then-current Premises, or (ii) a portion of the Premises consisting of at least fifty percent (50%) of the rentable square footage of the Premises; provided, however, that with respect to any renewal for less than all of the then-current Premises, then: (I) such renewed

WDC 91095636v14

portion of the Premises on a particular floor must consist of either all space then leased on such floor or a portion of the space leased on such floor but in no event less than one half (1/2) of the rentable square footage of such floor (i.e., no partial renewals on specific floors unless one-half (1/2) of a full floor), (II) all space renewed must be on contiguous floors and shall either be "top down" or "bottom up" (i.e., no spiking the floor plate of the Building), and (III) if Tenant elects to renew for less than all of the space then leased by Tenant on a floor, Tenant shall be responsible for the costs of designing, permitting and constructing a demising wall and for any other costs and expenses incurred in order to separate the renewed space from the remainder of the space on the floor.

ARTICLE IV
BASE RENT

4.1    From and after the Rent Commencement Date, subject to Section 4.2 below, Tenant shall pay the Base Rent in equal monthly installments in advance on the first day of each month during a Lease Year.

4.2    Rent Abatement and Payment in Lieu of Abatement

(a)    Notwithstanding the foregoing, except during any period in which an Event of Default by Tenant has occurred and is continuing under this Lease, Landlord grants to Tenant an abatement of the Base Rent otherwise payable hereunder during the first twelve (12) full calendar months of the Lease Term commencing on the Rent Commencement Date (the "Abatement Period"); provided, however, that if Tenant cures such Event of Default, Tenant shall be entitled to the remainder of the unexpired portion of the Abatement Period.  If the Rent Commencement Date is not the first day of a month, then the Base Rent from the Rent Commencement Date until the first day of the following month shall be prorated on a per diem basis at the rate of one-thirtieth (1/30th) of the monthly installment of the Base Rent payable during the first Lease Year, and Tenant shall pay such prorated installment of the Base Rent on the Rent Commencement Date.

(b)    At any time prior to the expiration of the Abatement Period, upon delivery of prior written notice to Tenant, Landlord shall have the right to elect to deposit into an escrow account for the benefit of Tenant a sum in an amount equal to the Base Rent, Operating Charges and Real Estate Taxes that would otherwise be abated during the Abatement Period (or the remaining portion thereof), in lieu of providing an abatement of Base Rent, Operating Charges and Real Estate Taxes during the Abatement Period (or the remaining portion thereof) (the "Payment in Lieu of Abatement").  If timely and properly exercised by Landlord, the parties shall cooperate in good faith to reasonably negotiate and memorialize the specific structure and process for the Payment in Lieu of Abatement, including, without limitation, the terms for the disbursement of the Payment in Lieu of Abatement to pay Base Rent, Operating Charges, and Real Estate Taxes during the Abatement Period (or the remaining portion thereof); provided that (i) the Payment in Lieu of Abatement does not create taxable income for Tenant and does not create any additional expense, tax, or other cost, liability or risk to Tenant, except for Tenant's reasonable attorneys' fees and any other out-of-pocket costs incurred by Tenant in reviewing such request, and (ii) the disbursement process agreed to by the parties shall not require Tenant to first pay Base Rent, Operating Charges or Real Estate Taxes and then seek reimbursement

11

DocuSign Envelope ID: EE8C1D67-8R68-4B8B-A358-6865DF8C2D22

from Landlord (i.e., the funds will be released from escrow with sufficient time to permit Tenant to use those funds to satisfy its obligation to pay Base Rent, Operating Charges or Real Estate Taxes during the Abatement Period (or the remaining portion thereof) without coming "out of pocket").

4.3      All sums payable by Tenant under this Lease shall be paid to Landlord or, if Landlord shall so direct in writing, to Landlord's agent or nominee, in legal tender of the United States, without, except as otherwise set forth in this Lease, setoff, deduction or demand, at the Landlord Payment Address, or to such other party or such other address as Landlord may designate in writing in the future.  Landlord's acceptance of rent after it shall have become due and payable shall not excuse a delay upon any subsequent occasion or constitute a waiver of any of Landlord's rights hereunder.  If any sum payable by Tenant under this Lease is paid by check which is returned due to insufficient funds, stop payment order, or otherwise, then:  (a) such event shall be treated as a failure to pay such sum when due; and (b) in addition to all other rights and remedies of Landlord hereunder, Landlord shall be entitled (i) to impose a returned check charge of Fifty Dollars ($50.00) to cover Landlord's administrative expenses and overhead for processing, and (ii) if such event has occurred more than four (4) times during the Lease Term, to require that all future payments be remitted by wire transfer, money order, or cashier's or certified check.

4.4      Landlord and Tenant agree that no rental or other payment for the use or occupancy of the Premises is or shall be based in whole or in part on the net income or profits derived by any person or entity from the Building or the Premises.  Tenant will not enter into any sublease, license, concession or other agreement for any use or occupancy of the Premises which provides for a rental or other payment for such use or occupancy based in whole or in part on the net income or profits derived by any person or entity from the Premises so leased, used or occupied.  Nothing in the foregoing sentence, however, shall be construed as permitting or constituting Landlord's approval of any sublease, license, concession, or other use or occupancy agreement not otherwise approved by Landlord in accordance with the provisions of Article VII.

ARTICLE V
INCREASES IN OPERATING CHARGES AND REAL ESTATE TAXES

5.1      For the purposes of this Article V, the term "Building" shall be deemed to include the site upon which the Building is constructed (which site is sometimes referred to herein as the "Land"), the roof of the Building and any physical extensions therefrom, any driveways, sidewalks, landscaping and parking facilities in the Building or on the Land, and all other areas, facilities, improvements and appurtenances relating to any of the foregoing.

5.2      (a)      From and after the first anniversary of the Rent Commencement Date, Tenant shall pay as additional rent Tenant's Proportionate Share of the amount by which Operating Charges (as hereinafter defined) for each calendar year falling entirely or partly within the Lease Term exceed a base amount (the "Operating Charges Base Amount") equal to the Operating Charges incurred during the Operating Charges Base Year.  Tenant's Proportionate Share with respect to Operating Charges set forth in Article I has been calculated to be that percentage which is equal to a fraction, the numerator of which is the number of square feet of rentable area in the Premises as set forth in Section 1.2, and the denominator of which is the

12

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

number of square feet of office rentable area in the Building (excluding any below-grade storage, roof and garage space).

(b)    "Operating Charges" shall mean all expenses, charges and fees incurred by or on behalf of Landlord in connection with the management, operation, ownership, maintenance, servicing, insuring and repairing of the Building, including, without limitation, the following:  (1) charges for electricity, gas, water, HVAC, sewer and other utility costs, charges and fees (including, without limitation, any tap fees and connection and switching fees) of every type and nature (not to include Landlord's costs of electricity and other services sold to tenants which services are not standard for the Building and for which Landlord is reimbursed by tenants (whether or not actually collected by Landlord)); (2) premiums, deductibles (to the extent reasonable and customary) and other charges for insurance, including fire, casualty, liability, rent loss and such other insurance as may from time to time be carried by Landlord with respect to the Building and reasonable fees of Landlord's insurance consultants or brokers in connection therewith; (3) management fees (but in no event more than three percent (3%) of the annual gross revenues of the Building subject to Section 5.2(c) below, provided, however, that if the management fees are based on revenues of the Building, (i) gross revenues shall exclude parking revenue, revenue from charges for after-hours or extra services and other *de minimis* miscellaneous revenue), and (ii) management fees for purposes hereof shall include amounts that would have been received had there been no rental abatements or other concessions) and personnel costs of the Building (including all fringe benefits, workers' compensation insurance premiums and payroll taxes) provided that personnel costs of individuals who are not substantially dedicated full time to the Building shall be equitably allocated; (4) costs of service, access control and maintenance contracts relating to the Building as a whole; (5) maintenance, repair and replacement expenses and supplies of a non-capital nature (not to include costs of correcting latent defects (not standard repairs) during the initial warranty period after construction, it being understood that all repairs and replacements resulting from ordinary wear and tear, use, fire, casualty, or vandalism, shall not be deemed to be latent construction defects); (6) capital expenditures made by Landlord to reduce Operating Charges, to implement measures for safety and security that are consistent with safety and security measures implemented by landlords of Comparable Buildings, or to comply with legal or insurance requirements that are created or imposed after the Lease Commencement Date, which shall be amortizing at a rate equal to eight percent (8%) per annum and charged to Operating Charges in annual installments (i) over the useful life of the items as determined in accordance with GAAP for which such costs are incurred (in the case of items required to comply with legal or insurance requirements or to implement measures for safety and security), or (ii) over the period Landlord reasonably estimates that it will take for the savings in Operating Charges achieved by such items to equal their costs (in the case of items intended to reduce Operating Charges), with an annual cap of the actual amount of the annual savings (collectively, the "Permitted Capital Expenditures"); (7) charges for janitorial and cleaning services and supplies; (8) any business, professional or occupational license tax payable by Landlord with respect to the Building and any association fees; (9) reasonable reserves for replacements, repairs and contingencies (to the extent such replacement, repairs and contingencies would be properly included as Operating Charges hereunder); (10) sales, use and personal property taxes payable in connection with tangible personal property and services purchased for and used in connection with the Building; (11) reasonable third party accounting and audit fees relating to the determination of Operating Charges (and tenants' proportionate shares thereof) and the preparation of statements required by

tenant leases; (12) expenses incurred in connection with concierge services provided to the Building (if any); (13) the fair market rental value of any management office (of reasonable and customary size) and health/fitness facilities in the Building (to the extent not offset by separate membership or usage fees imposed by Landlord); (14) special assessments, fees, penalties and other charges and costs for transit, transit encouragement traffic reduction programs, or any similar purpose; (15) all costs of operating, maintaining and repairing (but not replacing) equipment in any portion of the Fitness Facility (as defined in Section 14.4), roof deck, function room or other amenity of the Building; and (16) any other expense incurred by Landlord in arm's-length transactions in maintaining, repairing or operating the Building.  Notwithstanding any provision contained in this Lease to the contrary, Operating Charges shall not include:  (i) Retail Area Charges or Real Estate Taxes; (ii) principal or interest payments on any Mortgages (as defined in Section 21.1); (iii) leasing commissions or legal fees with respect to the negotiation of tenant leases and disputes with and/or enforcement of any leases with tenants, other occupants, or prospective tenants or other occupants of the Building; (iv) costs in connection with services (including electricity), items or other benefits of a material type which are not available to Tenant without specific charge therefor, but which are provided to another tenant or occupant of the Building, whether or not such other tenant or occupant is specifically charged therefor by Landlord; (v) ground lease payments; (vi) advertising and promotional expenses directly relating to leasing; (vii) costs for which Landlord is reimbursed by insurance proceeds or from tenants of the Building (other than such tenants' regular contributions to Operating Charges); (viii) legal fees incurred for negotiating leases or collecting rents; (ix) costs directly and solely related to the maintenance and operation of the entity that constitutes the Landlord, such as accounting fees incurred solely for the purpose of reporting Landlord's financial condition; (x) costs of repairs, replacements or other work occasioned by fire, windstorm or other casualty, or the exercise by governmental authorities of the right of eminent domain (except a commercially reasonable deductible); (xi) costs (limited to penalties, fines and associated legal expenses) incurred due to violation by Landlord or any tenant in the Building of the terms and applicable federal, state and local government laws, codes and similar regulations that would not have been incurred but for any such violations by Landlord or such tenant, it being intended that each party shall be responsible for costs resulting from its own violation of such laws, codes and regulations as the same shall pertain to the Building; (xii) cost of Landlord's general overhead and general administrative expenses (individual, partnership or corporate, as the case may be), which costs would not be chargeable to operating expenses of the Building and/or the land on which the Building is situated, in accordance with generally accepted accounting principles, consistently applied; (xiii) any compensation paid to clerks, attendants or other persons in commercial concessions (such as snack bar or restaurant), if any, operated by Landlord; (xiv) all items and services for which Tenant or other building tenants specifically reimburse Landlord and any other items, services or costs which are reimbursable to Landlord; (xv) payments of any other financing or refinancing costs on any mortgages, deeds of trust, ground leases or other encumbrances, whether secured or unsecured on the Building, including any equipment, fixtures or improvements therein existing at the Lease Commencement Date, or any penalties or late charges relating thereto; (xvi) any District of Columbia income, rental, franchise tax, or other similar tax; (xvii) tenant allowances, tenant concessions, and other costs and expenses (including permit, license and inspection fees) incurred in connection with completing, fixturing, furnishing, renovating or otherwise improving, decorating or redecorating leased premises for tenants or other occupants of the Building, or vacant, leasable space in the

14

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

Building, including space planning/interior architecture fees and/or engineering for same; (xviii) marketing expenses and all other expenses incurred for procuring tenants for the Building, including without limitation the cost of advertising; (xix) salaries, wages and benefits (including payroll taxes with respect thereto) paid to individuals who are not substantially dedicated full time to the Building (subject to the equitable allocation of such costs pursuant to Section 5.2(b)(3) above (including, but not limited to, any "finder's fees", job placement costs or job advertising costs); (xx) any fees or expenses paid to Landlord or an affiliate of Landlord to the extent such fees or expenses are in excess of customary market amounts which would be paid in the absence of such relationship; (xxi) costs of compliance with laws and regulations with respect to conditions existing in violation thereof on the Lease Commencement Date; (xxii) any costs to Landlord for any tax, levy, assessment or other cost in connection with a sale or transfer of Landlord's ownership interest in any portion of the Building; (xxiii) any penalty charges incurred by Landlord due to Landlord's violation of any governmental rule, or late payment of utility bills, or other amounts included in Operating Charges; (xxiv) any legal expense accountants', consultant's, auditors' and other costs and expenses incurred by Landlord in connection with (1) leasing space in the Building or (2) negotiations or disputes with current, former, or prospective tenants or occupants of the Building or (3) the enforcement of leases and collection of amounts payable thereunder; (xxv) cost of any political, civic or charitable donation or contributions; (xxvi) any legal expenses incurred in connection with disputes with former or existing employees, consultants, management, agents, purchasers or mortgagees of the Building, or associated with the enforcement of any other leases or the defense of Landlord's title to or interest in the real property or any part thereof (but, not including legal expenses incurred in disputing real estate taxes); (xxvii) any and all costs arising from the presence of Hazardous Materials (as defined herein) in or about the Premises or the Building, including, without limitation, Hazardous Material in the ground water or soil, not placed in the Premises or the Building by Tenant; (xxviii) costs incurred in connection with any environmental clean-up, response action, or remediation on, in, under or about the Premises or the Building, including, but not limited to, costs and expenses associated with the defense, administration, settlement, monitoring or management thereof; (xxix) costs for the acquisition of (as contrasted with the maintenance of) sculpture, paintings or other objects of art; (xxx) reserves for bad debts or for future improvements, maintenance, replacements, or repairs; (xxxi) rent for any office space occupied by Landlord's property management personnel to the extent the size or rental rate of such office space exceeds the size or fair market rental value of the office space occupied by property management personnel of Comparable Buildings in the greater District of Columbia metropolitan area, with adjustment where appropriate for the size of the Building; (xxxii) costs of correcting any Building or Common Area violations existing as of the Lease Commencement Date of the Americans with Disabilities Act as amended, and any future amendments thereto; (xxxiii) depreciation/amortization for capital expenditures, except as expressly permitted above; (xxxiv) costs incurred in connection with the original construction of the Building; (xxxv) collection costs and bad debt losses or reserves; and (xxxvi) expenses incurred in connection with the management, repair and maintenance of the Building's parking facilities, such as, but not limited to, parking management fees and restriping of parking spaces, provided, however, that utilities, Real Estate Taxes, non-routine maintenance and repair expenses (subject to the limitations on the passthrough of capital expenditures set forth herein) and Building security expenses to the extent not separately allocated to the Building garage facilities by Landlord shall be included in Operating Charges.  Operating Charges shall be reduced by all cash discounts,

15

trade discounts or quantity discounts received by Landlord or Landlord's property management company in the purchase of any goods, utilities or services in connection with the operation of the Building.  In the calculation of any Operating Charge hereunder, it is understood that no expense shall be charged more than once.  Landlord shall not recover more than one hundred percent (100%) of the Operating Charges actually incurred by Landlord in any calendar year. "Retail Area Charges" shall mean those expenses, if any, that are solely attributable to and payable by tenants of the Retail Area (for example, expenses relating to janitorial, bussing and cleaning services; storage and removal of trash; maintenance and replacement of tables, chairs, trash receptacles and other furnishings or facilities; and electricity, gas, water, sewer and other utility service furnished solely to such space, to the extent applicable).

(c)    If the average occupancy rate for the Building during any calendar year (including the Operating Charges Base Year) is less than ninety-five percent (95%), or if any tenant is separately paying for (or does not require) electricity, janitorial or other utilities or services furnished to its premises, then Landlord shall include in Operating Charges for such year (including the Operating Charges Base Year) all additional expenses, as reasonably estimated by Landlord, which would have been incurred during such year if such average occupancy rate had been ninety-five percent (95%) and if Landlord paid for such utilities or services furnished to such premises.  The extrapolation of Operating Charges under this paragraph shall be performed by appropriately adjusting the cost of those components of Operating Charges that are impacted by changes in the occupancy of the Building.

(d)    From and after the first anniversary of the Rent Commencement Date, Tenant shall make estimated monthly payments to Landlord on account of the amount by which Operating Charges are expected to be incurred during each calendar year (or portion thereof) would exceed the Operating Charges Base Amount.  At the beginning of the second (2nd) Lease Year and at the beginning of each calendar year thereafter, Landlord shall submit a reasonably detailed written statement setting forth Landlord's reasonable estimate of such excess and Tenant's Proportionate Share thereof.  From and after the first anniversary of the Rent Commencement Date, Tenant shall pay to Landlord on the first day of each month thereafter, until Tenant's receipt of the succeeding annual statement, an amount equal to one-twelfth (1/12) of Tenant's Proportionate Share of Landlord's reasonable estimate of such excess set forth in Landlord's last delivered annual written statement (estimated on an annual basis without proration pursuant to Section 5.4).  Not more than twice during any calendar year, Landlord may revise Landlord's estimate and adjust Tenant's monthly payments to reflect Landlord's revised estimate.  Within one hundred eighty (180) days after the end of each calendar year, Landlord shall submit a reasonably detailed written statement (an "Operating Charges Reconciliation Statement") showing (1) Tenant's Proportionate Share of the amount by which Operating Charges incurred during the preceding calendar year exceeded the Operating Charges Base Amount, and (2) the aggregate amount of Tenant's estimated payments made on account of Operating Charges during such year.  If an Operating Charges Reconciliation Statement indicates that the aggregate amount of such estimated payments exceeds Tenant's actual liability, then Landlord shall credit the net overpayment toward Tenant's next estimated payment(s) pursuant to this Section and against the next installment(s) of Base Rent due under this Lease, or, if the Lease Term has expired or will expire before such credit can be fully applied, or if Tenant is not otherwise liable to Landlord for further payment of Operating Charges, Landlord shall reimburse Tenant for the amount of such overpayment within thirty (30) days after the delivery of such

Operating Charges Reconciliation Statement.  If an Operating Charges Reconciliation Statement indicates that Tenant's actual liability exceeds the aggregate amount of such estimated payments, then Tenant shall pay the amount of such excess as additional rent within thirty (30) days after delivery of such Operating Charges Reconciliation Statement; provided, however, that if the balance due from Tenant exceeds the payment Tenant has been paying on a monthly basis immediately prior to receipt of such notice by more than twenty-five percent (25%) of such regular monthly payment, then Tenant shall have the right, in its sole discretion, to pay such Operating Charges arrearage in six (6) equal monthly installments, simultaneously with Tenant's monthly payment of Base Rent, over the immediately following six (6) months, provided, further, however, that if any portion of Tenant's monthly payment is not paid when due, the remaining installments shall become automatically and immediately due and payable.

    5.3    (a)    From and after the first anniversary of the Rent Commencement Date, Tenant shall pay as additional rent Tenant's Proportionate Share of the amount by which Real Estate Taxes (as hereafter defined) for each calendar year falling entirely or partly within the Lease Term exceed a base amount (the "Real Estate Taxes Base Amount") equal to the Real Estate Taxes incurred during the Real Estate Taxes Base Year.  Tenant's Proportionate Share with respect to Real Estate Taxes shall be that percentage which is equal to a fraction, the numerator of which is the number of square feet of rentable area in the Premises as set forth in Section 1.2, and the denominator of which is the number of square feet of total rentable area in the Building (excluding any below-grade storage, roof and garage space).

    (b)    "Real Estate Taxes" shall mean (1) all real estate taxes, vault and/or public space rentals, rates and assessments (including general and special assessments, if any), ordinary and extraordinary, foreseen and unforeseen, which are imposed upon Landlord or assessed against the Building or the Land, or Landlord's personal property used in connection therewith, (2) any other present or future taxes or charges that are imposed upon Landlord or assessed against the Building which are in the nature of or in substitution for real estate taxes, including any tax levied on or measured by the gross rents payable by tenants of the Building, any public safety fee or similar charge, any transit, sales, rental, use, receipts or occupancy tax or fee, and any assessment imposed in connection with business improvement, transportation or similar districts, and (3) reasonable expenses (including, without limitation, reasonable attorneys' and consultants' fees and court costs) incurred in reviewing, protesting or seeking a reduction or abatement of, or defending or otherwise participating in any challenge to, real estate taxes, whether or not such protest or reduction is ultimately successful.  Subject to the foregoing, Real Estate Taxes shall not include any inheritance, estate, gift, franchise, corporation, transfer, recordation, net income or net profits tax assessed against Landlord from the operation of the Building.  Real Estate Taxes shall not include any interest charges or penalties incurred as a result of Landlord's failure to timely pay Real Estate Taxes; provided, however, that if the taxing authority permits a taxpayer to elect to pay in installments, then, for purposes of determining the amount of Real Estate Taxes, Landlord shall be deemed to have paid such Real Estate Taxes in the maximum number of permitted installments and all interest charges resulting therefrom shall be deemed Real Estate Taxes.

    (c)    From and after the first anniversary of the Rent Commencement Date, Tenant shall make estimated monthly payments to Landlord on account of the amount by which Real Estate Taxes that are expected to be incurred during each calendar year would exceed the

Real Estate Taxes Base Amount. At the beginning of the second (2nd) Lease Year and at the beginning of each calendar year thereafter, Landlord shall submit a reasonably detailed written statement setting forth Landlord's reasonable estimate of such excess amount and Tenant's Proportionate Share thereof. From and after the first anniversary of the Rent Commencement Date, Tenant shall pay to Landlord on the first day of each month thereafter, until Tenant's receipt of the succeeding annual statement, an amount equal to one-twelfth (1/12) of Tenant's Proportionate Share of Landlord's reasonable estimate of such excess set forth in Landlord's last delivered annual written statement (estimated on an annual basis without proration pursuant to Section 5.4). Not more than twice during any calendar year, Landlord may revise Landlord's estimate and adjust Tenant's monthly payments to reflect Landlord's revised estimate. Within one hundred eighty (180) days after the end of each calendar year, Landlord shall submit a reasonable detailed written statement (a "<u>Real Estate Taxes Reconciliation Statement</u>" and, together with an Operating Charges Reconciliation Statement, a "<u>Reconciliation Statement</u>") showing (1) Tenant's Proportionate Share of the amount by which Real Estate Taxes incurred during the preceding calendar year exceeded the Real Estate Taxes Base Amount, and (2) the aggregate amount of Tenant's estimated payments made during such year. If a Real Estate Taxes Reconciliation Statement indicates that the aggregate amount of such estimated payments exceeds Tenant's actual liability, then Landlord shall credit the net overpayment toward Tenant's next estimated payment(s) pursuant to this Section and against the next installment(s) of Base Rent due under this Lease, or, if the Lease Term hereof has expired or will expire before such credit can be fully applied, or if Tenant is not otherwise liable for further payment of Real Estate Taxes, Landlord shall reimburse Tenant for the amount of such overpayment within thirty (30) days after delivery of such Real Estate Taxes Reconciliation Statement. If a Real Estate Taxes Reconciliation Statement indicates that Tenant's actual liability exceeds the aggregate amount of such estimated payments, then Tenant shall pay the amount of such excess as additional rent within thirty (30) days after delivery of such Real Estate Taxes Reconciliation Statement; provided, however, that if the balance due from Tenant exceeds the payment Tenant has been paying on a monthly basis immediately prior to receipt of such notice by more than twenty-five percent (25%) of such regular monthly payment, then Tenant shall have the right, in its sole discretion, to pay such Real Estate Taxes arrearage in six (6) equal monthly installments, simultaneously with Tenant's monthly payment of Base Rent, over the immediately following six (6) months, provided, further, however, that if any portion of Tenant's monthly payment is not paid when due, the remaining installments shall become automatically and immediately due and payable.

Tenant shall not have the right to contest the validity of any tax, lien, assessment or claim against the Premises, the Building, or the Land. If, however, Landlord elects not to contest same, then, provided that no material monetary or material non-monetary Event of Default exists hereunder and Tenant has paid its share of all Real Estate Taxes as and when due under the Lease, Tenant shall have the right to request that Landlord contest the validity of any tax, lien, assessment or claim against the Premises, the Building, or the Land by providing Landlord with timely written notice setting forth the reasons why Tenant desires to institute such action ("<u>Tenant's Request</u>"). If, after timely receipt of Tenant's Request, Landlord reasonably believes that such action has merit, then Landlord shall commence and prosecute such action, the cost of which shall be included in Real Estate Taxes. If, after timely receipt of Tenant's Request, Landlord reasonably does not believe that Tenant's Request has merit, then Landlord shall not be required to commence or pursue such action and Landlord shall have no liability to Tenant with

respect to the same.  If a reduction in Real Estate Taxes is obtained for any calendar year of the Lease Term during which Tenant paid Tenant's Proportionate Share of increases in Real Estate Taxes, then Real Estate Taxes for such calendar year will be retroactively adjusted and Landlord shall provide Tenant with a credit against Rent (or reimbursement if the reduction occurs after the expiration of the Lease Term) in an amount equal to Tenant's Proportionate Share of the net amount of such refund of Real Estate Taxes (with such amount prorated for any partial calendar year falling within the Lease Term with respect to which Tenant paid Tenant's Proportionate Share for such partial calendar year) when and as received by Landlord, after deduction therefrom of any expenses incurred by Landlord in obtaining such refund (to the extent not already included in and paid as Operating Charges).  Notwithstanding any contrary provision contained in this Lease, including, without limitation, this Section 5.3, if any incentives provided by any government authority to Tenant are provided in the form of abatements or reductions of Real Estate Taxes, including any abatements pursuant to D.C. Code § 47–811.03 (https://code.dccouncil.us/dc/council/code/sections/47-811.03.html), Tenant shall be entitled to one hundred percent (100%) of the benefit of such abatements or reductions to the extent solely applicable to Tenant (as evidenced by a separate line item on the real estate tax bill or as demonstrated by the real estate tax assessor's notes or as established by Tenant to Landlord's reasonable satisfaction), which benefit shall be provided, at Landlord's option, through an adjustment of rent otherwise due under this Lease and/or the payment by Landlord to Tenant of the amount of such abatements or reductions on or about the date on which such amount would have otherwise been due to the applicable governmental authority.  Landlord shall reasonably cooperate with Tenant, at no cost to Landlord, in connection with application by Tenant for any such Real Estate Tax abatement with the District of Columbia, including, without limitation, upon Tenant's written request, attaching to the real property tax return an original affidavit from Tenant stating that Tenant is a Qualified High Technology Company; provided, however, that notwithstanding Landlord's agreement to reasonably cooperate with Tenant, Tenant shall ultimately be solely responsible for complying with all obligations necessary to obtain and maintain any such Real Estate Tax abatements and/or reductions, and none of Tenant or Tenant's Agents may assert any Claims (as hereinafter defined) against Landlord directly or indirectly, based on, arising out of or resulting from any act or omission by Landlord in connection with the foregoing.  If any such abatements or reductions occur in any year during the Lease Term (including, without limitation, the Real Estate Taxes Base Year, if applicable), then the Real Estate Taxes for such year (including, without limitation, the Real Estate Taxes Base Amount, if applicable) shall be increased to the amount that Real Estate Taxes would have been had there not been such abatement or reduction.

5.4    If Tenant's obligations under this Article V commence or expire on a day other than the first day or the last day of a calendar year, respectively, then Tenant's liabilities pursuant to this Article for such calendar year shall be apportioned by multiplying the respective amount of Tenant's Proportionate Share thereof for the full calendar year by a fraction, the numerator of which is the number of days during such calendar year falling within the Lease Term, and the denominator of which is three hundred sixty-five (365).  Notwithstanding any contrary provision contained in this Lease, in the event Landlord has not billed Tenant for any Operating Charges (or Real Estate Taxes if, and to the extent, that Landlord has been appropriately billed for such Real Estate Taxes and excluding any Real Estate Taxes that are then pending on appeal) within twenty-four (24) months following the last day of the calendar year to which such Operating Charges (or Real Estate Taxes if, and to the extent, that Landlord has been appropriately billed

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

for such Real Estate Taxes and excluding any Real Estate Taxes that are then pending on appeal) relate (excluding with respect to any expenses amortized over a period of longer than twenty-four (24) months, the portion thereof yet to be amortized after the end of each such calendar year), Landlord shall have no right to collect any such Operating Charges from Tenant not so billed within such specified twenty-four (24) month period.

     5.5    For purposes of determining Tenant's Proportionate Share of increases in Operating Charges during the Lease Term, as extended, if at all, the amount of Controllable Operating Charges (in the aggregate and not on a line-by-line basis) during the second calendar year, and each calendar year thereafter, shall not exceed the product of the Controllable Operating Charges for the immediately preceding calendar year multiplied by one hundred five percent (105%) (the "Cap"), it being the intent that only Controllable Operating Charges be capped as set forth herein. The term "Controllable Operating Charges" shall mean all Operating Charges except (a) all taxes, utility charges and insurance costs, (b) Permitted Capital Expenditures and any other costs incurred to comply with Laws first applicable to the Building after the Lease Commencement Date, (c) increases to wages, salaries and other compensation and benefits paid to Landlord's employees, agents or contractors engaged in the operation, management, maintenance (including, but not limited to, janitorial and cleaning services) or security of the Building, to the extent increases to such wages, salaries and other compensation and benefits are incurred as a result of union labor or government mandated requirements including, but not limited to, prevailing wage laws and similar requirements, (d) management fees based on a percentage of gross revenues, (e) costs of snow and ice removal and other weather related matters, and (f) any other Operating Charges incurred by reason of any of the factors or causes described in Section 25.21 (it being the intent that only controllable expenses be capped as set forth herein).  In the event that in any calendar year the Controllable Operating Charges are less than the Cap for such year, any shortfall shall be carried forward to later calendar years (subject to the Cap for such calendar year).  In the event that in any calendar year the Controllable Operating Charges are more than the Cap for such year, any excess shall be carried forward to later calendar years and shall be due and payable in such later calendar years if the Controllable Operating Charges in such later calendar years are less than the Cap for such year (but nonetheless subject to the Cap for such later calendar year).  The Cap shall be determined and applied on a compounding and cumulative basis, so that, for example, if Controllable Operating Charges were $1,000,000.00 during the first calendar year, then the Cap would be as follows in subsequent years: $1,050,000.00, $1,102,500.00, $1,157,625.00, etc. Tenant's Proportionate Share of increases in Operating Charges shall be calculated after the determination of Controllable Operating Charges has been made pursuant to this Section 5.5 (subject to Tenant's obligation to make estimated payments pursuant to Section 5.2(d)).  If a service that was not previously provided to the Building during the Lease Term is provided to the Building (a "New Service") and the cost thereof is a Controllable Operating Charge, then (i) for the initial calendar year in which such New Service is provided, the costs of providing such New Service (as may be adjusted (grossed up) pursuant to Section 5.2(c) above) shall not be included in Controllable Operating Charges (such that Tenant shall pay for its full Proportionate Share of the cost of such New Service without application of the Cap, but subject to the terms of Section 5.7 below), and (ii) for the calendar year immediately thereafter, the cost of providing such New Service for such calendar year (as may be adjusted (grossed up) pursuant to Section 5.2(c) above) shall be included in Controllable Operating Charges for such calendar year and shall be

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8B69-4B8D-A358-6865DF8C2D22

added to and be a part of the Cap for such calendar year (i.e., annual increases in the cost of such New Service shall be subject to the Cap).

5.6     Provided no Event of Default exists and is continuing hereunder and Tenant has timely paid the amount set forth in the applicable Reconciliation Statement, Tenant (through Tenant's own qualified personnel or an independent professional services or public accounting firm who is hired by Tenant on a non-contingent fee basis and offers a full range of accounting services), shall have the right, during regular business hours, at the management office for the Building and after giving at least thirty (30) days' advance written notice to Landlord, to commence to have Landlord's books and records related to Operating Charges and Real Estate Taxes reviewed for the immediately preceding calendar year (or portion thereof) and the Operating Charges Base Year and Real Estate Taxes Base Year, as applicable (and if so commenced, to continuously, expeditiously and diligently pursue such review to completion), provided that all of the communications with Landlord (and Landlord's representatives) in connection with the review shall be conducted by an employee of Tenant.  If Landlord disagrees with the results of Tenant's review and Landlord and Tenant cannot otherwise agree on the amount of Operating Charges or Real Estate Taxes, as applicable, payable by Tenant for such calendar year, then Landlord and Tenant's auditor shall together select a neutral auditor of similar qualifications to conduct a review of such books and records, and the determination of Operating Charges or Real Estate Taxes, as applicable, reached by such neutral auditor shall be final and conclusive.  If the amounts paid by Tenant to Landlord on account of Operating Charges or Real Estate Taxes (a) exceed the amounts to which Landlord is entitled hereunder, then Landlord shall, upon final determination, credit the amount of such excess toward the next monthly payment(s) of Operating Charges, Real Estate Taxes and Base Rent due hereunder, or (b) are less than the amounts to which Landlord is entitled hereunder, then Tenant shall pay such deficiency as additional rent within thirty (30) days after such final determination is made.  All costs and expenses of any such review shall be paid by Tenant; provided, however, that if the amount of Operating Charges and Real Estate Taxes used in such statement to calculate Tenant's Proportionate Share of Operating Charges and Tenant's Proportionate Share of Real Estate Taxes was overstated by Landlord by five percent (5%) or more in the aggregate, Landlord shall reimburse Tenant for the commercially reasonable, out-of-pocket hourly or flat fee costs and expenses paid by Tenant in connection with Tenant's review (not to exceed $10,000 in total).  Any and all information obtained through any review (including, without limitation, any matters pertaining to Landlord, its managing agent, or the Building), and any compromise, settlement or adjustment that may be proposed or reached between Landlord and Tenant, shall be held in strict confidence, and neither Tenant nor any of Tenant's Agents shall disclose any such information to any person or entity other than a Permitted Recipient on a need-to-know basis.  A "Permitted Recipient" shall be the officers, partners and senior level employees of Tenant who are involved in lease administration, Tenant's certified public accountants who have responsibilities related to Operating Charges and Real Estate Taxes, Tenant's attorneys if involved in the dispute, any employees of Tenant's auditor involved with the review, or any person or entity to whom disclosure is required by applicable judicial or governmental authority.  Prior to disclosing any such information to any Permitted Recipient (including its auditor), Tenant shall instruct such Permitted Recipient to abide by this confidentiality provision.  Notwithstanding anything herein to the contrary, (i) if Tenant does not notify Landlord in writing of any objection to any Reconciliation Statement within one hundred eighty (180) days after receipt thereof, then Tenant shall be deemed to have waived any such objection and shall have no right to review pursuant to

21

DocuSign Envelope ID: EE8C1D67-8B68-4B8B-A358-6865DF8C2D22

this subsection, (ii) any audit shall be completed within one (1) year following receipt of the applicable Reconciliation Statement, (iii) Tenant shall have the right to review Landlord's books and records as set forth above no more than one (1) time each calendar year, and (iv) Tenant shall not be permitted to review Landlord's books and records as set forth above more than one (1) time with respect to any particular calendar year.  Notwithstanding anything herein to the contrary, (w) Tenant shall have the right to defer its audit of the Base Year and to perform such audit with respect to the Base Year concurrently with the audit of the first calendar year following the Base Year, (x) if Tenant elects to defer its audit of the Base Year until the first calendar year following the Base Year, then Landlord and Tenant shall share equally the cost of such audit up to $12,000 total (i.e., $6,000 for each party) with any costs in excess of $12,000 being Tenant's sole responsibility, (y) if Tenant does not elect to perform an audit of the Base Year during the first calendar year following the Base Year, then Tenant shall no longer have the right to audit the Base Year at any time during the Lease Term, and (z) for the avoidance of doubt, Tenant shall not have the right to audit the Base Year more than one (1) time during the Lease Term.

5.7     In the event that after the Operating Charges Base Year, Landlord introduces a new service or amenity that is not (i) not provided in order to comply with any Law or the requirements of Landlord's insurance company, (ii) not related to maintenance, repair or security of the Building, and (iii) not customarily offered by landlords of Comparable Buildings, and if such new service or amenity results in an Operating Charge that was not included in the Operating Charges Base Amount, then such Operating Charge shall be added to the Operating Charges Base Amount, such that Tenant shall only be obligated to pay for Tenant's Proportionate Share of increases in such new Operating Charge.

ARTICLE VI
USE OF PREMISES

6.1     Tenant shall use and occupy the Premises solely for general (non-medical and non-governmental) office purposes compatible with first class office buildings in the Building's submarket, and uses ancillary and incidental thereto and for no other use or purpose (the "Permitted Use").  Tenant shall not use or occupy the Premises for any unlawful purpose, or in any manner that will violate the certificate of occupancy for the Premises or the Building or that will constitute waste, nuisance or unreasonable annoyance to Landlord or any other tenant or user of the Building, or in any manner that will increase the number of parking spaces required for the Building or its full occupancy as required by applicable Law (defined below). Except as otherwise expressly set forth in this Lease, Tenant shall comply with all present and future laws (including, without limitation, the Americans with Disabilities Act and the regulations promulgated thereunder, as the same may be amended from time to time (the "ADA") and Environmental Laws (hereinafter defined) and the regulations promulgated thereunder, as the same may be amended from time to time), ordinances (including without limitation, zoning ordinances and land use requirements), regulations and orders (including, without limitation, those made by any public or private agency having authority over insurance rates), requirements, statutes, codes, by-laws and court decisions of the jurisdiction in which the Building is located or the federal government (collectively, "Laws") concerning the use, occupancy and condition of the Premises and all machinery, equipment, furnishings, fixtures and improvements (including the suite entry doors) therein, all of which shall be complied with in a timely manner at Tenant's

22

sole expense.  Notwithstanding the foregoing, Landlord, at its expense (subject to reimbursement pursuant to Article V, if and to the extent permitted thereby), shall comply with Laws (including, without limitation, the ADA, building and fire codes, and Environmental Laws) to the extent the same apply directly to the Building Structure and Systems (as hereinafter defined) and common areas of the Building as a whole; provided, however, that to the extent any non-compliance is a result of the particular use or occupancy of the Premises (as opposed to office use generally) or any negligence or willful misconduct of Tenant or any Agent of Tenant, or if any improvements made by Landlord to comply with any such Laws benefits solely the Premises (and not any other premises) and are atypical of those performed for similarly situated tenants, then such compliance shall be at Tenant's cost.  If any such Law requires an occupancy or use permit or license for the Premises or requires Tenant or its employees to obtain licenses or permits to conduct business in the Premises, then Tenant shall obtain (prior to the date required under applicable Laws) and keep current such permit(s) or license(s) at Tenant's expense and shall promptly deliver a copy thereof to Landlord, it being agreed that, upon request, Landlord shall cooperate, at no cost to Landlord, with Tenant in obtaining any such permits or licenses.  It is expressly understood that if any change in the use of the Premises by Tenant, or any Alterations to the Premises by Tenant, or any future Laws requires a new or additional permit from, or approval by, any governmental agency having jurisdiction over the Building, such permit or approval shall be obtained by Tenant on its own behalf and at its sole expense.  Without limiting the generality of the foregoing, Tenant, at its expense, shall install and maintain fire protection devices as may be required with respect to Tenant's particular use of the Premises (as opposed to office use generally) from time to time by any agency having jurisdiction thereof and/or the underwriters insuring the Building.  Use of the Premises is subject to all covenants, conditions and restrictions of record; provided, however, that, except to the extent required by applicable Laws, in no event shall Landlord voluntarily execute any restatement, supplement, amendment or other modification to any existing covenants, conditions and restrictions of record or to any new, covenants, conditions and restrictions of record hereafter recorded that results in a material degradation or diminution of any of the rights of Tenant under this Lease or materially increases any obligations or liabilities of Tenant under this Lease.  Landlord represents and warrants to Tenant that, to Landlord's knowledge as of the Execution Date hereof, none of the material terms of this Lease are prohibited by the terms of any existing covenants, conditions and restrictions of record.  Tenant shall not use any space in the Building or the Land for the sale of goods to the public at large or for the sale at auction of goods or property of any kind.  Tenant shall not conduct any operations, sales, promotions, advertising or special events in the Building or on the Land other than within the Premises or, from time to time as reasonably approved by Landlord in advance, within the Conference Facility, the Lounge and/or the Outdoor Terrace.

6.2    Subject to its right to contest the same in good faith, Tenant shall pay before delinquency any business, rent or other taxes or fees that are now or hereafter levied, assessed or imposed upon Tenant's use or occupancy of the Premises, the conduct of Tenant's business at the Premises, Tenant's equipment, fixtures, furnishings, inventory or personal property or resulting from or attributable to any Alterations by or for the account of Tenant in excess of those commonly found in offices in the metropolitan Washington, D.C. area.  If any such tax or fee is enacted or altered so that such tax or fee is levied against Landlord or so that Landlord is responsible for collection or payment thereof, then Tenant shall pay as additional rent the amount of such tax or fee.

6.3     Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, the Building is free from Hazardous Materials (other than Hazardous Materials typically used in the operation of Comparable Buildings in compliance with applicable Environmental Laws), and Landlord has not received any notice of a violation of applicable Environmental Laws that remains uncured, and Landlord covenants that the Premises shall be delivered to Tenant on the Lease Commencement Date, free of Hazardous Materials (including mold) (other than Hazardous Materials typically used in the operation of Comparable Buildings in compliance with applicable Environmental Laws), and in compliance with all applicable Environmental Laws. Tenant shall not allow, cause or permit any Hazardous Materials to be generated, used, treated, released, stored or disposed of in or about the Building or the Land by Tenant or any Agent of Tenant, provided that Tenant may use and store normal and reasonable quantities of standard cleaning and office materials in the Premises as may be reasonably necessary for Tenant to conduct normal general office use operations in the Premises so long as such materials are properly, safely and lawfully stored and used by Tenant and the quantity of same does not equal or exceed a "reportable quantity" as defined in 40 C.F.R. 302 and 305, as amended.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord free of all Hazardous Materials introduced into the Premises, the Building or the Land by Tenant or any Agent of Tenant.  "Hazardous Materials" means (a) asbestos and any asbestos containing material and any substance that is then defined or listed in, or otherwise classified pursuant to, any Environmental Law or any other applicable Law as a "hazardous substance," "hazardous material," "hazardous waste," "infectious waste," "toxic substance," "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or Toxicity Characteristic Leaching Procedure (TCLP) toxicity, (b) any petroleum and drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources, and (c) any petroleum product, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive material (including any source, special nuclear, or by-product material), medical waste, chlorofluorocarbon, lead or lead-based product, and any other substance whose presence could be detrimental to the Building or the Land or hazardous to health or the environment.  "Environmental Law" means any present and future Law and any amendments (whether common law, statute, rule, order, regulation or otherwise), permits and other requirements or guidelines of governmental authorities applicable to the Building or the Land and relating to the environment and environmental conditions or to any Hazardous Material (including, without limitation, CERCLA, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. § 1101 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., and any so-called "Super Fund" or "Super Lien" law, any Law requiring the filing of reports and notices relating to hazardous substances, environmental laws administered by the Environmental Protection Agency, and any similar state and local Laws, all amendments thereto and all regulations, orders, decisions, and decrees now or hereafter promulgated thereunder concerning the environment, industrial hygiene or public health or safety).  To the extent it becomes aware of the same, Tenant shall:  (i) give Landlord prompt written notice of any actual or threatened Environmental Default with respect

to conditions existing on account of Tenant's use or occupancy of the Premises or any action or inaction of Tenant or any Agent of Tenant, which Environmental Default Tenant shall cure in accordance with all Environmental Laws and only after Tenant has obtained Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed; and (ii) promptly deliver to Landlord copies of any notices or other items received from or submitted to any governmental or quasi-governmental agency, or any claim instituted or threatened by any third party, concerning the Premises, the occupancy or use thereof, or the existence or potential existence of Hazardous Materials therein.  Upon any Environmental Default, in addition to all other rights available to Landlord under this Lease, at law or in equity, Landlord shall have the right but not the obligation to immediately enter the Premises, to supervise and approve any actions taken by Tenant to address the Environmental Default, and, if Tenant fails to promptly address same in accordance with this Lease, to perform, with respect to conditions existing on account of Tenant's use or occupancy of the Premises or any action or inaction of Tenant or any Agent of Tenant, at Tenant's sole cost and expense, any lawful action necessary to address same.  "Environmental Default" means any of the following by Tenant or any Agent of Tenant:  a violation of an Environmental Law; a release, spill or discharge of a Hazardous Material on or from the Premises, the Land or the Building; an environmental condition requiring responsive action; or an emergency environmental condition.

Notwithstanding anything to the contrary contained in this Lease: (i) to the extent that any Hazardous Materials are present in the Premises as of the Lease Commencement Date, or the Building at any time during the Lease Term, in violation of any applicable Environmental Laws and the presence thereof was not caused, in whole or in part, by Tenant or any of Agent of Tenant, Landlord, at Landlord's sole cost and expense shall be responsible for the remediation (or causing the remediation) thereof (to the extent such Hazardous Materials were present in the Premises as of the Lease Commencement Date or are present in the Building and materially adversely affect Tenant's use of the Premises or expose Tenant to any unreasonable health or safety risk) in accordance with applicable Environmental Laws, provided an order (after any final appeals have been exhausted and subject to any available waivers, exemptions or variances) by a court or governmental entity with jurisdiction over the Building requires that such violation be cured; (ii) Landlord hereby agrees that it is and shall be responsible for all costs, expenses, damages or liabilities which accrue during its period of ownership of the Building arising out of, or related to, the use, storage, disposal, release, spill, discharge or emissions of Hazardous Materials in violation of any Environmental Laws by Landlord, its agents, contractors or employees on the Land or in the Building; and (iii) Landlord shall indemnify and hold harmless Tenant of and from any and all actual out-of-pocket losses, costs, damages and liabilities (including, without limitation, reasonable attorneys and consultant fees, court costs and litigation expenses) of whatever kind or nature, known or unknown, contingent or otherwise, arising out of, or related to, the use, storage, disposal, release, discharge, spill or emission of any Hazardous Materials in violation of any Environmental Laws by Landlord, its agents, contractors or employees on, or in connection with the operation of, the Land or the Building.

6.4     Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, as of the Execution Date hereof, Landlord has not received any notice of violation from any governmental authority having jurisdiction over the Building of any applicable Laws (including without limitation, the ADA) with respect to the Building Structure and Systems, including those within or otherwise serving the Premises, that remains uncured.  In the event that, as of the Lease

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

Commencement Date, the Building Structure and Systems, including those within or otherwise serving the Premises, are in violation of any applicable Laws (including the ADA), then, in such event Landlord shall promptly cure same, at Landlord's sole cost (and not as an Operating Charge), after receiving written notice thereof from Tenant.

ARTICLE VII
ASSIGNMENT AND SUBLETTING

7.1    Tenant shall not assign, transfer or otherwise encumber (collectively, "<u>assign</u>") this Lease or all or any of Tenant's rights hereunder or interest herein, or sublet or permit anyone to use or occupy (collectively, "<u>sublet</u>") the Premises or any part thereof, without obtaining the prior written consent of Landlord, which consent may be withheld or granted in Landlord's sole and absolute discretion (subject to the remainder of this Article VII).  Notwithstanding any of the foregoing to the contrary, provided no uncured Event of Default exists and is continuing under this Lease, and subject to Landlord's rights and Tenant's obligations pursuant to Sections 7.3 and 7.5 below, Landlord shall not unreasonably withhold, condition or delay its consent to any proposed subletting of the entire or any portion of the Premises or assignment of the Lease in its entirety.  For purposes of the immediately preceding sentence, it shall be reasonable for Landlord to withhold its consent if, for example:  (i) the proposed subtenant or assignee is engaged in a business, or the Premises will be used in a manner, that is inconsistent with the first-class nature of the Building as reasonably determined by Landlord; or (ii) the proposed assignee or subtenant (1) with respect to a proposed assignment or sublease, as applicable, shall have sufficient financial capacity and creditworthiness to perform its obligations under this Lease in the event of an assignment or under the proposed sublease, as the case may be, taking into consideration the obligations to be undertaken by the assignee or subtenant, as applicable, all as reasonably determined by Landlord and which determination shall require that Landlord take into consideration any proposed security deposit; or (iii) the proposed use of the Premises is not in compliance with Article VI or violates any exclusive of any of the other leases in the Building; or (iv) the initial Tenant does not remain fully liable as a primary obligor for the payment of all rent and other charges payable by Tenant under this Lease and for the performance of all other obligations of Tenant under this Lease; or (v) the proposed subtenant or assignee is a governmental or quasi-governmental agency or a medical tenant; or (vi) the holders of Mortgages encumbering the Building shall fail to consent to the extent any such holders have express consent rights over any proposed assignment or sublease in the applicable Mortgage documents (Landlord hereby agreeing to use commercially reasonable efforts to obtain such consent if Landlord approves such transaction); or (vii) the proposed subtenant or assignee is either (A) an existing tenant of the Building (or any parent, subsidiary or affiliate thereof) and Landlord has comparably sized and configured (from the standpoint of perimeter/demising walls as opposed to interior improvements) space available in the Building and being offered by Landlord for a comparable lease term, or (B) for a period of forty-five (45) days following the submission of a written proposal for the lease of space (and thereafter if a mutual agreement such as a letter of intent is executed within such period), any other person or entity with which Landlord is in the process of negotiating for the rental of space in the Building.  No assignment or right of occupancy hereunder may be effectuated by operation of law or otherwise without, except as otherwise expressly set forth in this Article VII, the prior written consent of Landlord. Any attempted assignment, transfer or other encumbrance of this Lease or all or any of Tenant's rights hereunder or interest herein, and any sublet or permission to use or occupy the Premises or

26

any part thereof not in accordance with this Article VII, shall be void and of no force or effect. Any assignment or subletting, Landlord's consent thereto, the listing or posting of any name other than Tenant's, or Landlord's collection or acceptance of rent from any assignee or subtenant shall not be construed either as waiving or releasing Tenant from any of its liabilities or obligations under this Lease as a principal and not as a guarantor or surety, or as relieving Tenant or any assignee or subtenant from the obligation of obtaining Landlord's prior written consent to any subsequent assignment or subletting. As security for this Lease, Tenant hereby assigns to Landlord the rent due from any assignee or subtenant of Tenant. During any period that there exists an uncured Event of Default under this Lease, Tenant hereby authorizes each such assignee or subtenant to pay said rent directly to Landlord upon receipt of notice from Landlord specifying same. Landlord's collection of such rent shall not be construed as an acceptance of such assignee or subtenant as a tenant. Tenant shall not mortgage, pledge, hypothecate or encumber (collectively "mortgage") this Lease without Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole and absolute discretion. The listing of any name other than that of Tenant, whether on the doors of the Premises or on the Building directory, or otherwise, shall not operate to vest in any such other person, firm or corporation any right or interest in this Lease or in the Premises or be deemed to effect or evidence any consent of Landlord, it being expressly understood that any such listing is a privilege extended by Landlord revocable at will by written notice to Tenant. Tenant shall reimburse Landlord for its reasonable, out-of-pocket, third party expenses (including reasonable attorneys' fees and accounting costs) incurred by Landlord, not to exceed Three Thousand Five Hundred Dollars ($3,500.00) in the aggregate, in connection with Tenant's request for Landlord to give its consent to any assignment, subletting, or mortgage, and Landlord's receipt of such sum shall be a condition to Landlord providing such consent. Any sublease, assignment or mortgage shall be effected on a form reasonably approved by Landlord but only to the extent Landlord has express approval rights over approving or rejecting such sublease, assignment or mortgage. Tenant shall deliver to Landlord a fully-executed copy of each agreement evidencing a sublease, assignment or mortgage, and, if applicable, Landlord's consent thereto, promptly after execution thereof.

7.2    (a)    If Tenant is or becomes a partnership or a limited liability company, then any event (whether voluntary, concurrent or related) resulting in a dissolution of Tenant, any withdrawal or change (whether voluntary, involuntary or by operation of law) of the partners or members, as applicable, owning a controlling interest in Tenant (including each general partner or manager, as applicable), or any structural or other change primarily undertaken for the purpose of limiting the liability of the partners under this Lease shall be deemed a prohibited assignment of this Lease subject to the provisions of this Article. If Tenant is or becomes a corporation or a partnership with a corporate general partner, then any event (whether voluntary, concurrent or related) resulting in a dissolution, merger, consolidation or other reorganization of Tenant (or such corporate general partner), or the sale or transfer or relinquishment of the interest of shareholders who, as of the date of this Lease, own a controlling interest of the capital stock of Tenant (or such corporate general partner), shall be deemed a prohibited assignment of this Lease subject to the provisions of this Article; provided, however, that if Tenant is a corporation whose stock is traded through a national or regional exchange or over-the-counter market, then the foregoing portion of this sentence shall be applicable only if such event has or is intended to have the effect of limiting liability under this Lease.

WDC 91095636v14

(b)    Notwithstanding anything contained in this Article VII to the contrary, provided no uncured default exists hereunder beyond any applicable notice and cure periods, Tenant may, upon not less than ten (10) days' prior written notice to Landlord (which notice shall contain a written certificate from Tenant, signed by an authorized representative of Tenant, containing a representation as to the true, correct and complete legal and beneficial relationship of Tenant and the proposed assignee, transferee or subtenant) but without Landlord's prior written consent and without being subject to Landlord's rights and Tenant's obligations set forth in Section 7.5 below, assign or transfer its entire interest in this Lease or sublease the entire or any portion of the Premises to any of the following (each, an "Affiliate"):  (i) to a corporation or other business entity (herein sometimes referred to as a "successor corporation") into or with which Tenant shall be merged or consolidated, or to which substantially all of the assets of Tenant may be transferred or sold, provided that such successor corporation shall have a net worth and general creditworthiness immediately after such merger, consolidation, transfer or sale at least equal to the net worth and general creditworthiness of Tenant as of the Execution Date of this Lease, provided that the successor corporation shall assume in writing all of the obligations and liabilities of Tenant under this Lease and the proposed use of the Premises is in compliance with Article VI, it being agreed, for clarification purposes, that any such merger, consolidation, transfer or sale shall not release the transferor Tenant under this Lease at such time; or (ii) to a corporation or other business entity (herein sometimes referred to as a "related corporation") which shall control, be controlled by or be under common control with Tenant, provided that such related corporation shall assume in writing all of the obligations and liabilities of Tenant under this Lease (without relieving Tenant therefrom) and the proposed use of the Premises is in compliance with Article VI.  In the event of any such assignment or subletting, Tenant shall remain fully liable as a primary obligor for the payment of all rent and other charges required hereunder and for the performance of all obligations to be performed by Tenant hereunder.  For purposes of clause (ii) above, "control" shall be deemed to be direct or indirect ownership of more than fifty percent (50%) of the stock or other voting interest of the controlled corporation or other business entity.  Notwithstanding the foregoing, if Tenant structures one or more assignment or sublease transactions to an entity that meets the definition of an Affiliate as specified above for the purpose of circumventing the restrictions on subleases and assignments provided elsewhere in this Article VII, then such subtenant(s) or assignee(s) shall conclusively be deemed not to be an Affiliate and subject to all such restrictions.  As used herein, a "Permitted Transfer" shall mean any assignment of the Lease or subletting of all, or any portion, of the Premises to any Affiliate not requiring Landlord's consent under this Section 7.3.

7.3    If at any time during the Lease Term Tenant desires to assign, sublet or mortgage all or part of this Lease or the Premises, then, provided Landlord has express consent right over any such proposed assignment, subletting or mortgage, and in connection with Tenant's request to Landlord for Landlord's consent thereto, Tenant shall give notice to Landlord in writing ("Tenant's Request Notice") containing: (i) the identity of the proposed assignee, subtenant or other party and a description of its business; (ii) the terms of the proposed assignment, subletting or other transaction (including a copy of the proposed document for same); (iii) the anticipated commencement date of the proposed assignment, subletting or other transaction (the "Proposed Sublease Commencement Date"); (iv) the area proposed to be assigned, sublet or otherwise encumbered (the "Proposed Sublet Space"); (v) evidence of financial responsibility of such proposed assignee, subtenant or other party; and (vi) a certification executed by Tenant and such party stating whether or not any premium or other consideration is being paid for the assignment,

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

sublease or other transaction. Landlord shall have thirty (30) days from the receipt of Tenant's Request Notice (or, if later, the date that is thirty (30) days after the date Tenant has provided all information requested by Landlord in accordance with clauses (i)-(vi), above) to review Tenant's request and to notify Tenant whether it will consent to such proposed sublease or assignment. If (x) Landlord fails to notify Tenant whether or not it will consent to such proposed subtenant or assignee within such thirty (30) day period, and, thereafter, Tenant delivers notice ("Transfer Response Failure Notice") to Landlord of such failure (which Transfer Response Failure Notice must refer to this provision and state in capital bold letters in the Transfer Response Failure Notice and on the outside of the envelope containing the Transfer Response Failure Notice the following using capital bold letters: "**LANDLORD MUST RESPOND TO TENANT'S REQUEST CONTAINED HEREIN WITHIN FIFTEEN (15) DAYS FOLLOWING RECEIPT OR SUCH REQUEST SHALL BE DEEMED APPROVED**"); and (y) Landlord fails to respond to such request within fifteen (15) days after Landlord's receipt of the Transfer Response Failure Notice, then Landlord's consent to the proposed subtenant or assignee, as applicable, shall be deemed given. If Landlord disapproves any proposed assignment or sublease, Landlord shall specify its reason(s) for such disapproval in reasonable detail.

7.4     [Intentionally Deleted]

7.5     If any sublease or assignment (whether by operation of law or otherwise, including without limitation an assignment pursuant to the provisions of the Bankruptcy Code or any other Insolvency Law) provides that the subtenant or assignee thereunder is to pay any amount in excess of the sum of (a) the rent and other charges due under this Lease plus (b) the reasonable out-of-pocket expenses (including but not limited to any reasonable improvement allowance or other reasonable out-of-pocket economic concession provided to the sublessee or assignee, brokers' commissions, reasonable attorney' fees, and reasonable improvement costs and advertising costs, but excluding, however, any costs attributable to vacancy periods or "downtime") which Tenant reasonably incurred in connection with the procurement of such sublease, assignment or other transfer (which expenses shall be amortized on a straight-line basis over the initial sublease term for the purposes hereof), then whether such net excess be in the form of an increased monthly or annual rental, a lump sum payment, payment for the sale, transfer or lease of Tenant's fixtures, leasehold improvements, furniture and other personal property, or any other form of payment having the effect of a "disguised" rental payment (and if the subleased or assigned space does not constitute the entire Premises, the existence of such excess shall be determined on a pro-rata basis), Tenant shall be permitted to retain one hundred percent (100%) of such net excess if, and to the extent, that the assignment and subletting, when aggregated with all other assignments and subletting of the Premises, constitutes two (2) floors of the Building or less and, for any assignments or subletting in excess of two (2) floors of the Building (the "Excess Assignment or Subletting"), Tenant shall pay to Landlord, along with the next monthly installment of Base Rent due, fifty percent (50%) of any such net excess or other premium applicable to the Excess Assignment or Subletting, which amount shall be calculated and paid by Tenant to Landlord on a monthly basis as additional rent (it being understood that Landlord is not intending to receive any amounts which are considered to be based on the income or profits of Tenant or any subtenant or assignee in accordance with Section 4.4 above). Acceptance by Landlord of any payments due under this Section shall not be deemed to constitute approval by Landlord of any sublease or assignment, nor shall such acceptance waive any rights of Landlord hereunder. Landlord shall have the right to inspect and audit Tenant's

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

books and records relating to any sublease or assignment, such audit being subject, to the extent practicable to the processes, procedures and limitations applicable to Tenant's audit rights under Section 5.6. Notwithstanding any contrary provision contained in this Article VII, Tenant shall not be required to pay to Landlord any net excess or other premium calculated under this Section 7.5 in connection with any Permitted Transfers or any Desk Space Licenses.

7.6     All restrictions and obligations imposed pursuant to this Lease on Tenant shall be deemed to extend to any subtenant, assignee, licensee, concessionaire or other occupant or transferee, and Tenant shall cause such person to comply with such restrictions and obligations. Any assignee shall be deemed to have assumed obligations as if such assignee had originally executed this Lease and at Landlord's request shall execute promptly a document confirming such assumption. Each sublease is subject to the condition that if the Lease Term is terminated or Landlord succeeds to Tenant's interest in the Premises by voluntary surrender or otherwise, at Landlord's option the subtenant shall be bound to Landlord for the balance of the term of such sublease and shall attorn to and recognize Landlord as its landlord under the then executory terms of such sublease.

7.7     Notwithstanding anything to the contrary contained in the Lease, Tenant may, without necessity of obtaining Landlord's consent, grant a license or licenses (each, a "Desk Space License") to one of more persons who have ongoing business relationships with Tenant, such as, without limitation, strategic partners, consultants or clients of Tenant, to use not more than five thousand (5,000) rentable square feet within the Premises at one time or when aggregated with all of the other space therein then being used pursuant to any other Desk Space License, provided that: (i) Tenant shall not separately demise any space within the Premises or otherwise act in a way to cause the Premises to appear other than as a single tenant space; (ii) Tenant provides Landlord with at least ten (10) days prior written notice of such Desk Space License, (iii) on or prior to the effective date of such Desk Space License, Tenant provides to Landlord one of more certificates of insurance evidencing that such licensee has procured the insurance coverages required hereunder or that Tenant's insurance covers such licensee; and (iv) no signage for any such licensee shall be permitted that is readily visible from the exterior of the Building or from any common areas on any floor of the Premises with respect to which Tenant leases only a portion of the rentable square footage on such floor. Each Desk Space License shall be subject and subordinate to the Lease in all respects and shall not be or purport or deemed to be an assignment of the Lease or a sublease with Tenant or to create any leasehold interest in the Premises or any portion thereof. Any act or omission of any licensee under a Desk Space License shall be deemed the act or omission of Tenant unless otherwise elected by Landlord in its sole and absolute discretion. At Landlord's request, but in no event more than one (1) time annually unless required more often in connection with a sale, financing or refinancing of the Building, Tenant agrees to certify to Landlord in writing as to the amount of space used or occupied by all licensees under any Desk Space License during the immediately preceding twelve (12) months and to certify to Landlord that such use or occupancy is by one or more licensees and does not constitute a sublease, assignment or other leasehold interest. Notwithstanding the foregoing, Tenant shall not have the right to enter into a Desk Space License if: (a) the licensee thereunder is engaged in a business, or the portion of the Premises affected thereby will be used or occupied in a manner, that is inconsistent with the permitted use or the first-class image of the Building, as reasonably determined by Landlord; or (b) the

WDC 91095636v14

proposed use by or identity of the licensee thereunder is not, in the reasonable opinion of Landlord, compatible with other tenants of the Building.

ARTICLE VIII
MAINTENANCE AND REPAIRS

8.1    Without limiting Landlord's maintenance obligations under this Lease with respect to the Building Structure and Systems and except as otherwise expressly set forth in this Lease, Tenant, at Tenant's sole cost and expense, shall promptly make all repairs and replacements, and perform all maintenance, in and to the Premises to keep the Premises in good operating condition and repair, in a clean, safe and tenantable condition, and otherwise in accordance with all Laws and the requirements of this Lease, reasonable wear and tear and damage by casualty excepted.  Tenant shall likewise maintain all attached fixtures, furnishings and equipment installed in the Premises and make all required repairs and replacements thereto. Tenant shall also maintain, repair and replace throughout the Lease Term, at Tenant's sole cost and expense, all non-Building standard supplemental heating, ventilation and air conditioning equipment and systems serving exclusively the Premises, and any special tenant areas, facilities and finishes, special fire protection equipment, telecommunications and computer equipment, kitchen/galley equipment and fixtures, all other furniture, furnishings, equipment and systems of Tenant and all Alterations (collectively, "Tenant Items").    Notwithstanding any contrary provision contained in this Section 8.1, in the event the need for any repairs set forth in this Section 8.1 are required as a result of the negligence or willful misconduct of Landlord, its agents, contractors or employees, Tenant shall make such repairs and Landlord shall reimburse Tenant for any reasonable out-of-pocket costs actually incurred by Tenant therewith to the extent such repairs are due to the negligence or willful misconduct of Landlord, its agents, contractors or employees; provided, however, that Landlord's liability for such costs and expenses shall be subject to the provisions of Section 13.3(b), and Landlord shall not be liable to Tenant for such expenses if and to the extent of any insurance proceeds for which Tenant is entitled on account thereof (or for which Tenant would have been entitled had Tenant obtained and maintained the insurance required pursuant to the terms of this Lease).

8.2    Tenant shall give Landlord prompt written notice of any defects or damage to the Building Structure and Systems (as defined below), or any part thereof, or any mold or moisture condition, of which Tenant has knowledge.  Tenant shall suffer no waste or injury to any part of the Premises, and shall, at the expiration or earlier termination of the Lease Term, surrender the Premises in an order and condition equal to or better than that on the Lease Commencement Date, except for ordinary wear and tear and as otherwise provided in Article XIII or Article XVII.  Except as otherwise provided in Article XVII, all injury, breakage and damage to the Premises and to any other part of the Building or the Land to the extent caused by the negligence or willful misconduct of any agent, employee, subtenant, assignee, contractor, client, family member, licensee, customer, invitee or guest (collectively, "Agents" or "Agent") of Tenant or Tenant, shall be repaired by and at Tenant's expense, except that if either an emergency condition exists placing persons and/or property at imminent risk of harm, damage or injury, or the Lease Term has expired or Tenant fails to commence and diligently prosecute to completion repair of any such injury, breakage or damage within a reasonable period (not to exceed twenty (20) days, unless the completion of such repair customarily takes longer than twenty (20) days, then such longer period of time, provided that Tenant commences such cure

31

within such initial twenty (20) day period and thereafter diligently pursues same to completion) following Tenant's receipt of notice from Landlord, then Landlord shall have the right at Landlord's option to make any such repair and to charge Tenant for all reasonable out-of-pocket costs and expenses actually incurred in connection therewith; provided, however, that Tenant's liability for such costs and expenses shall be subject to the provisions of Section 13.3(b) and Tenant shall not be liable to Landlord for such expenses if and to the extent of any insurance proceeds for which Landlord is entitled on account thereof (or for which Landlord would have been entitled had Landlord obtained and maintained the insurance required pursuant to the terms of this Lease).  Landlord shall provide and install replacement tubes for Building standard light fixtures (subject to reimbursement pursuant to Article V).  All other bulbs and tubes for the Premises shall be provided and installed at Tenant's expense; provided that if Tenant elects to supply the bulbs or tubes to Landlord, then Landlord shall provide the labor involved for such replacement at no cost to Tenant.

8.3     Except as otherwise provided in this Lease and subject to normal wear and tear, Landlord at its expense (subject to reimbursement pursuant to Article V if and to the extent permitted thereby) shall keep the exterior walls and common area walls, main lobby in the Building, slab floors, exterior windows, load bearing elements, foundations, parking garage, roof and common areas that form a part of the Building, and the Building standard mechanical, electrical, HVAC and plumbing and fire, life safety and sprinkler systems, including, without limitation, all related cabling, wiring, pipes, conduits and equipment, that are provided by Landlord in the operation of the Building (collectively, the "Building Structure and Systems"), clean and in good operating condition, in accordance with all applicable Laws and otherwise in a manner and condition consistent with standards of repair and maintenance performed by landlords in Comparable Buildings, and, promptly after becoming aware of any item needing repair or replacement, will make such repair or replacement thereto.  For clarification purposes, all Building standard components of restrooms contained in the Premises shall be maintained, including routine cleaning and servicing, at Landlord's sole cost and expense (subject to reimbursement pursuant to Article V if and to the extent permitted thereby), provided, however, that Tenant shall be responsible for the maintenance of any non-Building standard components installed by Tenant as part of the Tenant's Work or as an Alteration.  Notwithstanding any of the foregoing to the contrary, maintenance and repair of all Tenant Items shall be the sole responsibility of Tenant and shall be deemed not to be a part of the Building Structure and Systems.

8.4     Tenant may provide Landlord with written notice if Landlord fails to comply with any of Landlord's repair and maintenance obligations under this Lease and such failure has a material adverse effect on Tenant's ability to conduct business within the Premises (a "Landlord Failure").  Tenant's written notice shall specify the Landlord Failure including the adverse effect on Tenant's ability to conduct business within the Premises and shall demand that Landlord proceed to cure such failure.  Landlord shall promptly after receipt of such notice, commence such cure, and diligently pursue completion thereof.  If Landlord fails to promptly commence within thirty (30) days after Landlord's receipt of Tenant's notice and thereafter diligently pursue the cure of the subject default (the "First LL Failure Notice Period"), then Tenant shall have the right to provide a second (2nd) written notice to Landlord, so long as such second (2nd) notice refers to this provision and states therein, and again on the outside of the envelope containing such second (2nd) notice, in capital bold letters, the following: that "**LANDLORD'S FAILURE**

**TO RESPOND WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT OF TENANT'S NOTICE SHALL GIVE RISE TO CERTAIN SELF HELP RIGHTS**." If Landlord or Landlord's mortgagee fails to commence to cure such Landlord Failure during such five (5) business day period (the "Second LL Failure Notice Period") and thereafter diligently pursue such cure to completion, Tenant shall have the right to proceed to cure such Landlord Failure as set forth herein. Any repair, replacement or other work performed by Tenant in proceeding to cure such Landlord Failure shall (i) utilize only new or like-new materials; (ii) be performed in a good and workmanlike manner and in compliance with all applicable Laws; (iii) be performed by licensed contractors during normal business hours who have substantial experience performing the applicable type of repair, replacement or other work in Comparable Buildings and who carry customary insurance coverage, which insurance shall include Landlord an as additional insured; (iv) be performed only with respect to the Premises and not with respect to any area outside of the Premises or any portion of the Building Structure and Systems; and (v) not permit any mechanic's or materialman's liens to be filed against the Building or the Land in connection with such work. Landlord shall reimburse Tenant for all of the reasonable and actual third-party costs and expenses directly incurred by Tenant to perform such repair or replacement within thirty (30) days of Landlord's receipt of Tenant's invoice of such costs accompanied by reasonable supporting documentation, and if not so paid, then until such past due amount is paid or recouped under this Lease it shall accrue interest at the Default Rate, and Tenant shall have the right to deduct any such past due amount from the next payments of monthly Base Rent that are due and payable under this Lease, subject to the limitation that in no event shall Tenant offset an amount in excess of twenty percent (20%) of the Base Rent for any applicable month.

ARTICLE IX
ALTERATIONS

9.1    Except as otherwise set forth in this Lease, including, without limitation, Exhibit B attached hereto and made a part hereof, Tenant shall accept the Premises in its "as is" condition as of the Lease Commencement Date. The initial improvement of the Premises under this Lease shall be accomplished by Tenant or its designated contractor in accordance with Exhibit B and all other applicable provisions of this Lease (including, without limitation, Articles IX and XIII). Landlord is under no obligation to make any structural or other alterations, decorations, additions, installations, demolitions, improvements or other changes (collectively, "Alterations") in or to the Premises or the Building except as may be otherwise expressly provided in this Lease (including, without limitation, the work performed or to be performed by Landlord described in Exhibit B).

9.2    Tenant shall not make or permit anyone to make any Alterations in or to the Premises or the Building, without the prior written consent of Landlord, which consent may be withheld or granted in Landlord's sole and absolute discretion with respect to any Alterations that affect the base Building structure or adversely affect any base Building systems or are readily visible from the exterior of the Building or from any common areas on any floor of the Premises with respect to which Tenant leases only a portion of the rentable square footage on such floor, and which consent shall not be unreasonably withheld, conditioned or delayed with respect to all other Alterations. Notwithstanding the foregoing, Tenant shall have the right to make Cosmetic Changes (as defined below) within the Premises without requiring the consent of Landlord. "Cosmetic Changes" shall mean non-structural Alterations consistent with a first-class

33

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

office building for which a building permit is not required (e.g., carpeting and painting) and which cost (including installation) in the aggregate (excluding costs of any carpeting and painting) is less than Fifteen Dollars ($15.00) multiplied by the rentable square footage of the portion of the Premises being modified per project or series of related projects (as reasonably determined by Landlord).  Any Alterations made by Tenant, whether done prior to or after the Rent Commencement Date, shall be made:  (a) in a good, workmanlike, first-class and prompt manner; (b) using new or comparable materials only; (c) except for Cosmetic Alterations, by a contractor selected by Tenant and reasonably approved in writing by Landlord; (d) on weekdays (excluding Holidays) during Building Hours and at such other times reasonably approved in writing by Landlord, provided that Tenant shall perform any unreasonably loud work (e.g., core drilling) during non-Building Hours; (e) except for Cosmetic Alterations, under the supervision of an architect selected by Tenant and reasonably approved in writing by Landlord; (f) except for Cosmetic Alterations, in accordance with plans and specifications reasonably acceptable to Landlord, which plans and specifications shall be approved in advance in writing by Landlord at no cost to Tenant; provided, however, that if the proposed Alterations may affect the Building Structure or Systems, then Tenant shall reimburse Landlord for the actual out-of-pocket costs incurred by Landlord in having such plans and specifications reviewed by a third-party architect and/or engineer; (g) in accordance with all Laws; (h) [intentionally deleted]; (i) after Tenant obtaining or, at Tenant's election, Tenant's general contractor obtaining public liability, worker's compensation and builder's risk insurance policies reasonably approved in writing by Landlord and required in Exhibit F; (j) with the obligation for Tenant to obtain and deliver to Landlord written, unconditional full or partial (as applicable) waivers of mechanics' and materialmen's liens against the Premises and the Building for all work, labor and services to be performed and materials to be furnished promptly after the applicable portion of the Alterations are completed, it being understood that such contractor's, subcontractor's and materialman's lien waivers shall be provided to Landlord with each payment to the applicable contractor, subcontractor or materialman and shall cover all work previously paid in connection with such Alteration and the Alteration for which such contractor, subcontractor or materialman is then being paid; (k) after having entered into a written agreement with any contractor, sub-contractor or sub-subcontractor whereby such entity shall be required to (i) indemnify and hold Landlord harmless from and against any and all Claims in any way asserted against Landlord, to the extent not caused by Landlord, its agents, contractors or employees, which arise out of, result from, or are in any way connected with the work, operations, acts of commission or omission by such contractor, sub-contractor or sub-subcontractor, and (ii) maintain insurance as set forth in Exhibit F to this Lease; and (l) upon request, after Tenant has delivered to Landlord documentation reasonably satisfactory to Landlord evidencing Tenant's financial ability to complete the Alterations in accordance with the provisions of this Lease (including, without limitation, a payment or performance bond, if applicable).  Other than with respect to Cosmetic Alterations, Tenant shall provide Landlord with the plans and specifications designed by Tenant's architects and engineers for Alterations for Landlord's approval, which shall be granted or withheld in accordance with the standard set forth in this Section 9.2 above.  Landlord shall either approve (in accordance with the approval standards set forth in this Lease), conditionally approve or disapprove any proposed Alterations for which Landlord's consent is required (other than the Tenant's Work, which are subject to approval in accordance with Exhibit B) within ten (10) business days after written request (provided, however, that Landlord shall have an additional five (5) business days to approve, conditionally approve or disapprove any portion of Tenant's plans and specification

34

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

that may impact the Building Structure and Systems) and, in the case of Landlord's disapproval, Landlord shall specify in reasonable detail its reason(s) for such disapproval. If (i) Landlord fails to notify Tenant whether or not it will approve, conditionally approve or disapprove such proposed Alterations within such ten (10) business-day period (or fifteen (15) business-day period with respect to Alterations that may affect the Building Structure and Systems), and, thereafter, Tenant delivers written notice ("Alteration Response Failure Notice") to Landlord of such failure (which Alteration Response Failure Notice must refer to this provision and state therein, and again on the outside of the envelope containing such Alteration Response Failure Notice, in capital bold letters, the following: "**LANDLORD MUST RESPOND TO TENANT'S REQUEST CONTAINED HEREIN WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OR SUCH REQUEST SHALL BE DEEMED APPROVED**"), and (ii) Landlord fails to respond to such request within five (5) business days after Landlord's receipt of the Alteration Response Failure Notice, then such proposed Alterations shall be deemed approved by Landlord, but only to the extent shown on the plans and specifications to which Landlord failed to respond and only to the extent that the improvements or alterations shown thereon are to be made in the Premises. If any lien (or a petition to establish such lien) is filed in connection with any Alterations made by or on behalf of Tenant, such lien (or petition) shall be discharged by Tenant within ten (10) days after Tenant's actual knowledge thereof, at Tenant's sole cost and expense, by the payment thereof or by the filing of a reasonably acceptable bond. Any Alterations made or constructed by Tenant for the purpose of complying with the ADA or which otherwise require compliance with the ADA shall be done in accordance with this Lease; provided, that Landlord's consent to such Alterations shall not constitute either Landlord's assumption, in whole or in part, of Tenant's responsibility for compliance with the ADA, or representation or confirmation by Landlord that such Alterations comply with the provisions of the ADA. Tenant acknowledges that any Alterations are accomplished for Tenant's account, Landlord having no obligation or responsibility in respect thereof. Landlord's approval of any plans and drawings (and changes thereto) regarding any Alterations or any contractor or subcontractor performing such Alterations shall not constitute Landlord's representation that such approved plans, drawings, changes or Alterations comply with all Laws. Any deficiency in design or construction, although same had prior approval of Landlord, shall be solely the responsibility of Tenant. All Alterations involving structural, electrical, mechanical or plumbing work, the heating, ventilation and air conditioning system of the Premises or the Building, fire and life safety system, the roof of the Building, or any areas outside of the Premises shall, at Landlord's election, be performed by Landlord's designated contractor or subcontractor at Tenant's expense (provided the cost therefor is competitive). In connection with any Alterations (excluding Tenant's Work, with respect to which Exhibit B governs), Landlord shall be paid a construction supervision fee in an amount equal to one percent (1%) of the total "hard" costs of such Alterations if Tenant engages a reputable third-party construction manager reasonably approved by Landlord in advance in writing to manage the construction of such Alterations, and three percent (3%) of the total "hard" costs of such Alterations if Tenant engages Landlord or Landlord's designated third-party construction manager to manage the construction of such Alterations; provided, however, that no such construction supervision fee shall be charged in connection with any Cosmetic Alterations. Promptly after the completion of any Alterations, Tenant at its expense shall deliver to Landlord a digital copy and two (2) sets of accurate as-built (or record) drawings and CAD drawings showing such Alterations in place. Tenant agrees that it will not, either directly or indirectly, knowingly use any contractors and/or materials if their use

WDC 91095636v14

will create any difficulty, whether in the nature of a labor dispute or otherwise, with other contractors and/or labor engaged by Tenant or Landlord or others in the construction, maintenance and/or operation of the Building or any part thereof.  Notwithstanding any contrary provision contained in this Lease, in the event of any conflict between this Section IX and the attached <u>Exhibit B</u> with respect to the Tenant's Work, the parties hereto acknowledge and agree that the terms and provisions of the attached <u>Exhibit B</u> shall control.

9.3    If any Alterations that require Landlord's consent are made without the prior written consent of Landlord, then, if either an emergency condition exists placing persons and/or property at imminent risk of harm, damage or injury or the Lease Term has expired or Tenant fails to commence and diligently prosecute to completion, removal and correction of such Alterations and restoration of the Premises and the Building to their condition immediately prior thereto within a reasonable period following Tenant's receipt of notice from Landlord, Landlord shall have the right, and at Tenant's expense, to so remove and correct such Alterations and restore the Premises and the Building.  All Alterations to the Premises or the Building made by either party shall immediately become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or earlier termination of the Lease Term; provided, however, that if Tenant is not in default under this Lease beyond any applicable notice and cure periods, then Tenant shall have the right to remove, prior to the expiration or earlier termination of the Lease Term, all furniture, fixtures, furnishings and equipment installed in the Premises solely at the expense of Tenant, provided that Tenant restores such affected area to the condition existing prior to installation of same and repairs any damage caused thereby.  Notwithstanding any contrary provision contained in this Lease, Tenant shall not be required to remove, or pay for the removal of, (i) any initial Tenant's Work (including specialty improvements) other than the Tenant Kitchen (if applicable) as described in, and subject to the terms of, Section 6(b) of <u>Exhibit B</u>, (ii) any subsequent Alterations to the Premises approved by Landlord (to the extent Landlord's approval is required hereunder) in accordance with the terms hereof, (iii) any Cosmetic Alterations, or (iv) any cabling or wiring, provided that such cabling or wiring is properly tagged and bundled, upon the expiration or earlier termination of the Lease.  If such removal causes damage or injury to the Premises or the Building, then, Landlord shall have the right, at Tenant's expense, to repair all damage and injury to the Premises or the Building caused by such removal as aforesaid.  If any such furniture, fixtures, furnishings and equipment are not removed by Tenant prior to the expiration or earlier termination of the Lease Term, the same shall at Landlord's option be deemed abandoned or become the property of Landlord to be surrendered with the Premises as a part thereof; provided, however, that Landlord shall have the right at Tenant's expense to remove from the Premises any or all such items or to require Tenant to do the same, except as otherwise provided in this Section.  If Tenant fails to return the Premises to Landlord as required by this Section, then Tenant shall pay to Landlord all costs (including a construction management fee no greater than three percent (3%) of the "hard" costs incurred by Landlord in effectuating such return) incurred by Landlord in effectuating such return.

9.4    Tenant shall have the ongoing right during the Lease Term, at Tenant's sole cost and expense, subject to application of the Construction Allowance if performed as part of the Tenant's Work, to use the internal core exit stairwells in the Building for passage between the floors on which the Premises are located ("Interior Stairwells"), and install an access control system at the doors to such Interior Stairwells on each floor on which the Premises is located (the

36

"Stairwell Access Changes"); provided that (a) Tenant's Stairwell Access Changes are coordinated with Landlord's access control and fire alarm systems, as approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed; (b) such Stairwell Access Changes do not interfere with the use of such Interior Stairwells by other Building tenants, their employees, agents and invitees to the extent required in emergencies; (c) Tenant complies with all applicable Laws and insurance requirements with respect thereto, as well as such reasonable rules and regulations relating thereto as Landlord may impose from time to time; and (d) such Stairwell Access Changes are approved in advance in writing by Landlord in accordance with the standard for Landlord's approval of Tenant's Work if performed simultaneously with Tenant's Work or with the standard for Landlord's approval of future Alterations if performed after Tenant's Work has been completed.  If at any time Tenant is not leasing all of the rentable square footage on a floor, then, at Landlord's option, Tenant shall, at Tenant's sole cost and expense, remove the Stairwell Access Changes relating to such partially leased floor and repair any damage caused by such removal to the Interior Stairwells to Landlord's reasonable satisfaction.

9.5    (a)    Subject to the satisfaction of all applicable provisions of this Lease, the conditions in this Section 9.5 and Landlord's express rights under this Lease, Tenant shall have the license to use its proportionate share of the space located on the roof of the Building made available by Landlord for the use of tenants generally (the "Rooftop Equipment Area"), which Rooftop Equipment Area is shown on Exhibit L attached hereto and incorporated herein, at Tenant's sole risk, cost and expense, for the installation of equipment including, without limitation, supplemental HVAC units and telecommunications equipment, reasonably approved by Landlord in advance in writing in accordance with the terms set forth in this Section 9.5 (if applicable, the "Rooftop Equipment"), all in accordance with the plans and specifications to be approved in advance in writing by Landlord in its reasonable discretion.  The exact location within the Rooftop Equipment Area and the size, weight, height and all other features and specifications of the Rooftop Equipment and the manner of the initial installation of the same shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Tenant acknowledges and agrees that any use of the roof space by Tenant for the installation and operation of Tenant's Rooftop Equipment shall be on a non-exclusive basis.  Tenant may use its proportionate share of the Rooftop Equipment Area and Rooftop Equipment solely for Tenant's own use, including subtenants, but not for resale purposes.  The height, size, design and installation of the Rooftop Equipment shall be subject to Landlord's approval, which shall not be unreasonably withheld, conditioned or delayed.  All work in connection with the installation of Tenant's Rooftop Equipment, including core drilling and reinforcing the roof of the Building, if required, shall be performed at Tenant's sole cost and expense, including the cost of a fire watch and related reasonable, out-of-pocket supervisory costs relating to any core drilling, which shall be performed in such a manner and at such times as Landlord shall reasonably prescribe.  References in this Section 9.5 to the Rooftop Equipment shall be deemed to include such riser and the electrical and telecommunication conduits therein. There shall be no charge for the installation and use by Tenant of Tenant's Rooftop Equipment pursuant to the terms of this Lease, provided, however, that Tenant shall be required to install a submeter to measure any electricity used by such Rooftop Equipment, and Tenant shall pay for the costs of such electricity as measured by such submeter within thirty (30) days following receipt of an invoice therefor from Landlord.  Notwithstanding the foregoing, Tenant shall not be entitled to install any Rooftop Equipment (i) if such installation would adversely affect (or in a

manner that would adversely affect) any warranty with respect to the roof or structure of the Building, (ii) if such installation would adversely affect (or in a manner that would adversely affect) the Building Structure and Systems, or if such installation would require (or in a manner that would require) any structural alteration to the Building, or if such installation would disturb the roof membrane or make any other penetration on the roof or the exterior facade of the Building, unless Landlord in its reasonable discretion approves in writing such structural alteration, (iii) if such installation would violate (or in a manner that would violate) any applicable Law, (iv) [intentionally deleted], (v) unless Tenant has obtained and maintains at Tenant's expense, and has submitted to Landlord copies of, all permits, licenses, special zoning variances, authorizations and approvals relating to such Rooftop Equipment and related installation and maintenance (including, without limitation, any permit required if a crane is necessary to place such Rooftop Equipment on the roof) and pays all taxes and fees related thereto, (vi) unless such Rooftop Equipment is appropriately screened as Landlord may reasonably request, (vii) unless such Rooftop Equipment is installed, at Tenant's sole cost and expense, by a qualified contractor chosen by Tenant and approved in advance by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, (viii) if the installation or operation would interfere with or disrupt the use or operation of any other equipment on the roof of the Building, and (ix) unless Tenant coordinates with Landlord in advance as to the manner and time in which such installation work is to be done. All plans and specifications concerning such installation shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. Any failure to complete the installation of the Rooftop Equipment shall not delay the Rent Commencement Date. Tenant shall have no right to any abatement or reduction in the Base Rent, additional rent or any other sums due or payable under this Lease if for any reason Tenant is unable to obtain any required approval for installation of the Rooftop Equipment, or is thereafter unable to use the Rooftop Equipment for any reason.

(b)     Tenant shall not have access to any such Rooftop Equipment without Landlord's prior written consent, which consent shall be granted to the extent necessary for Tenant to perform its maintenance obligations hereunder only and only if Tenant is accompanied by Landlord's representative (if Landlord so requests) (it being expressly understood, however, that such access may be delayed or denied due to Force Majeure Events). Any such access by Tenant shall be subject to reasonable rules and regulations relating thereto established from time to time by Landlord, including without limitation rules and regulations prohibiting such access unless Tenant, at Landlord's election, is accompanied by Landlord's representative.

(c)     At all times during the Lease Term, Tenant shall (i) maintain all said Rooftop Equipment in clean, good and safe condition and in a manner that avoids interference with or disruption to any equipment installed by Landlord or other tenants of the Building prior to Tenant's Rooftop Equipment, it being understood that, in the event any equipment installed by Landlord or any other tenant or licensee in the Building after the installation of Tenant's Rooftop Equipment causes interference with (to more than a de minimis extent) or disruption (to more than a de minimis extent) to Tenant's Rooftop Equipment, Landlord shall remedy such interference or disruption to Tenant's reasonable satisfaction or remove or caused to be removed any such interfering or disruptive equipment, all at no cost to Tenant, (ii) comply with all requirements of all applicable Laws and applicable insurance requirements which shall impose any order or duty upon Landlord with respect to or affecting the Rooftop Equipment or Tenant's

use or manner of use thereof, and (iii) register the equipment, if required, with appropriate governmental authorities and keep same current. All repairs and maintenance shall be performed by a qualified contractor reasonably approved by Landlord. Tenant shall pay and discharge all out-of-pocket third party costs and expenses reasonably incurred by Landlord in connection with the furnishing, installation, maintenance, operation and removal of the Rooftop Equipment which Tenant fails to do itself following ten (10) business days written notice from Landlord, such sum being payable within thirty (30) days of receipt of Landlord's invoice therefor. All repairs and maintenance to the Building made necessary by reason of the furnishing, installation, maintenance, operation or removal of the Rooftop Equipment or any replacements thereof (including, without limitation, any invalidation of the roof warranty due to the Rooftop Equipment or Tenant's actions) shall be at Tenant's sole cost. At the expiration or earlier termination of the Lease Term, Tenant shall remove such Rooftop Equipment and related equipment from the Building and surrender the Rooftop Equipment Area in good condition, ordinary wear and tear and damage by casualty excepted. If Tenant fails to so remove the Rooftop Equipment in accordance with the foregoing after notice and the expiration of a ten (10) business day cure period for Tenant, Landlord shall have the right to remove and dispose of such Rooftop Equipment, at Tenant's sole cost and expense, and Landlord shall have no liability therefor.

(d)    Upon at least one hundred eighty (180) days' prior written notice to Tenant (except in the event of an emergency, as required for Building safety or as required by applicable Laws), Landlord shall have the right to require Tenant to relocate the Rooftop Equipment, if in Landlord's reasonable judgment such relocation is necessary or desirable. Any such relocation shall be performed by Tenant at Landlord's expense, and in accordance with all of the requirements of this Section. Nothing in this Section shall be construed as granting Tenant any line of sight easement with respect to such Rooftop Equipment.

(e)    It is expressly understood that by granting Tenant the license hereunder, Landlord makes no representation as to the legality of such Rooftop Equipment or its installation. In the event that any federal, state, county, regulatory or other authority pursuant to applicable Laws requires the relocation of such Rooftop Equipment, Tenant shall remove or relocate such Rooftop Equipment at Tenant's sole cost and expense, and Landlord shall under no circumstances be liable to Tenant therefor, except as otherwise provided herein. In addition, at Landlord's sole option and discretion, Landlord may require Tenant, at any time prior to the expiration or earlier termination of this Lease, acting reasonably and in good faith, to terminate the operation of the Rooftop Equipment if it is causing physical damage to the structural integrity of the Building, provided that if it is reasonably feasible to do so in a timely manner without risking the structural integrity of the Building or the safety of Landlord, any tenant of the Building and any of Landlord's and such tenants' employees, Tenant shall have the right, at its election and at its cost, to provide additional structural supports, subject to Landlord's prior approval of plans for same, in lieu of any such termination by Landlord.

(f)    Except to the extent, directly or indirectly, based on, arising out of or resulting from the negligence or willful misconduct of Landlord, its agents, contractors or employees, Tenant shall indemnify and hold Landlord harmless from and against all Claims (as hereinafter defined) suffered by or claimed against Landlord, directly or indirectly, based on, arising out of or resulting from any act or omission by Tenant or any of Tenant's Agents with

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

respect to the installation, use, operation, maintenance, repair, removal or disassembly of the Rooftop Equipment (including, without limitation, any damage to other wires or equipment of the Building or other tenants/occupants of the Building).

(g)    The Rooftop Equipment may be used by Tenant, including any subtenants or licensees in the Premises, only in the conduct of the Permitted Use and not for sale to any third party.

(h)    Tenant shall maintain such insurance (in addition to that required by Article XIII of this Lease) as is customary and reasonably appropriate with respect to the installation, operation and maintenance of the Rooftop Equipment. Landlord expressly makes no representations or warranties with respect to the capacity for an Rooftop Equipment placed on the roof of the Building to receive or transmit signals. The operation of the Rooftop Equipment shall be at Tenant's sole and absolute risk. Tenant shall in no event interfere with the use of any other communications equipment located on the roof of or anywhere else in the Building which was installed prior to the installation of the Rooftop Equipment.

ARTICLE X<br>SIGNS

10.1    If the Building has a directory (whether electronic or otherwise), then Landlord will list, at Landlord's expense, the name of Tenant in the Building directory. Tenant shall not place, inscribe, paint, affix or otherwise display any sign, advertisement, picture, lettering or notice of any kind on any part of the exterior or interior of the Building (including windows and doors), or on any part of the interior of the Premises which can readily be seen from outside the Premises with the naked eye, without the prior written approval of Landlord, which may be granted or withheld in Landlord's sole and absolute discretion, excluding (a) signage displaying the name and logo of Tenant or any permitted assignee on or adjacent to the entry doors of the Premises and in any receptionist area or elevator lobby within the Premises, signage Tenant shall be permitted to install, at Tenant's sole cost and expense (subject to application of the Construction Allowance if performed as part of the Tenant's Work), subject to Landlord's prior written consent of plans for same, which consent shall not be unreasonably withheld, conditioned or delayed, and (b) Building standard directional signage in the elevator lobby of any floor of which Tenant is leasing only a portion of such floor, which directional signage, if applicable at any time during the Lease Term, shall be installed by Landlord, at Landlord's sole cost and expense, and (c) the signage described, and subject to the terms and provisions set forth, in Section 10.2, below. If any such item that has not been approved by Landlord is so displayed, then, Landlord shall have the right to remove such item at Tenant's expense. Subject to Tenant's rights set forth in Section 10.2, below, Landlord reserves the right to install and display signs, advertisements and notices on any part of the exterior or interior of the Building; provided, however that Landlord shall only affix, install, or display signs on the interior of the Premises which pertain to the management or operation of the Building.

10.2    Notwithstanding anything in Section 10.1 to the contrary, but subject to the terms of this Section, simultaneously with the initial construction of the Tenant's Work in the Premises, (i) for so long as Tenant is leasing at least two (2) full floors in the Building and actually occupying at least one (1) full floor in the Building, Tenant shall have the non-exclusive right at

40

Tenant's expense (subject to the application of the Construction Allowance, if available) to place on the exterior of the Building adjacent to the main lobby a plaque sign and/or pin mounted letters/symbols identifying Tenant's name and/or logo (the "Exterior Entrance Sign") in approximately the size and location identified on Exhibit H-1 attached hereto as Version 2A, Version 2B or Version 2C (for the avoidance of doubt, Tenant acknowledges that Version 2A, Version 2B or Version 2C are alternative options and that Tenant shall have the right to select only one of such options for its Exterior Entrance Sign), and (ii) for so long as Tenant is leasing and occupying at least five (5) full floors in the Building, Tenant shall have the non-exclusive right at Tenant's expense (subject to the application of the Construction Allowance, if available) to place on the top of the exterior of the Building a sign identifying Tenant's name and/or logo (the "Building Top Exterior Sign" and, together with the Exterior Entrance Sign, the "Exterior Signs") in approximately the size and location identified on Exhibit H-2 attached hereto; provided, however, that (a) the installation and operation of such Exterior Signs shall be subject to Tenant's ability to obtain, at Tenant's sole cost and expense, any necessary government, quasi-governmental, lender, community and other permits, approvals and consent, provided that Landlord shall cooperate with Tenant, at no cost to Landlord, in Tenant's attempts to obtain any such permits, approvals or consents; (b) the size, materials, color, design, weight, lettering, logo, location and other aspects of such Exterior Signs shall be acceptable to Landlord in its reasonable discretion; (c) such Exterior Signs and their installation shall be in accordance with all applicable Laws and Landlord's reasonable rules and regulations regarding same, if any; (d) if not earlier removed by Tenant, Landlord shall have the right to remove such Exterior Signs at the expiration or earlier termination of the Lease Term, at Tenant's expense; and (e) subject to the requirements of applicable Law, the anticipated location and maximum size of the Exterior Signs are shown on the attached Exhibit H-1 and Exhibit H-2, as applicable.  The Exterior Signs shall be the only manner of identifying Tenant on the Building.  Throughout the Lease Term, such Exterior Signs shall be maintained in a first-class condition and repair at Tenant's sole expense. At the expiration or earlier termination of the Lease Term, or at such time, if any, that (y) with respect to the Exterior Entrance Sign, Tenant is leasing less than two (2) full floors in the Building or actually occupying less than one (1) full floor in the Building, and/or (z) with respect to the Building Top Exterior Sign, Tenant is leasing or occupying less than five (5) full floors in the Building, Landlord shall have the right to immediately remove, at Tenant's expense, the Exterior Entrance Sign and/or the Building Top Exterior Sign, as applicable, and to restore the area on which the Exterior Entrance Sign and/or the Building Top Exterior Sign, as applicable, was installed to its condition immediately prior to the installation thereof.  In addition to the foregoing, so long as no Event of Default is continuing and Tenant is leasing at least four (4) full floors in the Building, Tenant's Exterior Entrance Sign shall be the largest tenant sign (other than the Building Top Exterior Sign) granted to office tenants of the Building (based on the total square footage of the area bounded by the perimeter of the applicable signs) and the highest (if other tenant's signage is stacked one on top of the other) of any other signage rights granted to office tenants in the Building on the glass adjacent to the main lobby. Tenant's signage rights granted pursuant to this Section 10.2 shall be personal to the Tenant named herein and shall not be assigned to any other party except an Affiliate or other assignee to whom this Lease is assigned in its entirety in accordance with Article VII of this Lease.

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

## ARTICLE XI
## SECURITY DEPOSIT

11.1     Simultaneously with Tenant's execution of this Lease, Tenant shall deposit with Landlord the Security Deposit Amount (as defined in Section 1.9) as a security deposit which shall be security for the performance by Tenant of all of Tenant's obligations, covenants, conditions and agreements under this Lease.  Landlord shall not be required to maintain such security deposit in a separate account.  Except as may be required by law, Tenant shall not be entitled to interest on the security deposit.  Within approximately thirty (30) days after the later of the expiration or earlier termination of the Lease Term or Tenant's vacating the Premises, Landlord shall return such security deposit to Tenant, less such portion thereof as Landlord shall have properly appropriated to satisfy any Event of Default (or such other event which, with the giving of notice or the passage of time or both, would constitute an Event of Default) under this Lease.  If there shall be any Event of Default under this Lease, then Landlord shall have the right, but shall not be obligated, to use, apply or retain all or any portion of the security deposit for the payment of any (a) Base Rent, additional rent or any other sum applicable to such Event of Default, or (b) amount Landlord may spend or become obligated to spend, or for the compensation of Landlord for any losses incurred, by reason of such Event of Default (including, but not limited to, any damage or deficiency arising in connection with the reletting of the Premises).  If any portion of the security deposit (if cash) is so used or applied, then within ten (10) days after Landlord gives written notice to Tenant of such use or application, Tenant shall deposit with Landlord cash in an amount sufficient to restore the security deposit to the original Security Deposit Amount, and Tenant's failure to do so shall constitute an Event of Default under this Lease.

11.2     In connection with any sale or other transfer of the Building, Landlord shall transfer the security deposit to any such purchaser or other transferee of Landlord's interest in the Building, whereupon Tenant shall look only to such purchaser or transferee for the return of the security deposit, and Landlord shall be released from all liability to Tenant for the return of such security deposit.  Tenant acknowledges that the holder of any Mortgage shall not be liable for the return of any security deposit made by Tenant hereunder unless such holder actually receives such security deposit.  Tenant shall not pledge, mortgage, assign or transfer the security deposit or any interest therein.

11.3     In lieu of a cash security deposit, Tenant shall deliver to Landlord a clean, unconditional, irrevocable letter of credit meeting the following terms and conditions in lieu of such cash security deposit.  Such letter of credit shall be: (a) in form and substance satisfactory to Landlord in its reasonable discretion (with the following criteria at a minimum) (Landlord hereby approving the form of letter of credit attached hereto as Exhibit E); (b) at all times in the stated face amount of not less than the Security Deposit Amount (as defined in Section 1.9), and shall on its face state that multiple and partial draws are permitted and that, within five (5) business days after any such partial draw, the issuer will notify Landlord in writing that the letter of credit will not be reinstated to its full amount in which event Landlord shall have the right to immediately draw on the remainder of the letter of credit (it being understood that the total security deposit on hand, whether in cash or letter of credit form, shall at all times be not less than the total Security Deposit Amount as so defined); (c) issued by a commercial bank reasonably acceptable to Landlord from time to time and either located in the Washington, D.C.

metropolitan area or a bank located within the continental United States which shall permit draws by overnight courier for the account of Tenant, and its permitted successors and assigns under this Lease, it being agreed that Landlord hereby preapproves Citibank and Wells Fargo as acceptable banks to issue such letter of credit as of the Execution Date, subject to such bank's continued compliance with the other requirements set forth herein; (d) made payable to, and expressly transferable and assignable one or more times at no charge by, the owner from time to time of the Building or its lender (which transfer/assignment shall be conditioned only upon the execution of a reasonable and customary written document in connection therewith),whether or not the original account party of the letter of credit continues to be the tenant under this Lease by virtue of a change in name or structure, merger, assignment, transfer or otherwise; (e) payable at sight upon presentment to a branch of the issuer of a simple sight draft stating only that Landlord is permitted to draw on the letter of credit under the terms of the Lease and setting forth the amount that Landlord is drawing; (f) of a term not less than one year, and shall on its face state that the same shall be renewed automatically, without the need for any further written notice or amendment, for successive minimum one-year periods, unless the issuer notifies Landlord in writing, at least sixty (60) days prior to the expiration date thereof, that such issuer has elected not to renew the Letter of Credit (which will thereafter entitle Landlord to draw on the letter of credit); and (g) at least thirty (30) days prior to the then-current expiration date of such letter of credit, either (1) renewed (or automatically and unconditionally extended) from time to time through the ninetieth (90th) day after the expiration of the Lease Term, or (2) replaced by Tenant with another letter of credit meeting the requirements of this Section, in the full amount of the Security Deposit Amount. Tenant shall cooperate with Landlord to effect any modifications, transfers or replacements of the letter of credit requested by Landlord in order to assure that Landlord is at all times fully secured by a valid letter of credit that may be drawn upon by Landlord, its successors and assigns.  Throughout the Lease Term, Tenant shall have the right to provide a substitute letter of credit meeting all of the requirements of this Section from an alternate issuer satisfying the requirements of this Section, and Landlord shall return the existing letter of credit promptly following Landlord's receipt and approval of such substitute letter of credit.  Notwithstanding anything in this Lease to the contrary, any cure or grace period set forth in Section 19.1 shall not apply to any of the foregoing requirements of the Letter of Credit, and, specifically, if any of the aforesaid requirements are not complied with timely, then an immediate Event of Default shall occur and Landlord (as its exclusive remedy for any such Event of Default (other than such Event of Default resulting in either the unavailability of such Letter of Credit or the inability of Landlord to timely draw on the same in which case Landlord shall have all rights and remedies available to it under this Lease)) shall have the right to immediately draw upon the letter of credit without notice to Tenant and apply the proceeds to the security deposit.  Each Letter of Credit shall be issued by a commercial bank that has a credit rating with respect to certificates of deposit, short term deposits or commercial paper of at least P-2 (or equivalent) by Moody's Investor Service, Inc., or at least A-2 (or equivalent) by Standard & Poor's Corporation, and shall be otherwise acceptable to Landlord in its sole and absolute discretion.  If the issuer's credit rating is reduced below P-2 (or equivalent) by Moody's Investors Service, Inc. or below A-2 (or equivalent) by Standard & Poor's Corporation, or if the financial condition of such issuer changes in any other materially adverse way, then Landlord shall have the right to require that Tenant obtain from a different issuer a substitute letter of credit that complies in all respects with the requirements of this Section, and Tenant's failure to obtain such substitute letter of credit within ten (10) business days following Landlord's written

demand therefor (with no other notice or cure or grace period being applicable thereto, notwithstanding anything in this Lease to the contrary) shall entitle Landlord to immediately draw upon the then existing Letter of Credit in whole or in part, without notice to Tenant. In the event the issuer of any letter of credit held by Landlord is insolvent or is placed into receivership or conservatorship by the Federal Deposit Insurance Corporation, or any successor or similar entity, or if a trustee, receiver or liquidator is appointed for the issuer, then, effective as of the date of such occurrence, said Letter of Credit shall be deemed to not meet the requirements of this Section, and, within ten (10) business days thereof, Tenant shall replace such Letter of Credit with either cash or a substitute Letter of Credit meeting the requirements of this Section (and Tenant's failure to do so shall, notwithstanding anything in this Lease to the contrary, constitute an Event of Default for which there shall be no notice or grace or cure periods being applicable thereto other than the aforesaid ten (10) business day period). Any failure or refusal of the issuer to honor the letter of credit shall be at Tenant's sole risk and shall not relieve Tenant of its obligations hereunder with respect to the security deposit.

11.4    Provided that, as of the last day of the eighteenth (18th) month following the expiration of the Abatement Period (the "First Adjustment Date"), the last day of the thirty-sixth (36th) month following the expiration of the Abatement Period (the "Second Adjustment Date"), and the last day of the sixtieth (60th) month following the expiration of the Abatement Period (the "Third Adjustment Date"), no uncured Event of Default then exists under this Lease, Tenant shall have the right to request, by delivering written notice to Landlord, that the Security Deposit Amount be reduced by the following amounts: (i) with respect to the First Adjustment Date, $498,015.63, (ii) with respect to the Second Adjustment Date, $498,015.63, and (iii) with respect to the Third Adjustment Date, $996,031.26. If all of the aforesaid conditions are met for such Adjustment Date, Landlord shall so reduce the Security Deposit Amount by the amounts set forth above. If the Security Deposit has been provided in letter of credit form, such reduction shall occur by means of delivery by Tenant to Landlord of a substitute letter of credit in such amount (or an acceptable amendment to the existing letter of credit) and in strict conformity with the terms of Section 11.2. Notwithstanding anything in this Lease to the contrary, in no event during the Lease Term shall the Security Deposit Amount ever be less than $996,031.26.

ARTICLE XII
INSPECTION

12.1    Tenant shall permit Landlord, its agents and representatives, and the holder of any Mortgage, to enter the Premises at any time and from time to time, without charge therefor and without diminution of the rent payable by Tenant in order to examine, inspect or protect the Premises and the Building, to make such alterations and/or repairs as in the sole and absolute judgment of Landlord may be deemed necessary or desirable, or to exhibit the same to brokers, prospective tenants (during the last fifteen (15) months of the Lease Term), lenders, purchasers and others; it being understood, however, that Landlord shall (i) except with respect to prospective tenants, give Tenant advance notice at least twenty-four (24) hours prior to such entry (except in the event of an emergency placing persons and/or property at imminent risk of harm, injury or damage), (ii) with respect to prospective tenants, use commercially reasonable efforts to give Tenant advance notice at least twenty-four (24) hours prior to such entry, and (iii) use commercially reasonable efforts to minimize disruption to Tenant's normal business operations in the Premises in connection with any such entry and when making repairs, including

44

scheduling in advance with Tenant any Landlord work that occurs in the Premises (after Beneficial Occupancy of the Premises) that results in unreasonable loud noise (e.g., jack-hammering, core drilling, etc.), or that causes significant dust (appropriate "curtain" barriers to mitigate dust migration shall be implemented), or causes objectionable odors, all as reasonably and materially determined by the Landlord (but excluding any work required due to emergency circumstances), and Tenant agrees to cooperate with Landlord in good-faith in connection with such scheduling.  In connection with any entry into any portion of the Premises, Landlord and its contractors, employees and agents shall (a) be accompanied by a representative of Tenant (except in cases of emergency, for regularly scheduled janitorial services, or in cases where Tenant fails to identify and make available such representative on the date and the time of such entry and also except that such representative does not need to accompany Landlord and its agent if their entry is limited to core areas of the Building); and (b) not remove any of Tenant's personal property or papers from the Premises in connection with any such entry.  Landlord shall use commercially reasonable efforts to instruct any of its contractors, employees and agents entering the Premises to not (y) volitionally read or disturb any of Tenant's personal property or papers in (or remove the same from) the Premises, or (z) disclose anything seen or heard during such entry related to Tenant's business operations.

ARTICLE XIII
INSURANCE

13.1    Tenant shall not conduct or permit to be conducted any activity, or place or permit to be placed any equipment or other item in or about the Premises or the Building, which will in any way increase the rate of property insurance or other insurance on the Building, unless consented to by Landlord, which approval shall be in Landlord's sole discretion, provided that, if so consented to by Landlord, Tenant shall pay all additional premium costs arising directly or indirectly from (but attributable to) such increase.  If any increase in the rate of property or other insurance is due to any activity, equipment or other item of Tenant, and Tenant does not, within two (2) business days after written notice from Landlord, discontinue the activity or remove the equipment or other item causing such increase, then (whether or not Landlord has consented to such activity, equipment or other item) Tenant shall pay as additional rent due hereunder the amount of such increase.  The statement of any applicable insurance company or insurance rating organization (or other organization exercising similar functions in connection with the prevention of fire or the correction of hazardous conditions) that an increase is due to any such activity, equipment or other item shall be conclusive evidence thereof.

13.2    Tenant's Insurance.    Throughout the Lease Term, Tenant shall obtain and maintain in effect as its sole cost and expense:

(a)    Commercial General Liability Insurance: The policy shall be written on an ISO occurrence base form, CG 00 01 04 13 and provide limits of no less than the following minimums: (i) One Million Dollars ($1,000,000) Per Occurrence; (ii) Three Million Dollars ($3,000,000) General Aggregate; (iii) One Million Dollars ($1,000,000) Personal and Advertising Injury; (iv) One Million Dollars ($1,000,000) Damage to Premises Rented to You Limit (any one premises); and (v) Five Thousand Dollars ($5,000) Medical Payments.  The policy shall be provided inclusive of the following:

45

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

1.    The General Aggregate set forth below shall apply on a per location basis;

2.    The coverage for bodily injury shall include coverage for death and mental anguish;

3.    Contractual liability coverage insuring the obligations assumed by Tenant under this Lease, including those set forth in Article XV;

4.    Premises and operations coverage;

5.    Broad form property damage coverage, including vandalism and malicious mischief coverage;

6.    Independent contractors coverage;

7.    Liquor liability coverage, in the event Tenant hosts a function at the Premises or Building at which alcohol is served,

8.    An exception to the pollution exclusion for damage or injury arising out of heat, smoke, or fumes from a hostile fire;

9.    The separation of insureds provision shall not be amended to provide narrower coverage than that provided within the base policy form; and

10. Tenant's commercial general liability insurance shall name Landlord, its advisors, the managing agent of the Building and the holder of any Mortgage, in each case of whom Landlord gives notice to Tenant, and any other parties that Landlord may designate from time to time and their respective directors, officers, agents, employees, members, partners or other constituents of any of the foregoing (the "Landlord Insured Parties") as additional insured on a primary and non-contributory basis including completed operations.  The additional insured coverage for the General Liability policy shall be provided on Insurance Services Office (ISO) form CG 2011 or its equivalent.

(b)    Commercial Automobile Liability Insurance: Coverage shall be written on the ISO CA 00 01 04 13 covering all automobiles owned, hired and non-owned or used by Tenant in carrying on its business.  Coverage shall be provided with a minimum limit of One Million Dollars ($1,000,000) combined single limit for each accident.

(c)    Workers Compensation Insurance: Statutory. Such worker's compensation insurance shall be in minimum limits as defined by the law of the jurisdiction in which the Building is located (as the same may be amended from time to time).

(d)    Employer's Liability Insurance: Such employer's liability insurance shall be in an amount not less than One Million Dollars ($1,000,000) for each accident, One Million Dollars ($1,000,000) disease policy limit, and One Million Dollars ($1,000,000) disease each employee.

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

(e)    Umbrella or Excess Liability Insurance: The Umbrella or Excess Liability Insurance shall be provided on a follow form basis and its coverage shall not be narrower than any followed policy in excess of the Commercial General Liability, Commercial Automobile Liability, and Employer's Liability policies.  The minimum required limits are Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars ($5,000,000)  annual aggregate per location.  The limits may be achieved through any combination of the primary and excess or umbrella liability insurance, provided such primary and excess or umbrella insurance policies result in the same or greater coverage as the coverages required under the above sections.  There shall be no gap in coverage between the underlying policies and the umbrella or excess liability insurance.

(f)    [Intentionally Deleted]

(g)    Special Form Property Insurance: Such property insurance shall be in an amount not less than the full replacement cost of all tenant improvements installed in the Premises, all Alterations and all other contents of the Premises in the event of loss (including, without limitation, Tenant's trade fixtures, installations, decorations, furnishings, inventory, equipment and personal property).  Tenant covenants and agrees that, to the maximum extent permitted by law, all merchandise, furniture, fixtures and property of every kind, nature and description related or arising out of Tenant's leasehold estate hereunder, shall be at the sole risk and hazard of Tenant, and that if any part thereof shall be damaged, destroyed, stolen or removed for any cause or reason whatsoever, no part of such damage or loss shall be charged to, or borne by, Landlord.

(h)    Boiler and Machinery Insurance: If applicable, coverage shall insure against loss or damage from an accident from equipment.  Such boiler and machinery coverage shall be in minimum amounts typically covered by prudent tenants engaged in similar operations.

(i)    Business Interruption Coverage: Such business interruption insurance shall be in minimum amounts typically carried by prudent tenants engaged in similar operations, but in no event shall be in an amount less than the Base Rent then in effect.

(j)    Builder's Risk Insurance: At all times during the period between the commencement of construction of any Alterations until completion thereof, and during the performance of Tenant's Work and continuing until the date on which Tenant opens the Premises for business with the public with a valid certificate of occupancy in place, the Tenant shall purchase and maintain, from an insurance company or insurance companies lawfully authorized to issue insurance in the jurisdiction where the Building is located, property insurance written on a builder's risk "all-risk" completed value or equivalent policy form and sufficient to cover the total value of the entire Alterations on a replacement cost basis.  The Landlord, Landlord's architects, Landlord's contractor or subcontractors, Tenant and Tenant's contractors, must be covered as insureds as their interest may appear. This insurance shall include the interest of mortgages as loss payees. The Builder's Risk shall provide coverage for direct physical loss or damage, and shall not exclude the risks of fire, explosion, theft, vandalism, malicious mischief, collapse, earthquake, flood or windstorm.  The insurance shall also provide coverage for ensuing loss or resulting damage from error, omission, or deficiency in construction methods, design, specifications, workmanship, or materials.  Sub-limits are allowed if Landlord provides prior

47

approval. If the Builder's Risk policy is subject to a deductible or self-insured retention, the deductible or self-insured retention shall not exceed Twenty Five Thousand Dollars ($25,000) and Tenant is responsible for all loss not covered because of such deductible or retention. The Builder's Risk policy shall include coverage for materials while in transit to the Building or located at an off-site storage location in amount equivalent to or greater than the greatest value ever in transit or located at the off-site storage location. The Builder's Risk policy shall include soft costs insurance to reimburse the Landlord and/or Tenant for the costs due to the delay of completion of Alterations, arising out of physical loss or damage covered by the required property insurance: including construction loan fees; leasing and marketing expenses; additional fees, including those of architects, engineers, consultants, attorneys and accountants, needed for the completion of the construction, repairs, or reconstruction; and carrying costs such as property taxes, building permits, additional interest on loans, realty taxes, and insurance premiums over and above normal expenses.

(k)     Terrorism Coverage. Terrorism coverage is required where commercially available.

13.3    General Insurance Requirements:

(a)     Additional Insureds. With the exception of Worker's Compensation, Employer's Liability, and professional liability insurance, such policies must be endorsed to name the Landlord, its advisors the managing agent of the Building and the holder of any Mortgage, in each case of whom Landlord gives notice to Tenant, and any other parties that Landlord may designate from time to time and their respective directors, officers, agents, employees, members, partners or other constituents of any of the foregoing (the "Landlord Insured Parties") as additional insureds with respect to liability arising out of Tenant's leasing, maintenance, use or occupancy of the Premises and/or as loss payees (as applicable). The limits of insurance stated above for each type of insurance are minimum limits only. If Tenant's policy provides greater limits, then the Additional Insureds shall be entitled to, or to share in, the full limits of such policy, and this Section shall be deemed to require such full limits.

(b)     Waiver of Subrogation. The Landlord and Tenant waive all rights against each other and any of their agents and employees of each other for damages occurring on the premises of the Building to the extent those losses are covered by property insurance required by the Lease or any other property insurance applicable to the Building, except such rights as they have to proceeds of such insurance. Where allowable by law, the Tenant agrees to waive all rights against the Landlord to the extent those losses are covered by any insurance policy required in Section 13.2 (except for professional liability) of Article XIII of this Lease. The policies of insurance purchased and maintained by each person or entity agreeing to waive claims pursuant to this Article XIII shall not prohibit this waiver of subrogation. This waiver of subrogation shall be effective as to a person or entity (1) even though that person or entity would otherwise have a duty of indemnification, contractual, or otherwise, (2) even though that person or entity did not pay the insurance premium directly or indirectly, or (3) whether or not the person or entity had an insurable interest in the damage property.

(c)     Deductibles and Self-insured Retentions. No insurance policy shall contain any deductible provision or self-insured retention, except as otherwise approved in

WDC 91095636v14

writing by Landlord, which approval shall not be unreasonably withheld; and any such deductible and/or self-insurance retention permitted hereunder shall be commercially reasonable and shall not exceed $25,000. The Tenant is responsible for payment of all deductibles and self-insured retentions any of the required policies may have.

(d)    Primary and Non-contributory. All such insurance shall be specifically written or endorsed to be primary and non-contributory to all other insurance available to the additional insured.

(e)    Notice of Cancellation. Each insurance policy shall be endorsed to state that coverage shall not be cancelled, except after thirty (30) days' prior written notice has been given to Landlord except that ten (10) days' notice is permitted if the policy is cancelled for non-payment of premium.

(f)    Insurer Qualifications. All such insurance shall be issued by a company that is licensed to do business in the jurisdiction in which the Building is located, that has been approved in advance by Landlord and that has a rating equal to or exceeding A-VIII from the most current A.M. Best's Insurance Guide.

(g)    Evidence of Insurance. Tenant shall provide the Landlord with evidence of the required insurance on an Acord 25 certificate with respect to all liability insurance and an Acord 28 certificate with respect to all property insurance confirming that all insurance requirements of this Section 13.2 have been met.  Each certificate of insurance shall include copies of endorsement that confirm additional insured coverage, primary & non-contributory language, and the required waiver of subrogation.  The certificates must be provided to the Landlord within 30 days of the renewal of each policy evidenced on the certificate.  Upon request following the occurrence of a covered claim, Landlord may require Tenant to provide full copies of each insurance policy fulfilling the required coverages.

13.4    Landlord's Insurance. Landlord agrees to carry and maintain special form property insurance (with replacement cost coverage) covering the Building and Landlord's property therein in an amount required by its insurance company to avoid the application of any coinsurance provision.  Tenant shall be responsible for any deductible or self-insured retention on the special form property insurance policy when it is determined the Tenant is at-fault for the loss.  Landlord hereby waives its right of recovery against Tenant and releases Tenant from any and all claims for which Tenant may otherwise be liable to the extent Landlord receives proceeds from its property insurance therefor.  Landlord shall secure a waiver of subrogation endorsement from its insurance carrier.  Landlord also agrees to carry and maintain commercial general liability insurance in limits it reasonably deems appropriate (but in no event less than the limits required by Tenant pursuant to Section 13.2 above).  Landlord may elect to carry such other additional insurance or higher limits as it reasonably deems appropriate.  Tenant shall be responsible for any deductible or self-insured retention applicable to any of the Landlord's insurance policies, when it is determined the Tenant is at-fault for the loss.  Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for damage to, Tenant's personal property or any Alterations, and that Landlord shall not carry insurance against, or be responsible for any loss suffered by Tenant due to, interruption of Tenant's business.

13.5    Tenant's Contractors.    Tenant shall cause contractors, sub-contractors and sub-subcontractors of all tiers employed by or on behalf of Tenant in connection with work or services performed within the Building or the Premises, until completion thereof, including Tenant's Work, to provide at their sole cost and expense, in addition to the insurance required of Tenant pursuant to Section 13.2 above, the insurance listed on Exhibit F attached hereto and incorporated herein.

<u>ARTICLE XIV</u>
<u>SERVICES AND UTILITIES</u>

14.1    Landlord shall manage and operate (or cause to be managed and operated) the Building in a manner consistent with Comparable Buildings (the "Comparable Standard").  From and after the earlier to occur of Beneficial Occupancy or the Rent Commencement Date, Landlord will provide to the Premises services and utilities in accordance with applicable Law and in accordance with the standards set forth below; or, if no standards are specified below, in a manner and at a level consistent with the Comparable Standard:  (i) air conditioning during Building Hours during the seasons of the year when air conditioning is required and heat during Building Hours during the seasons of the year when heat is required, it being agreed that the base Building heating, ventilation and air-conditioning system for the Building (the "HVAC System") shall, at all times during the term, comply with the HVAC specifications set forth on Exhibit J attached hereto, and that Landlord shall operate and maintain such HVAC System in a manner that is comparable to the standards of operation and maintenance of similar HVAC systems in Comparable Buildings; (ii) janitorial service after 6:00 p.m. on Monday through Friday (or, at Landlord's option, Sunday through Thursday) only (excluding Holidays) in accordance, and consistent, with the cleaning standards set forth in Exhibit I provided the Premises is kept in reasonable order by Tenant, which cleaning standards are subject to change from time to time in Landlord's sole discretion; provided, however, (a) if Landlord changes such cleaning standards, such new cleaning standards must be comparable to the cleaning standards that are normally and customarily used for Comparable Buildings, and (b) if Landlord has agreed to provide cleaning services to any other office tenant of the Building that is greater than the cleaning specifications provided to Tenant, then, at Landlord's option, Landlord shall either provide to Tenant the same level of service or Landlord shall exclude from Operating Charges the additional incremental costs associated with providing the higher level of service to any other tenant of the Building (Tenant shall have the right to contract directly with Landlord's janitorial service provider for supplemental cleaning services, provided that Tenant pays directly to such janitorial service provider the costs for such supplemental services, and, in addition, Tenant shall have the right, at its sole cost, to contract with its own janitorial service provider for additional janitorial services beyond the Building standard janitorial services provided by the Landlord's service provider, subject to Landlord's consent, not to be unreasonably withheld, conditioned or delayed); (iii) electricity in accordance with the criteria set forth in the attached Schedule I of Exhibit B (the "Building Electrical Standard") at all times; (iv) standard hot and cold water in Building standard bathrooms and chilled water in Building standard drinking fountains; (v) elevator service by means of automatically operated passenger elevators (with all elevators in operation and subject to call to service during Building Hours and at least two (2) elevators in operation at all times, subject to emergencies, maintenance (including preventative maintenance), freight and construction scheduling, and Landlord's security protocols), provided that, except when in use, at least one (1) elevator shall be immediately available and subject to call at all times on the floor of

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

the Premises containing the Premises' main reception area (i.e., resting on such floor unless in use, after which an elevator (but not necessarily the same elevator) shall return to such floor); (vi) landscaping and snow and ice removal during the times of the year when they are required; (vii) exterior window-cleaning service; (viii) and at least one (1) onsite attendant or security personnel twenty-four (24) hours per day; and (ix) maintaining and keeping the Building lobby, Building Amenities and all other common areas of the Building clean and presentable, including painting, and in good working order and condition, consistent with the Comparable Standard.  If Tenant requires air-conditioning or heat beyond the Building Hours, then Landlord will furnish the same, provided Tenant gives Landlord advance notice of such requirement (by 2:00 p.m. of the same day for extra service needed Monday through Friday, and by 2:00 p.m. on Friday for extra service needed on Saturday or Sunday).  Tenant shall pay for such extra service in accordance with Landlord's then-current schedule, which shall reflect Landlord's actual cost of providing such service which may include a commercially reasonable and customary component for accelerated depreciation of equipment but without a profit increment and, provided further, that Tenant shall have the right to receive extra service on Saturdays from the hours of 9:00 a.m. to 1:00 p.m. without any additional charge subject to the notice requirements set forth herein.  In the event Tenant desires heating and air-conditioning during the Building Hours (excluding Holidays) on Saturdays, Tenant must request the same by giving Landlord written notice thereof at least one (1) business day prior to the date such service is requested.  Tenant agrees to use commercially reasonable efforts to lower and close the blinds or drapes when necessary because of the sun's position, whenever the air conditioning system is in operation, and to cooperate fully with Landlord with regard to, and to abide by all the reasonable regulations and requirements which Landlord may prescribe for the proper functioning and protection of the air conditioning system.  All services provided by Landlord to Tenant are based upon an assumed maximum premises population of one person per two hundred (200) square feet of rentable area (the "Building Maximum Density Ratio"); provided, however, that Tenant shall be permitted to exceed the Building Maximum Density Ratio in the Premises so long as (i) the population in the Premises is in accordance with all applicable District of Columbia laws, rules and regulations, and (ii) in the event that Tenant elects to exceed the Building Maximum Density Ratio in the Premises, Tenant shall be responsible, and reimburse Landlord, for any additional incremental costs actually incurred by Landlord, as reasonably evidenced by Landlord, in providing any Building services to the Premises as a result of Tenant exceeding the Building Maximum Density Ratio in the Premises.  To the extent Tenant provides or contracts for any services relating to any Building Structure or System or any service or utility being provided by Landlord (including, without limitation, extermination and janitorial services) to the Premises directly from the supplier (which Tenant shall not be permitted to do without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed), Tenant shall enter into and maintain a service contract therefor with a contractor licensed to do business in the jurisdiction in which the Building is located and otherwise reasonably approved by Landlord.  From time to time, at Landlord's request, Tenant shall provide Landlord with copies of all such service contracts.  Notwithstanding anything above to the contrary, Tenant shall have access to the Building and the Building's Parking Facility twenty-four (24) hours per day each day of the year (except in the event of an emergency).  Landlord shall provide a card key (or similar type of) access system to provide access to the Building and the parking areas in the garage underneath the Building (the "Parking Facility"), including such valet arrangements, if any, as may be provided or permitted pursuant thereto at times other than Building Hours.  Three

DocuSign Envelope ID: EE8C1D67-8B68-4B8B-A358-6865DF8C2D22

hundred (300) access cards shall be provided to Tenant at no cost to Tenant with Landlord providing to Tenant the number of cards equal to Tenant's employees working at the Premises as of Beneficial Occupancy with additional cards made available to Tenant thereafter by Landlord at no cost to Tenant upon Tenant's request from time to time, but no more than three hundred (300) cards in the aggregate for free (it being agreed that Landlord may charge Tenant for additional or replacement cards, based on Landlord's actual cost to provide same, in excess of the three hundred (300) cards). Such access cards shall be issued by Landlord to the specific individuals that are designated by Tenant. The Building service elevator shall be available for use by Tenant, without charge (except if Landlord personnel is required on an overtime basis, then the reasonable cost of such personnel), twenty-four (24) hours per day, seven (7) days per week, on a first-scheduled, first-served basis, subject to Landlord's reasonable scheduling requirements, repairs and emergencies. All Building elevators shall have programmable access control to lock off, using a proximity or insert type card reader, any floors of the Building on which Tenant leases the entire leasable area. Tenant shall have priority access to one (1) freight elevator during the weekend prior to its move-in to the Premises and move-out from the Premises, and Landlord will provide exclusive access to one (1) freight elevator on two (2) consecutive days during the two (2) week period prior to Tenant's move-in to, and move-out from, the Premises, which two (2) consecutive days will be mutually and reasonably agreed upon by Landlord and Tenant, each acting in good faith.

14.2    Landlord may install, at Landlord's expense, checkmeters to electrical circuits serving Tenant's equipment to verify that Tenant is not consuming excessive electricity (as defined below). If such checkmeters indicate that Tenant's electricity consumption is excessive (as defined below), then Landlord may install at Tenant's expense submeters to ascertain Tenant's actual electricity consumption, and Tenant shall thereafter pay for such excess consumption at the then-current rates charged by the electric service provider selected and used by Landlord. At Tenant's option and at Tenant's sole cost and expense, Tenant may install a separate submeter or submeters (which shall be E-Mon and D-Mon submeters and otherwise subject to the reasonable requirements imposed by Landlord) to measure Tenant's use of electric at the Premises, in which case (i) Tenant shall pay Landlord for the full amount of Tenant's electric usage as measured by such submeter or submeters, and (ii) from and after such time, Landlord shall exclude from Operating Charges electricity costs that relate to the leasable office space of the Building, but Operating Charges shall include electricity costs relating to the common areas, base Building systems and other areas of the Property. Tenant's electricity consumption shall be deemed excessive if the electricity consumption in the Premises per square foot of rentable area (including, without limitation, electricity consumed in connection with outlets and lighting use) during any consecutive three (3) month billing period exceeds the average electricity consumption per square foot of rentable area during the same period for typical, similarly situated office tenants in the Building, as reasonably calculated by Landlord in good faith and demonstrated by Landlord to Tenant by providing reasonable evidence of same. Landlord shall use commercially reasonable efforts not to make determinations of excessive consumption of electricity in a manner which unreasonably discriminates among similarly situated office tenants in the Building. The Building (including the Parking Facility) is a non-smoking facility.

14.3    Tenant shall reimburse Landlord for the actual cost of any excess water, sewer and chiller usage in the Premises with no markup. Tenant's consumption of any of the foregoing

DocuSign Envelope ID: EE8C1D67-8D68-4B8D-A358-6865DF8C2D22

utilities or services shall be deemed excessive if the consumption in the Premises per square foot of rentable area during any consecutive three (3) month billing period exceeds the average consumption per square foot of rentable area during the same period for typical, similarly situated office tenants in the Building, as reasonably calculated by Landlord in good faith and demonstrated by Landlord to Tenant by providing reasonable evidence of same. Landlord shall use commercially reasonable efforts not to make determinations of excessive consumption of any such utilities or services in a manner which unreasonably discriminates among similarly situated office tenants in the Building. Condenser water shall be available for Tenant's supplemental HVAC units, subject to a reasonable allocation by Landlord of the capacity thereof; provided that in no event shall there be less than six (6) tons per full floor available at all times for Tenant's use (i.e., assuming Tenant leases six (6) full floors, Landlord will make available up to thirty-six (36) tons of condenser water for Tenant's supplemental HVAC units, which may be reasonably allocated by Tenant among the floors leased by Tenant). If Tenant installs supplemental HVAC units, Tenant shall also be required to install submeters at its sole cost and expense to measure Tenant's consumption of electricity and condenser water, and Tenant shall pay for the actual cost of such electricity and condenser water so used as measured by such submeters within thirty (30) days following receipt of an invoice from Landlord (and Landlord agrees to provide reasonable documentation evidencing Tenant's consumption upon Tenant's request).

14.4    From and after Beneficial Occupancy and during the remainder of the Lease Term, as extended, if at all, Landlord shall provide the amenities described below (the "Amenities") to Tenant and its employees at no additional cost (other than through recovery of increases in Operating Charges as set forth in Article V above), subject to the terms and conditions that follow.

(a)    Fitness Facility:  Landlord shall maintain an unstaffed fitness facility located in the Building, which currently contains locker facilities, showers, restrooms, and exercise equipment and an auxiliary fitness room for yoga and other classes as well as a private "wellness suite" including individualized rooms with Mirror technology, a Mother's room, and a nutrition station (the "Fitness Facility"), which Fitness Facility shall be comparable, in terms of size, equipment and overall facilities, including lockers, showers and fitness rooms, to fitness facilities, and be managed and operated by Landlord in a manner consistent with that, provided by landlords to tenants in Comparable Buildings at no additional charge (other than through recovery of increases in Operating Charges as set forth in Article V above). Tenant's employees who are assigned to work at the Premises shall have the non-exclusive right to utilize the Fitness Facility twenty-four (24) hours per day each day of the year (except in the event of an emergency or if Landlord finds it reasonably necessary for security or other reasons to modify the hours of the Fitness Facility). Tenant and its employees shall use the Fitness Facility at its own risk and will provide such reasonable certifications of waiver of liability as Landlord may reasonably request from time to time. Without limiting the generality of the foregoing, each user of the Fitness Facility shall be required to execute and deliver a waiver of liability in a form to be provided by Landlord and reasonably acceptable to Tenant. Notwithstanding anything in this Lease to the contrary: (i) Landlord shall have the right at any time, in its sole and absolute discretion, to staff the Fitness Facility (or not) and contract or terminate any party hired in connection therewith; and (ii) at Tenant's request, Tenant shall have the right to conduct regularly scheduled workout classes for Tenant's employees in the separate fitness room subject

53

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

to availability and scheduling with the Building's property manager who shall act in good faith, and (iii) Tenant's employees shall have the right to have his/her own personal trainer access the Fitness Facility so long as (I) such employee is concurrently present with such personal trainer in the Fitness Facility during such employee's workout, (II) such personal trainer executes the Building's standard waiver of liability form, (III) such personal trainer does not solicit other tenants to use his or her services, and (IV) Tenant and/or Tenant's employee shall be responsible for any damage to, or excess use of, equipment in the Fitness Facility in connection with such personal training sessions.

(b)    Bicycle Storage Area:  Subject to applicable regulatory prohibitions and restrictions, Tenant and Tenant's employees shall have access on a non-exclusive, first-come, first-served basis to the Building's bicycle storage area (the "Bicycle Storage Area").  The Bicycle Storage Area shall generally be used for daily bicycle usage and not long-term storage.

(c)    Conference Facility:  Tenant shall have the non-exclusive right to use a tenant-only conference facility located on the third (3rd) floor of the Building (the "Conference Facility"), which Conference Facility shall be available to Tenant, Tenant's employees and guests (such guests only when accompanied by an employee of Tenant) free of direct rental charge (other than through recovery of increases in Operating Charges as set forth in Article V above or reserved usage in excess of Tenant's allocated credits as set forth in subpart (f) below) on a non-exclusive basis during Building Hours (except when reserved by another tenant in the Building).

(d)    Lounge:  Tenant shall have the non-exclusive right to use a tenant-only lounge located on the third (3rd) floor of the Building adjacent to the Conference Facility (the "Lounge"), which Lounge shall be available to Tenant, Tenant's employees and guests (such guests only when accompanied by an employee of Tenant) free of direct rental charge (other than through recovery of increases in Operating Charges as set forth in Article V above or reserved usage in excess of Tenant's allocated credits as set forth in subpart (f) below) on a non-exclusive basis during Building Hours (except when reserved by another tenant in the Building).

(e)    Outdoor Terrace:  Subject to applicable regulatory prohibitions and restrictions, Tenant and Tenant's employees, invitees and guests (such guests only when accompanied by an employee of Tenant) shall have access on a non-exclusive basis during the Building Hours to the Building's outdoor terrace (the "Outdoor Terrace") located on the third (3rd) floor of the Building, which Outdoor Terrace shall be available to Tenant, Tenant's employees, invitees and guests free of direct rental charge (other than through recovery of increases in Operating Charges as set forth in Article V above or reserved usage in excess of Tenant's allocated credits as set forth in subpart (f) below) on a non-exclusive basis during Building Hours (except when reserved by another tenant in the Building).  Tenant's use of the Outdoor Terrace shall be subject to compliance with those reasonable rules and regulations established by Landlord with respect to the Outdoor Terrace (including Tenant's executing Landlord's form of waiver and use agreement).  The Outdoor Terrace is a non-smoking area. Tenant shall use the Outdoor Terrace at its own risk and, in the absence of negligence or willful misconduct, Landlord shall not be liable to Tenant or any of Tenant's invitees or guests for injuries received while using the Outdoor Terrace and adjacent areas.

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

(f)    Reservation of the Conference Facility, the Lounge and the Outdoor Terrace:  In the event Tenant desires to reserve all, or any portions, of the Conference Facility, the Lounge or the Outdoor Terrace for Tenant's exclusive use, Tenant shall schedule such use with Landlord's property manager a reasonable period of time in advance as determined by Landlord in its reasonable discretion.  As of the Execution Date, reservations are typically scheduled via the Building's website/app as more generally shown on Exhibit K attached hereto. Landlord intends to utilize a credit system pursuant to which credit hours for use of the Conference Facility, the Lounge and the Outdoor Terrace are equitably allocated to each Tenant in the Building based on the rentable square footage leased by such Tenant.  Landlord's standard charge shall apply for any reserved use of the Conference Facility, the Lounge or the Outdoor Terrace in excess of the credit hours allocated to Tenant as measured on a quarterly basis. Standard set-up and cleaning is at no cost to Tenant, provided, however, if Tenant requires above-standard set-up or cleaning, or set-up or cleaning outside of Building Hours, Tenant shall pay Landlord's commercially reasonable charge therefor.  Tenant acknowledges that the Lounge and the Outdoor Terrace are general common amenities of the Building for the benefit of all tenants during Building Hours.  Accordingly, the Lounge and Outdoor Terrace generally may not be reserved for exclusive use during Building Hours; provided, however, that Landlord may permit the reservation of the Lounge for exclusive use during Building Hours for reasonable periods of time where reasonably required by a tenant (including Tenant) in connection with a meeting/function hosted in the Conference Facility for which additional capacity is required. Landlord shall monitor the use of the Conference Facility, the Lounge and the Outdoor Terrace to confirm that the use of such amenities is not disproportionately weighted to any one tenant (taking into consideration the allocation of credit hours based on relative square footage leased by such tenant) and shall take reasonable steps in good faith to limit access by such users as required to address any such overuse.  Scheduling with respect to the Conference Facility, the Lounge and the Outdoor Terrace shall be performed by Landlord in a commercially reasonable good faith manner.  Landlord typically permits tenants of the Building to schedule exclusive use of the Conference Facility, the Lounge and the Outdoor Terrace no more than six (6) months in advance.  Notwithstanding the foregoing, for so long as Tenant is leasing ninety-five thousand six hundred nineteen (95,619) rentable square feet in the Building, and provided that there is no uncured Event of Default under this Lease at the time Tenant submits its request, Tenant shall have the right to reserve exclusive use of each of the Conference Facility, the Lounge and/or the Outdoor Terrace more than six (6) months in advance (but no more than twelve (12) months in advance) up to twenty-five (25) times per calendar year (each, an "Early Scheduling Access Reservation").  If the rentable square footage leased by Tenant in the Building increases or decreases during the Lease Term, the number of Early Scheduling Access Reservations provided to Tenant shall be equitably increased or decreased, as applicable.  Throughout the Lease Term, Landlord agrees not to grant any other tenant in the Building Early Scheduling Access Reservations that exceeds the following ratio: (i) for tenants leasing up to five thousand (5,000) rentable square feet, two (2) Early Scheduling Access Reservation per calendar year, (ii) for tenants leasing between five thousand one (5,001) and ten thousand (10,000) rentable square feet, four (4) Early Scheduling Access Reservations per calendar year, and (iii) two (2) additional Early Scheduling Access Reservations per calendar year for each additional five thousand (5,000) rentable square foot increment.  No tenant (including Tenant) shall be permitted to schedule exclusive use of the Conference Facility, the Lounge and the Outdoor Terrace for more than three (3) consecutive calendar days at any time.

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

(g)    General Terms Applicable to Amenities: Use of the Fitness Facility, Bicycle Storage Area, Conference Facility, Lounge and Outdoor Terrace shall, in addition to the foregoing provisions of this Section 14.4, be in accordance with all applicable provisions of this Lease (including, without limitation, the insurance and indemnity provisions) and subject to such reasonable rules and regulations as Landlord may reasonably promulgate and uniformly enforce with respect thereto from time to time.  Landlord shall maintain all Amenities throughout the Lease Term (as may be extended) in first-class condition and repair (and in any event of no lesser than the Comparable Standard).  Subject to the foregoing, Landlord shall have the right at any time, in its sole but reasonable discretion and consistent with the Comparable Standard, to: (1) modify (but not to the extent of essentially depriving Tenant of their benefit) the hours of operation and other aspects of any of the foregoing Amenities; and (2) perform any other reasonable act with respect to the foregoing Amenities; provided that in no event shall Landlord relocate the Conference Facility, the Lounge or the Outdoor Terrace during the Lease Term, including extensions thereof, if any, to another portion of the Building.  In the event that Landlord makes any modification with respect to the foregoing Amenities pursuant to the immediately preceding sentence, then costs of such modification shall be included within Operating Charges except to the extent such costs should be reasonably characterized as capital expenditures and excluded by Article V.

14.5    Landlord shall not have any liability to Tenant, and Tenant shall not be entitled to terminate this Lease or receive a rent abatement, in the event of any interruption, failure or inability to furnish any of the utilities or services required to be furnished by Landlord hereunder; provided, however, that if (a) such, interruption, failure or inability is due to Landlord's negligence or willful misconduct, and (b) such interruption, failure or inability lasts for at least a continuous period of three (3) consecutive business days after Tenant gives Landlord written notice thereof, and (c) as a result of such interruption, failure or inability, Tenant does not in fact use all, or any portion, of the Premises during such period, then, so long as Tenant is not in default under this Lease beyond any applicable notice and cure period, Tenant shall be entitled, as its sole and exclusive remedy, to an abatement of the Base Rent and Tenant's Proportionate Share of increases in Operating Charges and Tenant's Proportionate Share of increases in Real Estate Taxes payable hereunder (with respect to the portion of the Premises rendered unusable) for the period beginning on the day after such three (3) business day period ends and continuing until the earlier of the date Tenant resumes use or occupancy of any such unusable portion of the Premises or the date such interruption, failure or inability is cured and use of such unusable portion of the Premises is restored to Tenant.  Landlord shall use reasonable efforts to restore such interruption, failure or inability so long as such interruption, failure or inability is within Landlord's reasonable control to correct.

## ARTICLE XV
## LIABILITY OF LANDLORD

15.1    Landlord and Landlord's Representatives shall not be liable to Tenant, any Agent of Tenant or any other person or entity for any damage, injury, loss or claim based on or arising out of any cause whatsoever (except as otherwise provided in this Section), including without limitation the following:  repair to any portion of the Premises or the Building; interruption in the use of the Premises (except as otherwise set forth in Section 14.5, above) or the Building or any equipment therein; any accident or damage resulting from any use or operation (by Landlord,

56

Tenant or any other person or entity) of elevators or heating, cooling, electrical, sewage or plumbing equipment or apparatus; termination of this Lease by reason of damage to the Premises or the Building; any fire, robbery, theft, vandalism, mysterious disappearance or any other casualty; actions of any other tenant of the Building or of any other person or entity; failure or inability to furnish any service specified in this Lease; and leakage in any part of the Premises or the Building from water, rain, ice or snow that may leak into, or flow from, any part of the Premises or the Building, or from drains, pipes or plumbing fixtures in the Premises or the Building.  If any condition exists which may be the basis of a claim of constructive eviction, then Tenant shall give Landlord written notice thereof and a reasonable opportunity to correct such condition, and in the interim Tenant shall not claim that it has been constructively evicted or, except as otherwise set forth in Section 14.5 above, is entitled to a rent abatement.  Any property placed by Tenant or any Agent of Tenant in or about the Premises or the Building shall be at the sole risk of Tenant, and Landlord shall not in any manner be held responsible therefor.  Any person receiving an article delivered for Tenant shall be acting as Tenant's agent for such purpose and not as Landlord's agent.  For purposes of this Article, the term "Building" shall be deemed to include the Land.  Notwithstanding the foregoing provisions of this Section, Landlord shall not be released from liability to Tenant for any physical injury to any natural person or to Tenant's property caused by the negligence or willful misconduct of Landlord or Landlord's Representatives to the extent such injury is not covered by insurance either carried by Tenant (or such person) or required by this Lease to be carried by Tenant; provided, however, that neither Landlord nor any of Landlord's Representatives (nor any past, present or future board member, partner, trustee, director, member, officer, employee, agent, representative or advisor of any of them) shall under any circumstances be liable for any exemplary, punitive, consequential or indirect damages (or, except as otherwise set forth in Section 14.5, above, for any interruption of or loss to business) in connection with or relating to this Lease.  Notwithstanding the foregoing, the provisions in this Section 15.1 shall not nullify or void any of Landlord's obligations under this Lease to restore or repair the Building as set forth elsewhere in this Lease and to otherwise comply with this Lease.

15.2    (a)    Subject to Section 13.3(b), above, and except to the extent caused by the negligence or willful misconduct of Landlord or its Agents, Tenant shall reimburse Landlord, its employees and Agents for (as additional rent), and shall indemnify (to the fullest extent permitted by law), defend upon request and hold them harmless from and against all reasonable costs, damages, claims, liabilities, expenses (including reasonable attorneys' fees), losses, penalties and court costs (collectively, "Claims") in any way asserted against them, to the extent arising out of, or resulting from, in whole or in part: (i) the use and occupancy of the Premises or any of the amenities or other common areas of the Building or the Complex by Tenant or its Agents or the business conducted therein, (ii) any negligent or willful act or omission of Tenant or any Agent of Tenant, (iii) any breach of Tenant's obligations under this Lease, including failure to comply with Laws or surrender the Premises upon the expiration or earlier termination of the Lease Term, or (iv) any entry by Tenant or any Agent of Tenant upon the Land prior to the Lease Commencement Date; provided, however, that, notwithstanding any contrary provision contained in this Lease, in no event shall Tenant have any liability to Landlord for (1) claims for which Tenant is released pursuant to the provisions of Section 13.3(b); or (2) consequential, punitive, loss of business, loss of profit or other indirect damages, except with respect to (y) such damages arising from a holdover by Tenant as more fully set forth in Section 22.1, and (z) such damages arising from a breach by Tenant of Tenant's obligations hereunder to deliver estoppel

57

certificates and subordination agreements, provided Landlord has delivered to Tenant notice of such breach and an additional ten (10) business days within which to cure such breach.

(b)     Subject to Section 13.3(b), except to the extent caused by the negligence or willful misconduct of Tenant or an Agent of Tenant, Landlord shall reimburse Tenant and shall indemnify (to the fullest extent permitted by law), defend upon request and hold Tenant harmless from and against all Claims in any way asserted against Tenant, to the extent arising out of, or resulting from, in whole or in part: (i) Landlord's use or control of the common areas of the Building and the Building Structure and Systems, and (ii) the negligence or willful misconduct of Landlord or its Agents.  In no event, however, shall Landlord have any liability to Tenant for interruption (except as set forth in Section 14.5, above) or loss to Tenant's business or any indirect or consequential damages.

15.3   No landlord hereunder shall be liable for any obligation or liability based on or arising out of any event or condition occurring during the period that such landlord was not the owner of the Building or a landlord's interest therein.  Within ten (10) business days after request, subject to the terms of Article XXII, below, Tenant shall attorn to any transferee landlord and execute, acknowledge and deliver any commercially reasonable document submitted to Tenant confirming such attornment provided such transferee assumes the obligations of Landlord in writing hereunder which, except as otherwise set forth in Article XXII below, accrue from and after the date of the transfer.

15.4   The obligations of Tenant under this Lease are separate and independent covenants and agreements, such that all such obligations of Tenant, including, without limitation, the obligation to pay Base Rent, additional rent and all other sums due hereunder, shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated or abated pursuant to an express provision of this Lease.  Such waiver and acknowledgements by Tenant are a material inducement to Landlord entering into this Lease.  Tenant shall not have the right to set off or deduct any amount allegedly owed to Tenant pursuant to any claim against Landlord from any rent or other sum payable to Landlord, except as otherwise expressly set forth in this Lease.  Tenant's sole remedy, except as otherwise expressly set forth in this Lease, for recovering upon such claim shall be to institute an independent action against Landlord, which action shall not be consolidated with any action of Landlord; provided, however, that the foregoing shall not prohibit Tenant from asserting a compulsory counterclaim in any proceeding instituted by Landlord against the Tenant that is required to be brought by applicable statute and will be deemed forever waived if not then asserted by Tenant.

15.5   (a)     If Tenant or any Agent of Tenant is awarded a money judgment against Landlord, then recourse for satisfaction of such judgment shall be limited to execution against Landlord's estate and interest in the Building which shall be deemed to include (subject to the rights of any Mortgagees) proceeds actually received by Landlord from any sale of the Building (net of all expenses of sale), insurance or condemnation proceeds (subject to the rights of any Mortgagees), and rental income from the Building (net of all expenses) to the extent all of the foregoing are held in an account for Landlord and have not been applied or distributed by Landlord in the ordinary course of business (i.e., not as a fraud against creditors).  No other asset of Landlord, and no asset of any of Landlord's Representatives (or any past, present or future board member, partner, director, member, officer, trustee, employee, agent, representative or

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8B68-4B8D-A358-6865DF8C2D22

advisor of any of them (each, an "officer")) or any other person or entity, shall be available to satisfy or be subject to any such judgment. No such Landlord's Representative, officer or other person or entity shall be held to have personal liability for satisfaction of any claim or judgment whatsoever under this Lease.

(b)    Landlord acknowledges that, notwithstanding any provisions to the contrary contained in this Lease, no past, present or future member, partner or shareholder of Tenant shall have any personal liability to Landlord for the obligations of Tenant under this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises. Tenant shall be solely liable for all of the obligations of Tenant under this Lease.

ARTICLE XVI
RULES

16.1    Tenant and its Agents shall at all times abide by and observe the rules and regulations specified in <u>Exhibit C</u>. Tenant and its Agents shall also abide by and observe any other rule that Landlord may reasonably promulgate in advance in writing from time to time for the operation and maintenance of the Building, provided that written notice thereof is given and such rule is not inconsistent with the provisions of this Lease and does not materially, adversely affect Tenant's use and enjoyment of, or access to, the Premises for the purposes set forth in this Lease; provided, however, that in the case of any conflict between the provisions of this Lease and any such rules, the provisions of this Lease shall control. All rules shall be binding upon Tenant and enforceable by Landlord as if they were contained herein. Nothing contained in this Lease shall be construed as imposing upon Landlord any duty or obligation to enforce such rules, or the terms, conditions or covenants contained in any other lease, as against any other tenant, and Landlord shall not be liable to Tenant for the violation of such rules by any other tenant or its employees, agents, assignees, subtenants, invitees or licensees. Landlord shall use reasonable efforts not to enforce any rule or regulation in a manner which unreasonably discriminates among similarly situated tenants. The Building (including the Parking Facility) is a non-smoking facility.

ARTICLE XVII
DAMAGE OR DESTRUCTION

17.1    If the Premises or the Building are totally or partially damaged or destroyed thereby rendering the Premises totally or partially inaccessible or unusable, then Landlord shall diligently repair and restore the Premises (such restoration of the Premises to exclude tenant improvements existing or installed in the Premises, any Alterations or any other contents of the Premises (including, without limitation, Tenant's trade fixtures, decorations, furnishings, equipment or personal property)) and the Building to substantially the same condition they were in prior to such damage or destruction; provided, however, that if in the reasonable judgment of Landlord's architect, such repair and restoration cannot be completed within two hundred seventy (270) days after the occurrence of such damage or destruction, Landlord shall provide written notice of Landlord's determination within thirty (30) days following such damage or destruction (the "<u>Restoration Notice</u>"), whereupon Landlord shall have the right to terminate this Lease by giving written notice of termination within forty-five (45) days after the occurrence of such damage or destruction. If this Lease is terminated pursuant to this Article, then rent shall be

59

apportioned (based on the portion of the Premises which is actually used by Tenant after such damage or destruction) and paid to the earlier of the date of termination or the date Tenant completely vacates and abandons the Premises on account of such damage and Landlord shall be entitled to any insurance proceeds received by Tenant that are attributable to Tenant's Work (as defined in Exhibit B) and other improvements insured or required to be insured by Tenant that would remain in the Premises at the end of the Lease Term.  If this Lease is not terminated as a result of such damage or destruction, then until such repair and restoration of the Premises are substantially complete, Tenant shall be required to pay rent only for the portion of the Premises that is reasonably usable while such repair and restoration are being made; provided, however, that if such damage or destruction was caused by the gross negligence or willful misconduct of Tenant or any Agent of Tenant, then Tenant shall not be entitled to any such rent reduction. After receipt of all insurance proceeds, Landlord shall proceed with and bear the expenses of such repair and restoration of the Premises and the Building; provided, however, that (y) if such damage or destruction was caused by the gross negligence or willful misconduct of Tenant or any Agent of Tenant, then Tenant shall pay Landlord's commercially reasonable deductible, and (z) Landlord shall not be required to repair or restore any tenant improvements installed in the Premises, any Alterations or any other contents of the Premises (including, without limitation, Tenant's trade fixtures, decorations, furnishings, equipment or personal property). Notwithstanding anything herein to the contrary, Landlord shall have the right to terminate this Lease if (1) insurance proceeds plus deductibles are insufficient to pay the full cost of such repair and restoration, (2) the holder of any Mortgage fails or refuses to make such insurance proceeds available for such repair and restoration, (3) zoning or other applicable Laws or regulations do not permit such repair and restoration, or (4) the damage to the Building exceeds thirty-five percent (35%) of the replacement value of the Building.

17.2    If, within thirty (30) days after the occurrence of the damage or destruction described in Section 17.1, Landlord's architect determines in its professional judgment that the repairs and restoration cannot be substantially completed within two hundred seventy (270) days after the date of such damage or destruction, and provided Landlord does not elect to terminate this Lease pursuant to this Article, then Landlord shall promptly notify Tenant of such determination, and for a period continuing through the later of the forty-fifth (45th) day after the occurrence of the damage or destruction or the tenth (10th) day after receipt of such notice, Tenant shall have the right to terminate this Lease by providing written notice to Landlord (which date of such termination shall be not more than thirty (30) days after the date of Tenant's notice to Landlord).  Notwithstanding any of the foregoing to the contrary, Tenant shall not have the right to terminate this Lease if the willful misconduct of Tenant or any Agent of Tenant shall have caused the damage or destruction.

17.3    If (i) the Premises is so damaged that, in the reasonable judgment of Landlord's architect, the Premises cannot be fully repaired, or access to the Premises is denied by reason of damage by casualty to such extent that Tenant's access to the Premises cannot be restored, within two hundred seventy (270) days from the date of the casualty, and this Lease has not otherwise been terminated by Landlord or Tenant pursuant to Sections 17.1 or 17.2, above, and (ii) the Premises is not actually fully repaired, or access to the Premises not fully restored, on or before the date that is thirty (30) days following the date set forth in the Restoration Notice (subject to extension for any delays in such restoration to the extent resulting from a Force Majeure Event) (the "Outside Restoration Date"), then Tenant, at its option, shall have the right to terminate this

60

DocuSign Envelope ID: EE8C1D67-3D68-4B8B-A358-6865DF8C2D22

Lease upon thirty (30) days prior written notice to Landlord, such notice to be delivered, if at all, by Tenant to Landlord within fifteen (15) days after the Outside Restoration Date, but in all cases before the completion of Landlord's restoration obligations or Landlord's restoring access to the Premises.  If a termination notice is timely delivered by Tenant as aforesaid, and the Premises is not fully repaired by Landlord within such thirty (30) day period, then this Lease shall automatically terminate with the same effect as if the such termination date were the date definitely fixed for expiration of the Lease Term; provided, however, in the event the Premises is fully repaired by Landlord within such thirty (30) day period, then Tenant termination notice shall be deemed null and void and of no further force or effect.

17.4    Notwithstanding anything to the contrary in this Article XVII, if any damage during the final eighteen (18) months of the Lease Term renders the Premises wholly unusable by Tenant for the conduct of its normal business operations, Tenant or Landlord may terminate this Lease by notice to the other party within thirty (30) days after the occurrence of such damage and this Lease shall expire on the thirtieth (30th) day after the date of such notice.  For purposes of this Section 17.4, the Premises shall be deemed wholly unusable by Tenant for the conduct of normal business operations, if Tenant shall be precluded from using thirty-three percent (33%) or more of the Premises for the conduct of normal business operations and Tenant's inability to so use the Premises is reasonably expected to continue for more than ninety (90) days.

ARTICLE XVIII
CONDEMNATION

18.1    If twenty-five percent (25%) or more of the Premises, or the use or occupancy thereof, shall be taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose or sold under threat of such a taking or condemnation (collectively, "condemned"), then this Lease shall terminate on the day prior to the date title thereto vests in such authority and rent shall be apportioned as of such date.  If less than twenty-five percent (25%) of the Premises or occupancy thereof is condemned, then this Lease shall continue in full force and effect as to the part of the Premises not so condemned, except that as of the date title vests in such authority Tenant shall not be required to pay rent with respect to the part of the Premises so condemned.    Landlord shall notify Tenant of any condemnation contemplated by this Section promptly after Landlord receives notice thereof.  Within fifteen (15) days after receipt of such notice, Tenant shall have the right to terminate this Lease with respect to the remainder of the Premises not so condemned as of the date title vests in such authority if such condemnation renders said remainder of the Premises totally unusable for their intended purpose.  Notwithstanding anything herein to the contrary, if twenty-five percent (25%) or more of the Land or the Building is condemned, then whether or not any portion of the Premises is condemned, Landlord shall have the right to terminate this Lease as of the date title vests in such authority.

18.2    All awards, damages and other compensation paid on account of such condemnation shall belong to Landlord, and Tenant assigns to Landlord all rights to such awards, damages and compensation.  Tenant shall not make any claim against Landlord or such authority for any portion of such award, damages or compensation attributable to damage to the Premises, value of the unexpired portion of the Lease Term, loss of profits or goodwill, leasehold

61

improvements or severance damages.  Nothing contained herein, however, shall prevent Tenant from pursuing a separate claim against the authority for relocation expenses and for the value of furnishings, equipment and trade fixtures installed in the Premises at Tenant's expense and which Tenant is entitled pursuant to this Lease to remove at the expiration or earlier termination of the Lease Term, provided that such claim shall in no way diminish the award, damages or compensation payable to or recoverable by Landlord in connection with such condemnation.

ARTICLE XIX
DEFAULT

19.1    Each of the following shall constitute an "Event of Default":  (a) Tenant's failure to make when due any payment of the Base Rent, additional rent or other sum when due and such failure shall remain uncured for a period of five (5) calendar days following written notice thereof to Tenant; provided that no such notice shall be required if Landlord has sent Tenant two (2) similar notices in any calendar year or ten (10) similar notices at any time during the Lease Term; (b) Tenant's failure to perform or observe any covenant or condition of this Lease not otherwise specifically described in this Section 19.1, which failure shall continue for a period of twenty (20) days after Landlord sends Tenant written notice thereof; provided, however, that if such cure cannot reasonably be effected within such twenty (20) day period and Tenant begins such cure promptly within such twenty (20) day period and is pursuing such cure in good faith and with diligence and continuity during such twenty (20) day period, then, except in the event of an emergency placing persons and/or property at imminent risk of harm, injury or damage, Tenant shall have such additional time (not to exceed ninety (90) days) as is reasonably necessary to effect such cure, provided that Tenant continues to diligently pursue such cure in good until completion; (c) [intentionally deleted]; (d) an Event of Bankruptcy as specified in Article XX; (e) Tenant's dissolution or liquidation; (f) any Environmental Default as specified in Section 6.3; or (g) any sublease, assignment or mortgage not permitted by Article VII.

19.2    If there shall be an Event of Default (even if prior to the Lease Commencement Date), then the provisions of this Section shall apply.  Landlord shall have the right, at its sole option, to terminate this Lease.  In addition, with or without terminating this Lease, Landlord may re-enter, terminate Tenant's right of possession and take possession of the Premises.  The provisions of this Article shall operate as a notice to quit, and Tenant hereby waives any other notice to quit or notice of Landlord's intention to re-enter the Premises or terminate this Lease. If necessary, Landlord may proceed to recover possession of the Premises under applicable Laws, or by such other proceedings, including re-entry and possession, as may be applicable.  If Landlord elects to terminate this Lease and/or elects to terminate Tenant's right of possession, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, however, to Tenant's liability for all Base Rent, additional rent and other sums specified herein.  If Tenant is in default under this Lease and has vacated the Premises, and if Landlord has terminated this Lease as a result of such default, then Landlord shall thereafter use commercially reasonable good-faith efforts to relet the Premises to the extent required by applicable Law.  In no event shall Landlord be required to re-let the Premises: (i) before leasing similar vacant space in the Building; or (ii) for a rental less than the then-current fair market rental value for office space in the Building; (iii) to any tenant that does not meet Landlord's then-current criteria for direct leases of a comparable amount of space; or (iv) under any terms that would require Landlord to incur any expenses greater than the sum that Tenant pays to

62

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

Landlord as damages.  Tenant hereby expressly waives, for itself and all persons claiming by, through or under it, any right of redemption, re-entry or restoration of the operation of this Lease under any present or future Law, including without limitation any such right which Tenant would otherwise have in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Premises as herein provided.  Landlord may relet the Premises or any part thereof, alone or together with other premises, for such term(s) (which may extend beyond the date on which the Lease Term would have expired but for Tenant's default) and on such terms and conditions (which may include any concessions or allowances granted by Landlord) as Landlord, in its sole but reasonable discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet all or any portion of the Premises or to collect any rent due upon such reletting.  Whether or not this Lease and/or Tenant's right of possession is terminated or any suit is instituted, Tenant shall be liable for any Base Rent, additional rent, damages or other sum which may be due or sustained prior to such default, and for all reasonable, out-of-pocket costs, fees and expenses (collectively, "Relet Costs") (including, but not limited to, reasonable attorneys' fees and costs, brokerage fees, expenses incurred in placing the Premises in first-class rentable condition, advertising expenses, and any concessions or allowances granted by Landlord) incurred by Landlord in pursuit of its remedies hereunder and/or in recovering possession of the Premises and renting the Premises to others from time to time.  Notwithstanding anything in this Lease to the contrary, if the Premises are relet for a period that is longer than the then-remaining balance of the Lease Term, Tenant shall only be responsible for a fraction of the Relet Costs, the numerator of which fraction is the number of months then remaining in the Lease Term, and the denominator of which is the total number of months in the initial term of the replacement tenant's lease; and provided further, that if the Premises are relet as part of a larger premises, then with respect to Relet Costs incurred by Landlord, the Relet Costs for which Tenant shall be responsible shall be only a fraction thereof, the numerator of which is the rentable square footage of the Premises, and the denominator of which is the total rentable square footage being leased pursuant to the terms of the replacement tenant's lease.  Tenant shall also be liable for additional damages which at Landlord's election shall be either:  (a) an amount equal to the Base Rent and additional rent due or which would have become due from the date of Tenant's default through the remainder of the Lease Term, less the amount of rental, if any, which Landlord receives during such period from others to whom the Premises may be rented (other than any additional rent received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), which amount shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following Tenant's default and continuing until the date on which the Lease Term would have expired but for Tenant's default, it being understood that separate suits may be brought from time to time to collect any such damages for any month(s) (and any such separate suit shall not in any manner prejudice the right of Landlord to collect any damages for any subsequent month(s)), or Landlord may defer initiating any such suit until after the expiration of the Lease Term (in which event such deferral shall not be construed as a waiver of Landlord's rights as set forth herein and Landlord's cause of action shall be deemed not to have accrued until the expiration of the Lease Term) and it being further understood that if Landlord elects to bring suits from time to time prior to reletting the Premises, Landlord shall be entitled to its full damages through the date of the award of damages without regard to any Base Rent, additional rent or other sums that are or may be projected to be received by Landlord upon reletting of the Premises; or (b) an amount equal to the difference between

63

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

(i) all Base Rent, additional rent and other sums due or which would be due and payable under this Lease as of the date of Tenant's default through the end of the scheduled Lease Term, and (ii) the fair market value rental of the Premises over the same period (net of all expenses (including reasonable attorneys' fees) and all vacancy periods reasonably projected by Landlord to be incurred in connection with the reletting of the Premises), which Tenant proves by a preponderance of the evidence would be received by Landlord upon reletting of the Premises from the end of the vacancy period reasonably projected by Landlord through the expiration of the scheduled Lease Term, which difference shall be discounted to present value at a rate per annum equal to one (1) whole percentage point above the discount rate in effect on the date of payment at the Federal Reserve Bank nearest the Building, having a maturity period approximately commensurate to the remainder of the Lease Term, and which resulting amount shall be payable to Landlord in a lump sum on demand, it being understood that upon payment of such liquidated and agreed final damages, Tenant shall be released from further liability under this Lease with respect to the period after the date of such payment, and that Landlord may bring suit to collect any such damages at any time after an Event of Default shall have occurred. Tenant shall pay all expenses (including reasonable attorneys' fees) reasonably incurred by Landlord in connection with or as a result of any Event of Default whether or not a suit is instituted. The provisions contained in this Section shall be in addition to, and shall not prevent the enforcement of, any claim Landlord may have against Tenant for anticipatory breach of this Lease (including, without limitation, the right of injunction and the right to invoke any remedy allowed at law or in equity as if reentry, summary proceedings and other remedies were not provided for herein). Nothing herein shall be construed to affect or prejudice Landlord's right to prove, and claim in full, unpaid rent accrued prior to termination of this Lease. If Landlord is entitled, or Tenant is required, pursuant to any provision hereof to take any action upon the termination of the Lease Term, then Landlord shall be entitled, and Tenant shall be required, to take such action also upon the termination of Tenant's right of possession.

19.3    All rights and remedies of Landlord set forth in this Lease are cumulative and in addition to all other rights and remedies available to Landlord at law or in equity, including those available as a result of any anticipatory breach of this Lease. The exercise by Landlord of any such right or remedy shall not prevent the concurrent or subsequent exercise of any other right or remedy. No delay or failure by Landlord or Tenant to exercise or enforce any of its respective rights or remedies or the other party's obligations (except to the extent a time period is specified in this Lease therefor) shall constitute a waiver of any such or subsequent rights, remedies or obligations. Neither party shall be deemed to have waived any default by the other party unless such waiver expressly is set forth in a written instrument signed by the party against whom such waiver is asserted. If Landlord waives in writing any default by Tenant, such waiver shall not be construed as a waiver of any covenant, condition or agreement set forth in this Lease except as to the specific circumstances described in such written waiver.

19.4    If Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, then the same shall not constitute a waiver of the same or of any other covenant, condition or agreement set forth herein, nor of any of Landlord's rights hereunder. Neither the payment by Tenant of a lesser amount than the monthly installment of Base Rent, additional rent or of any sums due hereunder nor any endorsement or statement on any check or letter accompanying a check for payment of rent or other sums payable hereunder shall be deemed an accord and satisfaction. Landlord may accept the same without prejudice to

64

Landlord's right to recover the balance of such rent or other sums or to pursue any other remedy. Notwithstanding any request or designation by Tenant, Landlord may apply any payment received from Tenant to any payment then due. No re-entry by Landlord, and no acceptance by Landlord or Landlord's agents of keys from Tenant, shall be considered an acceptance of a surrender of this Lease. No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the expiration of the Lease Term. In the event that Tenant at any time desires to have Landlord underlet the Premises for Tenant's account, Landlord or Landlord's agents are authorized to receive the keys for such purposes without releasing Tenant from any of the obligations under this Lease, and Tenant hereby relieves Landlord of any liability for loss of or damage to any of Tenant's effects in connection with such underletting.

19.5    If Tenant fails to make any payment to any third party or to do any act herein required to be made or done by Tenant, then, after providing Tenant with notice thereof and five (5) business days within which to cure (except in the case of any emergency or in the case any of the Building systems or structures or provision of services to any part of the Building are thereby affected, in which case no prior notice or cure period shall be required), Landlord may, but shall not be required to, make such payment or do such act. The taking of such action by Landlord shall not be considered a cure of such default by Tenant or prevent Landlord from pursuing any remedy it is otherwise entitled to in connection with such default. If Landlord elects to make such payment or do such act, then all expenses incurred by Landlord, plus interest thereon at a rate (the "Default Rate") equal to the greater of twelve percent (12%) per annum or the rate per annum which is three (3) whole percentage points higher than the prime rate published in the Money Rates section of *The Wall Street Journal* (the "Prime Rate"), from the date incurred by Landlord to the date of payment thereof by Tenant, shall constitute additional rent due hereunder; provided, however, that nothing contained herein shall be construed as permitting Landlord to charge or receive interest in excess of the maximum rate then allowed by applicable Law.

19.6    If Tenant fails to make any payment of Base Rent, additional rent or any other sum on or before the date such payment is due and payable (without regard to any grace period that may be specified in Section 19.1), then Tenant shall be assessed (and shall promptly pay) a late charge of five percent (5%) of the amount of such payment. In addition, such payment and such late fee shall bear interest at the Default Rate from the date such payment or late fee, respectively, became due to the date of payment thereof by Tenant; provided, however, that nothing contained herein shall be construed as permitting Landlord to charge or receive interest in excess of the maximum rate then allowed by applicable Law. Such late charge and interest shall constitute additional rent due hereunder without any notice or demand. Notwithstanding any contrary provision contained herein, Landlord shall waive its right to collect the late charge and interest on the first late payment of Rent in any twelve (12)-month period (but not more than ten (10) times in the aggregate during the Lease Term) provided that such payment is made no later than the fifth (5th) business day after Landlord delivers to Tenant written notice of such late payments.

19.7    Landlord hereby waives any statutory or contractual liens or security interests upon any of Tenant's personal property, intangibles or intellectual property; provided nothing herein shall prevent Landlord from (i) obtaining and enforcing (subject to others' priorities on

WDC 91095636v14

such items at the time) a judgment lien from a court of competent jurisdiction on any or all of the foregoing, or (ii) exercising any other right Landlord may have with respect to such personal property or equipment pursuant to the terms of this Lease (including any right Landlord to remove such personal property or equipment pursuant to the terms of this Lease).

19.8    If more than one natural person or entity shall constitute Tenant, then the liability of each such person or entity shall be joint and several.  If Tenant is a general partnership or other entity the partners or members of which are subject to personal liability, then the liability of each such partner or member shall be joint and several.  No waiver, release or modification of the obligations of any such person or entity shall affect the obligations of any other such person or entity.

19.9    <u>Landlord Default</u>.  Landlord shall be in default of this Lease (a "<u>Landlord Default</u>") upon the occurrence of the following at which time Tenant may pursue whatever remedies it has at law or in equity, subject to any limitations expressly set forth elsewhere in this Lease:

(a)    If Landlord shall fail to pay any monies due under this Lease on the date when due, and such failure shall continue for a period of five (5) business days after the giving of written notice from Tenant to Landlord of such failure.

(b)    If Landlord shall fail to observe or perform any of the other covenants, conditions and agreements of this Lease and such failure shall continue for a period of thirty (30) days after written notice from Tenant to Landlord of such failure; provided, however, that if such failure is not reasonably capable of being cured within such thirty (30) day period, then such additional time as is reasonably required to cure any such default, provided Landlord promptly commences and diligently pursues the cure of such failure.

ARTICLE XX
BANKRUPTCY & FINANCIAL STATEMENTS

20.1    An "<u>Event of Bankruptcy</u>" is the occurrence with respect to any of Tenant or any other person liable for Tenant's obligations hereunder (including, without limitation, any general partner of Tenant (a "<u>General Partner</u>")) of any of the following:  (a) such person becoming insolvent, as that term is defined in Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") or under the insolvency laws of any state (the "<u>Insolvency Laws</u>"); (b) appointment of a receiver or custodian for any property of such person, or the institution of a foreclosure or attachment action upon any property of such person; (c) filing by such person of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Laws; (d) filing of an involuntary petition against such person as the subject debtor under the Bankruptcy Code or Insolvency Laws, which either (1) is not dismissed within ninety (90) days after filing, or (2) results in the issuance of an order for relief against the debtor; (e) such person making or consenting to an assignment for the benefit of creditors or a composition of creditors; (f) such person knowingly submitting (either before or after execution hereof) to Landlord any financial statement containing any inaccuracy or omission that renders such financial statement false or misleading in any material respect; or (g) an admission by Tenant of its inability to pay debts as they become due.

66

20.2    Upon occurrence of an Event of Bankruptcy, Landlord shall have all rights and remedies available pursuant to Article XIX; provided, however, that while a case (the "Case") in which Tenant is the subject debtor under the Bankruptcy Code is pending, Landlord's right to terminate this Lease shall be subject, to the extent required by the Bankruptcy Code, to any rights of Tenant or its trustee in bankruptcy (collectively, "Trustee") to assume or assume and assign this Lease pursuant to the Bankruptcy Code.

20.3    Tenant, no later than ten (10) business days after written request by Landlord, will provide Landlord with a copy of its most recent financial statements, consisting of a Balance Sheet, Earnings Statement, Statement of Changes in Financial Position, Statement of Changes in Owner's Equity, and related footnotes, prepared in accordance with generally accepted accounting principles.  Such financial statements must be certified by Tenant's CFO or Tenant's outside certified public accountant.  The financial statements provided must be as of a date not more than twelve (12) months prior to the date of request; provided, however, if such request is made prior to the date that is three (3) months after the expiration of Tenant's fiscal year and Tenant's audited financial statements are not then available, then the audited financial statements provided must be as of a date not more than fifteen (15) months prior to the date of request and shall be accompanied by Tenant's unaudited statements for the most recent fiscal year.  Landlord shall retain such statements in confidence, but may provide copies to any lender, potential lender purchaser or potential purchaser in connection with a financing or potential financing or sale or potential sale of the Building or any interest therein or in Landlord (and to any of Landlord's advisors in connection with same).  Notwithstanding the foregoing, if Tenant is a corporation having its outstanding voting stock listed on a national securities exchange (as defined in the Securities Exchange Act of 1934), then the financial statements may be provided to Landlord by Tenant delivering to Landlord Tenant's annual report within ten (10) business days after Landlord's written request therefor (unless such information is publicly available through EDGAR (or such other computer system for the Securities and Exchange Commission as is available) on the internet, in which case Tenant shall not be required to provide Landlord with any documentation pursuant to this Section 20.3).  Notwithstanding anything contained in this Section 20.3 to the contrary, Tenant shall not be required to provide any financial statements to Landlord more than once in any calendar year, unless Tenant is in default (beyond any applicable notice and cure period) or such financial statements are required by a lender, potential lender, purchaser or potential purchaser in connection with a refinancing or potential refinancing or sale or potential sale of the Building or any interest therein or in Landlord.  Landlord agrees that (i) the format of Tenant's financial statements delivered to Landlord on September 8, 2020 and September 14th, 2020, prior to the Execution Date (collectively, the "Original Financials") satisfy the format and requirements specified in this Section 20.3, and (ii) any future financial statements delivered under this Section 20.3 that are materially in the same format as the Original Financials shall satisfy the format and requirements specified in this Section 20.3.

## ARTICLE XXI
## SUBORDINATION

21.1    Subject to the terms and provisions of this Article XXI, this Lease is subject and subordinate to the lien, provisions, operation and effect of all mortgages, deeds of trust, ground leases or other security instruments which may now or hereafter encumber any portion of the Building or the Land (collectively, "Mortgages"), to all funds and indebtedness intended to be

67

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

secured thereby, and to all renewals, extensions, modifications, recastings or refinancings thereof. Said subordination and the provisions of this Section shall be self-operative and no further instrument of subordination shall be required to effect such subordination. The holder of any Mortgage to which this Lease is subordinate shall have the right (subject to any required approval of the holders of any superior Mortgage) at any time to declare this Lease to be superior to the lien, provisions, operation and effect of such Mortgage.

21.2    Tenant shall, at Landlord's written request, promptly execute any commercially reasonable written document confirming such subordination within ten (10) business days following such written request on the standard form of the holder of any Mortgage; provided, however, that such document shall, subject to the terms of this Lease, (i) provide that Tenant's occupancy of the Premises shall not be disturbed so long as no Event of Default is in existence under this Lease, (ii) not increase the amount of Rent required under this Lease, shorten the Lease Term, change or redefine the Premises, increase any of Tenant's liabilities or obligations (to more than to a de minimis extent), or decrease any of Tenant's rights or Landlord's obligations, under this Lease (to more than to a de minimis extent), and (iii) recognize Tenant's right to offset any unpaid construction allowance against rent in accordance with the offset right set forth in the Work Agreement attached hereto as <u>Exhibit B</u>. Tenant waives the provisions of any statute or rule of law now or hereafter in effect which may give or purport to give Tenant any right to terminate or otherwise adversely affect this Lease and Tenant's obligations hereunder in the event any foreclosure proceeding is prosecuted or completed or in the event the Building, the Land or Landlord's interest therein is transferred by foreclosure, by deed in lieu of foreclosure or otherwise. This Lease shall not be extinguished upon any such transfer or by the transferee following such transfer so long no uncured Event of Default exists. In the event of any such transfer, Tenant shall attorn to such transferee and shall recognize such transferee as the landlord under this Lease. Tenant agrees that upon any such attornment (such date of attornment being the "<u>Succession Date</u>"), such transferee shall not be (a) bound by or required to credit Tenant with any prepayment of the Base Rent or additional rent more than thirty (30) days in advance excluding any deposit, rental security or any other sums deposited with any prior landlord under the Lease (including Landlord) to the extent said sum is actually received by such transferee, it being agreed by Landlord that Landlord shall be required to deposit with, or otherwise deliver to, any such transferee all such deposit, rental security and other prepaid amounts, including transferring the letter of credit; (b) bound by any amendment, modification or termination of this Lease made without the consent of the holder of each Mortgage existing as of the date of such amendment (to the extent such consent is required), except to the extent that such amendment or modification sets forth the terms and conditions governing the timely exercise by Tenant of a right or option expressly set forth in this Lease; (c) liable for any breach, act or omission of any prior landlord under the Lease (including Landlord) or any damages arising therefrom; provided, however, nothing herein shall be deemed to be a waiver of Tenant's rights or remedies in the event such breach, act or omission is of a continuing nature which existed as of the Succession Date and continues after the holder of the Mortgage succeeds to the ownership of the Building; (d) subject to any offsets or defenses which Tenant might have against any prior landlord (including Landlord) prior to the Succession Date; except for (i) those offset rights expressly set forth in the Lease, including the right to offset the Construction Allowance, or (ii) any free rent periods or rent abatement provisions benefitting Tenant expressly set forth in the Lease, or (iii) any compulsory counterclaims permitted by the Lease; provided, however, that the foregoing shall not limit mortgagee's obligations under the Lease to correct any

conditions of a continuing nature which existed as of the Succession Date; or (e) bound by any obligation which may appear in this Lease to pay any sum of money to Tenant; provided, however, that after succeeding to Landlord's interest under this Lease, such transferee shall agree to perform in accordance with the terms of this Lease all obligations of Landlord arising after the date of transfer.  Within ten (10) business days after the request of such transferee, Tenant shall execute, acknowledge and deliver any commercially reasonable document submitted to Tenant reasonably confirming such attornment, subject to, and provided same is consistent with, the terms, conditions and requirements set forth in this Article XXI.

21.3    If any prospective or current holder of a Mortgage requires that modifications to this Lease be obtained, and provided that such modifications (a) are commercially reasonable, (b) do not adversely affect in a material manner Tenant's use of the Premises as herein permitted, (c) do not increase Tenant's obligations or liabilities, or decrease Tenant's rights, under this Lease (to more than a de minimis extent), and (d) do not increase the Rent and other sums to be paid by Tenant, then Landlord may submit to Tenant an amendment to this Lease incorporating such required modifications, and, provided Tenant does not contest in good faith such modifications or amendment as being inconsistent with the requirements set forth above, then Tenant shall execute, acknowledge and deliver such amendment to Landlord within ten (10) business days after Tenant's receipt thereof.

21.4    Simultaneously with the full execution of this Lease by Landlord and Tenant, Landlord shall secure for the benefit of Tenant a subordination, non-disturbance and attornment agreement ("SNDA"), recognizing Tenant's rights under this Lease, from the holder of the Mortgage currently encumbering the Building and/or the Land in the form of Exhibit G attached hereto, and Landlord shall use commercially reasonable efforts to obtain an SNDA, recognizing Tenant's rights under this Lease, from the holder of each Mortgage hereafter encumbering the Building and/or the Land on such holder's standard form SNDA provided such form of SNDA (i) provides that Tenant's occupancy of the Premises shall not be disturbed so long as no Event of Default is in existence under this Lease, and (ii) does not increase the amount of Rent required under this Lease, shorten the Lease Term, change or redefine the Premises, increase any of Tenant's liabilities or obligations (to more than a de minimis extent), or decrease any of Tenant's rights or Landlord's obligations under this Lease (to more than a de minimis extent).  Tenant shall pay as additional rent under this Lease all reasonable and customary out-of-pocket costs (including reasonable attorneys' fees) incurred by Landlord in connection with Landlord's efforts to secure a future SNDA for Tenant.

ARTICLE XXII
HOLDING OVER

22.1    If Tenant (or anyone claiming through Tenant) does not immediately surrender the Premises or any portion thereof upon the expiration or earlier termination of the Lease Term, then the holdover fee payable by Tenant hereunder shall be equal to one hundred percent (100%) of the additional rent and other sums that would have been payable pursuant to the provisions of this Lease if the Lease Term had continued during such holdover period plus the following percentages of the Base Rent that would have been payable pursuant to the provisions of this Lease if the Lease Term had continued during such holdover period: (i) one hundred percent (100%) for the first (1st) month of such holdover, (ii) one hundred fifty percent (150%) for each

69

of the second (2nd) and third (3rd) months of such holdover; and (iii) two hundred percent (200%) for each month thereafter. Such holdover fee shall be computed by Landlord and paid by Tenant on a monthly basis and shall be payable on the first day of such holdover period and the first day of each calendar month thereafter during such holdover period until the Premises has been vacated. Notwithstanding any other provision of this Lease, Landlord's acceptance of such holdover fee shall not in any manner adversely affect Landlord's other rights and remedies, including Landlord's right to evict Tenant and to recover all damages (including consequential damages for any holdover by or through Tenant that lasts in excess of ninety (90) days). Any such holdover shall be deemed to be a tenancy-at-sufferance and not a tenancy-at-will or tenancy from month-to-month. In no event shall any holdover be deemed a permitted extension or renewal of the Lease Term, and nothing contained herein shall be construed to constitute Landlord's consent to any holdover or to give Tenant any right with respect thereto.

ARTICLE XXIII
COVENANTS OF LANDLORD

23.1    Landlord covenants that it has the right to enter into this Lease, and, provided that no uncured Event of Default then exists under this Lease beyond any applicable notice and cure periods, then Tenant shall during all such times during the Lease Term peaceably and quietly occupy and enjoy the full possession of the Premises (i.e., quiet enjoyment) without hindrance by Landlord, its employees or agents.

23.2    Subject to other applicable terms and provisions expressly provided in this Lease, Landlord reserves the following rights: (a) to change the street address and name of the Building provided that Tenant's access to the Premises is not permanently, materially and adversely affected, provided that, if Landlord changes the street address or name of the Building and such change is not made, directed or requested by the postal service or any governmental or quasi-governmental authority, then Landlord shall reimburse Tenant for the actual out of pocket cost incurred by Tenant to replace stationary, business cards, marketing materials on hand and update Tenant's webpage which bears the old address or name of the Building, as the case may be up to a maximum of Ten Thousand Dollars ($10,000.00); (b) to change the arrangement and location of entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets or other public parts of, and make additions to, the Building provided that Tenant's access to the Premises is not materially and adversely affected; (c) to erect, use and maintain pipes, wires, structural supports, ducts and conduits in and through the plenum areas of the Premises, provided that any such installation, use and maintenance does not unreasonably interfere with Tenant's use of the Premises; (d) to grant to anyone the exclusive right to conduct any particular business in the Building not inconsistent with Tenant's Permitted Use of the Premises, provided any such exclusive shall not result in a reduction in Tenant's rights under this lease; (e) excluding the Amenities, but otherwise subject to the terms and provisions of this Lease, to exclusively use and/or lease the roof areas, the sidewalks and other exterior areas; (f) to re-subdivide the Land or to combine the Land with other lands; (g) to relocate any parking areas designated for Tenant's use, provided the same are on the Land; (h) if Tenant abandons the Premises prior to the expiration of the Lease Term, to make Alterations to or otherwise prepare the Premises for re-occupancy without relieving Tenant of its obligation to pay all Base Rent, additional rent and other sums due under this Lease through such expiration; (i) to construct improvements (including kiosks) on the Land and in the public and common areas of the Building; (j) to

70

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

prohibit smoking (including the use of e-cigarettes, vapor pens, etc.) in certain perimeters surrounding the Building entrances and exits (including the Parking Facility) within which smoking (including the use of e-cigarettes, vapor pens, etc.) shall not be permitted; and (k) if any excavation or other substructure work shall be made or authorized to be made upon land adjacent to the Building or the Land, to enter the Premises (with reasonable prior written notice) for the purpose of doing such work as is required to preserve the walls of the Building and to preserve the land from injury or damage and to support such walls and land by proper foundations. Subject to the other applicable terms and provisions expressly provided in this Lease, Landlord may exercise any or all of the foregoing rights without being deemed to be guilty of an eviction, actual or constructive, or a disturbance of Tenant's business or use or occupancy of the Premises and Tenant shall have no claim against Landlord in connection therewith; provided that, with respect to clauses (b), (c), (e), (g), (i) and (k) above, Landlord shall use commercially reasonable efforts to minimize interference with Tenant's normal business operations in the Premises (subject, however, in all cases to governmental requirements, emergencies and/or temporary maintenance and repair activities, and in no event shall Landlord have any obligation to employ contractors or labor at overtime or other premium pay rates or incur any other overtime costs), provided that, in the exercise of any such rights above, Tenant shall have access to the Building and the Premises at all times.

ARTICLE XXIV
PARKING

24.1    During the Lease Term, Landlord agrees to make available (or to cause the operator of the Parking Facility (the "Operator") to make available) to Tenant and its employees, contracts for monthly parking permits for unreserved parking of standard-sized passenger automobiles in the Parking Facility in an amount equal to the Parking Allotment. The permits shall be non-exclusive, unassigned spaces on a self-park or attendant-park basis, and the charge for such permits shall be the prevailing rate charged from time to time by Landlord or the Operator (which rates shall be comparable to the market rates charged at Comparable Buildings, subject to periodic adjustments). Such charges shall be paid monthly in advance to the Operator. Except as otherwise provided herein, contracts for parking permits shall be with the Operator and shall contain the same terms as are usually contained in contracts with other customers of the Operator. Notwithstanding any contrary provision contained in this Article XXIV, Landlord shall only guarantee monthly parking permits up to the Parking Allotment, but in no event more than Parking Allotment, from and after the date of Beneficial Occupancy and thereafter during the Lease Term, as extended, if at all, if and to the extent Tenant provides at least ninety (90) days' prior written notice to Tenant that Tenant elects to lease any such parking permits from Landlord, it being agreed that any unused or relinquished parking permits by Tenant may be reclaimed by Tenant throughout the Lease Term by providing Landlord with at least ninety (90) days' prior written notice. Tenant shall be permitted to convert up to ten percent (10%) of its Parking Allotment to reserved parking spaces by delivering at least sixty (60) days' prior written notice to Landlord, which reserved parking spaces shall be in locations determined by Landlord. If Tenant elects to convert a portion of its Parking Allotment to reserved parking, the charge for such reserved parking spaces shall be the prevailing rate charged from time to time by Landlord or the Operator for reserved parking (which rates shall be comparable to the market rates charged at Comparable Buildings for reserved parking spaces, subject to periodic adjustments). Tenant shall not use the Parking Facility for the servicing or extended storage of vehicles. Tenant shall

71

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

not assign, sublet or transfer any permits hereunder, except in connection with any assignment or sublease permitted pursuant to Article VII hereof where parking is provided for in the sublease or assignment. Landlord reserves the right to institute either a Parking Facility operator system, a valet parking system or a self-parking system, or to otherwise change the parking system. Tenant and its employees shall observe reasonable safety precautions in the use of the Parking Facility or any other parking area and shall at all times abide by all rules and regulations governing the use of the Parking Facility. If Landlord, in its sole and absolute good-faith discretion, grants to any other tenant of the Building the exclusive right to use any particular parking spaces, then Landlord shall clearly mark the spaces to reflect such exclusive use, and neither Tenant nor its employees or visitors shall use such spaces. The Parking Facility, for daily users (as opposed to monthly permit holders), will remain open to the public on Monday through Friday (excluding legal holidays) during the hours of 7 a.m. to 7 p.m.; however, automobiles may exit (but not enter) the Parking Facility at any time. Landlord reserves the right to close the Parking Facility or any other parking area during periods of unusually inclement weather or for Alterations, improvements or repairs. At all times when the Parking Facility is closed, monthly permit holders shall be afforded access to the Parking Facility by means of a magnetic card or other procedure provided by Landlord or the Operator. Landlord does not assume any responsibility, and shall not be held liable, for any damage or loss to any automobile or personal property in or about the Parking Facility or any other parking area, or for any injury sustained by any person in or about the Parking Facility or any other parking area, except to the extent caused by the negligence or willful misconduct of Landlord, its agents, contractors or employees. Landlord shall not be liable to Tenant and this Lease shall not be affected if any parking rights hereunder are impaired by any Law imposed after the Lease Commencement Date. Landlord reserves the right to determine whether the parking facilities are becoming crowded and to allocate and assign parking spaces among Tenant and the other tenants provided that the Parking Allotment will not be reduced thereby.

24.2    From and after the Rent Commencement Date, if Tenant is unable to access twenty percent (20%) or more of its then-existing number of parking permits (the "Unavailable Parking Permits"), for a period in excess of forty-five (45) consecutive days, then Landlord shall use commercially reasonable efforts to identify comparable alternative parking for Tenant to the extent of the Unavailable Parking Permits in a parking garage within four (4) city blocks of the Building, the cost of which shall be paid solely by Tenant; provided, however, that Landlord shall reimburse Tenant for the cost of such alternate parking for the Unavailable Parking Permits to the extent the parking fees for the alternate parking exceed the parking fees that Tenant otherwise would have paid to Landlord or the Operator pursuant to Section 24.1 above for the Unavailable Parking Permits, which reimbursement shall be made within thirty (30) days following receipt of an invoice from Tenant and evidence reasonably satisfactory to Landlord that Tenant has paid such alternate parking fees for the Unavailable Parking Permits.

ARTICLE XXV
GENERAL PROVISIONS

25.1    Tenant acknowledges that neither Landlord nor any broker, agent or employee of Landlord has made any representation or promise with respect to the Premises or any portion of the Building except as herein expressly set forth, and no right, privilege, easement or license is being acquired by Tenant except as herein expressly set forth.

DocuSign Envelope ID: EE8C1D67-BB69-4B8B-A358-6865DF8C2D22

25.2    Nothing contained in this Lease shall be construed as creating any relationship between Landlord and Tenant other than that of landlord and tenant, and no estate shall pass out of Landlord.  Tenant shall not use the name of the Building for any purpose other than as the address of the business to be conducted by Tenant in the Premises, use the name of the Building as Tenant's business address after Tenant vacates the Premises, or do or permit to be done anything in connection with Tenant's business or advertising which in the reasonable judgment of Landlord may reflect unfavorably on Landlord or the Building or confuse or mislead the public as to any apparent connection or relationship between Landlord, the Building and Tenant.

25.3    Landlord and Tenant each warrants to the other that in connection with this Lease it has not employed or dealt with any broker, agent or finder, other than the Brokers.  It is understood that Landlord shall pay each of the Brokers a commission pursuant to the terms of separate agreements between Landlord and each such Broker.  Tenant shall indemnify and hold Landlord harmless from and against any claim for brokerage or other commissions, or for a lien under any applicable broker's lien law, asserted by any broker, agent or finder employed by Tenant or with whom Tenant has dealt, other than Landlord's Broker.  Landlord shall indemnify and hold Tenant harmless from and against any claim for brokerage or other commissions asserted by Landlord's Broker and any other broker, agent or finder employed by Landlord or with whom Landlord has dealt, other than Tenant's Broker.  Tenant's and Landlord's indemnities set forth in this Section shall survive the expiration or earlier termination of the Lease Term.

25.4    At any time and from time to time, upon not less than ten (10) days' prior written notice, Tenant shall execute, acknowledge and deliver (and shall cause each of Tenant's subtenants, assignees, licensees, concessionaires or occupants of Tenant to execute, acknowledge and deliver) to Landlord and/or any other person or entity designated by Landlord, a written statement certifying, to the extent accurate:  (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and stating the modifications); (b) the dates to which the rent and any other charges have been paid; (c) to Tenant's actual knowledge, whether or not Landlord is in default in the performance of any obligation, and if so, specifying the nature of such default; (d) the address to which notices to Tenant are to be sent; (e) [intentionally deleted]; (f) that Tenant has accepted the Premises and that all work thereto has been completed (or if such work has not been completed, specifying the incomplete work); and (g) such other matters as Landlord may reasonably request.  Any such statement may be relied upon by any owner of the Building or the Land, any prospective purchaser of the Building or the Land, any holder or prospective holder of a Mortgage or any other person or entity.  Tenant acknowledges that time is of the essence to the delivery of such statements and that Tenant's failure to deliver timely such statements may cause substantial damages resulting from, for example, delays in obtaining financing.

25.5    LANDLORD, TENANT, AND ALL GENERAL PARTNERS EACH WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT HEREUNDER, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE.  TENANT CONSENTS TO SERVICE OF PROCESS AND ANY PLEADING RELATING TO ANY SUCH ACTION AT THE PREMISES;

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

PROVIDED, HOWEVER, THAT NOTHING HEREIN SHALL BE CONSTRUED AS REQUIRING SUCH SERVICE AT THE PREMISES.  TENANT WAIVES ANY RIGHT TO RAISE ANY NON-COMPULSORY COUNTERCLAIM IN ANY SUMMARY OR EXPEDITED ACTION OR PROCEEDING INSTITUTED BY LANDLORD.  LANDLORD, TENANT, AND ALL GENERAL PARTNERS EACH WAIVES ANY OBJECTION TO THE VENUE OF ANY ACTION FILED IN ANY COURT SITUATED IN THE JURISDICTION IN WHICH THE BUILDING IS LOCATED, AND WAIVES ANY RIGHT, CLAIM OR POWER, UNDER THE DOCTRINE OF FORUM NON CONVENIENS OR OTHERWISE, TO TRANSFER ANY SUCH ACTION TO ANY OTHER COURT.

25.6    All notices or other communications required under this Lease shall be in writing and shall be deemed duly given and received when delivered in person (with receipt therefor), on the next business day after deposit with a recognized overnight delivery service, or on the day of confirmed receipt if being sent by certified or registered mail, return receipt requested, postage prepaid, to the following addresses:  (a) if to Landlord, at the Landlord Notice Address specified in Article I, with a copy to Stroock & Stroock & Lavan LLP, 1875 K Street N.W., Suite 800, Washington, D.C.  20036, Attention: Jeffrey R. Keitelman, Esq.; and (b) if to Tenant, at the Tenant Notice Address specified in Article I.  Either party may change its address for the giving of notices by written notice given in accordance with this Section.  If Landlord or the holder of any Mortgage notifies Tenant in writing that a copy of any notice to Landlord shall be sent to such holder at a specified address, then Tenant shall send (in the manner specified in this Section and at the same time such notice is sent to Landlord) a copy of each such notice to such holder, and no such notice shall be considered duly sent unless such copy is so sent to such holder.  Any such holder shall have thirty (30) days after receipt of such notice to cure any Landlord default before Tenant may exercise any remedy (provided that in the case of a Landlord default arising from an act or omission which cannot be reasonably remedied within said thirty (30) day period, then the holder of any Mortgage shall have as long as reasonably necessary to remedy such act or omission provided that (i) such holder commences such remedy and notifies Tenant within said thirty (30) day period of holder's desire to remedy, and (ii) holder pursues completion of such remedy with due diligence following such giving of notice and following the time when holder should have become entitled under the Mortgage to remedy the same).  Any cure of Landlord's default by such holder shall be treated as performance by Landlord.

25.7    Each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.  If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, then such provision shall be deemed to be replaced by the valid and enforceable provision most substantively similar to such invalid or unenforceable provision, and the remainder of this Lease and the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby.  Nothing contained in this Lease shall be construed as permitting Landlord to charge or receive interest in excess of the maximum rate allowed by law.

25.8    Feminine, masculine or neuter pronouns shall be substituted for those of another form, and the plural or singular shall be substituted for the other number, in any place in which the context may require such substitution.

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-BB68-4B8B-A358-6865DF8C2D22

25.9    The provisions of this Lease shall be binding upon and inure to the benefit of the parties and each of their respective representatives, successors and assigns, subject to the provisions herein restricting assignment or subletting by Tenant.

25.10    This Lease contains and embodies the entire agreement of the parties hereto and supersedes all prior agreements, negotiations, letters of intent, proposals, representations, warranties, understandings, suggestions and discussions, whether written or oral, between the parties hereto.  Any representation, inducement, warranty, understanding or agreement that is not expressly set forth in this Lease shall be of no force or effect.  This Lease may be modified or changed in any manner only by an instrument signed by both parties.  This Lease includes and incorporates all Exhibits attached hereto.

25.11    This Lease shall be governed by the Laws of the District of Columbia, without regard to the application of choice of law principles.  There shall be no presumption that this Lease be construed more strictly against the party who itself or through its agent prepared it (it being agreed that all parties hereto have participated in the preparation of this Lease and that each party had the opportunity to consult legal counsel before the execution of this Lease).  No custom or practice which may evolve between the parties in the administration of the terms of this Lease shall be construed to waive Landlord's right to insist on Tenant's strict performance of the terms of this Lease.

25.12    Headings and subheadings are used for convenience and shall not be considered when construing this Lease.

25.13    The submission of an unsigned copy of this document to Tenant shall not constitute an offer or option to lease the Premises.  This Lease shall become effective and binding only upon execution and delivery by both Landlord and Tenant.  This Lease shall be effective as of the Execution Date and such date shall be inserted by Landlord on the first page of this Lease upon the full execution and delivery by Landlord and Tenant of this Lease.

25.14    Time is of the essence with respect to each of Tenant's and Landlord's obligations hereunder.

25.15    This Lease may be executed in multiple counterparts, each of which shall be deemed an original and all of which together constitute one and the same document.  Faxed signatures shall have the same binding effect as original signatures.

25.16    Neither this Lease nor a memorandum thereof shall be recorded.

25.17    [Intentionally Deleted]

25.18    The rentable area in the Building and in the Premises has been determined by the Building's architect and as of the date hereof is in accordance with the 2010 BOMA (ANSI Z65.1-2010) calculation methodology with accompanying guidelines (the "BOMA Standard").

25.19    Except as otherwise provided in this Lease, any additional rent or other sum owed by Tenant to Landlord, and any cost, expense, damage or liability incurred by Landlord for which Tenant is liable, shall be considered additional rent payable pursuant to this Lease to be

DocuSign Envelope ID: EE8C1D67-BD69-4B8B-A358-6865DF8C2D22

paid by Tenant within the time specified in this Lease, or if no specific time period is specified, then no later than thirty (30) days after the date Landlord notifies Tenant of the amount thereof.

25.20   Tenant's liabilities and obligations with respect to the period prior to the expiration or earlier termination of the Lease Term shall survive such expiration or earlier termination, subject to the terms and provisions, if any, expressly set forth in the Lease with respect to same.

25.21   If Landlord or Tenant is in any way delayed or prevented from performing any obligation (except, with respect to Tenant, its obligations to pay rent and other sums due under this Lease, any obligation set forth in Exhibit B, any obligation with respect to insurance pursuant to Article XIII, any obligation to give notice to Landlord with respect to extensions, expansions or otherwise, and any holdover, and except, with respect to Landlord, its obligations to pay any amounts hereunder, including, without limitation, the Construction Allowance, any obligation set forth in Exhibit B, any obligation with respect to insurance pursuant to Article XIII and any obligation to give notice to Tenant with respect to expansions or otherwise) due to fire, act of God, governmental act or failure to act, strike, labor dispute, inability to procure materials, any actual or threatened health emergency, including, but not limited to, epidemics, pandemic, famine, disease, plague, quarantine, and other health risk, including, but not limited, to health risks declared or recognized by the Centers for Disease Control, the World Health Organization or any governmental authority or other similar body, or any cause beyond Landlord's reasonable control (whether similar or dissimilar to the foregoing events) (each, a "Force Majeure Event"), then the time for performance of such obligation shall be extended on a day-for-day basis for a period equal to the period of such delay or prevention.   No Force Majeure Event shall delay the Lease Commencement Date, the Rent Commencement Date or excuse the timely payment of all items of rent by Tenant.   Financial disability or hardship shall never constitute a Force Majeure Event.

25.22   Landlord's review, approval and consent powers (including the right to review plans and specifications) are for its benefit only and not a representation concerning legality, safety or any other matter.

25.23   The deletion of any printed, typed or other portion of this Lease shall not evidence the parties' intention to contradict such deleted portion.   Such deleted portion shall be deemed not to have been inserted in this Lease.

25.24   At the expiration or earlier termination of the Lease Term, Tenant shall deliver to Landlord all keys and security cards to the Building and the Premises, whether such keys were furnished by Landlord or otherwise procured by Tenant, and shall inform Landlord of the combination or access code of each lock, safe and vault, if any, in the Premises.

25.25   Tenant represents and warrants that the person executing and delivering this Lease on Tenant's behalf is duly authorized to so act; that Tenant is duly organized, is qualified to do business in the jurisdiction in which the Building is located, is in good standing under the Laws of the state of its organization and the Laws of the jurisdiction in which the Building is located, and has the power and authority to enter into this Lease; and that all action required to authorize Tenant to enter into this Lease has been duly taken.   Landlord represents and warrants

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

that the person executing and delivering this Lease on Landlord's behalf is duly authorized to so act; that Landlord is duly organized, is qualified to do business in the jurisdiction in which the Building is located, is in good standing under the Laws of the state of its organization and the Laws of the jurisdiction in which the Building is located, and has the power and authority to enter into this Lease; and that all action required to authorize Landlord to enter into this Lease has been duly taken. Each of Landlord and Tenant, each as to itself, hereby represents its compliance with all applicable anti-money laundering Laws, including, without limitation, the USA Patriot Act, and the Laws administered by the United States Treasury Department's Office of Foreign Assets Control, including, without limitation, Executive Order 13224 ("Executive Order"). Each of Landlord and Tenant further represents (i) that it is not, and it is not owned or controlled directly or indirectly by any person or entity, on the SDN List published by the United States Treasury Department's Office of Foreign Assets Control and (ii) that it is not a person otherwise identified by government or legal authority as a person with whom a U.S. Person is prohibited from transacting business. As of the Execution Date, a list of such designations and the text of the Executive Order are published under the internet website address www.ustreas.gov/offices/enforcement/ofac.

25.26  Any elimination or shutting off of light, air, or view by any structure which may be erected on lands adjacent to the Building, or any noise in connection with the activities permitted by this Lease, shall in no way affect this Lease or impose any liability on Landlord.

25.27  Tenant waives any and all claims, causes of action, or rights it may have against the Washington Metropolitan Area Transit Authority, Landlord, or third parties arising from noise or vibration caused directly or indirectly by the operation or repair of the metro system and its facilities. Tenant recognizes that Landlord does not control and is not responsible for operating or maintaining such system or facilities or the ingress or egress areas in and around such system and facilities.

25.28  In the event Landlord or Tenant is required or elects to take legal action against the other party to enforce the provisions of this Lease, then the prevailing party in such action shall be entitled to collect from the other party its costs and expenses incurred in connection with the legal action (including, without limitation, reasonable attorneys' fees and court costs). Notwithstanding the foregoing, if Landlord shall take any legal action for collection of rent or file any eviction proceedings (whether summary or otherwise) for the non-payment of rent, and Tenant shall make payment of such rent prior to the rendering of any judgment, then Landlord shall be entitled to collect and Tenant shall pay as additional rent all filing fees and other costs in connection therewith (including reasonable attorneys' fees).

25.29  Landlord and Tenant shall keep this Lease, and the existence, terms and conditions thereof and of any dispute thereunder, strictly confidential and shall not disclose same to any person or entity other than a Permitted Person on a need-to-know basis. A "Permitted Person" shall be defined as the officers and directors of Landlord or Tenant, the employees of Landlord or Tenant who are involved in lease administration, Landlord or Tenant's respective certified public accountants, lenders and attorneys who have responsibilities related to the Lease, or any person or entity to whom disclosure is required by applicable judicial or governmental authority. Prior to disclosing same to any Permitted Person, Landlord or Tenant shall each instruct such Permitted Person to abide by this confidentiality provision.

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

## ARTICLE XXVI
## RIGHT OF FIRST OFFER

26.1   ROFO Space.  Subject to the terms and conditions of this Section 26.1, if at least one-half (1/2), but in no event more than all, of the rentable square footage on any floor of the Building that is contiguous to the Premises (i.e., immediately below any floor on which the Premises is located if such floor of the Premises is a full floor and/or immediately adjacent to any portion of the Premises that is a partial floor) (the "ROFO Space") becomes available (following the expiration or earlier termination of an initial leasing of any space that is currently vacant as of the Execution Date) during the Lease Term as it may be extended or renewed, then Tenant shall have the right to lease such ROFO Space for the then remainder of the Lease Term (as it may have been extended or renewed) pursuant to the following terms and conditions:

(a)   At such time as Landlord reasonably becomes aware of the availability of any ROFO Space (following any initial leasings), Landlord shall notify Tenant in writing (the "Landlord ROFO Availability Notice") of the availability of such space and the annual Base Rent and other material terms and conditions (including the anticipated delivery date) upon which such space is to be offered to a third party.  Tenant shall then have ten (10) business days after receiving the Landlord ROFO Availability Notice to notify Landlord in writing ("Tenant's ROFO Election Notice") that Tenant desires to negotiate with Landlord for a lease of such ROFO Space for the then remainder of the Lease Term (as it may have been extended or renewed).  If Tenant does not properly and timely deliver Tenant's ROFO Election Notice to Landlord as set forth above, Landlord shall be free to lease the ROFO Space to any third party on terms and conditions as determined by Landlord in its sole and absolute discretion, and Tenant's right of first offer with respect to such ROFO Space shall lapse and be of no further force or effect (subject to Landlord's obligation to offer any subsequent ROFO Space, including the previously offered ROFO Space, that becomes available during the Lease Term in accordance with the terms and provisions of this Section 26.1).

(b)   If Tenant timely and properly exercises its right to lease the ROFO Space pursuant to this Section 26.1, then (i) such ROFO Space shall be added to the Premises as of the date Landlord delivers same to Tenant (the "ROFO Space Commencement Date") at an annual base rent, tenant allowance and other concessions (such as free rent) determined as provided herein (provided, however, that Tenant shall receive up to a 150-day rent free period following the ROFO Space Commencement Date to allow Tenant to modify/construct the ROFO Space (which abatement shall not be factored into the determination of Fair Market Rent so long as beneficial occupancy does not occur), and pursuant to all of the other then existing terms and conditions of this Lease; provided, however, that all provisions varying with rentable square footage not specifically described herein (including, without limitation, Tenant's Proportionate Share and Tenant's Parking Allotment) shall be re-determined to reflect the increased rentable area of the Premises, and (ii) for a period of thirty (30) days after Landlord's timely receipt of Tenant's ROFO Election Notice, Tenant shall have the right to negotiate with Landlord regarding the annual base rent, tenant allowance and other concessions (such as free rent) for such ROFO Space, it being agreed that Landlord and Tenant shall each negotiate in good faith. The parties shall attempt to agree upon an annual Base Rent payable for the first year with respect to the ROFO Space which would equal one hundred percent (100%) of the Fair Market Rent (as defined in Section 3.5(a) of this Lease), taking into account 100% of market

WDC 91095636v14

concessions (provided that the aforementioned abated build-out period shall not be factored into the determination of Fair Market Rent so long as beneficial occupancy does not occur). If during such thirty (30) day period the parties agree on such Fair Market Rent, then they shall promptly execute an amendment to this Lease adding such ROFO Space and stating the rent and other terms so agreed upon. If during such 30-day period and despite negotiating in good faith, the parties are unable, for any reason whatsoever, to agree on such Fair Market Rent, then within ten (10) days following such thirty (30) day period, the parties shall each appoint a real estate broker who satisfies the requirements set forth in Section 3.5 above. Such two individuals shall each determine, within ten (10) days after their appointment, such Fair Market Rent. If such individuals do not agree on the Fair Market Rent, then the two individuals shall, within five (5) days after the end of such 10-day period, render separate written reports of their determinations and together appoint a third broker satisfying the requirements set forth in Section 3.5. The third broker shall, within ten (10) days after his or her appointment, select either Landlord's broker's determination or Tenant's broker's determination (this being the third broker's sole function) as being closest to the applicable Fair Market Rent, and shall notify the parties of such selection. The third broker's decision shall be final and conclusive and binding on Landlord and Tenant. Landlord and Tenant shall each bear the cost of its broker and shall share equally the cost of the third broker. Upon determination of the Fair Market Rent pursuant to this Section, the parties shall promptly execute an amendment to this Lease adding the ROFO Space to the Premises and stating the annual base rent, tenant allowance and other concessions (such as free rent) so determined and any applicable additional terms with respect to the ROFO Space (the "ROFO Amendment").

(c)    Tenant rights pursuant to this Section 26.1 with respect to any particular ROFO Space shall not apply until such ROFO Space has been leased by Landlord to an initial tenant or tenants other than Tenant following the Execution Date. Tenant's rights under this Section are subject and subordinate to Landlord's rights to renew or continue to lease space to any current or future tenant of such space beyond the expiration date of the lease term of such tenant's lease.

(d)    Notwithstanding anything in the Lease to the contrary, delivery of possession of the ROFO Space to Tenant and commencement of Tenant's leasing thereof is and shall be subject to Landlord's obtaining possession from any prior tenant or occupant who holds over beyond the applicable lease expiration date, and Tenant shall have no claim against Landlord (for damages or otherwise) and Landlord shall have no obligation or liability for, on account of or with respect to any holdover in all or any portion of the ROFO Space; provided, however, that, in the event any such prior tenant or occupant has not vacated and surrendered the ROFO Space within the first thirty (30) days after the anticipated ROFO Space Commencement Date, Landlord shall commence eviction proceedings against such prior tenant or occupant. Notwithstanding anything contained in this Lease to the contrary, in the event Landlord has been unable to deliver possession of the ROFO Space to Tenant within six (6) months following the anticipated ROFO Space Commencement Date, then, at Tenant's sole option, Tenant shall have the right to terminate the Lease with respect to such ROFO Space only by written notice delivered to Landlord at any time until the ROFO Space has been delivered to Tenant, which termination shall be effective thirty (30) days following Landlord's receipt of Tenant's termination notice (provided, however, that if Landlord delivers the ROFO Space to Tenant during such thirty (30) day period, then Tenant's termination notice shall be deemed rescinded),

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

in which event any applicable expansion amendment to this Lease shall, if previously executed, be deemed void and of no further force or effect. Tenant shall accept possession of such ROFO Space and commence paying rent therefor on the ROFO Space Commencement Date.

(e)     If an Event of Default exists on the date Tenant sends Tenant's ROFO Election Notice or as of the date such ROFO Space is to be occupied by Tenant, then, at Landlord's election, Tenant's right to such ROFO Space only pursuant to this Section shall lapse and be of no further force or effect; provided, however, Tenant's rights to future ROFO Space shall be ongoing, subject to the terms and provisions of this Section 26.1.

(f)     Tenant's rights under this Section may be exercised by Tenant only and may not be exercised by or for the benefit of any transferee, sublessee or assignee of Tenant other than an Affiliate to whom this Lease has been assigned in its entirety pursuant to a Permitted Transfer.

(g)     If at any time fifty percent (50%) or more of the rentable area of the Premises has been subleased or assigned to other than an Affiliate, then Tenant's rights pursuant to this Section shall lapse and be of no further force or effect.

(h)     Notwithstanding any contrary provision contained in this Article XXVI: (i) in the event the ROFO Space is only one-half (1/2) of the rentable square footage of such floor, Tenant, if it timely elects to lease such ROFO Space, shall lease all of such ROFO Space; (ii) in the event the ROFO Space is greater than one-half (1/2), but less than all, of the rentable square footage of such floor, Tenant, if it timely elects to lease such ROFO Space, shall lease all of such ROFO Space, and (iii) in the event the ROFO Space is all of the rentable square footage of such floor, Tenant, if it timely elects to lease such ROFO Space, shall have the option, as elected by Tenant in writing in Tenant's ROFO Election Notice, to lease all of such ROFO Space or one-half (1/2) of such ROFO Space, it being agreed that, if only one-half (1/2) of such ROFO Space, the final determination of the size, location and configuration of the ROFO Space so leased by Tenant shall be as reasonably determined by Landlord and Tenant, taking into consideration the marketability, aesthetics, code compliance, preferable window lines and other reasonable considerations with respect to such ROFO Space leased by Tenant and any remaining space on such floor of the Building. Tenant shall have no right to renew or extend the Lease Term with respect to the ROFO Space except in connection with the renewal of the Lease Term for the entire Premises pursuant to Section 3.5 above.

(i)     Landlord shall have no obligation to offer any ROFO Space to Tenant if the ROFO Space Commencement Date would occur during the last thirty-six (36) months of the Lease Term (as extended, if applicable).

**[SIGNATURES ON NEXT PAGE]**

WDC 91095636v14

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease under seal as of the day and year first above written.

<u>LANDLORD</u>:

**TMG 1400 L STREET, L.L.C.**,
a Delaware limited liability company

By: _____ **[SEAL]**
Name: _____
Title: _____

By: _____ **[SEAL]**
Name: _____
Title: _____

<u>TENANT</u>:

**ENOVATIONAL CORP.**,
a District of Columbia corporation

By: _____ **[SEAL]**
Name: ___Vlad Enache___
Title: ___CEO___

WDC 91095636v14

# EXHIBIT A

# PLAN SHOWING PREMISES

7th Floor



A-1

8th Floor



A-2

9th Floor



A-2

10th Floor



A-2

DocuSign Envelope ID: EE8C1D67-8D68-4B8D-A358-6865DF8C2D22

11th Floor



A-2

12th Floor



A-2

DocuSign Envelope ID: EE8C1D67-8D68-4B8D-A358-6865DF8C2D22

**EXHIBIT B**

**WORK AGREEMENT**

This <u>Exhibit B</u> is part of that certain Office   Lease  Agreement  dated  as  of
_____  (the  "<u>Lease</u>"),  by  and  between  **TMG 1400 L STREET, L.L.C.**, a Delaware
limited liability company ("<u>Landlord</u>"), and **ENOVATIONAL CORP.**, a District of Columbia
corporation ("<u>Tenant</u>").  Unless the context otherwise requires, the terms used in this <u>Exhibit B</u>
that are defined in the Lease shall have the same meanings as provided in the Lease.  In the event
of any conflict between the terms hereof and the terms of the Lease, the terms hereof shall
prevail for the purposes of design and construction of the Tenant's Work.

1. <u>Authorized  Representatives</u>.    Tenant  designates  Vlad  Enache  at
vlad@enovational.com ("<u>Tenant's Authorized Representative</u>") as the person authorized to
approve in writing all plans, drawings, specifications, change orders, charges and approvals
pursuant to this <u>Exhibit B</u> (and the act of the aforenamed person shall be sufficient to bind
Tenant).  Landlord designates Wil Machen at <u>wilmachen@tmgdc.com</u> and Jim G. Eick at
<u>jimeick@tmgdc.com</u> (collectively, "<u>Landlord's Authorized Representative</u>"), as the persons
authorized to approve in writing all plans, drawings, specifications, change orders, charges and
approvals pursuant to this <u>Exhibit B</u> on behalf of Landlord.  Either party may designate a
substitute Authorized Representative, or add one or more additional Authorized Representatives,
by written notice to the other party.  Neither party shall be obligated to respond to any
instructions, approvals, changes, or other communications from anyone claiming to act on the
other party's behalf other than the other party's Authorized Representative(s).  All references in
this <u>Exhibit B</u> to actions taken, approvals granted, or submissions made by a party shall mean
that such actions, approvals or submissions have been taken, granted or made, in writing, by such
party's Authorized Representative acting for such party.  A copy of all plans, drawings,
specifications, change orders, charges and approvals pursuant to this <u>Exhibit B</u> must be
concurrently sent to any other party that Landlord reasonably designates by notice to Tenant.

2. <u>Shell Work</u>.  Except as set forth in the Lease, including this <u>Exhibit B</u>, Tenant
hereby accepts the Building in its "as-is" condition.  Landlord shall deliver the Premises to
Tenant, at Landlord's sole cost and expense, in substantial conformity with the base building
specifications set forth on <u>Schedule I</u> and in compliance with all applicable Laws, including
Environmental Laws and the ADA (collectively, the "<u>Shell Work</u>").  On the date Landlord
delivers the Premises to Tenant, connections to pipes, ducts and conduits for the mechanical,
HVAC, electrical and plumbing systems in the Building will be available for connection, which
connections shall be made by Tenant, at Tenant's sole cost and expense, subject to application of
the  Construction  Allowance.    Notwithstanding  the  foregoing  to  the  contrary,  Tenant
acknowledges that Landlord shall have until September 30, 2021 to repair or replace any existing
VAV terminal units that are not in good working order as of the Lease Commencement Date
pursuant to the terms set forth under the heading "HVAC/Plumbing System" in Schedule 1 to
this <u>Exhibit B</u>.

3. <u>Initial Improvements</u>.  Except for the Shell Work, Landlord shall not have any
obligation whatsoever with respect to the initial improvement or finishing of the Premises for
Tenant's use and occupancy, and, except for the Shell Work, the Premises shall be delivered

B - 1

DocuSign Envelope ID: EE8C1D67-8D68-4B8D-A358-6865DF8C2D22

containing no improvements or property of any kind.  Except for the Shell Work, all of the work to be performed in initially finishing and completing the Premises (including the design and architectural work required in connection with such work, connections to pipes, ducts and conduits for the mechanical, HVAC, electrical and plumbing systems in the Building (collectively, "Tenant's Work") shall be performed by or on behalf of Tenant pursuant to this Exhibit B and Article IX (as well as all other applicable provisions of the Lease, including, without limitation, insurance, damage and indemnification provisions), and such work shall be deemed to be Alterations for all purposes of the Lease; provided, however, that Landlord's designated contractor or subcontractor, at Landlord's election and provided to Tenant at the time of Landlord's approval of Tenant's Preliminary Plans, shall perform, at Tenant's sole cost and expense (provided such cost and expense shall be commercially reasonable and at competitive rates), those portions of Tenant's Work related to (i) tie-ins to the base Building's fire and life safety system; (ii) the Building's exterior envelope (including the roof); and (iii) tie-ins to the base Building's HVAC control system.  The general contractor who will be employed by Tenant to perform the Tenant's Work shall be a qualified, licensed contractor selected by Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed and shall be subject to Landlord's reasonable third-party requirements (including but not limited to insurance, bonding, credit, safety record and such other matters as is set forth in the Schedules to this Exhibit B).  Notwithstanding any contrary provision contained herein, Landlord hereby preapproves the following general contractors to perform the Tenant's Work without bonding: DFS, DPR, ADI, Rand, PWC and DWatts.  Tenant's taking of possession of the Premises shall constitute Tenant's acknowledgment that the Premises and the Building are in good condition and that all obligations of Landlord have been fully satisfied, except for (i) Latent Defects (hereinafter defined), and (ii) Punch List Items with respect to the Shell Work that are mutually and reasonably agreed upon by Landlord and Tenant during the walk-through of the Premises described below (provided, however, in the event the parties cannot agree whether any item should be a Punch List Item, then the determination shall be made by Landlord's architect in its reasonable professional judgment). Landlord and Tenant shall conduct such walk-though of the Premises following a final "passed" inspection by the District of Columbia of the Building's Shell Work.  The exact timing of the walk-through shall be mutually and reasonably agreed upon by Landlord and Tenant each acting in good faith, provided, however, that if Tenant refuses or fails to participate in a timely walk-through of the Premises, then Tenant shall waive its right to a walk-through and the determination of Landlord and Landlord's architect as to Punch List Items shall be final and conclusive.  As used herein, (a) the term "Latent Defect" shall mean a defect in the physical condition of the Shell Work existing as of the date of Landlord's delivery of the Premises to Tenant that (y) could not have reasonably been discovered prior to Tenant taking possession of the Premises by a commercially reasonable inspection of the Premises performed by a reasonably prudent architect or engineer exercising a professionally reasonable level of due diligence in such inspection, and (z) is identified in writing by Tenant to Landlord no later than twelve (12) months following the Delivery Date, and (b) the term "Punch List Items" shall mean minor items of work and minor mechanical adjustments, the non-completion of which will not unreasonably interfere with Tenant's commencement of the Tenant's Work.  Landlord shall promptly correct any Punch List Items (Landlord hereby agreeing to use commercially reasonable efforts to complete such Punch List Items within thirty (30) days following the walk-through), and Landlord shall use commercially reasonable efforts to correct any Latent Defects as soon as reasonably possible.  Tenant acknowledges that Tenant's Work is being accomplished

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8R69-4B8B-A358-6865DF8C2D22

for its own account, Landlord having no responsibility or obligation in respect thereof, except for the funding of the Construction Allowance as more fully set forth below.

4.    <u>Costs</u>.

(a)    Subject to the application of any Construction Allowance (as defined in Section 1.20 of the Lease), Tenant shall pay all costs and expenses incurred in connection with Tenant's Work (subject to application of the Construction Allowance).  Such costs and expenses shall include (i) a construction coordination fee (the "<u>Construction Supervision Fee</u>") equal to Fifty Thousand Dollars ($50,000.00), and (ii) all reasonable out-of-pocket costs and expenses incurred by Landlord to retain the services of the Building's mechanical, electrical, plumbing and engineering firm to review any proposed plans or working drawings which may affect the Building structure or any mechanical, electrical and plumbing systems of the Building (the "<u>Landlord's Review Costs</u>"), but in no event shall such Landlord's Review Costs exceed Twenty Thousand Dollars ($20,000.00) in the aggregate.  Any services provided by Landlord's architect or engineer at Tenant's request shall be paid for by Tenant within thirty (30) days after Tenant's receipt of a bill therefor.  Upon request, Tenant shall execute a separate agreement between Tenant and such architect or engineer with respect to such services.  All amounts payable by Tenant to Landlord pursuant to this Exhibit shall be considered additional rent subject to the provisions of the Lease.

(b)    Landlord shall make available to Tenant the Construction Allowance, subject to the following provisions of this subparagraph.  The Construction Allowance is being provided in order to reimburse Tenant for all costs associated with Tenant's design and construction of the tenant improvements actually installed in the Premises as part of Tenant's Work, including, without limitation, all hard construction costs, contractors' overhead and profit, insurance and other requirements, as well as any space planning, architectural and engineering design fees, all governmental and quasi-governmental approvals and permitting costs, and the cost of furniture installation, project management fees, moving expenses, furniture and fixtures and telephone wiring/computer cabling (collectively, the "<u>Allowable Costs</u>").  Notwithstanding the foregoing to the contrary, no more than thirty-five percent (35%) of the Construction Allowance may be used for the cost of Tenant's furniture, fixtures and equipment.  Tenant may begin drawing funds, up to an aggregate amount of thirty percent (30%) of the Construction Allowance, following the Execution Date to pay for costs incurred by Tenant for space planning and design services.  Landlord shall have no duty to advance any remaining portion of the Construction Allowance until the following conditions are satisfied: (1) Tenant begins and is diligently pursuing construction of Tenant's Work;  (2) Landlord shall have approved the final working drawings for Tenant's Work pursuant to the following provisions of this Work Agreement; (3) copies of all contracts, bills, vouchers, change orders and other information relating to the expenses for which reimbursement is being sought as may reasonably be requested by Landlord shall be made available to Landlord by Tenant, to the extent such items exist; (4) the work and materials for which payment is requested are in complete accordance with the final working drawings approved by Landlord; and (5) no Event of Default under the Lease then exists and is continuing.  As Tenant incurs Allowable Costs, Tenant may deliver to Landlord a written request for partial payment of the Construction Allowance, which request shall include all of the following (collectively, the "<u>Allowance Request</u>"): (i) a signed statement from an authorized officer of Tenant certifying that Tenant has incurred and paid Allowable Costs (for

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

which Tenant has not previously been paid or reimbursed from the Construction Allowance) and the amount requested to be paid from (but not exceeding in the aggregate) an amount equal to the Construction Allowance; (ii) detailed and proper invoices, marked as "paid", for the Allowable Costs referred to in item (i) above for which Tenant seeks reimbursement or payment to one or more third parties as permitted below); (iii) partial lien waivers from the general contractor performing Tenant's Work, which lien waivers cover all Tenant's Work performed as of the date of such Allowance Request; and (iv) a written statement certified by Tenant's general contractor or an authorized officer of Tenant stating that the work for which payment is being requested pursuant to such Allowance Request has been performed by a contractor approved by Landlord pursuant to this Exhibit and is physically incorporated into the Premises free of any security interest or lien of any kind.  Tenant shall not be allowed to submit more than one (1) Allowance Request during any calendar month.  Notwithstanding the foregoing, upon Tenant's request, Landlord will make disbursements of the Construction Allowance directly to Tenant's general contractor and up to five (5) additional vendors designated by Tenant per draw (i.e., the 5 designated vendors need not be the same for each draw), except that Tenant shall have the right to designate ten (10) vendors for direct payment (instead of 5) in connection with up to four (4) draws, in which event the invoices submitted to Landlord will not be marked "paid" and lien releases may be conditioned upon payment.  If a complete Allowance Request complying with the foregoing requirements is received by Landlord from Tenant, and there is no uncured Event of Default then continuing, Landlord shall pay to Tenant (or such third parties as identified by Tenant and permitted above) the amount properly covered by the Allowance Request (up to the maximum amount of the Construction Allowance in the aggregate) within thirty (30) days after Landlord's receipt of the foregoing.  Notwithstanding anything above to the contrary, Landlord shall: (A) have the right to withhold the final ten percent (10%) of the Construction Allowance until the date which is thirty (30) days following the later to occur of (1) Tenant's commencement of normal business operations from the Premises, (2) Tenant's receipt and delivery to Landlord of a final Certificate of Occupancy (or similar required certificate) for the Premises, and (3) Landlord's receipt of a final contractor's affidavit and final release and waiver of lien from Tenant's general contractor and all other contractors and vendors that have lien rights under applicable Laws; (B) have the right to first apply portions of the Construction Allowance against the Construction Supervision Fee and Landlord's Review Costs; and (C) not be required to reimburse Tenant for any invoice received after the last day of the eighteenth (18th) month following the Rent Commencement Date (the "Allowance Expiration Date").  If the entire Construction Allowance is not applied toward or reserved for the costs of the Tenant's Work on or before the Allowance Expiration Date, then, at Tenant's written request delivered on or prior to the Allowance Expiration Date and so long as there is no uncured Event of Default that is continuing at such time, Landlord shall convert such unapplied and unreserved portion of the Allowance, up to Five Million Nine Hundred Seventy-Six Thousand One Hundred Eighty-Seven and 56/100ths Dollars ($5,976,187.56), to an abatement of the next monthly installment(s) of Base Rent coming due under the Lease.  Except as otherwise set forth in the immediately preceding sentence, Tenant shall not receive any credit, cash or otherwise, for any unused portion of the Construction Allowance.

(c)    In the event Landlord fails to timely disburse all or any portion of the Construction Allowance if, as, and when required in accordance with the terms of this Section 4, and such failure continues for thirty (30) days after Landlord's receipt of written notice from Tenant of such failure, then Tenant shall send to Landlord a second written notice ("Notice of

B- 4

DocuSign Envelope ID: EE8C1D67-8D68-4B8D-A358-6865DF8C2D22

Construction Allowance Dispute") containing a detailed description of such amounts that Tenant believes are due and stating that Landlord's failure to pay Tenant is a breach of the Lease.  If, despite the good faith efforts of the parties, Landlord and Tenant are unable to settle such dispute amicably within fifteen (15) days after receipt of the Notice of Construction Allowance Dispute, then Tenant shall have the right to serve a written demand for arbitration (the "Arbitration Notice") on Landlord not later than the tenth (10th) business day after the expiration of said 15-day period.  Within three (3) business days after Landlord's receipt of an Arbitration Notice, the parties shall in good faith seek to find a mutually acceptable arbitrator (satisfying the qualifications set forth below) who shall be authorized solely to determine the amount of reimbursement, if any, that Tenant is entitled to pursuant to this Section 4.  If agreement as to a mutually acceptable arbitrator is not reached within such three (3) business-day period, then each party shall, within three (3) business days thereafter, name an arbitrator (satisfying the qualifications set forth below) and the two named arbitrators shall select a third arbitrator (satisfying the qualifications set forth below) not later than five (5) business days after the appointment of the first two arbitrators.

(i)     The single arbitrator (selected pursuant to the above) in, and in accordance with the applicable laws of, the District of Columbia, and when not in conflict with that law, by the then prevailing Commercial Arbitration Rules of the American Arbitration Association (AAA) (or any organizational successor thereto).  The decision shall be rendered by the arbitrator within thirty (30) days after the appointment of the arbitrator, shall be in writing and shall be final and conclusive on the parties.  Counterpart copies thereof shall be delivered to each of the parties.  In rendering such decision, the arbitrator shall not add to, modify, detract from, or alter in any way the provisions of this Lease.  Judgment may be had on the decision and award of the arbitrator so rendered in any court of competent jurisdiction.

(ii)     Any arbitrator appointed pursuant to this Section 4(c) shall be a lawyer in good standing, actively engaged in the licensed and full-time practice of law in the District of Columbia for a continuous period of at least ten (10) years, specializing and having extensive recent experience in the field of commercial leasing for similar properties in the District of Columbia, who is recognized as ethical and reputable within his or her field.  The arbitrator selected shall not have at any time ever represented or acted on behalf of any of the parties.

(iii)     The parties shall pay equally the cost of any such arbitration, and each party shall pay its own attorney's fees and disbursements and the fees of all other persons engaged by it in connection with the arbitration.  No arbitrator is authorized to make any award of consequential, punitive or exemplary damages.

(iv)     If Landlord shall fail to pay Tenant within ten (10) days after the earlier to occur of (a) a final and unappealable determination in a court of competent jurisdiction, or (b) a final decision by the arbitrator appointed pursuant to the terms of this Section 4(c) in Tenant's favor, then Tenant shall thereafter be entitled to deduct the unpaid amount from any installment of Base Rent then due or thereafter becoming due under this Lease (not to exceed twenty percent (20%) of the current installment of Base Rent), and any amount not yet offset or paid by Landlord shall carry over to subsequent installments; provided, however, that Tenant

B- 5

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

shall deliver written notice to Landlord that Tenant is exercising its offset rights pursuant to this Section 4(c) not later than five (5) days prior to such offset.

(d)     Landlord and Tenant acknowledge and agree that, pursuant to <u>Schedule I</u> attached hereto, Tenant has agreed to be responsible for acquiring and installing Building standard roller shade window treatments (i.e., Mecho Manual 5X Shades with 3% open 1605 Dove Grey fabric) on all exterior windows of the Premises.  In consideration of the foregoing, in addition to the Construction Allowance, Landlord hereby agrees to provide Tenant with an additional allowance of up to Ninety-Five Thousand Six Hundred Nineteen and 00/100ths Dollars ($95,619.00) (the "<u>Roller Shade Allowance</u>"), which Roller Shade Allowance may be used solely for the costs incurred by Tenant in connection with the acquisition and installation within the Premises of the Building standard roller shade window treatments.  The Roller Shade Allowance shall be subject to all of the terms, conditions and requirements (including the disbursement terms, conditions and requirements) applicable to the Construction Allowance, except that Tenant shall not be permitted to convert any unused portion of the Roller Shade Allowance to an abatement of Base Rent.

5.     <u>Schedule</u>.

(a)     Tenant shall be solely responsible for the timely completion of all plans and drawings for the Tenant's Work and for their compliance with all Laws.  Plans and specifications for the Building and the Premises shall be made available to Tenant electronically and for Tenant's inspection at the Building.

(b)     Tenant, at Tenant's expense, subject to application of the Construction Allowance, shall prepare (or cause to be prepared) Tenant's preliminary architectural working drawings and specifications for the Tenant's Work ("<u>Tenant's Preliminary Plans</u>") by a duly licensed architect selected by Tenant and approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed), it being agreed that Landlord hereby preapproves Wingate Hughes as an acceptable architect to design the Tenant's Work.  Tenant shall use commercially reasonable efforts to submit Tenant's Preliminary Plans to Landlord, for Landlord's approval, within ninety (90) days following the Execution Date.   Tenant's Preliminary Plans shall include a floor plan, elevations (both interior and exterior), proposed design elements, and Tenant's preliminary furniture layout.

(c)     Following Landlord's approval of Tenant's Preliminary Plans, Tenant, at Tenant's expense, subject to the application of the Construction Allowance, shall prepare (or cause to be prepared) a final set of architectural and mechanical working drawings and specifications (which shall include a complete set of detailed electrical plans, HVAC plans, plumbing plans and fire/life safety plan) all of which shall be prepared by an architect and one or more engineers, as applicable, all duly licensed and approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed) based upon and in accordance with the Landlord-approved Tenant's Preliminary Plan.  Said final set of plans and specifications shall be the "<u>Final Permit Plans</u>."  The Final Permit Plans (i) shall contain information and dimensions necessary for the construction and finishing of the Premises and for all engineering required in connection therewith, and (ii) shall contain sufficient detail and shall otherwise be suitable in all respects for submission to the applicable governmental building department to obtain a building

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

permit. Tenant shall use commercially reasonable efforts to submit four sets of the Final Permit Plans (in the form of half-size prints) to Landlord, for Landlord's written approval, within thirty (30) days following Landlord's approval of Tenant's Preliminary Plans. Said Final Permit Plans may be further supplemented by Tenant provided that Landlord approves same in accordance with the deadlines and standards set forth below, it being agreed that said Final Permit Plans, as supplemented, if at all, and, when finally approved by Landlord in writing, shall be the "Final Construction Drawings". In the event the Final Permit Plans are supplemented by Tenant and any such supplements require resubmission to the District of Columbia to obtain a building permit, Tenant shall be required to resubmit same.

(d)    (i)    The deadlines specified in this Paragraph shall apply whether plans and drawings are prepared for Tenant by Landlord's architect or engineer or an architect or engineer selected by Tenant. All deadlines must be met in order to allow Landlord sufficient time to review plans and drawings and discuss with Tenant any changes thereto which Landlord believes to be reasonably necessary or desirable.

(ii)    Landlord shall review and comment on all plans and drawings that have been prepared by, or on behalf of, Tenant for Tenant's Work and are submitted by Tenant to Landlord for approval or rejection within ten (10) business days after receipt of same. If Landlord rejects such plan or drawing, any such rejection shall provide Landlord's reasonably detailed comments as to why such plan or drawing was rejected and Landlord's proposed comments to the plan or drawing that would make such plan or drawing acceptable to Landlord. If Tenant revises and resubmits such plan or drawing to Landlord for Landlord's approval or rejection, Landlord shall approve, reject and/or comment on the revised plan or drawing (and all further revised plans or drawings) within five (5) business days after receipt of same (it being understood that Landlord shall be entitled to comment solely on the revised portions of such plan or drawing, unless the revisions affect any other portion of the plan or drawing).

(iii)    If (a) Landlord fails to notify Tenant whether it will approve, conditionally approve or reject any proposed plans or drawings submitted by Tenant to Landlord for approval with respect to the Tenant's Work within the foregoing seven (7) or five (5) business day period, as applicable, set forth in Section 5(d)(ii), above, and, thereafter, Tenant delivers written notice ("Landlord Response Failure Notice") to Landlord of such failure (which Landlord Response Failure Notice must refer to this provision and state therein, and again on the outside of the envelope containing such Landlord Response Failure Notice, in capital bold letters, the following: "**LANDLORD MUST RESPOND TO TENANT'S REQUEST CONTAINED HEREIN WITHIN THREE (3) BUSINESS DAYS OF RECEIPT OR SUCH REQUEST SHALL BE DEEMED APPROVED**"), and (b) Landlord fails to respond to such request within three (3) business days after Landlord's receipt of the Landlord Response Failure Notice, then such proposed plans or drawings shall be deemed approved by Landlord, but only with respect to the Tenant's Work shown on such plans or drawings (1) to which Landlord failed to respond and only to the extent that the Tenant's Work shown thereon are to be made in the Premises, or (2) that already were approved by Landlord in writing.

B- 7

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

6.    <u>Approval</u>.

(a)    All plans and drawings (and any changes thereto) shall be subject to Landlord's prior written approval, which approval shall be granted and rejected in accordance with the standard set forth in this Section 6.  Landlord agrees that it will not unreasonably withhold, condition or delay its approval of any plans or drawings (or any changes thereto) required hereunder, if, in Landlord's reasonable opinion, the applicable portion of the Tenant's Work covered by said plans or drawings (or any changes thereto), (i) is not likely to adversely affect the structural, mechanical, electrical, plumbing, HVAC, life safety, communications, security or other operating systems of the Building or the safety of its occupants, (ii) would not increase the costs or expenses incurred by or on behalf of Landlord for owning, managing, operating, maintaining or repairing the Building, (iii) would not impair Landlord's ability to furnish services to Tenant or any other tenant of the Building, (iv) would not violate any Laws or provisions of this Lease, (v) would not adversely affect the appearance of the Building (when viewed from outside the Premises), (vi) would not adversely affect the premises of any other tenant of the Building or such tenant's use or occupancy thereof, and (vii) is not prohibited by the provisions of any mortgage encumbering the Building.  The foregoing reasons shall not be exclusive of the reasons for which Landlord may withhold consent, it being understood and agreed that such other reasons may be similar or dissimilar to the foregoing.  Landlord's approval of the Tenant Plans or any revised Tenant Plans shall not constitute Landlord's representation that such approved plans, drawings or changes comply with all Laws or Landlord's waiver of any delay associated therewith.  Any deficiency in design or construction, although same had prior approval of Landlord, shall be solely the responsibility of Tenant.  All materials and equipment furnished by Tenant shall be new or like new and all work shall be done in a first class workmanlike manner.

(b)    Notwithstanding anything to the contrary set forth in the Lease, including Section 7 of <u>Exhibit C</u>, Landlord acknowledges that Tenant may desire to install a commercial or catering kitchen (the "<u>Tenant Kitchen</u>") within the Premises as part of the Tenant's Work.  Landlord agrees not to unreasonably withhold its consent to Tenant's installation, at Tenant's sole cost and expense (subject to the application of the Construction Allowance), of a Tenant Kitchen, provided, that (i) Tenant's Kitchen shall be located only on the twelfth (12th) floor of the Building, (ii) Landlord shall approve the plans and specifications for Tenant's Kitchen (such consent not to be unreasonably withheld, conditioned or delayed but otherwise subject to the terms and conditions related to plan approval set forth in this <u>Exhibit B</u>), (iii) Tenant shall be responsible for obtaining any and all permits, consents and approvals necessary for the construction and operation of Tenant's Kitchen, (iv) any modifications to the Building (including, without limitation, the plumbing and electrical systems) made in connection with Tenant's Kitchen shall not be part of the Building Structure and Systems and shall be the sole responsibility of Tenant to repair and maintain in the same manner as Tenant is required to maintain the Premises, (v) Landlord shall not be required to provide any services (including, without limitation, janitorial) in connection with Tenant's Kitchen in excess of those services typically required for office space as set forth in the Lease, and (vi) notwithstanding anything to the contrary set forth in Section 9.3 of the Lease, Landlord shall have the right to require that Tenant remove and restore all or any designated portion of the commercial or catering kitchen at the expiration of earlier termination of the Lease Term (or on such earlier date, if applicable, as Tenant no longer leases the twelfth (12th) floor of the Building), which removal and restoration

B- 8

designation shall be made at the time that Landlord approves the plans and specifications for such commercial/catering kitchen.

7.    <u>General Requirements</u>.

(a)    Tenant construction shall proceed only on the basis of approved or, if applicable, deemed approved plans and drawings. Changes that occur during actual construction that differ to more than a de minimis extent from the approved drawings may, at Landlord's election, acting reasonably and in good faith, require alterations at Tenant's expense, subject to the application of the Construction Allowance, to restore compliance with the approved drawings. No drawings are considered "approved" unless they bear Landlord's signature of approval, including approval in writing by, or electronically by e-mail from, Landlord's Authorized Representative, or they have been deemed approved pursuant to the terms and provisions set forth in Section 5(d)(iii) of this <u>Exhibit B</u>.

(b)    Landlord shall have no obligation or responsibility to Tenant in respect of minor deviations in the actual dimensions of the Premises. Tenant shall have the affirmative obligation to conduct an on-site verification of all measurements and dimensions prior to letting any contracts for the performance of Tenant's Work and prior to ordering the fabrication of any trade fixtures.

(c)    Following Landlord's approval of the Final Construction Drawings, and prior to commencement of construction of the Tenant's Work, Tenant shall submit the following:

(i)    Names of general contractor (including main office name, address, phone and fax, and, as soon as it becomes available, project manager name, direct phone, fax, cell phone and email address, superintendent and field supervisor name, direct phone, job phone, cell phone, fax and email address) and all subcontractors (with full contact information for office and field supervision as listed above for general contractor) (all of which shall be subject to Landlord's approval, not be unreasonably withheld, conditioned or delayed.);

(ii)    [Intentionally Omitted];

(iii)    Contractor/s/subcontractor's bond (to the extent reasonably required by Landlord);

(iv)    Evidence of Tenant insurance coverage;

(v)    Payment for any of Tenant's Work to be performed by Landlord at Tenant's expense, subject to the application of the Construction Allowance;

(vi)    Copy of building permit(s);

(vii)    Completion schedule from Tenant's contractor;

(viii)    [Intentionally Omitted]; and

(ix)    Written acknowledgment by Tenant and its contractor that the Rules and Procedures for Contractors attached as <u>Schedule II</u> to this <u>Exhibit B</u> shall be adhered to during the performance of Tenant's Work.

8.    <u>Time for Commencement and Completion of Tenant's Work</u>.    Tenant will commence construction of Tenant's Work following Tenant's receipt of Landlord's approval of Tenant's Final Construction Drawings and all required building permits.  Tenant will perform and complete Tenant's Work in compliance with such rules and regulations as Landlord and its architect and contractor, or contractors, may reasonably require.

9.    <u>Non-Interference</u>.  Tenant will perform Tenant's Work at a time and in a manner which will not interfere with Landlord or other tenants in the Building.  Any construction or other work that produces excessive noise (e.g., core drilling) or otherwise unreasonably interferes with Landlord or other tenants of the Building shall be performed only during the Building's noisy work hours before 8:00 am or after 6:00 pm, Monday through Friday, excluding holidays, or before 8:00 am or after 1:00 pm Saturdays, excluding holidays, or any time on Sundays and holidays, or at such other noisy work hours as are determined by Landlord. Landlord may stop any construction or other work that unreasonably interferes with the activities of other tenants of the Building during the Building Hours.

10.    <u>Obligations of Tenant Before Lease Term Begins</u>.  Tenant shall perform promptly such of its monetary and other obligations contained in this Exhibit and the Lease as are to be performed by it whether the same accrue before or after the Rent Commencement Date.

11.    <u>Completion of Tenant's Work</u>.    At such time as Tenant's Work shall be completed, Tenant, at its sole cost and expense and without cost to Landlord shall:

(a)    Furnish evidence reasonably satisfactory to Landlord that all of Tenant's Work (excluding any furniture, furnishings and equipment which may be leased or subject to a security interest) has been completed and paid for in full, that any and all liens therefor that have been or might be filed have been discharged of record (by payment, bond, order of a court of competent jurisdiction or otherwise) or waived, and that no security interests relating thereto are outstanding (excluding any furniture, furnishings and equipment which may be leased or subject to a security interest);

(b)    Reimburse Landlord for the cost of any Tenant's Work done for Tenant by Landlord;

(c)    Furnish to Landlord all certifications and approvals with respect to Tenant's Work that may be required from any governmental authority and any board of fire underwriters or similar body for the use and occupancy of the Premises;

(d)    Furnish Landlord with "as built" drawings electronically (on CADD file) and one (1) set of half-size paper prints of the Premises;

(e)    Furnish an affidavit from Tenant's architect certifying that (i) all work performed in the Premises is substantially in accordance with the working drawings and specifications approved by Landlord and (ii) the "record set" of as built drawings for the

B- 10

DocuSign Envelope ID: EE8C1D67-8B68-4B8B-A358-6865DF8C2D22

Tenant's Work are true and correct, which certifications shall survive the expiration or termination of the Lease Term, and (iii) a copy of all warranties, guaranties, and operating and maintenance manuals and information relating to the improvements, equipment and systems comprising the Tenant's Work; and

(f)    Furnish an HVAC air balancing report (reasonably satisfactory to Landlord).

12.    <u>Work Standards</u>.  All of Tenant's Work shall be done and installed in compliance with all applicable Laws.

13.    <u>Permits</u>.  As expeditiously as possible, Tenant shall file all applications, plans and specifications, pay all fees and obtain all permits, certificates and other approvals required by the jurisdiction in which the Building is located and any other authorities having jurisdiction in connection with the commencement and completion of Tenant's Work, and diligently and in good faith pursue same so that all permits and approvals are issued as soon as practicable.  If minor modifications are at any time required by government authorities to any such plans or specifications, then Tenant shall make such modifications.  Tenant shall permit Landlord to assist Tenant in obtaining all such permits and other items.  Tenant shall obtain a final certificate of occupancy and all other approvals required for Tenant to use and occupy the Premises and to open for business to the public.  Copies of all building and occupancy permits shall be provided to Landlord upon receipt.

14.    [Intentionally Omitted]

15.    <u>Contractor Insurance</u>.  Tenant's contractors and subcontractors shall be required to provide, in addition to the insurance required of Tenant pursuant to Article XIII of the Lease, insurance as set forth in <u>Exhibit F</u> to this Lease in connection with the performance of Tenant's Work and performance of any subsequent Alterations.

16.    <u>Contractor Liability</u>.  Except to the extent caused by Landlord, its agents, contractors or employees, Tenant shall be solely and exclusively liable for: (1) any  and all bodily injury, including mental or psychological injury, and/or death of any or all persons, including but not limited to Tenant's contractors and subcontractors, and their respective employees in connection with the Tenant's Work; and (2) for any and all damages to any property,  arising out of, resulting from, or in any way connected with the negligence or willful misconduct on the part of Tenant in connection with the Tenant's Work.  To the fullest extent permitted by law, except to the extent caused by Landlord, its agents, contractors or employees, Tenant, Tenant's contractors or subcontractors, agree to indemnify and hold harmless Landlord from and against all Claims, as defined in the Lease, arising out of or resulting from Tenant, the Tenant's contractor and/or subcontractors performing the Tenant's Work. Tenant and Tenant's contractors and/or subcontractors, or their respective insurance companies, shall assume and defend at their own expense all such Claims.  Tenant agrees to insure this assumed liability in its policy of Broad Form Commercial General Liability in accordance with the Insurance Requirements set forth in <u>Exhibit F</u>, annexed hereto.

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

17.     Coordination.  Subject to the other terms and provisions set forth in this Exhibit B, Tenant's Work shall be coordinated with any work being performed by Landlord and other tenants in the Building so that Tenant's Work will not interfere with or delay the completion of any other construction work in the Building and will be performed with the least possible disturbance to the occupants of other parts of the Building and to the structural and mechanical parts of the Building and Tenant will, at its own cost and expense, subject to application of the Construction Allowance, repair any damage to the Building Structure and Systems caused by Tenant's contractors in connection with the Tenant's Work.

18.     Roof.  Except as otherwise contemplated in the Lease, Landlord retains the sole right to disallow any and all roof penetrations by Tenant and roof installation of equipment and/or structures by Tenant.

19.     Loads.  Except as otherwise contemplated in the Lease, no item shall be mounted on or hung from the interior (other than typical and customary wall art) or exterior of the Building by Tenant without Landlord's prior written approval.  If Tenant desires to mount or hang anything (other than typical and customary wall art), Tenant shall notify Landlord of the loads involved and shall pay all review and installation costs involved.

20.     Ducts.  Tenant shall permit Landlord or its agent to install, maintain, repair and replace in the ceiling space and/or under the concrete slab, adjacent to demising partitions and free standing columns within the Premises, electrical, water or other lines and/or ducts that may be required to serve the common areas or others in the Building, provided that Landlord shall use commercially reasonable efforts to minimize interference with Tenant's business operations in the Premises.

21.     Contractor Responsibilities.  It shall be Tenant's responsibility to cause each of Tenant's contractors and subcontractors to:

(a)     Full-time supervision by superintendent or project manager of ongoing construction activities in the Premises.

(b)     Maintain continuous protection of any space adjacent to the Premises in such a manner (including the use of lights, guardrails, barricades and dust proof partitions where required) as to reasonably prevent any damage to adjacent premises by reason of the performance of Tenant's Work.

(c)     Secure all parts of Tenant's Work against accident, storm, and any other hazard.  However, no barricades or other protective device shall extend more than two (2) feet beyond the Premises.  In addition to the foregoing, Tenant's barricade or other protective device shall be attractive in appearance, shall extend across the frontage and full height of the Premises and shall be of materials approved by Landlord.

(d)     If Tenant's construction is not complete so that the public is protected, Landlord at its sole discretion may require Tenant, at Tenant's cost, subject to application of the Construction Allowance, to shield the Premises from the public view which may include requiring Tenant to erect a temporary barrier acceptable to Landlord.

B- 12

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

(e)    Comply strictly with the Rules and Regulations and Procedures set forth in Schedule II to this Exhibit B, and be responsible for any violations thereof.

(f)    Regularly remove and dispose of, at Tenant's sole cost and expense, subject to the application of the Construction Allowance, at least twice per week and more frequently as Landlord may reasonably direct, all debris and rubbish from the Premises and the Building caused by or resulting from Tenant's Work to a dumpster provided by Tenant's contractor.  Tenant's contractor shall be permitted to place a reasonably sized construction dumpster in an area of the loading dock reasonably designated by Landlord.  If Tenant's contractor elects to place a dumpster on a street adjacent the Building, Tenant's contractor shall be required to obtain and comply with the necessary permit(s) from the applicable governmental authority.  Upon completion, Tenant and Tenant's contractor shall remove all temporary structures, surplus materials, debris and rubbish of whatever kind remaining on any part of the Building or in proximity thereto which was brought in or created in the performance of Tenant's Work (including stocking refuse).  If at any time Tenant's contractors and subcontractors shall neglect, refuse or fail to remove any debris, rubbish, surplus materials, or temporary structures, Landlord at its sole option may remove the same at Tenant's expense without prior notice.

(g)    Use only the Premises for the performance of Tenant's Work.  Entry into areas unrelated to the performance of Tenant's Work is prohibited.

(h)    Guarantee that the work done by it will be free from any defects in workmanship and materials for a period of not less than one (1) year from the date of completion thereof.  Tenant shall also require that any such contractors and subcontractors shall be responsible for the replacement or repair without charge for any and all work done or furnished by or through such contractors or subcontractors which becomes defective within one (1) year after completion.  Replacement or repair of such work shall include, without charge, all expenses and damages in connection with such removal, replacement, or repair of all or any part of such work, or any part of the Building which may have been damaged or disturbed thereby.  All warranties or guarantees as to materials or workmanship or with respect to Tenant's Work shall be contained in the contract or subcontract, which shall provide that said guarantees or warranties shall inure to the benefit of both Landlord and Tenant and be directly enforceable by either of them.  Tenant covenants to give to Landlord any assignment or other assurance necessary to effect such right of direct enforcement.

22.    Utilities; Elevators.    Tenant shall not be charged for standard quantities of Building utilities (based on the amount of utilities typically required in connection with similar buildouts of first-class office space in Comparable Buildings), including electricity, water/sewer and heating, ventilation and air conditioning, or for use of any Building elevators (excluding any use of any Building elevators which occur during hours other than normal business hours and which require additional security and/or personnel for oversight of same) during construction of the Tenant's Work in the Premises, it being agreed that Landlord shall make such services available to Tenant at all times, subject to Force Majeure, during the performance of the Tenant's Work. In connection with utility service to the Premises, all applications, deposits, installation charges and arrangements for the same (except those provided by Landlord) shall be the sole responsibility of Tenant.  From and after the Rent Commencement Date, all utility charges shall be paid pursuant to the terms of the Lease.  Notwithstanding the foregoing, subject to Tenant

reasonably coordinating with Landlord in advance in writing, but in no event less than seventy-two (72) hours, Tenant shall have the right, at no additional expense or cost to Tenant, to access the Building and perform Tenant's initial move of materials into the Premises prior to commencement of construction of the Tenant's Work and prior to commencement of Tenant's initial move into the Premises, including no charge for HVAC or typical quantities of other utilities, access to the Building's freight elevator, loading area, materials staging area and other services, at reasonable times during any consecutive two weekends selected by Tenant and reasonably agreed to by Landlord, commencing at 6:00 p.m. on the immediately preceding Friday and ending at 7:00 a.m. on the immediately subsequent Monday.

23. <u>Internal Stairwell</u>. Notwithstanding anything to the contrary contained in this Lease, Landlord's consent to the installation of an internal stairway connecting two (2) or more floors of the Premises, whether as part of the Tenant's Work or a future Alteration, shall not be unreasonably withheld, conditioned or delayed, provided Landlord determines, in the exercise of Landlord's reasonable judgment, that (1) the internal stairwell is located within one (1) column bay (i.e., set of four (4) columns); (2) any reinforcing necessary for the internal stairway will not adversely impact the finished space outside the Premises; and (3) the installation of the internal stairway is not likely, in Landlord's reasonable judgment, to adversely affect (to more than a de minimis extent) the structure or safety of the Building, adversely affect (to more than a de minimis extent) any of the base Building systems or the functioning thereof or interfere in any adverse manner (to more than a de minimis extent) with the operation of the Building or the provision of services or utilities to other tenants in the Building. Tenant shall cause the contractors and subcontractors performing any such internal stairwell work to comply with any special rules and regulations that Landlord may impose from time to time regarding the work in connection with any such internal stairwell, provided such rules and regulations are commercially reasonable and consistent with those found at Comparable Buildings. In the event that Tenant requests the temporary removal of any portion of Building's exterior façade and/or windows in order to have structural materials for any such internal stairwell delivered to the Premises, Landlord shall not unreasonably withhold, condition or delay its consent thereto, provided that any such removal or reinstallation work associated with the Building's exterior and/or windows may, at Landlord's election, be performed by Landlord or Landlord's designated contractor, at Tenant's sole cost and expense, subject to application of the Construction Allowance. Any such work shall be performed by Tenant, at Tenant's sole cost and expense, provided that, if such work is performed as part of the Tenant's Work, it shall be at Tenant's sole cost and expense, subject to application of the Construction Allowance. Notwithstanding any contrary provision contained in the Lease, Landlord and Tenant acknowledge and agree that Tenant shall have no obligation to remove, or pay for the removal of, any such installed interior stairwells upon the natural expiration of the Lease Term; provided, however, that if the Lease is terminated early due to an Event of Default by Tenant, Tenant shall, at Landlord's election, be required to remove such internal stairwells and restore the area(s) affected by such internal stairwells (including restoring the slab cuts related thereto) to the condition they were in prior to the commencement of any work related to such internal stairwells. If Tenant fails to so remove and restore such internal stairwells on or prior to the earlier termination of the Lease Term, Landlord shall have the right to remove and restore such internal stairwells, and Tenant shall reimburse Landlord for all expenses incurred by Landlord in connection therewith within twenty (20) days following receipt of a written invoice from Landlord.

B- 14

24.    <u>Restroom Stall Partitions</u>.  Notwithstanding anything to the contrary contained in this Lease, Landlord's consent to the installation of floor to ceiling restroom stalls and partitions in the base Building core restrooms on any Building floor on which the Premises is located, whether as part of the Tenant's Work or a future Alteration, shall not be unreasonably withheld, conditioned or delayed.  Any such work shall be performed by Tenant, at Tenant's sole cost and expense, provided that, if such work is performed as part of the Tenant's Work, it shall be at Tenant's sole cost and expense, subject to application of the Construction Allowance. Notwithstanding the foregoing to the contrary, it shall be reasonable for Landlord to require that certain other modifications be made in connection with Tenant's request for approval of such stalls and partitions (for example, modifications to exhaust and lighting), all of which modifications shall be made at Tenant's sole cost and expense (subject to the application of the Construction Allowance if such work is performed as part of the Tenant's Work).  In addition, regardless of whether or not Landlord has requested that additional modifications be made to the lighting, exhaust or otherwise, Landlord shall have no responsibility or liability with respect to insufficiencies in Tenant's design of such restroom stalls, partitions and related improvements. Landlord and Tenant acknowledge and agree that Tenant shall have no obligation to remove, or pay for the removal of, any such restroom stalls and partitions upon expiration or earlier termination of the Lease.

25.    <u>Exterior Window Mullions</u>.  Notwithstanding anything to the contrary contained in this Lease, Landlord's consent to the installation of mullions on the interior-facing side of the exterior windows to accommodate Tenant's proposed wall and partition design of the Tenant's Work on any Building floor on which the Premises is located, whether as part of the Tenant's Work or a future Alteration, shall not be unreasonably withheld, conditioned or delayed. Any such work shall be performed by Tenant, at Tenant's sole cost and expense, provided that, if such work is performed as part of the Tenant's Work, it shall be at Tenant's sole cost and expense, subject to application of the Construction Allowance. Notwithstanding any contrary provision contained in the Lease, Landlord and Tenant acknowledge and agree that Tenant shall have no obligation to remove, or pay for the removal of, any such window mullions upon expiration or earlier termination of the Lease.

26.    <u>Landlord Delay</u>.  In the event (a) any delay in Landlord's response to Tenant's request for approval of any Tenant plans or drawings with respect to Tenant's Work or any revisions to the Tenant's Plans on or prior to the date that Landlord is required to respond thereto pursuant to this <u>Exhibit B</u>, or (b) any other breach of this Lease by Landlord or any of Landlord's agents, contractors or employees, actually causes a delay in Tenant's substantial completion of the Tenant's Work, then such event shall be deemed to be a "<u>Landlord Delay</u>" hereunder; provided, however, that a Landlord Delay shall not be deemed to have occurred unless and until (i) Tenant shall have given written notice of same to Landlord, which notice shall state with particularity the nature of the delay, and (ii) such delay is not cured by Landlord within two (2) business days following Landlord's receipt of such notice.  In the event that a Landlord Delay occurs pursuant to the preceding sentence, the number of days of Landlord Delay shall be the number of days that Tenant is actually delayed in substantially completing the Tenant's Work solely as a result of such Landlord Delay.  Tenant agrees to use commercially reasonable efforts (without being obligated to incur additional costs therefor, unless Landlord agrees to pay for such costs) to minimize the delay caused by any Landlord Delay.

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

# EXHIBIT B

## SCHEDULE I

## BUILDING SHELL DESCRIPTION

## The Aleck, 1400 L Street, NW

The Aleck is located at the corner of 14th Street and L Street, NW and has been transformed into an iconic Central Business District edifice.  Prior to the renovation, the facade  formed an inside corner where a new, urban, vitrine-like entry pavilion houses the new two-story lobby.  It features a sculptural, natural steel plate stair that arcs up to the new third floor lounge and the outdoor terrace.  This primary amenity takes aesthetic cues from the building's namesake, Alexander Graham Bell.  As a tinkerer with a nearby workshop and creator of historic inventions, his world focused on industrial design raised to the level of art.  The blending of industrial materials and crafted objects creates the chic, intriguing atmosphere of the live/work lounge and meeting spaces. On the upper floors, this inner corner is now re-clad in a floor to ceiling curtainwall, providing light filled interior spaces.

The mixed-use building consists of ground floor retail with office space above it. The structure is concrete with 12 floors above grade and 3 floors below grade including underground parking.

| | |
|---|---|
| **Architectural Attributes** | Street frontage: two-story building base<br>- New two-story glass façade lobby with Main Entry portal and revolving door<br>- New retail base consisting of black honed stone wall panels, new glass retail façades and canopies<br><br>Building façade at interior corner:<br>A new floor to ceiling window wall and metal panel system wraps the interior corner of the building.  At the slabs, a metal panel cladding is articulated with a horizontal profile that provides scale and shadow to the façade.<br><br>Main Building Lobby:<br>The lobby is framed on two sides by curved walls that lead back to the elevator bank.  These walls are clad in wood.  The ceiling heightens the drama with its curved profile.  The floor is finished with stone. The custom designed lobby desk ties the material palette together and boasts wood, black steel and glass elements.  The steel stair is hung from the ceiling by steel rods that form the guardrail. Furniture seating -- including a custom wood coffee table--complete the composition of the lobby. |
| **Amenities** | 3rd floor lounge, pantry and bar, multi-purpose conference room<br>3rd floor Urban Terrace off from lounge<br>C1 floor Fitness Center, Locker Room, Bike Storage, and Wellness Suite |

B-Schedule I-1

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

| | |
|---|---|
| **Structure** | All floors: Existing Reinforced Concrete Frame, 100 lbs./sq ft. (Minimum combined 80-lbs/sq. ft. live and 20-lbs/sq. ft dead load capacity) |
| | Lobbies, Stairs and Exit Corridors: 100-lbs/sq. ft.<br>Roof:  Existing Reinforced Concrete, 30-lbs/sq. ft. |
| | The flatness/levelness of concrete floors shall not exceed ¼" in 10 ft on a non-cumulative basis.  The methodology for determining floor levelness shall be the industry standard application utilizing a 10 foot steel straight edge. |
| **Slab to Slab Heights** | Typical floors: 10'-4", Ground floor retail: 14'-6" |
| **Typical Column spacing** | 19'-4" x 20'-0" |
| **Core-to-Window Depth** | Along the North, 47'-6"; at the corner, 52'-0", along the East, 47'-6"; along the South, 27'-9"; along the West, 45'-10" |
| **Window Treatments & Sill Height** | Tenant shall be responsible for acquiring and installing Building standard roller shade window treatments (i.e., Mecho Manual 5X Shades with 3% open 1605 Dove Grey fabric) on all exterior windows.<br>At the existing ribbon windows on floors 3-12, 2'-6".<br>At the second floor and the new corner (floors 4-12), floor to ceiling glass |
| **Core Walls and Columns** | Core walls and building perimeter columns on all floors shall be enclosed in gypsum board, spackled and ready for paint. |
| **Perimeter Walls** | Main Lobby Façade**:**<br>Custom cast aluminum and oversized glass curtain wall system:<br>- Flushed-appearance from the exterior with vertical "T-shaped" cast aluminum fins on the interior.<br>- Laminated, Insulated, low iron, low-e coated, vision glass units<br>- All glass revolving door, low iron glass<br>- Aluminum plate entrance portal<br>- 3-coat fluoropolymer coating system |
| | Retail Bays, ground to second floor:<br>- Two-sided structurally glazed silicone system<br>- 1" insulated, clear, low-e coated, vision glass units, fully tempered<br>- Integrated aluminum and glass canopies over retail entrances<br>- Integrated louvers with extruded aluminum blades and frames with concealed mullions<br>- 3-coat fluoropolymer coating system |
| | Main Facade, Ground to Third floor sill:<br>- 5cm honed granite stone panels |

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

Exterior Terrace:
   - Honed granite parapet walls with low-iron glass guardrails
- IPE wood pavers
- Reinforced hot fluid applied roofing membrane
- Exterior furniture
- Container planters

Window Wall, 3-12 floors (Corner):
- 2-sided, structurally glazed silicone window wall system
- 1" insulated, clear, low-e coated, vision glass units, fully tempered
- Aluminum plate wall panels at slab edges
- At 3rd floor: Operable glass wall to open up the interior lounge space
onto the terrace, 27'-wide opening, thermally broken system, with
insulated glass
- 3-coat fluoropolymer coating system

New Ribbon Window, at 3rd floor:
- Thermally broken system, to match existing ribbon windows
- 1" insulated, clear, vision glass units
- 3-coat fluoropolymer coating system to match existing frames

| | |
|---|---|
| **Vertical Transportation** | 4 elevators, modernized, electric traction:  3 passenger and 1 freight<br>- Capacity – 3500 lbs<br>- Speed – 350 fpm<br>- New Destination Dispatch system<br>- New cab finishes:  wood veneer, decorative glass, and natural steel wall panels; natural steel ceiling panels, stone flooring |
| **Elevator Lobby** | Elevator lobby and common corridor on floors 2-12:  gypsum board, spackled and ready for paint. |
| **Restrooms** | Restrooms have been designed to complement the aesthetic of the amenities lounge throughout the building.<br>- Porcelain tiles on wet walls, solid surface countertops with under-mount sinks<br>- Automatic and low flush consumption flushometer toilet fixtures and low-consumption sensor faucets.<br>- Floor mounted enamel toilet partitions with zero sightlines<br>- Recessed down lights |
| **HVAC/Plumbing System:** | Heating, ventilating and air conditioning is provided to building tenants via a central variable air volume (VAV) chilled water air handling unit (AHU) located in the penthouse. The AHU delivers cooled and dehumidified primary supply air (55 deg F) to each office floor via a central medium pressure supply air duct shaft located in the building core. Supply air will be tempered via electric heating coils during winter months to maintain minimum acceptable primary supply air temperature. The AHU fan speed will be controlled by variable frequency |

WDC 91095636v14

drive to maintain minimum required static pressure to meet the cooling load at the most critical point in the system. Air will return to the AHU via a central low pressure return air duct shaft in the core. Return air mixes with fresh outside ventilation air at the penthouse level and is recirculated through the air distribution system. Outside ventilation air quantity supplied to the system will be in accordance with IMC 2012 and ASHRAE Standard 62.1 minimum standards for acceptable indoor air quality.

A Central Cooling Plant provides chilled water to the central VAV AHU via two water-cooled centrifugal magnetic bearing chillers. Heat rejection is accommodated by two capacity-matched induced-draft cooling towers. Tower fans are equipped with variable frequency drives to maintain optimal condenser water supply temperatures, and condenser water flow is facilitated by a redundant variable pumping assembly.
Office floor space conditioning is accomplished with above ceiling single duct (shut-off type) terminal units within interior zones and fan powered terminal units with electric resistance heating coils within perimeter zones. Tenant will have the ability to relocate, remove or add VAV boxes to accommodate Tenant's design.

A central commercial (supplemental) condenser water system is provided for ground floor main lobby, retail areas and tenant supplement space conditioning needs. The commercial condenser water system runs 24/7 and consists of a dedicated cooling tower with variable speed drives for energy savings and winter waterside free cooling operation in accordance with ASHRAE 90.1-2010 requirements. The commercial condenser water system is interconnected with the base building Central Cooling Plant towers for added redundancy in case of outage or maintenance. Valved and capped commercial condenser water piping taps are provided at each floor which are detailed on the base building piping plans. Each floor is provided with 2" valved and capped taps off of the 24/7 condenser water piping riser, for connection to tenant supplemental cooling equipment.

The building will utilize new, fully automated Building Control System with DDC controls. This will allow remote troubleshooting and adjustment of set points, as well as programmed start, stop and system optimization
Tenant shall be responsible for the cost of HVAC work installed with the Above-Shell Improvements. Such HVAC work generally consists of all work "downstream" from Landlord provided work such as the main duct distribution, including taps, ductwork, registers, and perimeter linear diffusers.  The Above-Shell HVAC work would also include changes or additions to Landlord installed VAV terminal units per tenant design requirements, the final placement of the Tenant supplied thermostats programming terminal unit addresses, and any specialty or supplemental cooling systems.  Existing VAV terminal units will be coiled up in the

ceiling and connected to the Building Control System with DDC controls. Tenant architect will be required to coordinate space plan for acoustical considerations of VAV terminal units.

On or prior to the Lease Commencement Date, Landlord shall cause Sustainable Buildings, Baumann Consulting or another qualified third-party consultant selected by Landlord and approved by Tenant (such approval not to be unreasonably withheld, conditioned or delayed), to survey the existing VAV terminal units and identify any existing VAV terminal units that are not in good working order.  Landlord shall deliver a copy of the consultant's report to Tenant promptly following Landlord's receipt thereof.  On or prior to September 30, 2021, Landlord shall repair or replace (as necessary) any existing VAV terminal units that the consultant identifies are not in good working order (the "VAV Work"). Tenant acknowledges and agrees that the VAV Work will be performed simultaneously with the performance of the Tenant's Work, and Landlord and Tenant agree to cooperate in good faith to facilitate the simultaneous performance of Tenant's Work and the VAV Work and to not unreasonably interfere with each other in connection therewith.

Each tenant floor is provided with three (3) wet stacks for tenant use. Each wetstack consists of a 1" valved and capped domestic water connection, 4" capped sanitary connection and 2" capped vent connection. Domestic water is supplied at 40+ psi pressure.

The entire building is protected with an NFPA-13 wet pipe sprinkler system and NFPA-14 class 1 automatic wet standpipe system. These life safety systems are permitted to be modified to meet tenant designs.

| | |
|---|---|
| Electrical System: | The building is served by a 460/265V, 3 phase PEPCO Service which enters the main electric room at the 1st Cellar Level. The PEPCO service terminates in a 4000A switchboard. A 4000A busway serves office floors 2 through 12. Each office floor electric closet contains a 460/265V panelboard to serve lighting and HVAC loads; transformers and 208/120V panelboards for tenant receptacle loads. Landlord shall provide 1.0 watts per square foot of high voltage power (460/265V) for tenant lighting and 5.0 watts per square foot of low voltage power (208/120V) for tenant receptacles and equipment.  Power distribution is provided by 460/265 and 208/120 volt circuit breaker panel boards on each floor with (2) 30 kVA K-4 dry type transformers for low voltage. There are (4) 208/120 volt panel boards per each typical office floor. |
| Fire Alarm: | The building contains a high rise fire alarm system.  Landlord shall provide fully operational and tested fire alarm devices within the Premises in compliance with building code requirements for shell building use and occupancy.  Tenant shall be permitted to move the existing fire alarm devices and equipment, and shall be required to install additional fire alarm devices and equipment (including strobes, speakers, |

DocuSign Envelope ID: EE8G1D67-8D69-4B8D-A358-6865DF8C2D22

etc.) sufficient to satisfy building code requirements based on Tenant's design.  Tie-ins to the fire alarm system must be performed by the base Building contractor. Landlord will provide sufficient fire alarm panel capacity on each floor to meet tenant's reasonable needs and code compliance. Life safety devices within tenant's premises will be at tenant's cost.

**Emergency Power:**    The building has an emergency generator located on the main roof for base building life safety and standby loads. The base building generator serves the stair pressurization fans, elevators and controls, emergency lighting and the fire alarm system.

**Telecommunications:**    Adequate pathway (floor slab sleeves) for telecom risers are available in the core telecom closet on each floor. The main telephone room is located at the 1st Cellar Level.

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

## EXHIBIT B

## SCHEDULE II

## RULES AND PROCEDURES FOR CONTRACTORS
## FOR
## TENANT BUILDOUT AND/OR RENOVATION

Proper Conduct of Construction Employees and Sub-Contractors

All Construction workers should conduct themselves in a manner appropriate to business surroundings to including the following:

1.     Refrain from using vulgar language or shouting so as not to disturb working tenants.

2.     Use of alcohol or drugs on the job site is not allowed.  Any violators shall be immediately dismissed from the building and are subject to notification of law enforcement and prosecution as allowed under law.

3.     No radios/music will be played that can be heard in the common areas of the building.

4.     No smoking is permitted in the building.

5.     All food trash will be disposed of daily.

6.     Breaks for eating will be within the work area, not in any common areas of the building.

7.     Entry to the Premises for construction personnel shall be through the front door of the Premises, but all deliveries shall be through the rear loading area of the building.

8.     Construction personnel will not be allowed to use the building phones or restrooms, if any.

General Building Regulations

Construction supervisors shall ensure that the following regulations are followed:

9.     Construction materials may ***not*** be left in any portion of a common area that is utilized by tenants of the building, including hallways and lobby areas.

10.    Construction materials may ***not*** be placed in such a manner that egress to a fire doors or to stairwells are obstructed.

11.    Contractors will remove their trash and debris at least twice per week and more frequently as Landlord may reasonably direct. The contractor must provide construction dumpster(s). Building trash containers are not to be used for construction debris.  Failure to properly clean up debris outside the Premises will result in a reasonable cleaning charge to the contractor actually incurred by Landlord.  (Minimum charge is $50.00).

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

12.    Subject to the terms of Section 21(f) of <u>Exhibit B</u> to the Lease, dumpsters shall be placed in the Landlord designated area outside of the Building with Tenant's contractor being obligated to obtain all required permits for the same.

13.    During construction, contractor shall raise blinds, if any, and protect them with plastic so as not to damage them.  If the interior of the suite can be seen from the exterior of the building, Landlord may require screening from public view.

14.    Masonite boards will be placed on all carpeted areas and walls of the building and the freight elevator, when used during trash removal and delivery of supplies.

15.    Common areas of the building affected by construction will be vacuumed at the end of the workday.

16.    Prior to demolition, if carpet is to remain in the suite, it should be protected by heavy plastic cover or removed, stored and re-laid.  Failure to protect carpet or lobby floors will result in a cleaning charge.

17.    All doors from the common lobbies and corridors to the construction suite are to be kept closed at all times.

18.    The building is secured after normal business hours.  Arrangements for after hours entry must be made 48 hours in advance of need.

19.    All work must be performed in compliance with OSHA safety standards.

20.    Before any drilling, core boring or other structural work is performed, the contractors will verify the locations of the building's utility lines or other obstructions so as not to damage them.  Contractors are urged to take all possible precautions to protect utility lines.  **X-ray prior to any core drilling will be required.**

21.    No utilities or services to tenants are to be cut off or interrupted without first having requested in writing, and secured, in writing, the permission of the Landlord's representative.

22.    Landlord shall be notified of all exterior work 48 hours prior to commencement.  All construction work to be performed outside of the Premises, including within the parking garage of the Building, is included within the exterior work contemplated in the first sentence of this paragraph and such exterior work shall be coordinated with Landlord and performed after normal Building hours if such exterior work will require the blockage of any drive aisles or parking spaces.

23.    Wherever it is deemed necessary to temporarily issue a key to the contractor, the contractor shall be responsible for controlling possession and use of the same until returned to the issuing party.

24.    Due to post-tensioned structural slabs, drilling into the slabs, shall be done only with drills with drill-stop devices which detect metal within a slab.

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

## Elevator Use and Cleaning

25.    All construction personnel shall travel through the building via freight elevators and loading dock entrances.

26.    All construction materials and tools are to be hauled on the designated freight elevator *only*; any violations of this regulation may result in immediate removal of the contractor from the project.

27.    Elevator handrails may not be used as chairs or supply holders.

28.    The designated freight elevator is the only elevator to be used for moving materials and shall be properly protected with temporary Masonite floor and wall protection. Contractor is responsible for any damage to the elevator cab that may occur.

29.    Contractor must implement a *dust and debris* policy to prevent dust from being tracked or conveyed to any portion of the building.

30.    Arrangement must be made with the Building Engineer to place the elevator on independent service for the hauling of materials. Elevator doors should never be propped open by any method other than use of the elevator lock-off key.

31.    The contractor will remove all protective materials at the end of the contractor's workday.

32.    Damage must be reported to the management office immediately.

33.    Any damage to the elevator, mechanical or aesthetic, will be billed to the tenant.

## Deliveries

34.    The loading dock located at the rear of the property is for deliveries only.

35.    Deliveries must be coordinated with the Building Engineer or the Management Office to take place between the hours of 6:00 A.M. – 6:00 P.M. Monday -Friday.

36.    Deliveries scheduled at times other than regular business hours must be arranged at least twenty-four (24) hours in advance of such delivery and will require the presence of the Building Engineer. Tenant shall be responsible for cost of such services at the rate of $90.00 an hour, with no minimum charge.

## Parking

37.    Parking used by Tenant or its contractors shall be at prevailing rates as available through the Parking Facility Operator.

WDC 91095636v14

PART VI – Restrooms

38.     Tenant's contractor shall provide portable restrooms for use during construction and shall obtain all permits necessary for the placement and use thereof.  To be also coordinated with Landlord for placement in or around the Building.  Notwithstanding the foregoing, at Tenant's request, Landlord shall use commercially reasonable efforts to permit Tenant and Tenant's contractors to use core restrooms on one or more floors of the Building (as determined by Landlord).  If Tenant elects (and Landlord permits) the use of any core restrooms of the Building, Tenant and Tenant's contractors shall be responsible for (i) cleaning and stocking such restrooms, (ii) repairing any damage to such restrooms, and (iii) ensuring that the restrooms are in the same condition at the conclusion of Tenant's Work as they were in when Landlord granted Tenant and Tenant's contractors access to such restrooms.

Work Involving Excessive Noise

39.     All work involving excessive noise such as drilling, noisy demolition or any work which may disturb other tenants in the building will be permitted during non-business hours only, before 8:00 am or after 6:00 pm, Monday through Friday, or before 8:00 am or after 1:00 pm Saturdays unless coordinated with Landlord.  Manager should be notified of all work involving excessive noise at least 24 hours in advance.

Mechanical, Electrical and Plumbing Safety

40.     All work to be performed on mechanical, electrical or plumbing systems must be scheduled with the Building Engineer or the Management Office.

41.     Lock-out/Tag-out must be used for all electrical work.

42.     If any mechanical, electrical, or plumbing system is already *off* prior to the commencement of work, Tenant shall coordinate with the Building Engineer and determine why the system is off prior to commencing work.

43.     The Building Engineer must be present if a condenser water system needs to be drained.

44.     All work involving tie-ins to condenser or domestic water risers, the shutdown of electrical panels or any other disruptive activity must be scheduled after regular business hours and will require the presence of the Building Engineer.

45.     During construction, any exposed HVAC unit should be kept free of all construction materials, food and drinks.  Nothing should be placed on top of or in front of any units. Contractor will not operate any HVAC equipment without approval of the Building Engineer.  Contractor will protect all vents and units during construction.

Fire Annunciation System

46.     All fire alarm and sprinkler work must be coordinated with the engineer's office at least 24 hours in advance.

WDC 91095636v14

47.    Contractor shall take all necessary precautions to prevent accidental alarm of the fire system devices.    Before any such device is temporarily incapacitated, Landlord's representative shall be advised and contractor will be responsible for any necessary notification of the Fire Department.    **ANY CONTRACTOR WHO ACCIDENTALLY SETS OFF A BUILDING FIRE ALARM WILL BE ASSESSED $500.00 PER INCIDENT.**

48.    Any modifications to the building fire alarm system must be coordinated with the Building Engineer, the Management Office, and the Building Fire Alarm Contractor.

49.    **Building Hours:**

        (Mon.-Fri.) 8:00 am - 6:00 pm

        (Sat.) 9:00 am – 1:00 pm

        (Sun.) Closed

50.    Signage – Contractor or subcontractor signage may not be displayed in the building common areas or any of the window glass.

51.    Posting of rules and regulations – A copy of these rules and regulations, acknowledged and accepted by the General Contractor, must be posted on the job site in a manner allowing easy access by all workers.    It is the General Contractor's responsibility to instruct all workers, including subcontractors, to familiarize themselves with these rules.

52.    Engineering overtime – Should the Contractor perform any work which, in the sole estimation of Building Manager, requires the building engineer to be on duty during non-standard working hours, Tenant shall be responsible for cost of such services at the rate of $90.00 an hour, with no minimum charge.

53.    Safety – Contractors shall be extremely cognizant of all life safety issues and shall provide a list of emergency contacts in the event that a representative of the contractor's organization must be contacted after hours.    In addition to this contact list, contractors shall provide fire extinguishers at a ratio of one (1) for each 1,000 square feet of construction area and such fire extinguishers shall be mounted in a visible area marked properly.    Contractors shall comply with all OSHA regulations as well as all federal, state and district codes relating to workers safety.    The contractor shall review the job site and the job organization for total compliance to these rules and regulations on a regular basis and, upon request of Landlord, provide a report that such review has been performed and any infractions that were observed during this review.    ***After construction, the contractor will provide Material Safety Data Sheets for all materials used on-site by the contractor.***

Acknowledged By:



Date:    May 7, 2021

_____

B-Schedule II-5

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

**EXHIBIT C**

**RULES AND REGULATIONS**

This Exhibit is attached to and made a part of that certain Lease Agreement dated as of _____ (the "Lease"), by and between **TMG 1400 L STREET, L.L.C.**, a Delaware limited liability company ("Landlord"), and **ENOVATIONAL CORP.**, a District of Columbia corporation ("Tenant"). Unless the context otherwise requires, the terms used in this Exhibit C that are defined in the Lease shall have the same meanings as provided in the Lease.

The following rules and regulations have been formulated for the safety and well-being of all tenants of the Building and to insure compliance with municipal and other requirements. Strict adherence to these rules and regulations is necessary to guarantee that each and every tenant will enjoy a safe and undisturbed occupancy of its premises.

Tenant acknowledges that certain of these rules and regulations shall not apply to any retail tenants in the Building. Landlord may institute different rules for office, retail and food service tenants.

A.    ALL TENANTS.

The following rules shall be applicable to all tenants of the Building:

1.    Tenant shall not obstruct or encumber or use for any purpose other than ingress and egress to and from the Premises any sidewalk, entrance, passage, court, elevator, vestibule, stairway, corridor, hall or other part of the Building not exclusively occupied by Tenant. No bottles, parcels or other articles shall be placed, kept or displayed on window ledges, in windows or in corridors, stairways or other public parts of the Building. Tenant shall not place any showcase, mat or other article outside the Premises. Tenant shall keep all portions of the Premises which are visible from public parts of the Building in a tasteful, neat and orderly condition characteristic of first-class professional offices, so as not to be offensive to other tenants of the Building. No desks, bookcases, file cabinets and other furniture shall be placed against exterior windows.

2.    Landlord shall have the right to control and operate the public portions of the Building and the facilities furnished for common use of the tenants, in such manner as Landlord deems best for the benefit of the tenants generally. Tenant shall not permit the visit to the Premises of persons in such numbers or under such conditions as to interfere with the use and enjoyment of the entrances, corridors, elevators and other public portions or facilities of the Building by other tenants. Tenant shall coordinate in advance with Landlord's property management department all deliveries to the Building so that arrangements can be made to minimize such interference. Tenant shall not permit its employees and invitees to congregate in the elevator lobbies or corridors of the Building. Canvassing, soliciting and peddling in the Building are prohibited, and Tenant shall cooperate to prevent the same. Public corridor doors, when not in use, shall be kept closed. Nothing, including mats and trash, shall be placed, swept or thrown into the corridors, halls, elevator shafts, stairways or other public or common areas.

C-1

3.     Tenant shall not attach, hang or use in connection with any window or door of the Premises any drape, blind, shade or screen, without Landlord's reasonable prior written consent.  All awnings, drapes projections, curtains, blinds, shades, screens and other fixtures shall be of a quality, type, design and color, and shall be attached in a manner, reasonably approved in writing by Landlord.  Any Tenant-supplied window treatments shall be installed behind Landlord's standard window treatments so that Landlord's standard window treatments will be what is visible to persons outside the Building.

4.     Tenant shall not use the water fountains, water and wash closets, and plumbing and other fixtures for any purpose other than those for which they were constructed, and Tenant shall not place any debris, rubbish, rag or other substance therein (including, without limitation, coffee grounds).  All damages from misuse of fixtures shall be borne by the tenant causing same.

5.     Tenant shall not construct, maintain, use or operate within the Premises any electrical device, wiring or apparatus in connection with a loudspeaker system (other than an ordinary telephone and paging system) or other sound system, in connection with any excessively bright, changing, flashing, flickering or moving light or lighting device, or in connection with any similar device or system, without Landlord's prior written consent.  Tenant shall not construct, maintain, use or operate any such device or system outside of its Premises or within such Premises so that the same can be heard or seen from outside the Premises.  No flashing, neon or search lights shall be used which can be seen outside the Premises.  Only warm white lamps may be used in any fixture that may be visible from outside the Building or Premises.  Tenant shall not maintain, use or operate within the Premises any space heater.

6.     Tenant shall not bring any bicycle, vehicle, animal, bird or pet of any kind into the Building, except (i) bicycles in designated bike rack or bike room area, and (ii) service animals whose use in the Premises is permitted as a matter of Law.  Except while loading and unloading vehicles, there shall be no parking of vehicles or other obstructions placed in the loading dock area.

7.     Except as specifically provided to the contrary in the Lease (including Section 6(b) of Exhibit B to the Lease), Tenant shall not cook or permit any cooking on the Premises, except for microwave cooking and use of coffee machines by Tenant's employees for their own consumption.  Tenant shall not cause or permit any unusual or objectionable odor to be produced upon or emanate from the Premises.

8.     Tenant shall not make any unseemly or disturbing noise or disturb or interfere with occupants of the Building, whether by the use of any musical instrument, radio, talking machine or in any other way.

9.     Tenant shall not place on any floor a load exceeding the floor load per square foot which such floor was designed to carry.  Landlord shall have the right to prescribe the weight, position and manner of installation of safes and other heavy equipment and fixtures. Landlord shall have the right to repair at Tenant's expense any damage to the Premises or the Building caused by Tenant's moving property into or out of the Premises or due to the same being in or upon the Premises or to require Tenant to do the same.  Tenant shall not receive into

C-2

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

the Building or carry in the elevators any safes, freight, furniture, equipment or bulky item except as approved by Landlord, and any such furniture, equipment and bulky item shall be delivered only through the designated delivery entrance of the Building and the designated freight elevator at designated times.  Tenant shall remove promptly from any sidewalk adjacent to the Building any furniture, furnishing, equipment or other material there delivered or deposited for Tenant.  Landlord reserves the right to inspect all freight to be brought into the Building, except for government classified and confidential client materials, and to exclude from the Building all freight which violates any of these rules or the Lease.

10.      Tenant shall not place additional locks or bolts of any kind on any of the doors or windows, and shall not make any change in any existing lock or locking mechanism therein, without Landlord's prior written approval.  At all times Tenant shall provide Landlord with a "master" key for all locks on all doors and windows.  Tenant shall keep doors leading to a corridor or main hall closed at all times except as such doors may be used for ingress or egress and shall lock such doors during all times the Premises are unattended.  Tenant shall, upon the termination of its tenancy: (a) restore to Landlord all keys and security cards to stores, offices, storage rooms, toilet rooms, the Building and the Premises which were either furnished to, or otherwise procured by, Tenant, and in the event of the loss of any keys so furnished, Tenant shall pay the replacement cost thereof; and (b) inform Landlord of the combination of any lock, safe and vault in the Premises.  At Landlord's request, Landlord's then customary charge per key shall be paid for all keys in excess of two (2) of each type.  Tenant's key system shall be consistent with that for the rest of the Building.

11.      Except as shown in the Final Construction Drawings, Tenant shall not install or operate in the Premises any electrically operated equipment or machinery (other than standard servers, desk-top office equipment, including, without limitation, desk-top computers and copiers, typewriters, facsimile machines, printers or other similar equipment used in connection with standard office operations) without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  Landlord may condition such consent upon Tenant's payment of additional rent in compensation for the excess consumption of electricity or other utilities and for the cost of any additional wiring or apparatus that may be occasioned by the operation of such equipment or machinery.  Landlord shall have the right at any time and from time to time to designate the electric service providers for the Building.  Tenant shall cooperate with Landlord and such service providers and shall allow, as reasonably necessary, access to the Building's electric lines, feeders, risers, wiring and any other Building machinery.  Tenant shall not install any equipment of any type or nature that will or may necessitate any changes, replacements or additions to, or changes in the use of, the water system, heating system, plumbing system, air-conditioning system or electrical system of the Premises or the Building, without obtaining Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole and absolute discretion.  If any machine or equipment of Tenant causes noise or vibration that may be transmitted to such a degree as to be reasonably objectionable to Landlord or any tenant in the Building, then Tenant shall install at Tenant's expense vibration eliminators or other devices sufficient to reduce such noise and vibration to a level reasonably satisfactory to Landlord.

12.      All telephone and telecommunications services desired by Tenant shall be ordered by and utilized at the sole expense of Tenant.  Unless Landlord otherwise requests or

C-3

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

consents in writing, all of Tenant's telecommunications equipment shall be and remain solely in the Premises and the telephone closet(s) designated by Landlord.  Landlord shall have no responsibility for the maintenance of Tenant's telecommunications equipment (including wiring) nor for any wiring or other infrastructure to which Tenant's telecommunications equipment may be connected.  Landlord shall have the right, upon reasonable prior notice to Tenant (except in the event of an emergency), to interrupt telecommunications facilities as necessary in connection with any repairs or with installation of other telecommunications equipment.  Subject to the provisions of the Lease, Tenant shall not utilize any wireless communications equipment (other than usual and customary cellular telephones), including antennae and satellite receiver dishes, at the Premises or the Building, without Landlord's prior written consent, which may be granted or withheld in Landlord's reasonable discretion.

13.    No telephone, telecommunications or other similar provider whose equipment is not then servicing the Building shall be permitted to install its lines or other equipment within or about the Building without first securing the prior written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord's approval shall not be deemed any kind of warranty or representation by Landlord, including, without limitation, any warranty or representation as to the suitability, competence, or financial strength of the provider.  Without limitation of the foregoing standards, as specific conditions of any consent: (i) Landlord shall incur no expense whatsoever with respect to any aspect of the provider's provision of its services (including, without limitation, the costs of installation, materials and services); (ii) prior to commencement of any work in or about the Building by the provider, the provider shall supply Landlord with such written indemnities, insurance, financial statements, and such other items as Landlord reasonably determines and Landlord shall have reasonably determined that there is sufficient space in the Building for the placement of the necessary equipment and materials; provided, however, in no event shall Tenant be provided less than Tenant's Proportionate Share of space in Building's risers; (iii) the provider agrees to abide by such rules and regulations, building and other codes, job site rules and such other requirements as are reasonably determined by Landlord to be necessary; (iv) the provider shall agree to use existing building conduits and pipes or use building contractors (or other contractors approved by Landlord); (v) the provider shall pay Landlord such compensation as is reasonably determined by Landlord to compensate it for space used in the building for the storage and maintenance of the provider's equipment, the fair market value of a provider's access to the Building, and the costs which may reasonably be expected to be incurred by Landlord; (vi) the provider shall agree to deliver to Landlord detailed "as built" plans immediately after the installation of the provider's equipment is complete; and (vii) all of the foregoing matters shall be documented in a written agreement between Landlord and the provider on Landlord's commercially reasonable form and otherwise reasonably satisfactory to Landlord and Tenant. Landlord shall use commercially reasonable efforts to cooperate with Tenant and Tenant's preferred telecommunications provider in such provider providing its services to the Premises, subject to the conditions set forth in this Paragraph 13.

14.    Landlord reserves the right to exclude from the Building at all times any person who does not properly identify himself to the Building management or attendant on duty. Landlord shall have the right to exclude any undesirable or disorderly persons from the Building at any time.  Landlord may require all persons admitted to or leaving the Building to show satisfactory identification and to sign a register.  Tenant shall be responsible for all persons for

C-4

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

whom it authorizes entry into the Building and shall be liable to Landlord for all acts of such persons.    Landlord has the right to evacuate the Building in the event of emergency or catastrophe or for the purpose of holding a reasonable number of fire drills.

15.    Tenant shall not permit or encourage any loitering in or about the Premises and shall not use or permit the use of the Premises for lodging, dwelling or sleeping.

16.    Tenant, before closing and leaving the Premises at the end of each business day, shall use reasonable efforts to see that all lights and equipment are turned off, expressly excluding any items which are required by Applicable Law to remain turned on (e.g., emergency lighting) or are customarily left on by tenants in Comparable Buildings (e.g., automatic coffee machines, soda fountain machines, vending machines).

17.    Tenant shall not request Landlord's employees to perform any work or do anything outside of such employees' regular duties without Landlord's prior written consent. Tenant's special requirements will be attended to only upon application to Landlord, and any such special requirements shall be billed to Tenant in accordance with the schedule of charges maintained by Landlord from time to time or as is agreed upon in writing in advance by Landlord and Tenant.    Tenant shall not employ any of Landlord's employees for any purpose whatsoever without Landlord's prior written consent.    Tenant shall notify Landlord or the Building manager of any person employed by it to do janitorial work within the Premises, except for full-time employees of Tenant, prior to such person's commencing work, and such person shall, while in the Building and outside of the Premises, comply with all instructions issued by Landlord or its representatives.

18.    There shall not be used in any space, or in the public halls of the Building, either by any tenant or by jobbers or others in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.    Tenant shall be responsible for any loss or damage resulting from any deliveries made by or for Tenant.

19.    Tenant shall not install or permit the installation of any wiring for any purpose on the exterior of the Premises.    Landlord will direct electricians as to where and how telephone and telegraph wires are to be introduced.    No boring or cutting for wires or stringing of wires will be allowed without written consent of Landlord.    The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.    All such work shall be effected pursuant to permits issued by all applicable governmental authorities having jurisdiction.    Tenant shall not do anything, or permit anything to be done, in or about the Building, or bring or keep anything therein, that will in any way increase the possibility of fire or other casualty or obstruct or interfere with the rights of, or otherwise injure or annoy, other tenants, or do anything in conflict with the valid pertinent laws, rules, or regulations of any governmental authority.

20.    Tenant acknowledges that it is Landlord's intention that the Building be operated in a manner which is consistent with the highest standards of cleanliness, decency and morals in the community which it serves.    Toward that end, Tenant shall not sell, distribute, display or offer for sale any item which, in Landlord's reasonable judgment, is inconsistent with

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-BD69-4B8B-A358-6865DF8C2D22

the quality of operation of the Building or may tend to impose or detract from the moral character or image of the Building.  Tenant shall not use the Premises for any immoral or illegal purpose.  Tenant shall cooperate with Building employees in keeping the Premises neat and clean.

21.    Unless otherwise expressly provided in the Lease, Tenant shall not use, occupy or permit any portion of the Premises to be used or occupied for the storage, manufacture, or sale of liquor, marijuana or cannabis or any products containing marijuana or cannabis or any derivative thereof.

22.    [Intentionally Omitted]

23.    Tenant shall not remove, alter or replace any base Building ceiling light diffusers, ceiling tiles or air diffusers in any portion of the Premises provided to Tenant at delivery of the Premises to Tenant, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

24.    Tenant shall not purchase water, ice, coffee, soft drinks, towels, or other merchandise or services from any company or person whose repeated violation of Building regulations has caused, in Landlord's reasonable opinion, a hazard or nuisance to the Building and/or its occupants.

25.    Tenant shall not pay any employee on the Premises except those actually employed therein; nor shall Tenant use the Premises as headquarters for large scale employment of workers for other locations.

26.    Landlord shall have the right, upon written notice to Tenant, to require Tenant to refrain from or discontinue any advertising by Tenant which, in Landlord's reasonable opinion, tends to impair the reputation of the Building or its desirability for offices.

27.    Tenant shall not in any manner deface any part of the Premises or the Building.  Other than ordinary office decorations, no stringing of wires, boring or cutting shall be permitted except with Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Any floor covering installed by Tenant shall have an under layer of felt rubber, or similar sound-deadening substance, which shall not be affixed to the floor by cement or any other non-soluble adhesive materials.

28.    Should Tenant's use and occupancy of the Premises require the installation of supplemental cooling, and should the Building contain a closed loop, Tenant agrees that its supplemental cooling requirements will be serviced by tapping into the Building's closed loop.  Tenant shall be responsible for the actual cost of connecting into the loop and agrees to pay to Landlord as additional rent all actual costs incurred by Landlord in connection with Tenant's use of the Building's closed loop.  Should the Building not contain a closed loop, Tenant agrees to be responsible for fees associated with placing equipment on the roof of the Building.

29.    Tenant shall handle its newspapers, "office paper," garbage, trash and other waste products in the manner required by applicable law (as the same may be amended

C-6

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

from time to time) whether required of Landlord or otherwise and shall conform with any recycling plan instituted by Landlord. As of the Execution Date, Waste Management is the provider and all recycling is a single sort. Glass, plastic and paper are put into recycle barrels, and cardboard is broken down and recycled separately. Landlord shall have no obligation to accept any waste that is not prepared for collection in accordance with any such requirements. Landlord reserves the right to require Tenant to arrange for waste collection, at Tenant's sole cost and expense, utilizing a contractor reasonably satisfactory to Landlord, and to require Tenant to pay all costs, expenses, fines, penalties, or damages that may be imposed on Landlord or Tenant by reason of Tenant's failure to comply with any such requirements. If Tenant is unable to comply with Landlord's standard procedures regarding the internal collection, sorting, separation and recycling of waste, then, upon reasonable advance notice to Landlord, Landlord shall use reasonable efforts to arrange for alternative procedures for Tenant, provided Tenant shall pay Landlord all additional costs incurred by Landlord with respect thereto.

30.    Tenant shall not bring or keep, or permit to be brought or kept, in the Building any weapon or flammable, combustible or explosive fluid, chemical or substance, except as otherwise expressly permitted in the Lease.

31.    The Building (including the Parking Facility) is a non-smoking facility. There shall be no smoking (or any use of e-cigarettes, vapor pens, etc.) in the Building or in the Parking Facility. Landlord shall have the right from time to time in its sole discretion to establish "smoke-free" perimeters surrounding the Building entrances and exits (including the Parking Facility) within which smoking (or any use of e-cigarettes, vapor pens, etc.) shall not be permitted.

32.    All wiring and cabling installed by Tenant shall be marked and coded, in a manner reasonably acceptable to Landlord, to identify such facilities as belonging to Tenant and the point of commencement and termination of such facilities.

33.    Landlord may, upon request of Tenant, waive Tenant's compliance with any of the rules, provided that (a) no waiver shall be effective unless signed by Landlord, (b) no waiver shall relieve Tenant from the obligation to comply with such rule in the future unless otherwise agreed in writing by Landlord, (c) no waiver granted to any tenant shall relieve any other tenant from the obligation of complying with these rules and regulations, and (d) no waiver shall relieve Tenant from any liability for any loss or damage resulting from Tenant's failure to comply with any rule. Landlord reserves the right to rescind any of these rules and make such other and further rules as in the judgment of Landlord shall from time to time be needed for the safety, protection, care, and cleanliness of the Building, the operation thereof, the preservation of good order therein, and the protection and comfort of its tenants, their agents, employees, and invitees, which rules when made and notice thereof given to a tenant shall be binding upon it in like manner as if originally herein prescribed. In the event of any conflict or inconsistency between the terms and provisions of these rules, as now or hereafter in effect, and the terms and provision of the Lease, the terms and provision of the Lease shall prevail.

B.    RETAIL TENANTS ONLY.

The following rules shall be applicable to retail tenants only:

1.      Tenant shall replace promptly any cracked or broken glass in the Premises (including without limitation all windows, display cases, countertops and doors) with glass of like color, kind and quality.

2.      Tenant shall not operate its business in a manner which is commonly known as a "discount house", "wholesale house", "cut-rate store", or "outlet store". The Premises shall not be used for conducting any barter, trade, or exchange of goods, or sale through promotional give-away gimmicks, or any business involving the sale of second-hand goods, insurance salvage stock or fire sale stock, and shall not be used for any auction or pawnshop business, any fire sale, bankruptcy sale, going-out-of-business sale, moving sale, bulk sale or any other business which, because of merchandising methods or otherwise, would tend to lower the first-class character of the Building.

3.      Tenant shall not receive or ship articles of any kind outside the designated loading area for the Premises or other than during the designated loading times.

4.      Tenant shall keep any garbage, trash, rubbish or other refuse in rat-proof containers within the interior of the Premises; deposit daily such garbage, trash, rubbish and refuse in receptacles designated by Landlord; and enclose and/or shield such receptacles in a manner approved by Landlord.

5.      Tenant shall not sell, display or offer for sale any roach clip, water pipe, bong, coke spoon, cigarette papers, hypodermic syringe or other paraphernalia which in Landlord's opinion are commonly used in connection with illegal drugs, or any pornographic, lewd, suggestive or "adult" newspaper, book, magazine, film, picture or merchandise of any kind.

6.      Tenant shall not install burglar bars in or to the Premises without Landlord's prior approval and if requested to do so by Landlord, install a locking system compatible with the locking system being used by Landlord at the Building.

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

**EXHIBIT D-1**

**CERTIFICATE AFFIRMING THE LEASE COMMENCEMENT DATE**

This Certificate is being provided pursuant to that certain Office Lease Agreement dated as of _____, 20_ (the "Lease"), by and between **TMG 1400 L STREET, L.L.C.**, a Delaware limited liability company ("Landlord"), and **ENOVATIONAL CORP.**, a District of Columbia corporation ("Tenant"). The parties to the Lease desire to confirm the following:

1. The Premises was delivered to Tenant in the condition required by the Lease on, and accordingly the Lease Commencement Date is, _____, 20__.

Attached to this Certificate is evidence of payment of premiums for all insurance required pursuant to the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Certificate under seal on _____, 20__.

LANDLORD:

**TMG 1400 L STREET, L.L.C.**,
a Delaware limited liability company


By: _____ [SEAL]
Name: _____
Title: _____


By: _____ [SEAL]
Name: _____
Title: _____


TENANT:

**ENOVATIONAL CORP.**,
a District of Columbia corporation


By: _____ [SEAL]
Name: Vlad Enache
Title: CEO

D-1-1

## EXHIBIT D-2

### CERTIFICATE AFFIRMING THE RENT COMMENCEMENT DATE

This Certificate is being provided pursuant to that certain Office Lease Agreement dated as of _____, 20_ (the "Lease"), by and between **TMG 1400 L STREET, L.L.C.**, a Delaware limited liability company ("Landlord"), and **ENOVATIONAL CORP.**, a District of Columbia corporation ("Tenant"). The parties to the Lease desire to confirm the following:

1.       The Rent Commencement Date is _____, 20__.

2.       The initial term of the Lease shall expire on _____, ____.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Certificate under seal on _____, 20__.

LANDLORD:

**TMG 1400 L STREET, L.L.C.**,
a Delaware limited liability company

By:       _____ [SEAL]
Name: _____
Title: _____


By:       _____ [SEAL]
Name:_____
Title: _____


TENANT:

**ENOVATIONAL CORP.**,
a District of Columbia corporation

By:       _____ [SEAL]
Name: Vlad Enache
Title: CEO

DocuSign Envelope ID: EE8C1D67-BD69-4B8D-A358-6865DF8C2D22

# EXHIBIT E

## ACCEPTABLE FORM OF LETTER OF CREDIT

IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER

| LETTER OF CREDIT AMOUNT | ISSUE DATE | EXPIRY DATE |
|---|---|---|
| USD2,988,093.78 | ___/___/___ | 1 YEAR FROM ISSUE DATE |

BENEFICIARY:

**TMG 1400 L STREET, LLC**
C/O THE MERIDIAN GROUP
3 BETHESDA METRO CENTER, SUITE 1400
BETHESDA, MD 20814
ATTN: WIL MACHEN

APPLICANT:

**ENOVATIONAL CORP.**
(AND ITS SUCCESSORS)
1101 K STREET, NW, SUITE 1010
WASHINGTON, DC 20005
ATTN: VLAD ENACHE

WE HEREBY OPEN OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR FAVOR FOR THE ACCOUNT OF THE ABOVE REFERENCED APPLICANT IN THE AGGREGATE AMOUNT OF **TWO MILLION, NINE HUNDRED EIGHTY EIGHT THOUSAND, NINETY THREE AND 78/100** ONLY U.S. DOLLARS (USD **2,988,093.78**) WHICH IS AVAILABLE BY PAYMENT WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1.      A DRAFT AT SIGHT DRAWN ON **WELLS FARGO BANK, N.A.**, DULY ENDORSED ON ITS REVERSE SIDE THEREOF BY THE BENEFICIARY, SPECIFICALLY REFERENCING THIS LETTER OF CREDIT NUMBER.

2.      THE ORIGINAL LETTER OF CREDIT AND ANY AMENDMENT(S) ATTACHED THERETO.

3.      A DATED STATEMENT ISSUED ON THE LETTERHEAD OF THE BENEFICIARY AND PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE STATING:

WE HEREBY CERTIFY THAT BENEFICIARY IS PERMITTED TO DRAW UNDER LETTER OF CREDIT NO. _____ PURSUANT TO THAT CERTAIN OFFICE LEASE AGREEMENT BY AND BETWEEN **ENOVATIONAL CORP.**, AS TENANT, AND **TMG 1400 L STREET, LLC**, AS LANDLORD, FOR PREMISES LOCATED AT **1400 L STREET, N.W., WASHINGTON, DC**, AS SUCH LEASE MAY BE MODIFIED OR AMENDED TO DATE.  WE THEREFORE DEMAND PAYMENT IN THE AMOUNT OF (INSERT AMOUNT) AS SAME IS DUE AND OWING.

THIS LETTER OF CREDIT SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING.  THIS UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED,

WDC 91095636v14

AMENDED, AMPLIFIED OR INCORPORATED BY REFERENCE TO ANY DOCUMENT, CONTRACT OR AGREEMENT REFERENCED TO HEREIN.

WE HEREBY AGREE WITH YOU THAT DRAFT(S) DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT SHALL BE DULY HONORED IF PRESENTED TOGETHER WITH DOCUMENT(S) AS SPECIFIED AT EITHER ONE OF OUR OFFICE LOCATION AT, 794 DAVIS STREET, MAC A0283-023, SAN LEANDRO, CA 94577, OR 401 N. RESEARCH PKWY, MAC D4004-017, WINSTON-SALEM, NC 27101, ATTENTION: US TRADE SERVICES, STANDBY LETTERS OF CREDIT ON OR BEFORE THE ABOVE STATED EXPIRY DATE, OR ANY EXTENDED EXPIRY DATE IF APPLICABLE.

DRAFT(S) DRAWN UNDER THIS LETTER OF CREDIT MUST SPECIFICALLY REFERENCE OUR LETTER OF CREDIT NUMBER.

WE WILL ACCEPT SUCH STATEMENT AS CONCLUSIVE, BINDING AND CORRECT WITHOUT HAVING TO INVESTIGATE OR HAVING TO BE RESPONSIBLE FOR THE ACCURACY, TRUTHFULNESS, CORRECTNESS OR VALIDITY THEREOF, AND NOTWITHSTANDING THE CLAIM OF ANY PERSON TO THE CONTRARY.

MULTIPLE AND PARTIAL DRAWINGS ARE ALLOWED UNDER THIS LETTER OF CREDIT. YOU SHALL HAVE THE RIGHT TO IMMEDIATELY DRAW ON THE REMAINDER OF THIS LETTER OF CREDIT AFTER SUCH PARTIAL DRAW.

THIS LETTER OF CREDIT SHALL BE DEEMED AUTOMATICALLY EXTENDED, WITHOUT AMENDMENT, FOR ADDITIONAL PERIOD(S) OF ONE YEAR FROM THE EXPIRY DATE HEREOF, OR ANY FUTURE EXPIRATION DATE, UNLESS AT LEAST SIXTY (60) CALENDAR DAYS PRIOR TO ANY EXPIRATION DATE WE NOTIFY YOU BY REGISTERED MAIL, OVERNIGHT COURIER OR BY ANY OTHER RECEIPTED MEANS AT THE ABOVE ADDRESS THAT WE ELECT NOT TO CONSIDER THIS LETTER OF CREDIT EXTENDED FOR ANY SUCH ADDITIONAL PERIOD, WHEREUPON DURING SUCH SIXTY (60) CALENDAR DAYS PERIOD THIS LETTER OF CREDIT SHALL REMAIN IN FULL FORCE AND EFFECT AND YOU MAY DRAW FOR UP TO THE FULL AMOUNT AVAILABLE UNDER THIS LETTER OF CREDIT BY MEANS OF YOUR SIGHT DRAFT(S), DRAWN ON US, MENTIONING OUR LETTER OF CREDIT NUMBER. IN NO EVENT SHALL THIS LETTER OF CREDIT BE EXTENDED BEYOND **03/31/2032** WHICH WILL BE CONSIDERED THE FINAL EXPIRATION DATE. ANY REFERENCE HEREIN TO A FINAL EXPIRATION DATE DOES NOT IMPLY THAT WE ARE OBLIGATED TO EXTEND THIS LETTER OF CREDIT BEYOND THE INITIAL OR ANY EXTENDED DATE THEREOF.

THIS LETTER OF CREDIT IS TRANSFERABLE ONE OR MORE TIMES, BUT IN EACH INSTANCE ONLY TO A SINGLE TRANSFEREE AND ONLY IN THE FULL AMOUNT AVAILABLE TO BE DRAWN UNDER THE LETTER OF CREDIT AT THE TIME OF SUCH TRANSFER. ANY SUCH TRANSFER MAY BE EFFECTED ONLY THROUGH WELLS FARGO BANK, N.A. AND ONLY UPON PRESENTATION TO US AT OUR PRESENTATION OFFICE SPECIFIED HEREIN OF A DULY EXECUTED TRANSFER

REQUEST IN THE FORM ATTACHED HERETO AS EXHIBIT A, WITH INSTRUCTIONS THEREIN IN BRACKETS COMPLIED WITH, TOGETHER WITH THE ORIGINAL OF THIS LETTER OF CREDIT AND ANY AMENDMENTS THERETO. EACH TRANSFER SHALL BE EVIDENCED BY OUR ENDORSEMENT ON THE REVERSE OF THE ORIGINAL OF THIS LETTER OF CREDIT, AND WE SHALL DELIVER SUCH ORIGINAL TO THE TRANSFEREE.  THE TRANSFEREE'S NAME SHALL AUTOMATICALLY BE SUBSTITUTED FOR THAT OF THE BENEFICIARY WHEREVER SUCH BENEFICIARY'S NAME APPEARS WITHIN THIS STANDBY LETTER OF CREDIT.  ALL CHARGES IN CONNECTION WITH ANY TRANSFER OF THIS LETTER OF CREDIT ARE FOR THE APPLICANT'S ACCOUNT.

OUR OBLIGATION UNDER THIS LETTER OF CREDIT SHALL NOT BE AFFECTED BY ANY CIRCUMSTANCE, CLAIM OR DEFENSE, REAL OR PERSONAL, OF ANY PARTY AS TO THE ENFORCEABILITY OF THE LEASE AGREEMENT BETWEEN **ENOVATIONAL CORP.** AND YOU; IT BEING UNDERSTOOD THAT OUR OBLIGATION SHALL BE THAT OF A PRIMARY OBLIGOR AND NOT THAT OF A SURETY, GUARANTOR OR ACCOMMODATION MAKER.

DRAWINGS MAY BE PRESENTED TO US AT EITHER ONE OF THE ABOVE STATED OFFICES DELIVERED TO US BY U.S. POSTAL SERVICE MAIL, REGISTERED MAIL OR CERTIFIED MAIL OR BY EXPRESS COURIER OR OVERNIGHT COURIER. DRAWINGS MAY ALSO BE PRESENTED TO US BY FACSIMILE TRANSMISSION TO FACSIMILE NUMBER 844-879-5593  (EACH SUCH DRAWING, A "FAX DRAWING"); PROVIDED, HOWEVER, THAT A FAX DRAWING WILL NOT BE EFFECTIVELY PRESENTED UNTIL YOU CONFIRM BY TELEPHONE OUR RECEIPT OF SUCH FAX DRAWING BY CALLING US AT TELEPHONE NUMBER 1-800-776-3862 (OPTION 2).  IF YOU PRESENT A FAX DRAWING UNDER THIS LETTER OF CREDIT YOU DO NOT NEED TO PRESENT THE ORIGINAL OF ANY DRAWING DOCUMENTS, AND IF WE RECEIVE ANY SUCH ORIGINAL DRAWING DOCUMENTS THEY WILL NOT BE EXAMINED BY US.  IN THE EVENT OF A FULL OR FINAL DRAWING THE ORIGINAL LETTER OF CREDIT MUST BE RETURNED TO US BY OVERNIGHT COURIER.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES 1998, INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 590 ("ISP98").

SINCERELY,

_____
AUTHORIZED SIGNATURE

PLEASE DIRECT ANY WRITTEN CORRESPONDENCE OR INQUIRIES REGARDING THIS LETTER OF CREDIT, ALWAYS QUOTING OUR REFERENCE NUMBER, TO **WELLS FARGO BANK, NATIONAL ASSOCIATION,** ATTN: U.S. STANDBY TRADE SERVICES

E-3

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

**AT EITHER**                                **OR**

    794 DAVIS STREET                    401 N. RESEARCH PKWY

    MAC A0283-023                       MAC D4004-017,

    SAN LEANDRO, CA  94577              WINSTON-SALEM, NC  27101

PHONE INQUIRIES REGARDING THIS CREDIT SHOULD BE DIRECTED TO OUR
STANDBY CUSTOMER CONNECTION PROFESSIONALS

| 1-800-798-2815 OPTION 1 | 1-800-776-3862 OPTION 2 |
|---|---|
| (HOURS OF OPERATION: 8:00 A.M. PT TO 5:00 P.M. PT) | (HOURS OF OPERATION: 8:00 A.M. EST TO 5:30 P.M. EST) |

EXHIBIT A
TRANSFER REQUEST OF WELLS FARGO BANK, N.A. IRREVOCABLE STANDBY
LETTER OF CREDIT NUMBER: _____

EXHIBIT ___ TO LETTER OF CREDIT NUMBER: _____

REQUEST FOR FULL TRANSFER OF LETTER OF CREDIT

DATE:

WELLS FARGO BANK, N.A.
U.S. TRADE SERVICES
STANDBY LETTER OF CREDIT DEPARTMENT
794 DAVIS STREET, 2ND FLOOR, MAC A0283-023
SAN LEANDRO, CALIFORNIA 94577-6922

OR

WELLS FARGO BANK, N.A.
STANDBY LETTER OF CREDIT DEPARTMENT
401 NORTH RESEARCH PARKWAY, 1ST FLOOR,
WINSTON-SALEM, NC 27101-4157

E-4

WDC 91095636v14

LETTER OF CREDIT NUMBER: _____

ISSUING BANK:

_____

FOR VALUE RECEIVED, THE UNDERSIGNED BENEFICIARY OF THE ABOVE REFERENCED LETTER OF CREDIT (THE "TRANSFEROR") HEREBY IRREVOCABLY TRANSFERS ALL ITS RIGHTS UNDER THE LETTER OF CREDIT AS AMENDED TO THIS DATE (THE "CREDIT") TO THE FOLLOWING TRANSFEREE (THE "TRANSFEREE"):

TRANSFEREE
NAME:_____
ADDRESS:

_____
_____
_____

PHONE NUMBER: _____

BY THIS TRANSFER, ALL RIGHTS OF TRANSFEROR IN THE LETTER OF CREDIT ARE TRANSFERRED TO THE TRANSFEREE, AND THE TRANSFEREE SHALL BE THE SOLE BENEFICIARY OF THE LETTER OF CREDIT, POSSESSING ALL RIGHTS PERTAINING THERETO, INCLUDING, BUT NOT LIMITED TO, SOLE RIGHTS RELATING TO THE APPROVAL OF ANY AMENDMENTS MADE AFTER THE DATE HEREOF.  YOU ARE HEREBY IRREVOCABLY INSTRUCTED TO ADVISE FUTURE AMENDMENT(S) TO THE LETTER OF CREDIT TO THE TRANSFEREE WITHOUT THE TRANSFEROR'S CONSENT OR NOTICE TO THE TRANSFEROR.

ENCLOSED ARE THE ORIGINAL LETTER OF CREDIT AND THE ORIGINAL OF ALL AMENDMENTS ISSUED TO DATE WHICH WE REQUEST THAT WELLS FARGO SEND TO THE TRANSFEREE AFTER NOTING THIS TRANSFER ON THE CREDIT.  ALSO, WITH REGARD TO PAYMENT OF WELLS FARGO'S TRANSFER COMMISSION OF 1/4% OF THE TRANSFER AMOUNT WITH A MINIMUM OF $250.00 AND A MAXIMUM OF $1500.00:

_____        WE ENCLOSE AN OFFICIAL OR CERTIFIED CHECK IN THE AMOUNT OF $(INSERT FIELD).
_____   WE AUTHORIZE YOU TO DEBIT OUR ACCOUNT NUMBER (INSERT FIELD) WITH YOU FOR THE AMOUNT OF YOUR TRANSFER COMMISSION.
_____        PER THE TERMS AND CONDITIONS STATED IN THE CREDIT, THE APPLICANT HAS AGREED TO PAY YOUR TRANSFER COMMISSION.

WE REPRESENT AND WARRANT TO WELLS FARGO THAT THIS TRANSFER AND THE TRANSACTION(S) THEREUNDER DO NOT VIOLATE ANY LAW OR REGULATION.

WDC 91095636v14

PLEASE NOTIFY THE TRANSFEREE OF THIS TRANSFER AND OF THE TERMS AND
CONDITIONS OF THE LETTER OF CREDIT AS TRANSFERRED.  THIS TRANSFER
WILL BECOME EFFECTIVE UPON WELLS FARGO BANK, N.A.'S WRITTEN
NOTIFICATION TO THE TRANSFEREE THAT SUCH TRANSFER WAS EFFECTED.

THE BANK SIGNING BELOW GUARANTEES THAT THE  [TRANSFEROR'S NAME]
TRANSFEROR'S SIGNATURE IS GENUINE AND THAT THE INDIVIDUAL SIGNING
THIS TRANSFER REQUEST HAS THE AUTHORITY TO DO SO:

BENEFICIARY: _____
BY: _____
PRINTED NAME: _____
TITLE: _____
PHONE NUMBER: _____

BANK NAME: _____
BY: _____
PRINTED NAME: _____
 TITLE: _____

AS AN ALTERNATIVE TO THE ABOVE REQUIREMENT FOR A BANK'S SIGNATURE
GUARANTEE, THE FOLLOWING AUTHORIZED SIGNER CERTIFICATION MAY BE
COMPLETED:

I, THE UNDERSIGNED DO HEREBY CERTIFY THAT I HOLD THE TITLE OF
___SECRETARY, ___ ASSISTANT SECRETARY, __CHIEF FINANCIAL OFFICER, __
CHIEF EXECUTIVE OFFICER, __PRESIDENT, __ VICE PRESIDENT, __ TREASURER, __
MANAGING MEMBER, __ MANAGER, OR __ OTHER _____ AND I
AM AUTHORIZED TO CERTIFY ON BEHALF OF THE BENEFICIARY, AS OF THE
DATE OF THIS AUTHORIZED SIGNER CERTIFICATION, THAT THE PERSON(S)
SIGNING AS TRANSFEROR ABOVE PRESENTLY HOLDS THE TITLE SPECIFIED IN
THE TRANSFEROR SIGNATORY SECTION AND THE SIGNATURE IS GENUINE OF
SUCH PERSON.

THAT SUCH PERSON SIGNING ABOVE AS TRANSFEROR IS AUTHORIZED ON
BEHALF OF THE BENEFICIARY TO ENTER INTO OR EXECUTE AND DELIVER THIS
REQUEST TO TRANSFER A LETTER OF CREDIT ISSUED BY WELLS FARGO BANK,
N.A. INCLUDING THE ABOVE TERMS AND CONDITIONS IN SUCH REQUEST FOR
FULL TRANSFER OF LETTER OF CREDIT.

WITNESS WHEREOF,  I HAVE HEREUNTO SUBSCRIBED MY NAME THIS      DAY
OF            , 20   .

*BY: _____ (SIGNATURE)
PRINTED NAME: _____

E-6

*THE PERSON MAKING THIS CERTIFICATION MAY NOT BE THE AUTHORIZED SIGNATORY ON THE REQUEST FOR FULL TRANSFER OF LETTER OF CREDIT.

E-7

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

**EXHIBIT F**

**INSURANCE REQUIREMENTS FOR CONTRACTORS**

At all times during the period between the commencement of construction of any Alterations, or other alterations, improvements, construction, fixturing or related work thereafter performed within the Building or the Premises, until completion thereof, including Tenant's Work, Tenant's contractors, sub-contractors and sub-subcontractors of all tiers shall be required to provide at their sole cost and expense, in addition to the insurance required of Tenant pursuant to Section 13.2 of Article XIII, the following types of insurance:

(a)    Worker's Compensation Insurance as required by the jurisdiction in which the Building is located at statutory limits.  The workers compensation policy shall waive any rights of subrogation against Landlord, its property management company, and their respective partners, members, officers, directors, employees, successors, and assigns.

(b)    Jones Act, and the Longshore & Harbor Workers' Compensation Act, as required, if the Tenant's Work involves hazards arising from work on or near navigable waterways, including vessels and docks.

(c)    Employer's Liability Insurance in the amount of $1,000,000 each accident for bodily injury by accident, $1,000,000 each employee for bodily injury by disease, and $1,000,000 policy limit for bodily injury by disease, or such other amount as may be required by Umbrella/Excess Liability Insurance to effect umbrella coverage.

(d)    Commercial General Liability Insurance, including coverage for  bodily injury (including coverage for death and mental anguish), Premises-Operations, Independent Contractors' Protective, Products-Completed Operations, Blanket Contractual Liability, Personal Injury and Broad form Property Damage (including coverage for Explosion, Collapse and Underground hazards), and including Cross Liability and Severability of Interests, with the following minimum limits:

| | |
|---|---|
| $1,000,000 | Each Occurrence; |
| $2,000,000 | General Aggregate; |
| $1,000,000 | Personal and Advertising Injury; and |
| $2,000,000 | Products-Completed Operations Aggregate. |

Such policy shall provide coverage on a on a per occurrence basis on the ISO CG 00 01 04 13 policy form and the limits shall apply on a per project basis.  Products and Completed Operations insurance shall be maintained for a minimum period equal to the greater of (i) the period under which a claim can be asserted under the applicable statute of repose or (ii) six (6) years after substantial completion of the applicable work, whichever is longer.  The Contractual Liability Insurance shall include coverage at a minimum sufficient to meet the indemnity obligations of such contractor.

(e)    Comprehensive Automobile Liability Insurance, including coverage for owned, non-owned, leased and hired autos, or on an "if any" basis in the minimum amount of

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

$1,000,000. combined single limit for Bodily Injury and Property Damage if automobiles are used in the performance of Contractor's obligations hereunder.

(f)    Umbrella/Excess Liability Insurance on a follow form basis, and its coverage shall not be narrower than any followed policy, with a per occurrence and annual aggregate limit of $5,000,000 per location / project.   Coverage shall be excess of Commercial General Liability Insurance (including products and completed operations coverage), Automobile Liability Insurance and Employer's Liability with such coverage being concurrent with and not more restrictive than the underlying insurance policies.   These limits can be met through any combination of the underlying policy and the excess or umbrella policy.  There shall be no gap in coverage between the underlying policies and the umbrella or excess liability insurance.

(g)    If Tenant, Tenant's contractors, sub-contractors, or sub-subcontractors is required to furnish professional services as part of the Tenant's Work, Professional Liability Insurance by Tenant's design professional(s) in the minimum amount of $5,000,000 per occurrence and in the aggregate.

(h)    If the Tenant's Work involves the transport, dissemination, use, or release of pollutants, the Tenant, Tenant's contractors, sub-contractors and sub-subcontractors shall provide Contractors Pollution Liability in the minimum amount of $1,000,000 per occurrence and in the aggregate.

(i)    Property Insurance covering all equipment and materials on site for Contractor.

(j)    Builder's Risk Insurance. Tenant shall maintain, or cause the Contractor to be maintained, from an insurance company or insurance companies lawfully authorized to issue insurance in the jurisdiction where the Building is located, builder's risk insurance completed value or equivalent policy form and sufficient to cover the total value of the entire Alterations on a replacement cost basis.   The Landlord, Landlord's architects, Landlord's contractor or subcontractors, Tenant and Tenant's contractors, must be covered as insureds as their interest may appear.  This insurance shall include the interest of mortgages as loss payees. The insurance required by this Section (i) Builder's Risk Insurance shall provide coverage for direct physical loss or damage, and shall not exclude the risks of fire, explosion, theft, vandalism, malicious mischief, collapse, earthquake, flood or windstorm.  The insurance shall also provide coverage for ensuing loss or resulting damage from error, omission, or deficiency in construction methods, design, specifications, workmanship, or materials.  Sub-limits are allowed if Landlord provides prior approval.  If the Builder's Risk policy is subject to a deductible or self-insured retention, the deductible or self-insured retention shall not exceed Twenty Five Thousand Dollars ($25,000) and Tenant is responsible for all loss not covered because of such deductible or retention. The Builder's Risk policy shall include coverage for materials while in transit to the Building or located at an off-site storage location in amount equivalent to or greater than the greatest value ever in transit or located at the off-site storage location. The Builder's Risk policy shall include soft costs insurance to reimburse the Landlord and/or Tenant for the costs due to the delay of completion of Alterations, arising out of physical loss or damage covered by the required property insurance: including construction loan fees; leasing and marketing expenses; additional fees, including those of architects, engineers, consultants, attorneys and accountants, needed for the completion of the construction, repairs, or reconstruction; and carrying costs such

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

as property taxes, building permits, additional interest on loans, realty taxes, and insurance premiums over and above normal expenses.

(k)    Policy Requirements:

1.    All such insurance shall be specifically written or endorsed to be primary and non-contributory to all other insurance available to the additional insured and shall meet the same additional terms with respect to waiving all rights of recovery and subrogation as required of Tenant and as otherwise set forth in Section 13.2 of this Lease.

2.    All such insurance, with the exception of workers' compensation, employer's liability, and professional liability insurance, shall name the Landlord (including its officers, directors and employees), its advisors, the managing agent of the Building and the holder of any Mortgage, in each case of whom Landlord gives notice to Tenant, and any other parties that Landlord may designate from time to time and their respective directors, officers, agents, employees, members, partners or other constituents of any of the foregoing (the "Landlord Insured Parties"), as additional insureds with respect to liability arising out of such contractor, sub-contractor, or sub-subcontractor's work and/or as loss payees (as applicable). The additional insured coverage for the General Liability policy shall be provided on Insurance Services Office (ISO) forms CG 2010 or CG 2038 and CG 2037 or its equivalent. The limits of insurance stated above for each type of insurance are minimum limits only. If General Contractor's or Subcontractor's policy provides greater limits, then the Additional Insureds shall be entitled to, or to share in, the full limits of such policy, and this Exhibit shall be deemed to require such full limits.

3.    Where applicable, such insurance shall require of its subcontractors and any sub-tier contractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of the other parties set forth herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. Contractor and sub-contractors of all tiers shall agree to waive all rights of subrogation against the Landlord and all additional insureds, where allowable by law, for all insurance provided in this Exhibit F.

4.    Any deductibles and/or self-insured retentions thereunder shall be commercially reasonable and shall not exceed $25,000. Landlord shall not be responsible to pay any deductible or self-insured retention except for the policies provided by the Landlord found in Section 13.3. of this Lease, except that Tenant shall be responsible for any deductible or self-insured retention applicable to any of the Landlord's insurance policies, when it is determined the Tenant is at-fault for the loss.

5.    Tenant shall submit, or shall cause each such contractor, sub-contractor, or sub-subcontractor employed by Tenant to submit, certificates (on ACORD form for property and liability coverages) evidencing the coverage set forth above to Landlord prior to the commencement of any Alteration, or other alterations, improvements, construction, fixturing or related work thereafter performed within the Building or the Premises, including Tenant's Work, and at least 15 days prior to any policy renewals. Upon written request, Tenant, Tenant's

contractors, sub-contractors and sub-subcontractors shall provide Landlord with a complete copy of the applicable insurance policy.

6.      All such insurance shall be written by an insurance company with an A.M. Best Company rating of A-VIII or better and lawfully authorized to conduct business in the jurisdiction where the Building is located.

7.      Coverage afforded by the Tenant's contractor required in this <u>Exhibit F</u> shall not be altered, suspended, cancelled, or not renewed until at least sixty (60) days prior written notice is provided to the Landlord.

F-4

## EXHIBIT G

## FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**This document prepared by and after recording return to:**

Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
Attn: Robert N. Boyd, Esq.

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT** (this "Agreement") dated this _____ day of _____, 2021, is made by and among **ENOVATIONAL CORP.**, a District of Columbia corporation ("Tenant"), **TMG 1400 L STREET, L.L.C.**, a Delaware limited liability company ("Landlord"), and **MORGAN HILLS GROUP, LLC**, a Delaware limited liability company, its successors and assigns ("Lender").

WHEREAS, Lender has made a loan to Landlord in the maximum principal amount of $_____ (the "Loan"), secured by, among other things, a Mortgage, Assignment of Leases and Rents and Security Agreement (herein, as may from time to time be extended, amended, restated or supplemented, the "Security Instrument"), covering the land (the "Land") described in **Exhibit A** which is attached hereto and incorporated herein by reference, and the improvements thereon ("Improvements") (such Land and Improvements being herein together called the "Property");

WHEREAS, Tenant is the tenant under a certain Office Lease Agreement from Landlord dated February ___, 2021 (the "Original Lease" as may from time to time be extended, amended, restated or supplemented, if at all, collectively, the "Lease"), covering a portion of the Property (said portion being herein referred to as the "Premises"); and

WHEREAS, the term "Landlord" as used herein means the present landlord under the Lease or, if the Landlord's interest is transferred in any manner, the successor(s) or assign(s) occupying the position of Landlord under the Lease at the time in question.

NOW, THEREFORE, in consideration of the mutual agreements herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Subordination.  Tenant agrees and covenants, subject to the terms and provisions of this Agreement, that the Lease and the rights of Tenant thereunder, all of Tenant's right, title and interest in and to the property covered by the Lease, and any Lease thereafter executed by Tenant covering any part of the Property, are and shall be subject, subordinate and inferior in all respects to the Security Instrument, including, for clarification purposes, any and all renewals,

WDC 91095636v14

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

modifications, extensions, substitutions, replacements and/or consolidations of the Security Instrument and the rights of Lender thereunder, and all right, title and interest of Lender in the Property.  This Agreement is not intended and shall not be construed to subordinate the Lease to any mortgage, deed of trust or other security document other than those referred to in the immediately preceding sentence, securing the indebtedness owing to Lender.  Without limiting the generality of the foregoing subordination provision, the Tenant hereby agrees that all of its right, title and interest in and to insurance proceeds and condemnation awards (or other similar awards arising from eminent domain proceedings) with respect to damage to or the condemnation (or similar taking) of any portion of the Property, shall be subject and subordinate to the Lender's right, title and interest in and to such proceeds and awards pursuant to the Security Instrument and any and all other instruments executed in connection with same, including, for clarification purposes, any and all renewals, modifications, extensions, substitutions, replacements and/or consolidations of same (collectively, the "Loan Documents"), provided that the foregoing shall in no way limit any claims that Tenant may have pursuant to the terms of the Lease to any condemnation awards given for its leasehold estate, personal property and relocation expenses, provided, further that such claim does not reduce the amount of the award that the Landlord is otherwise entitled to.

      2.      <u>Non-Disturbance</u>.  Lender agrees that so long as the Lease is in full force and effect and Tenant is not in default in the payment of rent, additional rent or other payments due under the Lease or in the performance of any of the other terms, covenants or conditions of the Lease on Tenant's part to be performed (beyond the period, if any, specified in the Lease within which Tenant may cure such default):

      (a)      Tenant's possession of the Premises under the Lease shall not be disturbed or interfered with by Lender in the exercise of any of its foreclosure rights under the Security Instrument or in connection with the conveyance of the Property by deed in lieu of foreclosure, and

      (b)      Lender will not join Tenant as a party defendant for the purpose of terminating Tenant's interest and estate under the Lease in any proceeding for foreclosure of the Security Instrument.

      3.      <u>Attornment</u>.

      (a)      Tenant covenants and agrees that in the event of the foreclosure of the Security Instrument, whether by power of sale or by court action, or upon a transfer of the Property by a deed in lieu of foreclosure (the purchaser at foreclosure or the transferee in such deed in lieu of foreclosure, including Lender if it is such purchaser or transferee, being herein called the "New Owner"), Tenant shall attorn to the New Owner as Tenant's new landlord, and agrees that the Lease shall continue in full force and effect as a direct lease between Tenant and New Owner upon all of the terms, covenants, conditions and agreements set forth in the Lease and this Agreement, except for provisions which are impossible for New Owner to perform; provided, however, that in no event shall the New Owner be:

WDC 91095636v14

(i)    liable for any act, omission, default, misrepresentation, or breach of warranty, of any previous landlord (including Landlord) or obligations accruing prior to New Owner's actual ownership of the Property;

(ii)    subject to any offset, defense, claim or counterclaim which Tenant might be entitled to assert against any previous landlord (including Landlord) unless the Tenant shall have provided the Lender with (A) notice of the applicable default that gave rise to such offset or defense, and (B) the opportunity to cure the same, all in accordance with the terms of Section 4(b) below;

(iii)    bound by any payment of rent, additional rent or other payments, made by Tenant to any previous landlord (including Landlord) for more than one (1) month in advance of the date when due under the Lease;

(iv)    bound by any amendment or modification of the Lease hereafter made, without the written consent of Lender (if such consent is required pursuant to the terms of the Loan Documents); or

(v)    liable for any deposit that Tenant may have given to any previous landlord (including Landlord) which has not been transferred to New Owner.

(b)    The provisions of this Agreement regarding attornment by Tenant shall be self-operative and effective without the necessity of execution of any new lease or other document on the part of any party hereto or the respective heirs, legal representatives, successors or assigns of any such party.  Tenant agrees, however, to execute and deliver upon the request of New Owner, any reasonable instrument or certificate which in the reasonable judgment of New Owner may be necessary or appropriate to evidence such attornment, including a new lease of the Premises on the same terms and conditions as set forth in the Lease for the unexpired term of the Lease.

4.    <u>Acknowledgment and Agreement by Tenant</u>.  Tenant acknowledges and agrees as follows:

(a)    Tenant will not amend, alter or waive any provision of, or consent to the amendment, alteration or waiver of any provision of, the Lease without the prior written consent of Lender, unless such amendment is permitted pursuant to the Loan Documents.  Tenant shall not prepay any rents or other sums due under the Lease for more than one (1) month in advance of the due date therefor.  Tenant acknowledges that Lender will rely upon this instrument in connection with the Loan as secured, in part, by the Security Instrument.

(b)    From and after the date hereof, in the event of a default by Landlord under the Lease which would give Tenant the right, either immediately or after the lapse of time, the giving of notice, or both, to terminate the Lease or to claim a partial or total eviction, Tenant will not exercise any such right (i) until it has given written notice of such act or omission to the Lender; and (ii) until Tenant has given Lender a period of thirty (30) days after the expiration of Landlord's applicable cure period to cure such default, or such longer period of time as may be necessary to cure or remedy such default,

G-3

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865D8C2D22

during which period of time Lender shall be permitted to cure or remedy such default; provided, however, that Lender shall have no duty or obligation to cure or remedy any default. It is specifically agreed that Tenant shall not, as to Lender, require cure of any such default which is personal to Landlord, and therefore not susceptible to cure by Lender.

(c)     In the event that Lender notifies Tenant of a default under the Security Instrument or any of the other Loan Documents and demands that Tenant pay its rent and all other sums due under the Lease directly to Lender, Tenant shall honor such demand and pay the full amount of its rent and all other sums due under the Lease directly to Lender, without offset, or as otherwise required pursuant to such notice beginning with the payment next due after such notice of default, without inquiry as to whether a default actually exists under the Security Instrument or other Loan Documents, and notwithstanding any contrary instructions of or demands from Landlord.

(d)     Tenant has no right or option of any nature whatsoever, whether pursuant to the Lease or otherwise, to purchase the Premises or the Property, or any portion thereof or any interest therein, and to the extent that Tenant has had, or hereafter acquires, any such right or option, the same is hereby acknowledged to be subject and subordinate to the Security Instrument and is hereby waived and released as against Lender and New Owner.

(e)     Lender and any New Owner shall have no obligation nor incur any liability with respect to the erection or completion of any improvements in which the Premises are located or for completion of the Premises or any improvements for Tenant's use and occupancy, either at the commencement of the term of the Lease or upon any renewal or extension thereof or upon the addition of additional space, pursuant to any expansion rights contained in the Lease, provided that the foregoing shall not limit Tenant's right to exercise against Lender or any New Owner any offset rights which accrue to Tenant pursuant to the terms of the Lease for such failure.

(f)     Lender and any New Owner shall have no obligation nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Lease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, Landlord's title, Landlord's authority, habitability, fitness for purpose or possession provided that to the extent that the breach of any such warranty shall give the Tenant the right to terminate the Lease pursuant to the terms of the Lease, Tenant shall retain such right to terminate pursuant to the terms of the Lease.

(g)     In the event that Lender or any New Owner shall acquire title to the Premises or the Property, Lender or such New Owner shall have no obligation, nor incur any liability, beyond Lender's or New Owner's then equity interest, if any, in the Premises or Property, as the case may be, and Tenant shall look exclusively to such equity interest of Lender or New Owner, if any, for the payment and discharge of any obligations imposed upon Lender or New Owner hereunder or under the Lease or for recovery of any judgment from Lender, or New Owner, and in no event shall Lender, New Owner, or any

G-4

of their respective officers, directors, shareholders, agents, representatives, servants, employees or partners ever be personally liable for any such judgment.

5.  <u>Acknowledgment and Agreement by Landlord</u>.  Landlord, as landlord under the Lease and grantor under the Security Instrument, acknowledges and agrees for itself and its heirs, representatives, successors and assigns, that:  (a) this Agreement does not constitute a waiver by Lender of any of its rights under the Security Instrument or any of the other Loan Documents, or in any way release Landlord from its obligations to comply with the terms, provisions, conditions, covenants, agreements and clauses of the Security Instrument and the other Loan Documents; (b) the provisions of the Security Instrument and the other Loan Documents remain in full force and effect and must and shall be complied with by Landlord; and (c) Tenant is hereby authorized to pay its rent and all other sums due under the Lease directly to Lender upon receipt of a notice as set forth in Section 4(c) above from Lender and that Tenant is not obligated to inquire as to whether a default actually exists under the Security Instrument or any of the other Loan Documents.  Landlord hereby releases and discharges Tenant of and from any liability to Landlord resulting from Tenant's payment to Lender in accordance with this Agreement. Landlord represents and warrants to Lender that a true and complete copy of the Lease has been delivered by Landlord to Lender.

6.  <u>Lease Status</u>.  Landlord and Tenant represent and warrant to Lender that neither Landlord nor Tenant has knowledge of any default or event which with the giving of notice or the passage of time, or both, would constitute a default on the part of the other under the Lease, that the Lease is bona fide and contains all of the agreements of the parties thereto with respect to the letting of the Premises and that all of the agreements and provisions therein contained are in full force and effect.

7.  <u>Notices</u>.  All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the addresses set forth at the end of this Agreement or as such party may from time to time designate by written notice to the other parties.  Any party by notice to the others in the manner provided herein may designate additional or different addresses for subsequent notices or communications.

8.  <u>Miscellaneous</u>.

(a)  This Agreement supersedes any inconsistent provision of the Lease.

(b)  Nothing contained in this Agreement shall be construed to derogate from or in any way impair, or affect the lien, security interest or provisions of the Security Instrument or any of the other Loan Documents.

(c)  This Agreement shall bind and shall inure to the benefit of the parties hereto, their respective successors and permitted assigns, and any New Owner, and its heirs, personal representatives, successors and assigns; provided, however, that in the

DocuSign Envelope ID: EE8C1D67-8D68-4B8B-A358-6865DF8C2D22

event of the assignment or transfer of the interest of Lender, all obligations and liabilities of the assigning Lender under this Agreement shall terminate, and thereupon all such obligations and liabilities shall be the responsibility of the party to whom Lender's interest is assigned or transferred.

(d)     THIS AGREEMENT AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF [PROPERTY LOCATION] AND APPLICABLE UNITED STATES FEDERAL LAW EXCEPT ONLY TO THE EXTENT, IF ANY, THAT THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED NECESSARILY CONTROL.

(e)     The words "herein", "hereof", "hereunder" and other similar compounds of the word "here" as used in this Agreement refer to this entire Agreement and not to any particular section or provision.

(f)     This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest.

(g)     If any provision of the Agreement shall be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not apply to or affect any other provision hereof, but this Agreement shall be construed as if such invalidity, illegality, or unenforceability did not exist.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]**

WDC 91095636v14

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and sealed as of the date first above written.

| | |
|---|---|
| **ADDRESS OF LENDER**: | **LENDER**: |
| | **MORGAN HILLS GROUP, LLC**, a Delaware limited liability company |
| Attention: _____ | By:_____ |
| | Name:_____ |
| | Title:_____ |
| **ADDRESS OF TENANT**: | **TENANT**: |
| Attention: _____ | By:_____ |
| | Name:    Vlad Enache |
| | Title:    CEO |
| **ADDRESS OF LANDLORD**: | **LANDLORD**: |
| Attention: _____ | By:_____ |
| | Name:_____ |
| | Title:_____ |

G-7

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

STATE OF _____    )
                          ) SS.
COUNTY OF _____       )

      The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that _____, the _____ of **MORGAN HILLS GROUP, LLC**, a Delaware limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said company, for the uses and purposes therein set forth.

      GIVEN under my hand and notarial seal this _____ day of _____, 20____.


_____
                 Notary Public

My Commission Expires:


_____

G-8

STATE OF _____    )
_____    ) SS.
COUNTY OF _____    )

    The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that _____, the _____ of _____ **[TENANT]**, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said company, for the uses and purposes therein set forth.

    GIVEN under my hand and notarial seal this _____ day of _____, 20____.


_____
                   Notary Public

My Commission Expires:


_____

G-9

STATE OF _____    )
                          ) SS.
COUNTY OF _____       )

     The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that _____, the _____ of _____, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said company, for the uses and purposes therein set forth.

     GIVEN under my hand and notarial seal this _____ day of _____, 20_____.


_____
                Notary Public

My Commission Expires:


_____

G-10

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

## **GUARANTOR'S CONSENT**

_____, guarantor of the Lease, signs below to express its consent to the foregoing Agreement and its agreement that its guaranty of the Lease is and shall remain in full force and effect in accordance with its terms.

_____

By:_____

Name:_____

Title:_____

STATE OF _____    )
                                                        ) SS.
COUNTY OF _____    )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that _____, the _____ of _____ **[GUARANTOR],** who is personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this \_\_\_\_\_ day of _____, 20\_\_\_\_.

_____
Notary Public

My Commission Expires:

_____

G-11

# **EXHIBIT A**

# **LEGAL DESCRIPTION OF THE PROPERTY**

WDC 91095636v14

**EXHIBIT H-1**

**OPTIONS FOR APPROXIMATE SIZE AND LOCATION OF EXTERIOR ENTRANCE SIGN**







Version 2B - Dimensions

Note: Dimensions are approximate



Version 2B - Rendering

H-1-2





## EXHIBIT H-2

## APPROXIMATE SIZE AND LOCATION OF BUILDING TOP EXTERIOR SIGN



# EXHIBIT I

# JANITORIAL SPECIFICATIONS

## AREAS TO BE COVERED

Clean all areas of the building, including entrance lobby, basement areas, loading platforms, public halls, stairwells, lavatories, passageways, and elevator cabs. Areas not normally included are: retail areas, garages, elevator shafts, elevator pits, mechanical rooms, or electrical rooms.

### I.  Restrooms-Daily/Weekly/Monthly
   A.   Wash all mirrors.
   B.   Wash hand basins and bright work with a non-abrasive cleaner.
   C.   Wash urinals and bright work.
   D.   Wash toilet seats.
   E.   Wash toilet bowls and bright work.
   F.   Damp mop floor.
   G.   Damp wipe and clean where necessary. Walls and partitions are to be free of hand prints and dust.
   H.   Replenish hand soap, towels, tissues, and feminine supplies.
   I.   Partition and ventilating louvers are to be damp wiped weekly.
   J.   Machine Scrub floors with approved germicidal detergent solution on a monthly basis.

Toilet bowl brush shall be used on toilet bowls, and care shall be given to clean flush holes under the rim of bowls and passage traps.  Bowl cleaner shall be used at least once each month, and more often, if necessary.

The intent of this specification is that restrooms shall be maintained in a spotlessly clean and odor free condition at all times.

### II.  Offices and Hallways (Corridors)
   A.   *Dusting-Weekly*
        All unobstructed furniture, exterior appliances, window sills, etc., shall be dusted with a treated cloth or static duster. This shall include all horizontal surfaces up to 84 inches high. Enough vertical surfaces shall be completed daily to complete all vertical surfaces each week. Desks and tables not cleared of paper and work materials shall only be dusted where the desk top is exposed.   Equipment such as computers, calculators, telephones, printers, etc., shall not be dusted.

   B.   *Dust Mopping*
        All non-carpeted floor areas shall be dust mopped with a treated yarn dust mop, with special attention being given to areas under desks and furniture to prevent accumulation of dust and dirt. Dust mopping shall be performed after furniture has been dusted.

   C.   *Wastepaper*
        Wastepaper baskets are to be emptied daily, and shall be damp wiped as necessary. Plastic liners, where utilized, shall be changed as needed.

   D.   *Vacuuming-Daily-Weekly*
        All rugs and carpets in office areas, as well as public spaces, shall be vacuumed daily in all traffic areas.  Hard to reach places, such as under desks and chairs, shall be vacuumed weekly.

        The intent of this specification is to provide a complete vacuuming at least once each week.

   E.   *Spot Cleaning Carpets-Daily*
        All carpeted ares shall be inspected daily for spots and stains. All spots and stains shall be removed, if possible.  Entrance

lobbies shall be cleaned thoroughly, daily.
Where difficult spots are encountered, a notation shall be left with the building management representative.

   F.   *Wet Mopping*
        When floors require wet mopping, they shall be left in a streak free condition. Extreme care shall be exercised in all mopping to as to avoid splashing walls or furniture.  Transporting of water and other liquids over carpets areas shall be accomplished in such a manner as to avoid spillage.

   G.   *Tile Floors*
        All tile floors shall be refinished, buffed, and kept in a consistently clean condition at all times.  Since some tile areas require more attention than others, refinishing and buffing shall be accomplished on an as needed basis. Transporting of floor finish and other liquids over carpeted areas shall be accomplished in such a manner as to avoid spillage.

        Care shall be exercised in applying finish so as to keep it off furniture and walls. Floor machines shall be used in a careful manner to avoid damage to the walls, base boards, and furniture.

   H.   *Special Floor Coverings-As Necessary*
        Parquet, quarry, ceramic, raised computer floors, and other special floor coverings shall be treated with appropriate methods and approved materials separately. For these floor coverings additional costs as determined with management and/or tenant.

   I.   *Water Coolers-Daily*
        All water coolers shall be cleaned and polished daily.

   J.   *Spot Cleaning-Daily-As Needed*
        All hand prints and spots shall be removed from doors and light switches daily. Walls, woodwork, and interior glass shall be spot cleaned as needed.

   K.   *High Dusting-Quarterly*
        Ledges, moldings, picture frames, etc., shall be cleaned quarterly, or more frequently, if necessary.

   L.   *Venetian Blinds-Periodic*
        A sufficient number of venetian blinds shall be dusted daily, so that all blinds are dusted every 90 days.

   M.   *Air Conditioning Grilles-Monthly*
        All areas around air conditioning and return air grilles shall be cleaned once each month, or more often, if necessary.

### III.  Stairways & Landings-Weekly/Daily
All stairways and landings shall be policed daily.   They shall be damp mopped, as necessary.  Spot cleaning of walls and doors shall be performed monthly.  Hand rails, fire points, and other miscellaneous hardware shall be cleaned  periodically

### IV.  Entrance Lobby-Daily
Lobby walls up to 84 inches shall be dusted and kept free from finger marks, smudges, etc.  Lobby floors and entrance ways are to be dust mopped thoroughly nightly.

I-1

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

V.  **Polishing-As Necessary**

All door plates, kick plates, and brass and metal fixtures within the building shall be polished as necessary, and residue from floor maintenance cleaned as necessary.

VI.  **Elevators-Daily**

A.    All elevators shall be vacuumed nightly.
B.    All stainless steel and metal shall be cleaned nightly.
C.    All elevator tracks shall be vacuumed as needed.
D.    Elevator button panels and elevator doors shall be cleaned nightly.
E.    Carpets shall be spot cleaned as necessary.
F.    Ceilings, overhead plexiglass, and/or special light fixtures shall be cleaned as necessary, through arrangement with building management. representative.

VII. **Light Fixtures-Quarterly**

The exterior of all light fixtures shall be dusted.

## GENERAL

**Personnel:**
Employees of Contractor who are assigned permanently to the facility shall be interviewed carefully and bonded. They shall be neat and clean in appearance and properly identified.

Employees of Contractor shall not eat, drink, or smoke during their shift. Employees shall not disturb papers on desks, open drawers or cabinets, use tenant's telephones, office equipment, televisions, or radios.

All employees of Contractor shall abide by all building regulations and safety rules, which may be promulgated from time to time, as they pertain to our operation.

**Supervision:**
Competent supervisory personnel shall be employed by the Contractor,

Supervisory personnel shall arrive and depart approximately one half hour before and after the cleaning crew.

The Supervisor shall report to the building management any conditions such as leaky faucets, spotted toilets and drains, broken fixtures, etc/. The Supervisor shall also report any unusual happenings in the building.

## OTHER:

Contractor shall furnish the necessary, appropriate, approved, implements, machinery, and cleaning supplies for the satisfactory performance of our services.

Sufficient space in the premises shall be assigned to Contractor for storage of cleaning materials, implements, and machinery. Adequate utilities shall be provided to Contractor, without charge, for the performance of assigned duties.

A communications log book shall be kept in a designated place on the premises, in which a record shall be made promptly of any occurrences requiring building management or contractor's attention

Contractor shall furnish Worker's Compensation and Public Liability insurance; certification of which is available on request.  **Contractor shall be responsible for loss or damage caused by its employees and for the conduct of its employees.  Contractor shall make reasonable and prompt restitution for any damage for which it is**

proven liable, subject to approval by building management.

All office cleaning, where applicable, shall be performed behind locked doors.  On the completion of the assigned duties, the Contractor shall ensure that all slop sinks and equipment storage areas are left in a neat and orderly condition, all lights are extinguished, and appropriate doors are locked.

**Building management may require, in writing, the dismissal of any employee who is incompetent, careless, insubordinate, or otherwise objectionable, or whose continued employment is contrary to a consistent, positive relationship with tenants or building management.**

Regular, periodic inspections of the facility shall be performed by our management staff, accompanied by a management representative, in addition to the regular nightly inspections performed by the Supervisory staff.

## SCHEDULE OF CLEANING

Nightly cleaning services shall normally be rendered five nights per week, Mondays through Fridays, with the exception of legal holidays.

## DAY PERSONNEL (IF REQUIRED)

Contractor shall provide uniformed day personnel whose duties shall be coordinated by building management.  Day staff shall work eight hours per day, five days per week, Mondays through Fridays, with the exception of holidays, to perform the following:

**Entrance Lobby**
Police and maintain the lobbies to ensure they are maintained in a neat and clean condition.  Lobby glass shall be washed and cleaned as necessary.  **Particular attention shall be give to floors and glass doors during inclement weather.**

**Lavatories**
Day personnel shall make periodic checks of restrooms to ensure they are maintained in a neat and clean condition.  Restroom supplies shall be stocked as necessary.  Fixtures shall be cleaned, waste cans emptied, etc., as necessary.

**Building Exterior**
Entrance of building shall be swept clean of litter and hosed down when possible.  Police and maintain loading and driveway areas to ensure a neat and clean appearance. Cigarette urns and ash receivers shall be cleaned and sanitized as necessary, and where required, the sand level shall be maintained.

**Interior Public Areas**
Interior public areas shall be policed and floors maintained as necessary.

**Miscellaneous**
Perform other duties within the scope of job assignment, as assigned by building management and Contractor.

I-2

# EXHIBIT J

## HVAC SPECIFICATIONS

**Design Conditions:**

The office floor air conditioning systems are designed to maintain the following inside conditions in Tenant and public areas:

a.  Summer:          $75°F \pm 2°F$ and 50% RH $\pm$ 5% RH
b.  Winter:          $70°F \pm 2°F$
c.  Winter humidification is not provided.

**Design Criteria:**

The air conditioning system will provide the above conditions based on the following criteria.

a.  Outside Summer Conditions:    ASHRAE 1% design conditions for Washington National Airport; 92°F dry bulb, 75 °F wet bulb. Cooling towers are designed for 78°F WB.
b.  Outside Winter Conditions:    ASHRAE 99.6% design conditions for Washington National Airport, 17 °F dry bulb.

WDC 91095636v14

# EXHIBIT K

# AMENITY RESERVATION PAMPHLET



## who we are

At cove, we build software, design workspaces, and deliver services to create a better workday. We're partnering with The Meridian Group to deliver a unique, modern experience at *The Aleck*.

## what does cove mean for you

We're focused on creating the best possible experience every time your employees walk through the doors at *The Aleck* – a modern app to access everything you need and services that bring your office forward.

## what to expect in a cove-powered Meridian building





### tech

Download the *Commons by cove* app to unlock doors, purchase snacks, book conference and wellness rooms, discover events, and much more!

### services

From booking catering for your next meeting to fully managed IT, and from snack services to team event planning, we take care of the details so you can focus on your mission.

DocuSign Envelope ID: EE8C1D67-9D59-4B8D-A358-6865DF8C2D22

# Meet **cove Services**

**A new kind of office. Powered by cove, so you can focus on your mission.**



**Designed** — meet with our Design Team to get a space tailored to your team's needs and your company's identity, from layout to branding to furniture



**Connected** — fully managed IT, from fiber internet and WiFi to voice services and conferencing AV, at a fraction of the cost you pay elsewhere



**Culture Building** — from weekly lunches and social events to care packages delivered to every employee's doorstep, we handle it all and help you build culture, even with a more remote team

**Focus Fuel** — stay focused without having to lift a finger, with freshly brewed coffee and a snack bar delivered to your office and fully stocked by cove



**Hi, I'm Meg Ronan!**

*cove Experience Director*          meg@cove.is
*DMV Area*                          202-750-0401

**cove**

www.cove.is

K-2

# the ALECK
## at your fingertips



**Events, Meeting Rooms, Food, Wellness.** Everything you need, brought to your fingertips through coveTech. When you have an app for everything else in your life, we're making your workday better by putting everything The Aleck has to offer in your pocket.

### Mobile Unlock

No need for keycards – your smartphone becomes your passport to the building. Touchless, secure, and simple – wave your hand to unlock entrances, elevators, and your office.

### Flexible Bookings

Reserve state-of-the-art conference rooms, private workout rooms and meditation spaces, and our beautiful 3rd Floor Lounge & Patio for your team's next event – all from your phone.









### Snack Market

Load cash into the app and use it to pay for amenities and services, like The Aleck's Snack Market, where you'll find a selection of healthy grab-and-go snacks to keep you productive.

**cove**
www.cove.is

K-3

## EXHIBIT L

## ROOFTOP EQUIPMENT AREA



## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT** (this "Agreement") dated this 27th day of _____ April _____, 2021, is made by and among **ENOVATIONAL CORP.**, a District of Columbia corporation ("Tenant"), **TMG 1400 L STREET, L.L.C.**, a Delaware limited liability company ("Landlord"), and **MORGAN HILLS GROUP, LLC**, a Delaware limited liability company, its successors and assigns ("Lender").

WHEREAS, Lender has made a loan to Landlord in the maximum principal amount of $82,625,000 (the "Loan"), secured by, among other things, a Mortgage, Assignment of Leases and Rents and Security Agreement (herein, as may from time to time be extended, restated or supplemented, the "Security Instrument"), covering the land (the "Land") described in **Exhibit A** which is attached hereto and incorporated herein by reference, and the improvements thereon ("Improvements") (such Land and Improvements being herein together called the "Property");

WHEREAS, Tenant is the tenant under a certain Office Lease Agreement from Landlord dated April ___, 2021 (the "Original Lease" as may from time to time be extended, amended, restated or supplemented, if at all, collectively, the "Lease"), covering a portion of the Property (said portion being herein referred to as the "Premises"); and

WHEREAS, the term "Landlord" as used herein means the present landlord under the Lease or, if the Landlord's interest is transferred in any manner, the successor(s) or assign(s) occupying the position of Landlord under the Lease at the time in question.

NOW, THEREFORE, in consideration of the mutual agreements herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Subordination.  Tenant agrees and covenants, subject to the terms and provisions of this Agreement, that the Lease and the rights of Tenant thereunder, all of Tenant's right, title and interest in and to the property covered by the Lease, and any Lease thereafter executed by Tenant covering any part of the Property, are and shall be subject, subordinate and inferior in all respects to the Security Instrument, including, for clarification purposes, any and all renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Security Instrument and the rights of Lender thereunder, and all right, title and interest of Lender in the Property.  This Agreement is not intended and shall not be construed to subordinate the Lease to any mortgage, deed of trust or other security document other than those referred to in the immediately preceding sentence, securing the indebtedness owing to Lender.  Without limiting the generality of the foregoing subordination provision, the Tenant hereby agrees that all of its right, title and interest in and to insurance proceeds and condemnation awards (or other similar awards arising from eminent domain proceedings) with respect to damage to or the condemnation (or similar taking) of any portion of the Property, shall be subject and subordinate to the Lender's right, title and interest in and to such proceeds and awards pursuant to the Security Instrument and any and all other instruments executed in connection with same, including, for clarification purposes, any and all renewals, modifications, extensions, substitutions, replacements and/or

consolidations of same (collectively, the "Loan Documents"), provided that the foregoing shall in no way limit any claims that Tenant may have pursuant to the terms of the Lease to any condemnation awards given for its leasehold estate, personal property and relocation expenses, provided, further that such claim does not reduce the amount of the award that the Landlord is otherwise entitled to.

2.    Non-Disturbance.  Lender agrees that so long as the Lease is in full force and effect and Tenant is not in default in the payment of rent, additional rent or other payments due under the Lease or in the performance of any of the other terms, covenants or conditions of the Lease on Tenant's part to be performed (beyond the period, if any, specified in the Lease within which Tenant may cure such default):

(a)    Tenant's possession of the Premises under the Lease shall not be disturbed or interfered with by Lender in the exercise of any of its foreclosure rights under the Security Instrument or in connection with the conveyance of the Property by deed in lieu of foreclosure, and

(b)    Lender will not join Tenant as a party defendant for the purpose of terminating Tenant's interest and estate under the Lease in any proceeding for foreclosure of the Security Instrument.

3.    Attornment.

(a)    Tenant covenants and agrees that in the event of the foreclosure of the Security Instrument, whether by power of sale or by court action, or upon a transfer of the Property by a deed in lieu of foreclosure (the purchaser at foreclosure or the transferee in such deed in lieu of foreclosure, including Lender if it is such purchaser or transferee, being herein called the "New Owner"), Tenant shall attorn to the New Owner as Tenant's new landlord, and agrees that the Lease shall continue in full force and effect as a direct lease between Tenant and New Owner upon all of the terms, covenants, conditions and agreements set forth in the Lease and this Agreement, except for provisions which are impossible for New Owner to perform; provided, however, that in no event shall the New Owner be:

(i)    liable for any act, omission, default, misrepresentation, or breach of warranty, of any previous landlord (including Landlord) or obligations accruing prior to New Owner's actual ownership of the Property;

(ii)    subject to any offset, defense, claim or counterclaim which Tenant might be entitled to assert against any previous landlord (including Landlord) unless the Tenant shall have provided the Lender with (A) notice of the applicable default that gave rise to such offset or defense, and (B) the opportunity to cure the same, all in accordance with the terms of Section 4(b) below;

(iii)    bound by any payment of rent, additional rent or other payments, made by Tenant to any previous landlord (including Landlord) for more than one (1) month in advance of the date when due under the Lease;

2

(iv)    bound by any amendment or modification of the Lease hereafter made, without the written consent of Lender (if such consent is required pursuant to the terms of the Loan Documents); or

(v)    liable for any deposit that Tenant may have given to any previous landlord (including Landlord) which has not been transferred to New Owner.

(b)    The provisions of this Agreement regarding attornment by Tenant shall be self-operative and effective without the necessity of execution of any new lease or other document on the part of any party hereto or the respective heirs, legal representatives, successors or assigns of any such party.  Tenant agrees, however, to execute and deliver upon the request of New Owner, any reasonable instrument or certificate which in the reasonable judgment of New Owner may be necessary or appropriate to evidence such attornment, including a new lease of the Premises on the same terms and conditions as set forth in the Lease for the unexpired term of the Lease.

4.    <u>Acknowledgment and Agreement by Tenant</u>.  Tenant acknowledges and agrees as follows:

(a)    Tenant will not amend, alter or waive any provision of, or consent to the amendment, alteration or waiver of any provision of, the Lease without the prior written consent of Lender, unless such amendment is permitted pursuant to the Loan Documents. Tenant shall not prepay any rents or other sums due under the Lease for more than one (1) month in advance of the due date therefor.  Tenant acknowledges that Lender will rely upon this instrument in connection with the Loan as secured, in part, by the Security Instrument.

(b)    From and after the date hereof, in the event of a default by Landlord under the Lease which would give Tenant the right, either immediately or after the lapse of time, the giving of notice, or both, to terminate the Lease or to claim a partial or total eviction, Tenant will not exercise any such right (i) until it has given written notice of such act or omission to the Lender; and (ii) until Tenant has given Lender a period of thirty (30) days after the expiration of Landlord's applicable cure period to cure such default, or such longer period of time as may be necessary to cure or remedy such default, during which period of time Lender shall be permitted to cure or remedy such default; provided, however, that Lender shall have no duty or obligation to cure or remedy any default.  It is specifically agreed that Tenant shall not, as to Lender, require cure of any such default which is personal to Landlord, and therefore not susceptible to cure by Lender.

(c)    In the event that Lender notifies Tenant of a default under the Security Instrument or any of the other Loan Documents and demands that Tenant pay its rent and all other sums due under the Lease directly to Lender, Tenant shall honor such demand and pay the full amount of its rent and all other sums due under the Lease directly to Lender, without offset, or as otherwise required pursuant to such notice beginning with the payment next due after such notice of default, without inquiry as to whether a default actually exists under the Security Instrument or other Loan Documents, and notwithstanding any contrary instructions of or demands from Landlord.

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A358-6865DF8C2D22

(d)    Tenant has no right or option of any nature whatsoever, whether pursuant to the Lease or otherwise, to purchase the Premises or the Property, or any portion thereof or any interest therein, and to the extent that Tenant has had, or hereafter acquires, any such right or option, the same is hereby acknowledged to be subject and subordinate to the Security Instrument and is hereby waived and released as against Lender and New Owner.

(e)    Lender and any New Owner shall have no obligation nor incur any liability with respect to the erection or completion of any improvements in which the Premises are located or for completion of the Premises or any improvements for Tenant's use and occupancy, either at the commencement of the term of the Lease or upon any renewal or extension thereof or upon the addition of additional space, pursuant to any expansion rights contained in the Lease, provided that the foregoing shall not limit Tenant's right to exercise against Lender or any New Owner any offset rights which accrue to Tenant pursuant to the terms of the Lease for such failure.

(f)    Lender and any New Owner shall have no obligation nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Lease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, Landlord's title, Landlord's authority, habitability, fitness for purpose or possession provided that to the extent that the breach of any such warranty shall give the Tenant the right to terminate the Lease pursuant to the terms of the Lease, Tenant shall retain such right to terminate pursuant to the terms of the Lease.

(g)    In the event that Lender or any New Owner shall acquire title to the Premises or the Property, Lender or such New Owner shall have no obligation, nor incur any liability, beyond Lender's or New Owner's then equity interest, if any, in the Premises or Property, as the case may be, and Tenant shall look exclusively to such equity interest of Lender or New Owner, if any, for the payment and discharge of any obligations imposed upon Lender or New Owner hereunder or under the Lease or for recovery of any judgment from Lender, or New Owner, and in no event shall Lender, New Owner, or any of their respective officers, directors, shareholders, agents, representatives, servants, employees or partners ever be personally liable for any such judgment.

5.    Acknowledgment and Agreement by Landlord.  Landlord, as landlord under the Lease and grantor under the Security Instrument, acknowledges and agrees for itself and its heirs, representatives, successors and assigns, that:  (a) this Agreement does not constitute a waiver by Lender of any of its rights under the Security Instrument or any of the other Loan Documents, or in any way release Landlord from its obligations to comply with the terms, provisions, conditions, covenants, agreements and clauses of the Security Instrument and the other Loan Documents; (b) the provisions of the Security Instrument and the other Loan Documents remain in full force and effect and must and shall be complied with by Landlord; and (c) Tenant is hereby authorized to pay its rent and all other sums due under the Lease directly to Lender upon receipt of a notice as set forth in Section 4(c) above from Lender and that Tenant is not obligated to inquire as to whether a default actually exists under the Security Instrument or any of the other Loan Documents. Landlord hereby releases and discharges Tenant of and from any liability to Landlord resulting from Tenant's payment to Lender in accordance with this Agreement.  Landlord represents and

DocuSign Envelope ID: EE8C1D67-8B69-4B8B-A358-6865DF8C2D22

warrants to Lender that a true and complete copy of the Lease has been delivered by Landlord to Lender.

6. <u>Lease Status</u>. Landlord and Tenant represent and warrant to Lender that neither Landlord nor Tenant has knowledge of any default or event which with the giving of notice or the passage of time, or both, would constitute a default on the part of the other under the Lease, that the Lease is bona fide and contains all of the agreements of the parties thereto with respect to the letting of the Premises and that all of the agreements and provisions therein contained are in full force and effect.

7. <u>Notices</u>. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the addresses set forth at the end of this Agreement or as such party may from time to time designate by written notice to the other parties. Any party by notice to the others in the manner provided herein may designate additional or different addresses for subsequent notices or communications.

8. <u>Miscellaneous</u>.

(a) This Agreement supersedes any inconsistent provision of the Lease.

(b) Nothing contained in this Agreement shall be construed to derogate from or in any way impair, or affect the lien, security interest or provisions of the Security Instrument or any of the other Loan Documents.

(c) This Agreement shall bind and shall inure to the benefit of the parties hereto, their respective successors and permitted assigns, and any New Owner, and its heirs, personal representatives, successors and assigns; provided, however, that in the event of the assignment or transfer of the interest of Lender, all obligations and liabilities of the assigning Lender under this Agreement shall terminate, and thereupon all such obligations and liabilities shall be the responsibility of the party to whom Lender's interest is assigned or transferred.

(d) THIS AGREEMENT AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE DISTRICT OF COLUMBIA AND APPLICABLE UNITED STATES FEDERAL LAW EXCEPT ONLY TO THE EXTENT, IF ANY, THAT THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED NECESSARILY CONTROL.

(e) The words "herein", "hereof", "hereunder" and other similar compounds of the word "here" as used in this Agreement refer to this entire Agreement and not to any particular section or provision.

(f)      This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest.

(g)      If any provision of the Agreement shall be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not apply to or affect any other provision hereof, but this Agreement shall be construed as if such invalidity, illegality, or unenforceability did not exist.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;**
**SIGNATURE PAGE FOLLOWS]**

DocuSign Envelope ID: EE8C1D67-8D69-4B8B-A358-6865DF8C2D22

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and sealed as of the date first above written.

**ADDRESS OF LENDER**:

c/o AEW Capital Management, LP
Two Seaport Lane
Boston, MA  02201
Attention:  Portfolio Manager

**LENDER**:

**MORGAN HILLS GROUP, LLC**, a Delaware limited liability company

By: *daniel jacobson*
Name: Daniel Jacobson
Title: Authorized Signatory

**ADDRESS OF TENANT**:

1400 L Street
Washington, DC  20005
Attention:  Vlad Enache

**TENANT**:

**ENOVATIONAL CORP.**, a District of Columbia corporation

By:
Name:
Title:

**ADDRESS OF LANDLORD**:

c/o The Meridian Group
3 Bethesda Metro Center, Suite 1400
Bethesda, MD  20814
Attention:  Wil Machen

**LANDLORD**:

**TMG 1400 L STREET, L.L.C.**, a Delaware limited liability company

By:
Name:
Title:

DocuSign Envelope ID: EE8C1D67-8D69-4B8D-A359-6865DF8C2D22

## EXHIBIT A

### LEGAL DESCRIPTION

All that certain lot or parcel of land together with all improvements thereon located and being in the City of Washington in the District of Columbia and being more particularly described as follows:

Lot numbered Fifty-two (52) in Square numbered Two Hundred Seventeen (217) in the subdivision made by 14 L Associates, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 176 at folio 157.



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: FE8C1D672D694B8BA3586865DF8C2D22 | | Status: Completed |
| Subject: Please DocuSign: (91095636_15) Meridian - 1400 L - Enovational Lease - Execution Copy.PDF, (910... | | |
| Source Envelope: | | |
| Document Pages: 168 | Signatures: 5 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Fallon Zonarich |
| AutoNav: Enabled | | 3 Bethesda Metro Center |
| EnvelopeId Stamping: Enabled | | Suite 1400 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Bethesda, MD  20814 |
| | | fallonzonarich@tmgdc.com |
| | | IP Address: 73.132.191.41 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Fallon Zonarich | Location: DocuSign |
|     5/5/2021 2:41:27 PM |     fallonzonarich@tmgdc.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Vlad Enache<br>vlad@enovational.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Vlad Enache*<br>2F1B0BD668214C9...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 71.178.201.100 | Sent: 5/5/2021 2:50:42 PM<br>Viewed: 5/5/2021 4:09:59 PM<br>Signed: 5/7/2021 7:39:08 AM |

**Electronic Record and Signature Disclosure:**
   Accepted: 5/5/2021 4:09:59 PM
   ID: 10609e6a-4144-4c10-b420-597d8444727b

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/5/2021 2:50:42 PM |
| Certified Delivered | Security Checked | 5/5/2021 4:09:59 PM |
| Signing Complete | Security Checked | 5/7/2021 7:39:08 AM |
| Completed | Security Checked | 5/7/2021 7:39:08 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure | | |
|---|---|---|

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, The Meridian Group (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

### How to contact The Meridian Group:

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: sagebrewer@tmgdc.com

### To advise The Meridian Group of your new email address

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at sagebrewer@tmgdc.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

### To request paper copies from The Meridian Group

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to sagebrewer@tmgdc.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

### To withdraw your consent with The Meridian Group

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to sagebrewer@tmgdc.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify The Meridian Group as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by The Meridian Group during the course of your relationship with The Meridian Group.